## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE WORLD PROFESSIONAL
ASSOCIATION FOR TRANSGENDER
HEALTH,
     1061 E. Main St. Suite 300
     East Dundee, IL 60118

         *Plaintiff,*

    *v.*

FEDERAL TRADE COMMISSION;
ANDREW N. FERGUSON, in his official
capacity as Chairman of the Federal Trade
Commission; MARK R. MEADOR, in his
official capacity as Commissioner of the
Federal Trade Commission; and JOHN DOES
1–3, in their official capacities as
Commissioners of the Federal Trade
Commission,
600 Pennsylvania Ave., NW
Washington, DC 20580

         *Defendants.*

Case No. 26-_____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

**(Rule 57 Speedy Hearing
Request)**

## INTRODUCTION

1.    Plaintiff, the World Professional Association for Transgender Health ("WPATH"),

is an Illinois-based, non-profit organization dedicated to ensuring that transgender people have

access to established, medically necessary, and individualized healthcare.  WPATH serves as a

forum where medical and related professionals convene to exchange research, clinical experience,

and expertise.  A key output of these discussions is WPATH's Standards of Care—its

internationally-recognized, evidence-informed guidelines that are free to the public, intended to

provide clinicians with recommendations to reference when providing appropriate, individualized

healthcare to transgender patients.

2.    But "[t]hroughout history, governments have 'manipulat[ed] the content of doctor-patient discourse' to increase state power and suppress minorities." *NIFLA v. Becerra*, 585 U.S. 755, 771 (2018).  The past is prologue, and the Trump Administration has targeted WPATH, among other highly respected medical organizations, for their support of science-based and well-established medical care, rather than the Administration's pseudoscientific and ideological opposition to medically necessary healthcare for transgender individuals.  WPATH has endured the Administration's threats, animus, investigations, and inflammatory mischaracterizations about its members and its Standards of Care.

3.    Most recently, on January 16, 2026, the Federal Trade Commission ("FTC") served a Civil Investigative Demand ("CID") on WPATH in a transparent attempt to silence and punish proponents of science-based treatment for transgender people.  The FTC has no place in the middle of individualized patient-physician decision-making—nor does it have any jurisdiction over WPATH and its noncommercial speech.  In initiating this investigation and issuing this CID, the FTC has replaced its respected role in the regulation of commerce with that of a stooge for the Administration's ideological agenda.

4.    The First Amendment does not permit the FTC to use compulsory process and investigations to intimidate, censor, or retaliate against viewpoints and speakers with which it disagrees.  Where, as here, the FTC is using an overbroad CID, untethered from its jurisdiction or statutory mandate, to compel the disclosure of protected materials, it has violated the Fourth Amendment as well.  WPATH and its members have already suffered the chilling effects of the FTC's actions.  Now, without intervention from this Court, WPATH and its members will continue to suffer as the FTC flouts the Constitution and wields its enormous power to censor dissenting

2

voices in the medical community.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because WPATH's causes of action arise under the Constitution and laws of the United States.  WPATH's claims arise under the First and Fourth Amendments of the United States Constitution.

6.      Subject matter jurisdiction exists under Article III because Plaintiff has suffered, and will continue to suffer, injury in fact.  There is a sufficient causal connection between WPATH's injuries and Defendants' pursuit of this investigation, and a favorable decision by this Court granting WPATH relief will redress those injuries.

7.      This dispute is ripe because WPATH's constitutional rights have already been violated, and WPATH will suffer further imminent invasions of those rights in the absence of relief from this Court.  Defendants' CID and investigation have already chilled WPATH's speech, among other harms.

8.      This Court has authority to enter a declaratory judgment and to provide preliminary and permanent relief, as well as other relief, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the All Writs Act, 28 U.S.C. § 1651, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers.

9.      Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(A) because the FTC has its principal place of business and individual Defendants perform their official duties in the District of Columbia.

## PARTIES

10.      Plaintiff, the World Professional Association for Transgender Health, is a 501(c)(3)

nonprofit and non-partisan organization dedicated to promoting science-based medical care, education, research, public policy and respect in transgender health. WPATH is headquartered in, and has its principal place of business in, the State of Illinois. It is operated exclusively for charitable and educational purposes.

11.     Defendant Federal Trade Commission is an administrative agency of the United States that is headquartered in Washington, D.C.

12.     Defendant Andrew N. Ferguson is the Chairman of the FTC and one of the five Commissioners in charge of the agency. His business address is in Washington, D.C. Chairman Ferguson is responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. He is being sued in his official capacity.

13.     Defendant Mark R. Meador is a Commissioner of the FTC. His business address is in Washington, D.C. Commissioner Meador is responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. He is being sued in his official capacity.

14.     Defendant John Doe 1 is a Commissioner of the FTC and is the individual serving out the unexpired term of former FTC Commissioner Melissa Ann Holyoak. On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. They are being sued in their official capacity.

15.     Defendant John Doe 2 is a Commissioner of the FTC and is the individual serving out the unexpired term of Rebecca Kelly Slaughter. On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. They are being sued in their official

capacity.

16.    Defendant John Doe 3 is a Commissioner of the FTC and is the individual serving out the unexpired term of Alvaro Bedoya.  On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein.  They are being sued in their official capacity.

## FACTUAL ALLEGATIONS

### I.    Since 1979, WPATH Has Advocated for the Rights, Respect, and Health of Transgender People.

17.    WPATH was founded in 1979 as the Harry Benjamin International Gender Dysphoria Association, with the mission of promoting evidence-based medical care, education, research, public policy, and respect in transgender health.

18.    WPATH has two core purposes, as set forth in its bylaws.  First, it "provide[s] a mechanism whereby professionals from various subspecialties . . . may interact and communicate with each other to share research and clinical practice experience affecting the health and well-being of transsexual, transgender, and gender-nonconforming people."  Second, it "promote[s] meetings of interested professionals from a variety of professions" and "encourages the dissemination of knowledge and best practice guidelines regarding gender dysphoria, transsexualism, and transgender health and wellbeing in general, to the professions and to the general public."[1]

19.    Since its founding, WPATH and its members have worked tirelessly towards the organization's vision of "a world wherein people of all gender identities and gender expressions

_____

[1] WPATH Bylaws, WPATH (Jan. 22, 2016), https://wpath.org/wp-content/uploads/2024/11/Bylaws-APPROVED-by-Members-1-22-2016.pdf [https://perma.cc/9UWD-K9ND].

have access to evidence-based healthcare, social services, justice and equality."[2]

20.    At this time, WPATH has over 3,000 members.  WPATH members work together to increase access to competent healthcare and address the medical needs and concerns of transgender people through collaboration of their expertise in education, public policy, clinical medicine, and research.

### A. WPATH is a Volunteer-Run, Charitable Membership Organization with Zero Profit Motivation.

21.    WPATH is a nonprofit, international membership organization with regional affiliated organizations in Europe and the United States.

22.    WPATH's administrative body is made up of an Executive Committee and a Board of Directors.  The Executive Committee consists of the President, the Immediate Past-President, the President-Elect, the Secretary, and the Treasurer.  The Board of Directors consists of one non-voting student liaison, the five Executive Committee officers, and one voting member for each Regional Affiliate of WPATH.  WPATH's Board of Directors and Executive Committee members are volunteers.  They come from a variety of backgrounds and specialties, including surgeons, medical professionals, pediatricians, mental health professionals, and public policy.

23.    WPATH contracts with Veritas Association Management, an independent management company, for the services of its Executive Director, who carries out administrative work necessary for the day-to-day operation of the organization, including running its finances, coordinating and planning symposia and events, and providing information technology support.

24.    WPATH is a voting membership organization.  It includes three types of voting members:  (1) Honorary Members, who are designated by the Board of Directors and have full

---

[2] *About WPATH*, WPATH, https://wpath.org/about/mission-and-vision [https://perma.cc/QF2M-LT9E].

voting rights but do not pay dues; (2) Full Members, who are individuals that apply for membership, have certain professional qualifications, and pay dues; and (3) Emeritus Members, who are retired in their fields and pay reduced dues.  WPATH also has two tiers of non-voting members, Student Members and Supporting Members.  WPATH's voting members elect the Board of Directors and Executive Committee, and vote on awards presented at WPATH's symposia.

25.    Many WPATH members engage in clinical and academic research in their independent professional capacities relating to transgender healthcare.   Others are legal professionals, social workers, psychologists, and medical providers.

26.    Outside of its members, WPATH frequently collaborates with unaffiliated membership organizations globally.  These organizations and WPATH members work together to help ensure transgender people around the world have access to science-based, well-established, and effective treatment.

27.    As a 501(c)(3) non-profit organization, WPATH operates on a modest budget and generates revenue primarily through membership dues, education, and its symposia.

28.    WPATH's financial disclosures and tax forms are public, and list WPATH's revenue sources and expenditures.  These financial statements show that WPATH's revenue is used to effectuate its charitable and educational purpose, not for advertising, lobbying, or provision of services on behalf of its members.

29.    WPATH does not advertise products or services to consumers.  Outside of the benefits set forth on its website, WPATH does not provide discounts, products, or services to its members.  WPATH does not provide licenses or set requirements for clinicians, researchers, or other professionals to engage in their respective fields or professions.  And not one of its activities is undertaken for the profit of its governing body or members.

**B.  WPATH Effectuates Its Mission by Providing a Safe Forum for Discussion, Collaboration, Educational, and Research.**

30.     WPATH effectuates its mission through several avenues.

31.     ***A forum for debate, collaboration, and discussion.***  As part of its mission to encourage evidence-based medicine and healthcare for transgender individuals, one of WPATH's core purposes is to provide a professional environment for its members to engage in free and open discussion, debate, and research.

32.     WPATH hosts events which provide members and others working in transgender health the opportunity to interact, collaborate, and learn from their colleagues who are leading authors, clinicians, and expert researchers in transgender health.  Some of the primary events that WPATH hosts include the biennial Scientific Symposium and yearly meetings, which permits participants to present research, listen to panels, network, socialize, and learn from leading experts in the field of transgender health.

33.     Until April 2025, WPATH provided a secure online messaging and discussion platform for its members.  The platform provided members an internal, protected space for WPATH members to discuss, debate, and brainstorm on topics such as evidence-informed healthcare, education, research, public policy, and respect for transgender individuals. Confidentiality of this forum was critically important to ensure that members could engage in open discussion, evaluate new ideas, test theories, and debate cutting-edge issues without fearing that their discussions would be used against them or their patients.  For this reason, WPATH members that used the platform agreed to a Code of Conduct, which required the users to agree, among other things, not to "display, distribute, license, perform, publish, reproduce, duplicate, copy, create derivative works from, modify, sell, resell, exploit, transfer, or upload for any purposes, any portion of the content published by the members of the WPATH Member Forum."

34.    Despite this agreement, WPATH's Member Forum was breached on two occasions. In June 2022, WPATH became aware of postings on the social media platform Twitter which included screenshots from within the platform. The screenshots were posted without context, and, as a result, members became increasingly worried about engaging in open discussion on the forum due to the risk of having their own thoughts and posts republished without context.

35.    In August 2023, WPATH became aware of a second data breach. Because sharing such information to outside sources was a violation of the Code of Conduct, WPATH launched another internal investigation, identified a WPATH member who shared such information, and removed their access to the platform and revoked their WPATH membership.

36.    The consequences of this second data breach were significant and severe for WPATH and its members. Internal WPATH communications were published, misrepresented, taken out of context, and used in an intentional campaign to distort WPATH's work. Organizations opposed to WPATH's mission have since further decontextualized these communications and used them to manufacture support for their opposition to transgender healthcare.[3]

37.    These breaches had a significant and lasting consequence: knowing that their candid professional discussions could be stolen and distorted, WPATH members became understandably reluctant to engage openly on WPATH-provided platforms, undermining the very exchange of expertise that has made the organization so effective.

38.    ***Education and Research.*** WPATH hosts educational and research symposia, courses, and workshops to improve access to accurate and up-to-date information and research in the field of transgender health. It also provides mentorship programs and a searchable directory

---

[3] *See, e.g.*, *Press Release: Leaked documents reveal deep-rooted medical scandal behind international guideline-setters on "gender-affirming healthcare"*, ADF International (March 5, 2024), https://adfinternational.org/news/wpath-guidelines-press-statement [https://perma.cc/A44L-35KG].

of providers.  These events and educational efforts espouse one of WPATH's key efforts: that healthcare and recommendations cannot be static, but rather must be based on ongoing evaluations of current research.

39.    WPATH's Global Education Initiative ("GEI") organizes and provides courses relating to transgender health.[4]  It provides these courses to a variety of audiences, with attendees from many countries and many disciplines in attendance.  These attendees include psychologists, psychiatrists, therapists, social workers, family practice providers, nurses, nurse practitioners, physician assistants, endocrinologists, urologists, gynecologists, plastic surgeons, adolescent development specialists, professional educators, spiritual leaders, students, addiction counselors, HIV case managers, and researchers.  Attendees of WPATH's courses have worked in many contexts, such as federal and state government institutions, medical schools, private practices, and community hospitals.

40.    WPATH has offered a WPATH Certification program, which signifies that a member has completed an educational curriculum that includes course work, mentorship, and a certification exam.  WPATH additionally offered the California Health Provider Program ("HPP") in compliance with California Senate Bill SB 855, which provided training on applying and understanding the WPATH Standards of Care.  The information WPATH provided to the attendees of these trainings is available on it's website.[5]

41.    WPATH's other educational offerings include member access to the International Journal of Transgender Health, which is an independently owned peer-reviewed medical journal,

---

[4] *See, e.g.*, *GEI Certified Training Courses*, WPATH (July 13, 2022), https://wpath.org/wp-content/uploads/2024/11/GEI-Course-Descriptions_Updated-7.13.22.pdf [https://perma.cc/EE5C-AJV7] (describing courses including "Foundations in Transgender Health," "Advanced Medical Treatment," and "Advanced Ethics Workshop.").
[5] *CA SB855*, WPATH, https://wpath.org/resources/ca-sb855-materials [https://perma.cc/8SCY-7VKT].

as well as the Journal Club, a recurring online meeting featuring discussion of articles from the International Journal of Transgender Health that allows participants the opportunity to delve further into transgender health research topics and ask questions of the authors. Journal access and the Journal Club foster continued evaluation of ongoing research about transgender healthcare.

42.    As part of its mission to further research and promote guidance on transgender healthcare, WPATH is internationally recognized for establishing and updating the WPATH Standards of Care ("SOC") for the treatment and health of transgender people globally. These SOC articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of transgender people. WPATH's standards are not frozen in time and are periodically updated to reflect current research.

43.    After receiving the CID, WPATH decided to temporarily pause offering certain educational programs. This includes the GEI activities, such as online and in-person courses, mentorship programs, and certification examination–related functions, as well as closing the Journal Club. WPATH decided to do so because of the risk to its members and its mission that would be caused by the disclosures required by the CID and the scrutiny of the FTC.

44.    ***Public Statements and Amicus Practice.***    While WPATH does not engage in lobbying or litigation on behalf of its members, it speaks out and advocates in furtherance of its core mission—to promote and expand respect and access to quality healthcare for transgender individuals.

45.    WPATH has joined amicus briefs in cases threatening access to transgender healthcare. It has issued public statements adverse to the Trump Administration's actions and policies related to transgender healthcare.[6]

---

[6] *See, e.g.*, *WPATH & USPATH Joint Response to HHS Report on Gender Dysphoria*, WPATH (May 2, 2025), https://wpath.org/wp-content/uploads/2025/05/WPATH-USPATH-Response-to-

### C. WPATH's Standards of Care Version 8

46.    In September 2022, the International Journal of Transgender Health published the Standards of Care, Version 8 ("SOC8").  SOC8 are clinical guidelines written to promote informed, doctor-patient decision making on optimal healthcare, which may include varying interventions based on individual patient needs.  Like other professional clinical practice guidelines, SOC8 was written to be flexible and adaptable to meet the individualized healthcare needs of transgender and gender diverse individuals globally.  SOC8 is free to the public and available on WPATH's website.[7]  SOC8 provides detailed descriptions of sources, evidence, and methodologies used to create the publication.

47.    SOC8 consists of recommendation statements developed through the Delphi method, a well-established methodology for building expert consensus.  These statements reflect both the best available scientific evidence and the collective professional judgment of experts in transgender health.

48.    SOC8 grades recommendations on two levels of strength—strong recommendations and weak recommendations—based on the estimated effectiveness and risks of the strategy, treatment, or intervention, as well as its evidentiary support and the consensus of the healthcare community.[8]  SOC8 also includes supportive text providing the rationale or reasoning for each recommendation statement.  This includes extensive discussion of available evidence and

---

HHS-Report-02May2025-3.pdf [https://perma.cc/TUV9-C3AN]; *WPATH Statement Regarding Executive Order "Protecting Children from Chemical and Surgical Mutilation"*, WPATH (Jan. 2025), https://wpath.org/wp-content/uploads/2025/01/01.28.25-WPATH-Board-Statement-Regarding-Executive-Order.pdf [https://perma.cc/2YV4-9YSE].

[7] E. Coleman et al, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 International Journal of Transgender Health 51, (Sept. 15, 2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.

[8] *Methodology for the Development of SOC8*, WPATH, https://wpath.org/publications/soc8/methodology [https://perma.cc/XMJ3-5QF3].

detailed descriptions of potential benefits and risks, descriptions of uncertainties, the role of values and experience in developing the recommendation, and information about implementation of the recommendation, including expected barriers or challenges.

49.     The WPATH Guideline Steering Committee provided oversight of the guideline development process for all chapters of the Standards of Care.  Except for the Chair, who was selected by WPATH to provide continuity from previous SOC, the two co-chairs were selected by the WPATH Board from WPATH members applying for these positions.  The Guideline Steering Committee (chairs and co-chairs) provided general oversight of the guideline development process.  The Committee reviewed all chapters of the Standards of Care to confirm adherence to the WPATH guideline methodology and to ensure consistency of statements across the Standards of Care.

50.     Each chapter of SOC8 was reviewed and approved by a Chapter Lead and contributed to by five to seven Chapter Workgroup Members.  These individuals were well-known experts in transgender health, with backgrounds in scientific research and with publication records related to each chapter.  The Chapters were also reviewed by Chapter Stakeholder Members, who were experts that worked outside of the scientific publishing arena, such as those working directly in community health or in policy making and in NGOs around the globe, who could provide alternative, on-the-ground perspectives to SOC8's recommendations.  The criteria for these positions, the process for voting on and selecting them, and the individuals on the SOC8 Committees are provided in detail on WPATH's website.[9]

51.     The Chapter Leads and Members were responsible for drafting recommendation statements, following months of internal debate.  Each recommendation statement was also

---

[9] *Establishing the SOC8 Revision Committee and the Chairs and Lead Evidence Team*, WPATH, https://wpath.org/publications/soc8/revision-committee [https://perma.cc/VM85-2CR4].

approved by the SOC8 chairs.

52.     WPATH also engaged an Evidence Review Team at Johns Hopkins University to engage in a preliminary comprehensive review of secondary sources, provide methodological guidance, and to help provide a roadmap for updating the previous Standards of Care. WPATH rigorously followed the guideline development processes designed by Johns Hopkins University, including screening for conflicts of interest among committee members.[10]

53.     The Evidence Review Team abstracted recommendation statements from the prior version of the Standards of Care and helped determine which recommendations needed updating, which new areas required recommendations, and which systematic reviews were required. It conducted systematic reviews, reviewed existing ones, and presented evidence tables and results to the members of each relevant chapter.

54.     On recommendation of the Evidence Review Team, each recommendation statement went through an approval process known as the Delphi Method, during which all SOC8 committee members graded each recommendation statement, giving it a score to indicate their agreement with the statement, using a process adapted from the Grading of Recommendations, Assessment, Development and Evaluations ("GRADE") framework. To pass, recommendations needed approval of 75% of committee members. Recommendations that did not meet the requirements for agreement were sent back to the Chapter Leads and Members for revisions, and then the process began again.[11] If a statement was not approved after three rounds, the statement was removed from SOC8.

---

[10] Involvement in the care and treatment of transgender individuals is not a conflict of interest for participating in guideline development. In fact, the involvement of practitioners in setting standards of care is typical and necessary, and excluding practicing physicians would be inappropriate.

[11] See Methodology for the Development of SOC8, supra n.8.

55.     The development of SOC8 relied in part on systematic reviews commissioned by the WPATH Evidence Review Team at Johns Hopkins University, as well as systematic reviews conducted by others.  Systematic reviews were not the sole basis for the SOC8 recommendations, and they need not be to ensure its reliability.  Consistent with Delphi, some recommendations rested on narrative reviews, the literature, and the consensus of expert advice.

56.     After SOC8 completed this process and was edited by a professional independent editor, it was distributed for member and public comment.  SOC8 was open for public comment from December 2021 through January 2022.

57.     During the public comment process, WPATH received feedback from professionals from many different professional backgrounds and with many different levels of expertise and varying perspectives.  After public comment closed, WPATH deliberated on the comments and determined whether or not to incorporate suggested feedback.

58.     Significant attention has been paid to one particular change that occurred after the public comment period: the removal of age minimums for providing different surgeries as treatment for gender dysphoria.  Professionals in the field from around the world were concerned that the listing of ages would lead to further limitations to healthcare by creating or reinforcing arbitrary boundaries to such care and/or by ignoring possible contributing health factors including mental health, family support, and other individual health needs.

59.     After internal communications related to SOC8's methodology and processes were disclosed in data breaches and as third-party discovery in litigation, the SOC8 Committee's decision to remove age minimums for transgender medical care has been repeatedly mischaracterized, taken out of context, and editorialized by the individuals and organizations hostile to WPATH's mission, ultimately to falsely claim that WPATH's SOC8 is not scientific and

is politically motivated.

60.    In *Boe v. Marshall*, No. 2:22-cv-00184 (M.D. Ala.), the district court permitted extensive, invasive third-party discovery into WPATH and SOC8.  Much of this information remains subject to a protective order, but the court authorized the release of significant internal communications and deposition testimony regarding SOC8 to the public.  These records contained communications between SOC8 contributors and the office of Admiral Rachel Levine, the Biden Administration's Assistant Secretary for Health regarding the Admiral's feedback that specific ages should be taken out of SOC8's recommendations.  They also contained communications with the American Academy of Pediatrics ("AAP"), which provided similar feedback.

61.    WPATH received feedback on the issue of age minimums from multiple sources. The entire purpose of the public comment period was to solicit feedback from the broader community, generate internal debate, and protect against groupthink.  WPATH members and representatives have testified that the decision to remove age minimums was not based on one single contributor's feedback, but rather were the result of careful deliberations.  As WPATH has since clarified, age minimums for providing certain types of medical care for transgender individuals were removed from SOC8 and replaced by strengthened criteria to ensure individualized assessment and medical care.  The removal of the age minimums in SOC8 promotes individualized medical care between doctors and patients and reduces the likelihood of misapplication of these standards.

62.    Despite these clarifications, the records released in *Boe* are frequently mischaracterized and viewed out of context to erroneously claim that SOC8 was drafted based on political considerations.

63.    Regardless of the weaponization of misrepresented internal deliberations, SOC8

remains a well-respected authority and guidance document for international transgender healthcare.

### D.  WPATH's Work Results in Harassment

64.    Over the last several years, as transgender health has become the subject of charged rhetoric, WPATH's work has been considered controversial in some corners, particularly by individuals and groups advocating against transgender individuals' access to medically necessary healthcare.

65.    WPATH members and staff have been increasingly harassed, intimidated, and subjected to threats of harm.  Staff and members have experienced attacks via email, threatening phone calls and voicemails, and social media messages and posts threatening and harassing them by name.  For example, recent posts on the social media platform X have displayed WPATH members covered in blood, and demanding they be locked up:



66.     Members have been illegally videotaped during educational presentations and had their intellectual property misused and edited in a manner that has led to threats of violence.

67.     Members and staff have been required to implement serious security measures in response to these threats and harassment, such as installing panic buttons and conducting security audits.  Indeed, even at WPATH's symposia, attendees have discussed the risks of having an online footprint at all.[12]

68.     The threats against WPATH and its members reflect the threats against any advocates of evidence-informed, science-based healthcare for transgender people.

69.     Hospitals and providers are frequently targeted with threats and violence.[13] Medical providers have left their practices where state governments have commenced investigations and/or rendered necessary transgender healthcare illegal.[14]  Hospitals are closing their transgender healthcare programs due to the "current regulatory environment."[15]

---

[12] *See* Subha Karim et al., *A Dangerous Chilling Effect in Gender-Affirming* Care, MedPage Today (Dec. 3, 2023), https://www.medpagetoday.com/opinion/second-opinions/102026 [https://perma.cc/FC8P-D8ZX].

[13] Ron Southwick, *Threats and harassment: 24 hospitals targeted for providing gender-affirming care*, Chief HealthCare Executive (Dec. 19, 2022), https://www.chiefhealthcareexecutive.com/view/two-dozen-hospitals-targeted-for-providing-gender-affirming-care-report [https://perma.cc/99AC-8FKR]; Sonia Moghe, *Woman faces federal charge for calling in a false bomb threat to a Boston hospital providing gender-affirming care*, CNN (Sept. 16, 2022), https://www.cnn.com/2022/09/15/us/boston-hospital-bomb-threat-gender-affirming-care [https://perma.cc/979A-3HRB].

[14] Eleanor Klibanoff and Alex Nguyen, *Austin doctors who treated trans kids leaving Dell Children's clinic after AG Paxton announces investigation*, The Texas Tribune (May 13, 2024) https://www.texastribune.org/2023/05/13/austin-dell-childrens-gender-affirming [https://perma.cc/NM79-F223] (doctors departing Dell Children's Medical Center in Austin, Texas, after Texas Attorney General Ken Paxton announced an investigation into "potentially illegal" activity at the clinic).

[15] Joseph Goldstein, *Manhattan Hospital Ends Medical Treatment for Transgender Youth*, N.Y. Times (Feb. 17, 2026), https://www.nytimes.com/2026/02/17/nyregion/nyu-hospital-transgender-youth.html [https://perma.cc/7GVW-ESY7].

II.    **Trump Administration Fulfills Campaign Promises to Target Transgender Individuals' Rights and Access to Healthcare.**

70.    President Trump campaigned on ending medically necessary healthcare for transgender people and his belief that transgender people should not exist.[16]   Since his inauguration, President Trump has relentlessly pushed this agenda and harmed the lives of transgender individuals through policy changes as well as harmful comments made in public.  He has been open about his goals:  to silence proponents of transgender healthcare and end access to medically necessary healthcare for transgender people.

71.    In President Trump's own words, "PROMISE MADE: 'We are not going to allow child sexual mutilation.' PROMISE KEPT: Hospitals and health systems across the country have ended their irreversible sex change operations and so-called 'gender affirming care' programming for minors to comply with the Trump Administration's executive order."[17]

72.    The Administration has acted on its agenda through a series of Executive Orders based on partisanship and animus towards transgender people and the organizations that work to provide them with medically necessary healthcare.  On January 20, 2025, President Trump issued an Executive Order, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," that declared that gender identity is a "false" idea and commands that federal funds "shall not be used to promote gender ideology."[18]  On January 28, 2025, President Trump issued an executive order, titled "Protecting Children from Chemical

---

[16] *See* @realDonaldTrump, Truth Social (Feb. 3, 2023), https://truthsocial.com/@realDonaldTrump/posts/109797076368777392 ("Donald Trump Pledges To End 'Left-Wing Gender Insanity' On Day One").

[17] Promises Made, Promises Kept — One Year Later (Nov. 5, 2025), https://www.whitehouse.gov/articles/2025/11/promises-made-promises-kept-one-year-later [https://perma.cc/VY7E-PR8F] (internal citations omitted).

[18] Exec. Order No. 14,168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8,615 (Jan. 20, 2025).

and Surgical Mutilation," that directed all federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end" medically necessary healthcare for transgender individuals under nineteen.[19]  In announcing this Executive Order, the President made his position clear:  "Our Nation will no longer fund, sponsor, promote, assist, or support so-called 'gender-affirming care,' which has already ruined far too many precious lives."[20]

73.    The January 28 Executive Order pointed fingers directly at WPATH.  It directed all federal agencies to "rescind or amend all policies that rely on WPATH guidance," including SOC8.  It labeled WPATH's Standards of Care "junk science" and accused WPATH of "lack[ing] scientific integrity."

74.    These Executive Orders relied on pseudoscience to substantiate these claims, ignoring that WPATH's guidelines are well-established, internationally recognized, and based on science.  They intentionally use inflammatory, partisan terminology, such as "gender ideology" and "rapid-onset gender dysphoria" that have no basis in science or evidence.

75.    The White House touted the immediate effects of the January 28 Executive Order, stating that, within a week, it was "already having its intended effect—preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex. Hospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming care' programs."[21]  These inflammatory statements celebrated the censorship and prevention of medically necessary healthcare for transgender individuals, and the

---

[19] Exec. Order No. 14,187, Protecting Children from Chemical and Surgical Mutilation, 90 Fed. Reg. 8,771 (Jan. 28, 2025).
[20] Donald Trump (@realDonaldTrump), Truth Social (Jan. 28, 2025), https://truthsocial.com/@realDonaldTrump/posts/113908666572035035.
[21] *President Trump is Delivering on His Commitment to Protect our Kids*, the White House (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids [https://perma.cc/62D6-EXUS].

viewpoint-based interventions into individualized, science-based medical care.

76.     The Administration's orders and attacks did not stop there.  On January 29, 2025, another Executive Order directed government agencies to eliminate federal funding for educational entities "indoctrinating" children with the "anti-American, subversive, harmful, and false ideology" that a person could be transgender.[22]

77.     The Trump administration has repeatedly claimed that its goal is to stop or ban medically necessary healthcare for transgender minors—even going so far as to claim it has already done so.[23]  In July 2025, a White House news release touted President Trump's achievements of his campaign promise, stating that President Trump "repeatedly pledged to end the irreversible chemical and surgical mutilation of our children," and touting that "politicians have promised to end the barbaric, pseudoscientific practice — but President Trump is the only one who has actually delivered."[24]  The White House also touted their pressure campaign against hospitals, writing, "Minnesota's largest children's hospital just halted prescriptions of puberty blockers and cross-sex hormones for minors, joining a growing list of institutions *finally backing down amid the Trump Administration's relentless pressure*."[25]  According to the White House, during President Trump's first year in office, the Administration "[e]nded federal funding for chemical and surgical

---

[22]*Ending Radical Indoctrination in K-12 Schooling*, Exec. Order No. 14190, (Jan. 29, 2025).

[23] *Donald Trump Addresses a GOP House Member Retreat*, RollCall (Jan. 6, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-gop-house-member-retreat-january-6-2026/#200 [https://perma.cc/6UHS-DJY5].

[24]*President Trump Promised to End Child Sexual Mutilation – and He Delivered*, The White House (July 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-childsexual-mutilation-and-he-delivered [https://perma.cc/ZC8R-N22S](touting closures or changes in practice at 21 clinics nationwide, including in Plaintiff States California, New York, and Illinois).

[25] *Don't Be a Panican. We're Winning — and We're Not Slowing Down*, The White House (Feb. 9, 2026), https://www.whitehouse.gov/articles/2026/02/dont-be-a-panican-were-winning-and-were-not-slowing-down/ [https://perma.cc/T77H-U36B] (emphasis added).

gender procedures for minors through executive action and regulatory enforcement, driving the end to these harmful procedures for minors at health systems across the country," and "[r]eleased a comprehensive review of so-called 'gender-affirming care,' finding no strong medical or scientific evidence exists to support the treatment's irreversible effects."[26]

78.    These deeply troubling characterizations demonstrate the results of the Administration's campaign of intimidation against proponents of transgender healthcare, and continue to rely on pseudoscience and ideology instead of evidence-informed, science-based publications and standards.

79.    The President and his Administration's rhetoric regarding healthcare for transgender minors demonstrates that it believes that science-based healthcare is a partisan issue, and its incorrect perception that WPATH is a political organization.  It casts healthcare for transgender individuals as a political stance of the Democratic Party, claiming that "they want transgender for everybody"[27] and that it is a result of "gender ideology."[28]  The terminology used is intentionally inflammatory and misleading,[29] for example, characterizing healthcare for

---

[26] *365 WINS IN 365 DAYS: President Trump's Return Marks New Era of Success, Prosperity*, The White House (Jan. 20, 2026), https://www.whitehouse.gov/articles/2026/01/365-wins-in-365-days-president-trumps-return-marks-new-era-of-success-prosperity [https://perma.cc/SE89-A6PD].

[27] Donald Trump Addresses the National Prayer Breakfast at the Capitol (Feb. 5, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-national-prayer-breakfast-capitol-february-5-2026/#151 [https://perma.cc/6CVU-MN6B].

[28] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 12, 2026), https://truthsocial.com/@realDonaldTrump/posts/116058518017586892 ("Maybe [Democrats] should focus on their quest to Open our Borders to the World's Greatest Criminals, have Transgender for Everybody or, get Men, no matter their size or strength, to play in Women's Sports.").

[29] *See* GLAAD, Fact Check: Intentional Mischaracterizations of Transgender Health Care (Feb. 7, 2026), http://glaad.org/intentional-mischaracterizations-of-transgender-health-care [https://perma.cc/M4VF-DBMY].

transgender minors as "mutilation of children."[30]

80.     The Administration has also frequently repeated misinformation and conspiracy theories popularized by organizations hostile to transgender people as a method of going after President Trump's political opponents.  For example, on January 6, 2026, President Trump claimed that in Minnesota, clinicians conducted surgical interventions on children without informing their parents.[31]

81.     The January 28 Executive Order had numerous specific mandates for the Secretary of Health and Human Services ("HHS), including to "publish a review of the existing literature on best practices for promoting the health of children who assert gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion," and "increase the quality of data to guide practices for improving the health of minors with gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion, or who otherwise seek chemical or surgical mutilation."[32]

82.     In response to this directive, in May 2025, HHS issued "Treatment for Pediatric Gender Dysphoria, Review of Evidence and Best Practices"[33] ("HHS Report"), a 400-page

---

[30] Donald Trump Addresses the National Prayer Breakfast at the Capitol, supra n.27; *see also* Donald Trump Addresses the Detroit Economic Club (Jan. 13, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-detroit-economic-club-january-13-2026/#97 [https://perma.cc/97DH-XGM2]; Donald Trump Holds a Political Rally in Rocky Mount, North Carolina (Dec. 19, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-rocky-mount-north-carolina-december-19-2025/#184 [https://perma.cc/ZU8K-MR6M];Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 24, 2025), https://truthsocial.com/@realDonaldTrump/posts/115260622454907511.
[31] Donald Trump Addresses a GOP House Member Retreat (Jan. 6, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-gop-house-member-retreat-january-6-2026/#200 [https://perma.cc/JBJ6-JPUN].
[32] Exec. Order No. 14,187, supra n.19.
[33] The May 2025 publication has been superseded by the November 2025 publication.  *See U.S. Department of Health and Human Services, Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (Nov. 2025), https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report.pdf.

literature review that has been criticized for misrepresenting available research and relying on studies with flawed methodologies.[34]

83.     The January 28 Executive Order also ordered the HHS Secretary to "to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve the following laws, programs, issues, or documents: (i) Medicare or Medicaid conditions of participation or conditions for coverage. . . ."[35]   In response, the Centers for Medicare & Medicaid Services released "a notice of proposed rulemaking to bar hospitals from performing sex-rejecting procedures on children under age 18 as a condition of participation in Medicare and Medicaid programs," and "prohibit federal Medicaid funding for sex-rejecting procedures on children under age 18."[36]   The comment period for these two proposed rules closed on February 17, 2026.[37]

84.     Over the last year, other administrative agencies have echoed the White House's pseudoscientific misinformation about medically necessary healthcare for transgender people.  For example, HHS Secretary Robert Kennedy issued a declaration regarding the "Safety,

---

[34] *See, e.g.*, Phie Jacobs, *Researchers slam HHS report on gender-affirming care for youth*, Science (May 2, 2025), https://www.science.org/content/article/researchers-slam-hhs-report-gender-affirming-care-youth [https://perma.cc/UT6W-KQ2T].  For example, the Utah State Legislature commissioned a review, conducted by the University of Utah College of Pharmacy, Drug Regimen Review Center, that applied well-established scientific methodologies, and thoroughly contradicted the HHS Report's claims.  *See* AP, *Utah lawmakers said gender-affirming care is harmful to kids. Their own study contradicts that claim*, NBC News (May 29, 2025), https://www.nbcnews.com/nbc-out/out-politics-and-policy/utah-lawmakers-said-gender-affirming-care-harmful-kids-study-contradic-rcna209691 [https://perma.cc/FH2Q-568Q].
[35] Exec. Order No. 14,187, supra n.19.
[36] *Medicare and Medicaid Programs; Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children*, 42 C.F.R. Part 482 (Dec. 19, 2025); Medicaid Program; Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children, 42 CFR Part 441, 457 (Dec. 19, 2025); *see HHS Acts to Bar Hospitals from Performing Sex-Rejecting Procedures on Children*, HHS (Dec. 18, 2025), https://www.hhs.gov/press-room/hhs-acts-bar-hospitals-performing-sex-rejecting-procedures-children.html [https://perma.cc/5RZ4-UASK].
[37] *Id.*

Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents."[38]  Secretary Kennedy declared: "Sex-rejecting procedures for children and adolescents are neither safe nor effective as a treatment modality for gender dysphoria, gender incongruence, or other related disorders in minors, and therefore, fail to meet professional recognized standards of health care."[39]

85.    The Department of Justice also followed the President Trump's orders.  On April 22, 2025, Attorney General Pamela Bondi issued a DOJ memorandum titled "Preventing the Mutilation of American Children," which falsely stated that healthcare for transgender people is based in "a radical ideological agenda," promoted by "far-left politicians, celebrities, politically captured academics, and legacy media."  It further repeated similar ideological rhetoric that "politically captured profiteers . . . . have deployed junk science and false claims about the effects of so-called 'gender-affirming care' to justify the barbaric practice of surgically and chemically maiming and sterilizing children."  It repeated the false statement that WPATH was "pressured" by Admiral Levine to change its guidance.  The memorandum "put[] medical practitioners, hospitals, and clinics on notice" that the DOJ would investigate healthcare providers under statutes criminalizing female genital mutilation, and that it would investigate medical providers and pharmaceutical companies for violations of the Food, Drug and Cosmetic Act and False Claims Act.  The memorandum applied the January 28 Executive Order's directive to stop relying on "the ideologically driven WPATH guidelines" and that the DOJ was directed to "withdraw all court filings that rely on WPATH's guidelines in any case in which the Department of Justice is actively

---

[38] Robert F. Kennedy, *Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents*, HHS (Dec. 18, 2025), https://www.hhs.gov/sites/default/files/declaration-pediatric-sex-rejecting-procedures.pdf [https://perma.cc/TK5M-DUN7].
[39] *Id.*

involved, whether as a party, an amicus, or through a submission of a statement of interest."  It

directed the Civil Division to "identify and purge all Department policies, memoranda, and

publications and court filings based on WPATH guidelines," and justified these actions by reciting

the same, baseless talking points against WPATH regarding its methodology and association with

the Biden administration.  The memorandum closed by stating that, under Attorney General

Bondi's "leadership," the DOJ would bring medically necessary healthcare for transgender people

"to an end."[40]

86.    On July 9, the DOJ announced publicly that it had issued more than 20 subpoenas

to doctors and healthcare facilities providing healthcare to transgender minors.[41]  Many of these

subpoenas have since been quashed.  *See In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025

WL 3724705 (W.D. Pa. Dec. 24, 2025); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*,

No. 25-mc-00063, 2026 WL 33398 (D. Colo. Jan. 5, 2026); *In re 2025 Subpoena to Children's*

*National Hospital*, No. 1:25-cv-03780, 2026 WL 160792 (D. Md. Jan. 21, 2026);  *In re Admin.*

*Subpoena No. 25-1431-019*, 2025 WL 2607784 (D. Mass. Sept. 9, 2025); *QueerDoc, PLLC v. U.S.*

*Dep't of Just.*, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025); *In re Subpoena No. 25-1431-014*,

2025 WL 3252648 (E.D. Pa. Nov. 21, 2025).

87.    In quashing these subpoenas, courts have recognized that this "timeline tells the

story":  that DOJ's purpose in issuing these subpoenas, and conducting these investigations, was

to effectuate the Administration's goal of ending healthcare for transgender people.  *In re Dep't of*

---

[40] Pamela Bondi, *Preventing the Mutilation of American Children*, Office of the Attorney General (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl [https://perma.cc/4TQN-8SEF].
[41] *See Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, Department of Justice (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical [https://perma.cc/VK2G-6SPJ].

*Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *6 (quoting *QueerDoc*, 2025 WL 3013568, at *5).  "No clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating" through the Subpoena.  *Id.* (quoting *QueerDoc*, 2025 WL 3013568, at *5).

### III.    FTC Follows Administration's Orders; Targets WPATH and Other Organizations.

88.    Despite its lacking jurisdiction over WPATH and its speech, the FTC has followed the DOJ's footsteps in conducting unlawful investigations and issuing invasive subpoenas.  It has taken a starring role in the Trump administration's vendetta against medically necessary healthcare for transgender people—and WPATH.

89.    While typically consisting of five Commissioners, the FTC is currently run by two: defendants Andrew Ferguson and Mark Meador.  After the politically-motivated terminations[42] of the two Democrat Commissioners, Commissioner Rebecca Slaughter and Commissioner Alvaro Bedoya, only Republican Commissioners remained.  Chairman Ferguson, a Republican Commissioner appointed by President Joe Biden, was appointed as Chairman of the FTC by President Trump in January 2025. In March and April 2025, President Trump appointed Republicans Melissa Holyoak and Commissioner Meador.  Commissioner Holyoak left the Commission on November 17, 2025.

90.    Chairman Ferguson and Commissioner Meador have been clear that conservative values and ideology (versus scientific or well-established evidence)—and President Trump's agenda—are guiding forces in their leadership and policy in the FTC.[43]

---

[42] Cecilia Kang, *Federal Appeals Court Reinstates an F.T.C. Commissioner Fired by Trump*, N.Y. Times (Sept. 2, 2025), https://www.nytimes.com/2025/09/02/us/politics/ftc-commissioner-slaughter-trump.html [https://perma.cc/ZH6W-SKFB].

[43] Andrew Ferguson, *The Key to Building Trump's New American Golden Age*, NY Post (May 2, 2025), https://nypost.com/2025/05/02/opinion/the-key-to-building-trumps-new-american-golden-

91.     In a document setting out his agenda for the FTC, Chairman Ferguson said that he would "[f]ight back against the trans agenda. Investigate the doctors, therapists, hospitals, and others who deceptively pushed gender confusion, puberty blockers, hormone replacement, and sex-change surgeries on children and adults while failing to disclose strong evidence that such interventions are not helpful and carry enormous risks" as part of his broader goal to "Protect Freedom of Speech and Fight Wokeness."[44]

92.     On information and belief, the FTC began to take steps towards "fight[ing] back against the trans agenda" when it began looking into healthcare for transgender minors in spring 2025.

93.     According to media reporting, then-FTC senior policy advisor Jon Schweppe[45] authored a memorandum stating that "[u]nder the Federal Trade Commission Act, the FTC is provided broad authority to protect consumers from unfair and deceptive trade acts and practices." It stated that "[t]here is now considerable reason to believe that the doctors and medical providers

---

age/ [https://perma.cc/S486-33J4] ("For far too long, Americans have been getting ripped off — and Trump is just the man to make it stop. But he will need the entire federal government to bring about this result. Every agency must do its part to repair the damage from four years of the Biden-Harris administration — as well as decades of swamp politicians who got rich while many Americans were left behind . . . . There's a common theme running through the FTC's deregulatory mission and antitrust enforcement: Powerful interests both in and out of government can use their influence to harm Americans and distort markets. Under my leadership, they will find no quarter. An American Golden Age will . . . . be built through the innovation of companies free to act without government interference on behalf of left-wing nonprofits."); Mark Meador, *Antitrust and the Rule of Law*, American Affairs Journal (2025), https://americanaffairsjournal.org/2025/11/antitrust-and-the-rule-of-law [https://perma.cc/65VB-GBZS] ("Speaking from the Right, those of us pursuing the revival of antitrust in the second Trump administration have zero interest in trying to garner plaudits from left-wing stakeholders by carrying on the ideological excesses of the Biden FTC.").

[44] *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-Andrew-N-Ferguson-Overview.pdf [https://perma.cc/GRM6-2ZLM].

[45] Mr. Schweppe has returned to his previous position at the American Principles Project ("APP"). Even before his tenure at FTC, APP and Schweppe personally have fought aggressively against gender-affirming care.

pushing [healthcare for transgender] minors are knowingly deceiving parents by exaggerating [such care's] 'benefits' and downplaying its harmful side effects . . . ." Ultimately, it proposed an FTC workshop, titled "The Big Lie: The Dangers of Gender-Affirming Care for Minors" to further build on President Trump's executive orders.[46]

94.    Under Chairman Ferguson, Commissioner Meador, and former-Commissioner Holyoak's leadership, Mr. Schweppe organized an FTC workshop on "unfair or deceptive trade practices in 'gender-affirming care' for minors."[47]

95.    Seven days before the workshop was held, 149 FTC employees sent an anonymous Statement of Concern. The letter challenged the FTC's jurisdiction over these issues, and stated that "the announcement's use of charged language suggest the Commission has already taken a position opposing gender-affirming care for minors."[48] It noted that the "FTC has not historically intervened in the confidential, individualized advice given across a series of professional, consent-based appointments protected by the doctor-patient relationship."[49]

96.    The workshop, now titled "The Dangers of 'Gender-Affirming Care' for Minors," was hosted on July 9, 2025, in Washington, D.C. The FTC stated that the workshop was planned to "focus on unfair or deceptive trade practices in 'gender-affirming care' for minors. Doctors, medical ethicists, whistleblowers, detransitioners, and parents of detransitioners will share

---

[46] Mary Margaret Olohan, *EXCLUSIVE: Federal Trade Commission Sets Sights On Transgender Procedures On Kids*, The Daily Wire (May 21, 2025), https://www.dailywire.com/news/exclusive-federal-trade-commission-is-setting-its-sights-on-transgender-procedures-on-kids [https://perma.cc/M69B-TZ6H].
[47] The Dangers of "Gender-Affirming Care" for Minors (July 9, 2026), https://www.ftc.gov/news-events/events/2025/07/dangers-gender-affirming-care-minors [https://perma.cc/6B89-VDKE].
[48] Jody Godoy, US FTC workshop criticizing medical care for transgender youth draws staff opposition, Reuters (July 2, 2025), https://www.reuters.com/legal/litigation/us-ftc-workshop-criticizing-medical-care-transgender-youth-draws-staff-2025-07-02 [https://perma.cc/33P5-NGC6] (describing and linking to statement).
[49] *Id.*

perspectives grounded in research, expertise, and personal experience."  It noted that the FTC's "authority could be implicated if there is evidence that medical professionals or others omitted warnings about the risks or made false or unsupported claims about the benefits and effectiveness of gender-affirming care for minors," and that the workshop would "help the FTC to understand whether consumers are being or have been exposed to false or unsupported claims about 'gender-affirming care' and to gauge the harms consumers may be experiencing."[50]

97.    Chairman Ferguson, Commissioner Meador, former-Commissioner Holyoak, and Mr. Schweppe spoke at the workshop.[51]

98.    Chairman Ferguson opened the workshop by repeating the unsubstantiated claim that the Biden administration had interfered with WPATH's SOC8.[52]  While he claimed that, "[a]s Chairman," he is "not charged with passing moral judgment on anyone's ideology, lifestyle, or medical choices," his track record and prior statements on healthcare for transgender individuals reveals the opposite.

99.    The speakers and panelists invited to participate in this "workshop" further reveal its bias.  There appeared to be no effort to provide insight from neutral or supporting perspectives on healthcare for transgender people—rather, the FTC only sought participation from individuals who are hostile to these science-based, medically necessary treatments.[53]    Many came from

---

[50] The Dangers of "Gender-Affirming Care" for Minors, supra n.47.

[51] The Dangers of "Gender-Affirming Care" for Minors Transcript, FTC (July 9, 2026), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-The-Dangers-of-Gender-Affirming-Care-for-Minors-Transcript.pdf ("FTC Workshop Transcript") [https://perma.cc/2EEX-QXTL].

[52] Andrew Ferguson, *Address to the Workshop on Unfair or Deceptive Trade Practices in Gender Affirming Care Washington, D.C.*, Federal Trade Commission (July 9, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/chairman-ferguson-gender-affirming-care-workshop-speech.pdf [https://perma.cc/2YHM-WZAD].

[53] Speakers, The Dangers of "Gender-Affirming Care" for Minors, FTC (July 9, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/Healthcare-Workshop-Speakers-July-9-2025.pdf [https://perma.cc/9KAN-665Z].

organizations that are outspoken in their advocacy against transgender individuals' rights, access to healthcare, and personhood, including the American Principles Project,[54] the Heritage Foundation;[55] Do No Harm Medicine;[56] and Moms for Liberty.[57]  It included a doctor who was federally prosecuted for unlawfully disclosing patient records as part of a "whistleblowing" on transgender healthcare at Texas Children's Hospital.  The Trump administration dropped the charges against him in January 2025.[58]

100.    No transgender individuals were given a voice in this workshop.

101.    Several themes continued throughout the workshop.  Speakers frequently made claims that well-established healthcare for transgender individuals is deceptive because of the speaker's own beliefs that only two genders exist, that gender is defined "at conception," and cannot change.  They recited talking points of individuals and organizations that oppose any form of recognition or support for transgender people, and have been widely criticized by the scientific community.  And despite the FTC's repeated protestations that the workshop was not political, it cast the Biden administration in a villainous, puppet-master role while characterizing established transgender healthcare as "radical gender ideology" and "radical left-wing ideolog[y]."

102.    WPATH featured prominently in the workshop's discussions, although no WPATH

---

[54] *Ending Child Gender Transitions*, American Principles Project, https://americanprinciplesproject.org/issues/ending-child-gender-transitions/ [https://perma.cc/9VTB-RTFK].
[55] Project 2025, The Heritage Foundation (2023), 62, https://static.heritage.org/project2025/2025_MandateForLeadership_FULL.pdf [https://perma.cc/5X6Y-FN69].
[56] Do No Harm, https://donoharmmedicine.org/about/ [https://perma.cc/7YYU-LAQU].
[57] *See* Caroline Downey, *Moms for Liberty Locked Out of Twitter After Criticizing California Gender-Transition Bill*, Yahoo (July 25, 2022), https://www.yahoo.com/news/moms-liberty-locked-twitter-criticizing-191154286.html [https://perma.cc/3T6J-TP3U].
[58] Ayden Runnels, *Feds drop charges against Texas doctor accused of leaking transgender care data, The Texas Tribune* (Jan. 24, 2025), https://www.texastribune.org/2025/01/24/transgender-care-data-leak-texas-childrens-hospital [https://perma.cc/9P2N-CDLC].

member was invited to participate.  Speakers and panelists leaned heavily on the records released

in the third-party discovery in *Boe*, claiming that the documents provided evidence of WPATH's

"fraud."  Any discussion between WPATH and the Biden administration, or any other medical

organization, was denounced as activism, fraud, and "credibility laundering."

103.    The workshop consisted of four panels.  The first, titled "the Politicization of

Science," included Edmund LaCour, the former solicitor general of Alabama, responsible for the

*Boe* litigation.  Annie Chiang, the attorney advisor to Chairman Ferguson, moderated, posing

questions about "how did politics and ideology creep into and ultimately capture this area of

medicine?"[59]

104.    Other panels included "What Does the Science Actually Say About 'Gender-

Affirming Care," and "Blowing the Whistle on 'Gender-Affirming Care' for Minors."

105.    The fourth and final panel, titled "How Can the FTC Protect Families from Harm?",

featured speakers Brandon Showalter, Josh Payne, Glenna Goldis, Paul Dupont, and Jay Richards,

and was moderated by Commissioner Meador.

106.    Goldis was then a New York state Assistant Attorney General, and a publisher of

the blog *Bad Facts*, which purportedly "examines the misbegotten, sometimes fraudulent

movement for 'transgender' rights from a legal and historical perspective."

107.    Goldis made a particularly troubling, and telling recommendation during the fourth

panel:

> [J]ust the act of conducting thorough investigations in the course of pursuing a
> prosecution and making that public will be really helpful in exposing the medical
> associations to the public and to themselves so that they see the road back because
> they're at the point where they're going to start losing members. Pediatricians are
> going to think, "You know what? This is not representing me well, this group.

---

[59] FTC Workshop Transcript, supra n.51, at 18.  Ms. Chiang is also one of the attorneys staffed
on WPATH's Civil Investigative Demand.  Her title at the organization is unclear.

They're actually making me look bad. I don't like what they're doing. I'm not going to pay dues anymore.  They could lose other revenue streams as well.[60]

108.    The FTC has since hired Goldis as a senior litigator to lead FTC investigations related to pediatric transgender healthcare.

109.    When asked what FTC should investigate, and what questions it should ask during its investigation of "gender-affirming care," Showalter offered that the FTC should "[s]tart with the people that have been named today and just start digging around, and you'll find a hornet's nest and their associates and their affiliates."  He later added that "the medical societies and the courts are the biggest thing that keeps things anchored in insanity here in America" and recommended that the FTC "put the screws to those who are writing these junk guidelines because they're just based in lies[.]"

110.    After the workshop, Commissioner Meador told the Daily Signal that, "I think they gave a lot of extremely alarming and concerning information that absolutely gives us the basis to investigate, to fill out the entire legal framework that we would need to pursue a case."  He additionally stated, "There's a lot of things that need to be verified—dot the I's, cross the T's, that sort of thing . . . But I think what we saw today gave us an unequivocal basis to start investigating and determining how and where there have been violations."[61]

111.    Following the workshop, the FTC sought public comment "to better understand how consumers may have been exposed to false or unsupported claims about 'gender-affirming care,' especially as it relates to minors, and to gauge the harms consumers may be experiencing."[62]

---

[60] *Id.* at 81–82.

[61] Elizabeth Troutman Mitchell, *FTC to Investigate Trans Industry's Threats of Child Suicide*, The Daily Signal (July 10, 2025), https://www.dailysignal.com/2025/07/10/ftc-has-unequivocal-basis-to-scrutinize-transgender-industry-commissioner-says/ [https://perma.cc/PGP3-QVSZ].

[62] *FTC Requests Public Comment Regarding "Gender-Affirming Care" for Minors*, FTC (July 28, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/07/ftc-requests-public-comment-regarding-gender-affirming-care-minors? [https://perma.cc/E9BY-FSZB].

112.    Each of these statements and claims shows that the FTC has accepted and continued the Administration's reliance on pseudoscience and ideology, rather than well-established and science-based research and guidance on healthcare for transgender individuals.

**IV.    FTC Targets WPATH with Investigation and a Civil Investigative Demand, Violating its First and Fourth Amendment Rights.**

113.    On January 15, 2025, FTC served WPATH with a Civil Investigative Demand ("CID"), FTC Matter No. P264800.  *See* Exhibit 1.  WPATH received the CID on January 16, 2026.

114.    The CID contained fifteen interrogatories and thirteen document requests, broadly calling for WPATH to produce records relating to all aspects of its work and operations since its founding.

115.    It stated that the subject of the investigation as:

> Whether the Organization or any other Person ... have made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment ... which, according to the Organization, purports to treat gender dysphoric or gender diverse minors, to consumers in violation of Sections 5 and 12 of the FTC Act . . . and whether FTC action to obtain monetary relief would be in the public interest.

*See* Exhibit 1.

116.    It defined "the Organization" as "The World Professional Association for Transgender Health, Inc., its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, members, employees, agents, consultants, and other Persons working for or on behalf of the foregoing." Ex. 1 at 6.  Commission Staff clarified during communications with WPATH that "members," in this definition, did not refer to the WPATH's members.

117.    The CID requests are broad, ill-defined, exceedingly invasive, and reveal the FTC's

predetermined viewpoint opposing WPATH's guidance and advocacy. As described above, and as WPATH told the FTC, much of the information sought is already public. But when asked, Commission staff clarified that the FTC does not seek publicly available information, and implied that it already had all of the relevant public documents.

118.    In light of this clarification, the only information it seeks is the confidential, non-public information about WPATH, its members, stakeholders, and others that support its work, such as records of donations, identifying information regarding members, internal communications between WPATH staff, members' internal discussions, conversations, and detailed records or information on every single statement that WPATH has made, to whom, and when, regarding healthcare for transgender minors. For example, the CID seeks production of every single representation that WPATH has made—express or implied—about "Pediatric Gender Dysphoria Treatment"("PGDT"), including language, location, context, purpose, method and timing of the dissemination of the representations, the process used to create the statement, any material that could have been used to support the representation, and the identities of the persons or entities who received, contributed to, developed, evaluated, or substantiated each and every representation. *See, e.g.*, Interrogatory 7 ("Any Covered Statements You have made, including but not limited to the exact wording, its location and context, the means of communication, and when dissemination occurred."). It seeks records of every single petition for redress that WPATH has made to a governing body or court. *See, e.g.*, Document Request 8 ("All testimony, advocacy, or other information provided to any legislature or regulator related to PGDTs"). And it seeks the names, statements, and descriptions of WPATH's associates. *See, e.g.*, Document Request 4 ("Regardless of time period, all Communications with Professional Medical Organizations related to SOC 8"); Document Request 9 ("With respect to any workshop, townhall or other formal or informal

session, or conference You hosted or organized related in any way to PGDTs: (a) all recordings and transcripts; (b) all Documents distributed to attendees or participants; and (c) *Documents required to be signed by any attendee, participant, or speaker*.") (emphasis added).

119.    The information sought by these requests falls squarely within the First Amendment's protection of the freedom to associate, speak, and petition.

120.    The language of the CID, particularly in the context of the FTC's own public framing of the investigation, shows that it was crafted to fit the FTC's pre-determined, false narrative that the provision of evidence-based, scientific healthcare for transgender minors is deceptive and fraudulent.

121.    For example, the definition of "Covered Statement," includes "any representation, whether express or implied," that: (1) "PGDTs are safe, including without limitation the representation that a treatment is safe for muscle, bone, or brain development; (2) "PGDTs are proven effective, including without limitation the representation that PGDTs are supported by evidence-based science;" (3) "PGDTs improve mental health;" (4) "PGDTs reduce the incidence of suicide, including without limitation the representation that PGDTs are life-saving;" (5) "PGDTs are fully or partly reversible, including without limitation the representation that a treatment is only a pause or otherwise do not cause permanent physical changes;" and (6) "PGDTs have few side effects."

122.    Setting aside their self-referential and circular structure, these definitions expose the viewpoint bias underpinning the CID and mimic the inflammatory, biased talking points of the FTC workshop.

123.    Moreover, by answering requests relying on these definitions, WPATH is required to strip necessary context and nuance from its statements, such as the discussions and disclosures

of risks and the precise terminology that WPATH has used in its statements and recommendations, and contort them to fit within the arguments of ideologically-driven opponents of medically necessary healthcare for transgender individuals.

124.    WPATH has already experienced the fallout from disclosures of members' internal discourse and debates.  Members are less willing to speak and engage in the necessary free exchange of ideas and discourse when those communications and ideas are shared outside of WPATH members and spaces—particularly to a government that has expressed its desire to prosecute them for holding these opinions.

125.    The CID not only seeks information from the past, but it also imposes a continuing obligation of disclosure "until the date of full and complete compliance with this CID."  Ex. 1 at 3.  Such an obligation signals to all members, donors, affiliates, and participants that any association with WPATH regarding the requested subject matter will be shared with the government.

126.    Even before enforcement, the CID has chilled WPATH's speech and association. WPATH has resultingly paused certain educational activities, *see* Paragraph 43, while staring down the barrel of an FTC investigation, CID, and potential future FTC enforcement actions.  For the rest, WPATH is stifled under the fear that each statement or action it takes to effectuate its mission, or any connection with members, supporters, organizations, government bodies, or the public at large, will be cited as Exhibit A in future FTC actions against WPATH, its members, or other groups similarly working to provide evidence-based healthcare to transgender individuals. The impairment of WPATH's ability to effectuate its mission is absolute.

127.    Nor is the CID, or the investigation, subject to meaningful change.  After the issuance of the CID, WPATH conferred with Commission Staff on January 30 and February 3, to

37

discuss the scope, burden, and unconstitutionality of the CID, as required by 16 C.F.R. § 2.I0(a)(2).

Despite the harms already incurred by the issuance of the CID, and the FTC's lack of investigatory

jurisdiction over WPATH, WPATH still came to the table to try to find meaningful resolution with

Commission Staff.  Not only did Commission Staff indicate that the scope of the CID was not

negotiable, but they also did not follow typical practice of providing extensions while good faith

negotiations over the scope of the CID were ongoing.

128.    Throughout communications with WPATH, Commission Staff made it abundantly

clear that the CID would be enforced in its entirety absent a favorable ruling on the petition to

quash.

129.    On February 9, 2026, WPATH petitioned to quash the CID.[63]  Although the petition

is pending, per the FTC's regulations, WPATH's Petition, and the underlying CID, was

immediately made public on filing.  16 C.F.R. § 2.10(d).  This publication broadened the chilling

effect caused by the CID—as Goldis indicated during the FTC workshop, the very fact of

investigation jeopardizes organizations' and members' willingness to associate with WPATH, not

only because their communications and records could be publicized, but because the FTC has

made clear that it intends to unearth any organization or individual with connections to WPATH—

and prosecute them as well.  And despite the fact that the CID has not been enforced, it caused

substantial chilling effects on WPATH's speech and association through its very issuance.

130.    AAP and The Endocrine Society received remarkably similar CIDs with the same

---

[63] *See* Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to World Professional Ass'n for Transgender Health*, FTC File No. P264800 (Feb. 9, 2026), https://www.ftc.gov/system/files/ftc_gov/pdf/WPATH-PTQ.pdf [https://perma.cc/G7UX-UDKY].

matter number and both petitioned to quash for substantially similar reasons.[64]  Both organizations

have filed suit in this Court against the FTC.  *See American Academy of Pediatrics v. FTC*, No.

26-cv-00508, ECF 1 (D.D.C. Feb. 17, 2026); *The Endocrine Society v. FTC*, No. 26-cv-00512,

ECF 1 (D.D.C. Feb. 17, 2026).

**CLAIMS FOR RELIEF**

**COUNT ONE**
**RETALIATION IN VIOLATION OF THE FIRST AMENDMENT**

131.    The preceding paragraphs are incorporated and realleged herein.

132.    The FTC's investigation into WPATH, and its issuance of the CID, are

unconstitutional retaliation against WPATH for exercise of its First Amendment rights to speak,

associate, and petition.  Defendants have violated, and continue to violate, WPATH's First

Amendment rights.

133.    WPATH has engaged in First Amendment protected speech through its

publications, statements, and other initiatives regarding its mission to ensure access to gender-

affirming medical care and protect the rights and personhood of transgender individuals.  It has

spoken out against President Trump, his policies, and other administrative agencies' positions and

actions on these issues.  Moreover, WPATH has petitioned courts to overturn the laws barring

access to medically necessary and science-based healthcare for transgender individuals and

associated with other medical organizations and government representatives in the Biden

administration holding viewpoints antithetical to the Trump Administration's stance opposing

science-based, medically necessary healthcare for transgender individuals.

134.    The FTC is an organization with enormous power.  For for-profit companies, when

---

[64] *See* Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to Am. Acad. Of Pediatrics*, FTC File No. P264800 (Feb. 9, 2026), https://www.ftc.gov/system/files/ftc_gov/pdf/AAP-PTQ.pdf [https://perma.cc/W3KP-WBWC].

the issuance of a civil investigative demand becomes public, it can have an immediate impact on that company's stock price.[65]  As detailed above, for WPATH, the issuance of the civil investigative demand, and the revelation that the investigation is focused on WPATH itself, had an immediate, irreparable chilling effect on WPATH's speech, associations, and right to petition.

135.    There is a clear causal link between WPATH's protected expression, association, and petitioning activities and the FTC's decision to undertake this investigation and issue the CID. Through its statements and actions over the past 13 months, the Trump Administration has publicly bragged about its ultimate goal of ending access to all "gender affirming care," regardless of its medical need or scientific bases.  At every turn, the Trump administration has made it clear that it believes that transgender individuals should not exist and that providing medically necessary healthcare for transgender people is a crime.  The FTC has mirrored such sentiments, and, through its statements and actions, has shown that it will leverage its power to punish individuals and organizations that provide and advocate for gender-affirming healthcare for transgender individuals.  It has found that WPATH, and WPATH's Standards of Care, are obstacles to the Trump Administration's opposition to "gender-affirming care."  The FTC has pointed directly at WPATH's protected activities as the reason for investigating WPATH, including its speech to members, coordination of educational activities, publication of SOC8, and associations with a Biden Administration official and other medical organizations, in creating its guidelines.  The investigation and CID serve as punishments for WPATH's protected activities.

136.    The retaliatory nature of the FTC's actions here is amplified by the fact that it lacks jurisdiction to investigate or bring a Section 5 action against WPATH, as WPATH is not a

---

[65] *See, e.g.*, Jordan Novet, *Instacart shares drop on report that FTC is probing company over AI pricing tool*, CNBC (Dec. 17, 2025), https://www.cnbc.com/2025/12/17/instacart-sec-probe-pricing-tool.html [https://perma.cc/2AGL-CB4M].

"corporation," nor does it engage in commercial speech.

137.    The issuance of the CID and the resulting requirements that WPATH hire counsel to defend itself, expend its limited resources preparing for potential disclosures of information, as well as the above-described chilling effect of impending disclosures and legal action, are materially adverse actions that deter WPATH, its members, and the medical field as a whole from exercising their First Amendment rights.

<u>**COUNT TWO**</u>
**VIEWPOINT DISCRIMINATION IN VIOLATION OF THE FIRST AMENDMENT**

138.    The preceding paragraphs are incorporated and realleged here.

139.    The FTC's investigation and issuance of the CID additionally violated, and continues to violate, the First Amendment's prohibition on viewpoint discrimination.  The CID is content-based on its face, seeking to burden and punish WPATH's science-based viewpoints that are adverse to the Trump Administration's ideological and pseudoscientific stances on healthcare for transgender individuals.

140.    The FTC is using its power to suppress WPATH's contrary viewpoint and support the President's false narrative that WPATH's Standards of Care are unsupported by scientific evidence and are politically motivated.  In attempting to silence and discredit WPATH, the FTC is violating a core principle of the First Amendment, that "'the best test of truth is the power of the thought to get itself accepted in the competition of the market,' and the people lose when the government is the one deciding which ideas should prevail."  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771–72 (2018) (quoting *Abrams v. United States,* 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)) (cleaned up).

141.    The FTC's investigation and CID are forms of compulsory process that include a "threat of legal sanctions" and "prior restraints," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175,

180 (2024), as the FTC may enforce them in federal court.  Defendants, and the CID, additionally indicate that the FTC could conduct an enforcement action against WPATH as a result of its investigation.

142.    As described above, Defendants and the Administration have been clear that their intention is "to achieve the suppression," *id.* at 202, of WPATH's viewpoint.

143.    Because the FTC's actions constitute viewpoint discrimination, strict scrutiny applies.  *See Reed v. Town of Gilbert,* 576 U.S. 155, 168-71 (2015).  The CID and investigation fail under this exacting standard, as they are not "narrowly tailored to serve compelling state interests." *Id.* at 163.  The FTC cannot have a compelling interest in the punishment of individuals for advancing views in which the government disagrees, nor in the investigation of an entity or speech that is outside of its jurisdiction.  As WPATH's speech is not commercial, and WPATH is a non-profit, the FTC has no right to investigate it at all.

144.    The harms detailed herein are ongoing and irreparable.

## COUNT THREE
## VIOLATION OF THE FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH AND ASSOCIATION

145.    The preceding paragraphs are incorporated and realleged here

146.    Beyond retaliation and viewpoint discrimination, the FTC has violated WPATH's First Amendment rights to speak and associate through its unlawful investigation and issuance of the CID.

147.    As detailed above, the CID and investigation into WPATH chill, and therefore violate, WPATH's freedom to speak on the issues of healthcare for transgender individuals, as well as its freedom to associate with individuals, organizations, and groups that the government disagrees with or disapproves of, through its invasive and overbroad requests for information

protected by the First Amendment, including but not limited to, member and donor information, attendance sheets, and internal deliberations and discussions.

148.    WPATH's speech is not commercial, but even if it were, the investigation and CID fail intermediate scrutiny.  The breadth of the CID's requests is not, and cannot be, found to directly advance a substantial government interest, particularly where the FTC has no jurisdiction over WPATH.

149.    Moreover, the fact that the CID compels disclosure of WPATH's members, stakeholders, associates, and affiliates, as well as the content of their communications, has "a chilling effect on, and therefore infringe[s], the exercise of fundamental rights."  *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010).

<u>**COUNT FOUR**</u>
**IMPROPER INVESTIGATION IN VIOLATION OF
THE FIRST AMENDMENT AND FOURTH AMENDMENT**

150.    The preceding paragraphs are incorporated and realleged here.

151.    Generally, the Fourth Amendment requires the use of compulsory process to be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."  *See v. City of Seattle*, 387 U.S. 541, 544 (1967).  As Defendants' compulsory process here compels disclosure of materials protected by the First Amendment, the Fourth Amendment imposes an additional constraint:  the request must avoid sweeping intrusions and precisely identify the information sought "with scrupulous exactitude." *See Zurcher*, 436 U.S. at 564 (citation omitted). The CID satisfies neither the "narrowly tailored" or "scrupulous exactitude" standard.

152.    As described above, the CID is overbroad and unduly burdensome, and violates WPATH's First and Fourth Amendment rights by forcing it to disclose information, such as member identities, deliberations, donations and funding sources, and affiliations, that will chill

WPATH and its members' protected speech.  This investigation is "of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power."  *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

153.    Moreover, the information sought in the CID is not reasonably relevant to any permissible investigation, and is unduly burdensome and unreasonably broad.  For this reason, the CID violates the First and Fourth Amendments.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff WPATH requests that the Court enter an Order awarding it the following relief:

a) Declare that Defendants' investigation of WPATH is retaliation in violation of the First Amendment;

b) Declare that Defendants' investigation of WPATH is viewpoint discrimination in violation of the First Amendment;

c) Declare that Defendants' investigation of WPATH violates WPATH's First Amendment rights to freedom of speech and association;

d) Declare that WPATH's effectuation of its mission, including education initiatives and creation of its Standards of Care, are protected under the First Amendment, and do not constitute activities in or affecting commerce;

e) Declare that WPATH is not a "corporation" as defined by the 15 U.S.C. § 44;

f) Grant preliminary and permanent injunctive relief barring Defendants, their officers, agents, servants, and employees, from taking further or continuing action to hinder, interfere with, intimidate, or restrain WPATH's exercise of its constitutional rights, including enforcing the CID;

g)  Grant any other relief as the Court deems appropriate.

Date:   February 18, 2026
        Washington, D.C.

*/s/ Abbe David Lowell*
Abbe David Lowell [Bar No. 358651]
Schuyler J. Standley [Bar No. 90013858]
Isabella M. Oishi [Bar No.  90018056]
Lowell & Associates, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
SStandley@lowellandassociates.com
IOishi@lowellandassociates.com

*Attorneys for WPATH*