**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, | |
| *Plaintiff*, | Civil Action No. 1:26-cv-00532-JEB |
| *v.* | **Hearing Requested** |
| FEDERAL TRADE COMMISSION; ANDREW N. FERGUSON, in his official capacity as Chairman of the Federal Trade Commission; MARK R. MEADOR, in his official capacity as Commissioner of the Federal Trade Commission; and JOHN DOES 1–3, in their official capacities as Commissioners of the Federal Trade Commission, | |
| *Defendants*. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

    I.    WPATH Engages in First Amendment-Protected Activities on Matters of Public Concern ..................................................................................................... 2

        A.    WPATH Releases the Standards of Care, Volume 8 ...................................... 3

        B.    Threats Against WPATH and its Members are Amplified With Unauthorized Disclosures ................................................................................ 5

    II.    The FTC Follows the Trump Administration's Lead in Targeting WPATH and Other Proponents of Transgender Healthcare ................................................. 6

    III.    The FTC Issues Sweeping CID to WPATH ......................................................... 14

    IV.    The CID and Investigation Have Harmed, and Will Continue to Harm, WPATH ................................................................................................................. 17

ARGUMENT ................................................................................................................... 18

    I.    WPATH is Likely to Succeed on the Merits of Its First Amendment Claims ................................................................................................................... 19

        A.    The Investigation and CID are Retaliation for WPATH's Protected Expression ..................................................................................................... 19

            1.    WPATH has engaged in activities protected by the First Amendment ................................................................................................ 20

            2.    The FTC's investigation and CID constitute sufficiently adverse action against WPATH ...................................................................... 22

            3.    There is a causal link between FTC's animus and its investigation and CID ........................................................................................... 27

        B.    The CID and Investigation are Unconstitutional Viewpoint Discrimination ................................................................................................ 31

        C.    The FTC's Investigation and CID Abridge the Freedom of Association ....... 34

    II.    WPATH Has Been, and Will Continue to Be, Irreparably Harmed by the FTC's Actions ...................................................................................................... 36

    III.    The Balance of the Equities Favors WPATH ...................................................... 38

CONCLUSION ................................................................................................................ 39

# TABLE OF AUTHORITIES

**Cases**

*A.B.B. v. Morgan*,
 548 F. Supp. 3d 209 (D.D.C. 2020) ........................................................................ 19

*AFL-CIO v. FEC*,
 333 F.3d 168 (D.C. Cir. 2003) ............................................................................... 24

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
 570 U.S. 205 (2013) .............................................................................................. 34

*Am. Acad. of Pediatrics v. FTC*,
 1:26-cv-00508 (D.D.C. Feb. 17, 2026) .................................................................. 34

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
 2026 WL 80796 (D.D.C. Jan. 11, 2026) .......................................................... 21, 39

*Ams. for Prosperity Found. v. Bonta*,
 594 U.S. 595 (2021) .............................................................................................. 34

*Aref v. Lynch*,
 833 F.3d 242 (D.C. Cir. 2016) .......................................................................... 20, 22

*Banks v. York*,
 515 F. Supp. 2d 89 (D.D.C. 2007) ......................................................................... 20

*Bantam Books, Inc. v. Sullivan*,
 372 U.S. 58 (1963) ................................................................................................ 23

*Bd. of Trs. of Leland Stanford Jr. Univ. v. Sullivan*,
 773 F. Supp. 472 (D.D.C. 1991) ............................................................................ 21

*Boe v. Marshall*,
 No. 2:22-cv-00184 (M.D. Ala.) ............................................................................... 4

*Borough of Duryea, Pa. v. Guarnieri*,
 564 U.S. 379 (2011) .............................................................................................. 22

*Buckley v. Valeo*,
 424 U.S. 1 (1976) .................................................................................................. 24

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
 40 F.4th 716 (D.C. Cir. 2022) ............................................................................... 19

*Cmty. Blood Bank of Kansas City Area, Inc. v. FTC*,
 405 F.2d 1011 (8th Cir. 1969) ............................................................................... 28

*Doe v. Reed*,
 561 U.S. 186 (2010) .............................................................................................. 35

*Endocrine Society v. FTC*,
 No. 1:26-cv-00512 (D.D.C. Feb. 17, 2026) ........................................................... 34

*FCC v. League of Women Voters of Cal.*,
 468 U.S. 364 (1984) ................................................................................................ 1

*Goodwin v. District of Columbia,*
  579 F. Supp. 3d 159 (D.D.C. 2022) ....................................................... 27

*Gordon v. Holder,*
  721 F.3d 638 (D.C. Cir. 2013) ............................................................. 38

*Hartley v. Wilfert,*
  918 F. Supp. 2d 45 (D.D.C. 2013) ........................................................ 25

*Heffernan v. City of Paterson,*
  578 U.S. 266 (2016) ......................................................................... 33

*Houston Cmty. Coll. Sys. v. Wilson,*
  595 U.S. 468 (2022) ......................................................................... 20

*Huisha-Huisha v. Mayorkas,*
  27 F.4th 718 (D.C. Cir. 2022) ............................................................. 38

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
  515 U.S. 557 (1995) ......................................................................... 21

*In re 2025 Subpoena to Children's National Hospital,*
  2026 WL 160792 (D. Md. Jan. 21, 2026) .................................................. 8

*In re 2025 UPMC Subpoena,*
  2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) .............................................. 8

*In re Admin. Subpoena No. 25-1431-019,*
  2025 WL 2607784 (D. Mass. Sept. 9, 2025) ............................................... 8

*In re Dep't of Just. Admin. Subpoena No. 25-1431-030,*
  2026 WL 33398 (D. Colo. Jan. 5, 2026) ................................................... 8

*In re Subpoena No. 25-1431-014,*
  2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) .............................................. 8

*Karem v. Trump,*
  960 F.3d 656 (D.C. Cir. 2020) ............................................................. 38

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
  385 U.S. 589 (1967) ......................................................................... 21

*Media Matters for Am. v. FTC,*
  2025 WL 2988966 (D.C. Cir. Oct. 24, 2025) ............................................. 27

*Media Matters for Am. v. FTC,*
  805 F. Supp. 3d 105 (D.D.C. 2025) ................................................. passim

*Media Matters for Am. v. Paxton,*
  138 F.4th 563 (D.C. Cir. 2025) ....................................................... 23, 38

*Media Matters for Am. v. Paxton,*
  732 F. Supp. 3d 1 (D.D.C. 2024) ......................................................... 23

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ......................................................................... 21

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ............................................................................................ 20, 31

*NAACP v. Ala. ex. rel. Patterson*,
   357 U.S. 449 (1958) ..................................................................................... 22, 32, 34

*NAACP v. Button*,
   371 U.S. 415 (1963) ............................................................................................ 22, 35

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024) ............................................................................................ 31, 32

*Newsguard Technologies v. FTC*,
   No. 26-cv-00353 (D.D.C. Feb. 6, 2026) .................................................................. 33

*Nieves v. Bartlett*,
   587 U.S. 391 (2019) .................................................................................................. 27

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................................................. 19

*Perkins Coie LLP v. U.S. Dep't of Just.*,
   783 F. Supp. 3d 105 (D.D.C. 2025) ......................................................................... 36

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) .................................................................................................. 31

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ............................................................................ 36, 38

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
   2025 WL 3013568 (W.D. Wash. Oct. 27, 2025) ....................................................... 8

*Red Lion Broad. Co. v. FCC*,
   395 U.S. 367 (1969) .................................................................................................... 1

*Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*,
   593 F.2d 1030 (D.C. Cir. 1978) ............................................................................... 22

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) .................................................................................................. 32

*Roth v. United States*,
   354 U.S. 476 (1957) .................................................................................................. 21

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) .................................................................................................... 1

*Sweezy v. State of N.H. by Wyman*,
   354 U.S. 234 (1957) ............................................................................................ 22, 23

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) .................................................................................................. 34

*Ukr.-Am. Bar Ass'n, Inc. v. Baker*,
   893 F.2d 1374 (D.C. Cir. 1990) ............................................................................... 22

*United States v. Associated Press*,
    52 F.Supp. 362 (D.C.S.D.N.Y.1943) ............................................................. 31

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ............................................................................................ 1

*Waln v. Dysart School District*,
    54 F.4th 1152 (9th Cir. 2022)........................................................................... 32

*Whitney v. Cal.*,
    274 U.S. 357 (1927) ............................................................................................ 1

**Statutes**

15 U.S.C. § 57b-1 .................................................................................................. 28

15 U.S.C. §§ 44–46.......................................................................................... 27, 28

**Other Authorities**

Executive Order No. 14168 ................................................................................. 6, 7

Executive Order No. 14187 ................................................................................... 6

Executive Order No. 14190 ................................................................................... 7

**Regulations**

16 C.F.R. § 2.I0(a)(2)........................................................................................... 16

## INTRODUCTION

A federal agency reaching beyond its jurisdiction to investigate (and thereby intimidate) a non-profit organization raises serious questions about the agency's motive—and whether its motive or actions violates the Constitution. But the fact that it has done so while broadcasting its opposition to that organization's charitable mission turns those questions into alarm bells.

The First Amendment "makes for us" the choice "between the dangers of suppressing information[] and the dangers of its misuse if it is freely available." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011) (quoting *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976)). When crafting the First Amendment, the Framers recognized "that fear breeds repression; that repression breeds hate;" and "that hate menaces stable government." *Whitney v. Cal.*, 274 U.S. 357, 375–76 (1927) (Brandeis, J. concurring). They believed that information, knowledge, and public discourse would lessen animosity based on fear and, "[b]elieving in the power of reason as applied through public discussion, they eschewed silence coerced by law[.]" *Id.* It is therefore "the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969)).

Plaintiff, the World Professional Association for Transgender Health ("WPATH"), is a non-profit, non-partisan organization dedicated to ensuring that transgender people have access to established, medically necessary, and individualized healthcare. On January 16, 2026, the Federal Trade Commission ("FTC") served a Civil Investigative Demand ("CID") on WPATH—its latest move in an investigation transparently aimed at silencing and punishing proponents of science-based medical treatment for transgender minors.

WPATH's viewpoint on transgender healthcare, and its speech, associations, and

1

advocacy, have made it a favorite target of President Trump and his administration.  As the FTC's investigation and CID violate WPATH's First Amendment rights, have irreparably harmed WPATH, and will continue to do so without this Court's intervention, WPATH respectfully requests that this Court enter a preliminary injunction barring the FTC from enforcing the CID and from taking further actions to silence and punish WPATH for engaging in constitutionally protected expression.

## BACKGROUND

### I.    WPATH Engages in First Amendment-Protected Activities on Matters of Public Concern

Founded in 1979 as the Harry Benjamin International Gender Dysphoria Association, WPATH is a 501(c)(3) non-profit organization dedicated to promoting science-based guidance, education, research, public policy, and respect in transgender health.  *See* Decl. of Leo Lewis, ¶¶ 3, 7.  With more than 3,000 members in diverse fields—including medicine, mental health, research, law, and public policy—WPATH serves as a hub for professionals committed to transgender healthcare and an internationally-recognized authority on ethical, well-established, and science-based healthcare for transgender individuals.  *See* Lewis Decl. ¶¶ 6, 8, 10.

WPATH effectuates its mission by providing a forum for debate, collaboration, and discussion among its members, by facilitating research and providing educational programs regarding transgender healthcare, and by advocating for access to medically necessary, well-established healthcare for transgender people.  *See id.* ¶ 8.  WPATH has hosted major conferences, maintained (until 2025) a confidential online discussion platform, led global educational efforts through courses, mentorship, and certification programs, and participated in amicus briefs and issued statements aligned with its mission.  *See id.* ¶¶ 18–20; Decl. of Abbe Lowell, Exs. 2–4.

WPATH is internationally recognized for providing its Standards of Care ("SOC") for the

treatment and health of transgender people globally.  *See* Lewis Decl. ¶ 9.  These SOC articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of transgender people, and are periodically updated to ensure that the standards reflect current research and professional consensus.  *See id.*; *see also*, Decl. of Dr. Asa Radix ¶ 8.

WPATH is many things, but profit-motivated is not one of them.  WPATH is a volunteer-run, charitable organization that uses its revenue (generated through membership dues, donations, and grants, not commercial transactions) to further its mission of promoting well-established healthcare for transgender individuals.  *See* Lewis Decl. ¶ 15.  WPATH does not advertise or sell products or services to consumers.  *See id.* ¶ 17.  Outside of the benefits set forth on its website, WPATH does not provide discounts, products, or services to its members.  *See id.*  WPATH does not provide licenses or set requirements for clinicians, researchers, or other professionals to engage in their respective fields or professions.  *See id.*  And not one of its activities is undertaken for the profit of its governing body or members.  *See id.* ¶ 16.

## A.  WPATH Releases the Standards of Care, Volume 8

In September 2022, the International Journal of Transgender Health published the Standards of Care, Version 8 ("SOC8").  *See* E. Coleman et al, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 International Journal of Transgender Health 51, (Sept. 15, 2022), https://doi.org/10.1080/26895269.2022.2100644.  SOC8 is free to the public and provides detailed descriptions of sources, evidence, and methodologies used to create the publication.  *See id.* at 178, 247.  SOC8 is intended to be used as clinical guidance for informed, doctor-patient decision making on transgender healthcare, which may include varying interventions based on individual patient needs.  *See id.* at 5.  SOC8 consists of recommendation statements developed through the Delphi method, a well-established methodology for building expert consensus.  *See id.* at 8.  These statements reflect what WPATH believes is the available

scientific evidence and the collective professional judgment of experts in transgender health. *See* Radix Decl. ¶ 9.

When SOC8 was open for public comment, WPATH received feedback from thousands of professionals from myriad professional backgrounds, with varying levels of expertise and diverse perspectives. *See id.* ¶ 11. The comments and feedback received during this time period are not generally public, but certain communications were disclosed in *Boe v. Marshall*, No. 2:22-cv-00184 (M.D. Ala.), when the district court permitted extensive, invasive third-party discovery into WPATH and SOC8. *See id.* ¶ 14. Among these records were communications between SOC8 contributors and the office of Admiral Rachel Levine, the Biden Administration's Assistant Secretary for Health regarding the Admiral's feedback that specific ages should be taken out of SOC8's recommendations. *See id.* ¶¶ 12, 14.

Although WPATH received similar feedback from many other professionals and organizations, the SOC8 Committee's decision to replace age minimums for certain recommendation statements with strengthened criteria to ensure individualized assessment and medical care has been repeatedly mischaracterized, taken out of context, and editorialized by the individuals and organizations hostile to WPATH's mission. *See id.* ¶ 14. These groups, and United States government, *see infra*, Argument Section II, have ultimately used these mischaracterizations to falsely claim that WPATH's SOC8 is not scientific and is politically motivated. *See* Radix Decl. Instead, as WPATH members and representatives have since clarified, the decision to remove age minimums was not based on one single contributor's feedback, but rather were the result of careful deliberations. *See id.* ¶ 13. The removal of the age minimums in SOC8 promotes individualized medical care between doctors and patients and reduces the likelihood of misapplication of these standards. *See id.*; Decl. of Dr. Loren Schechter ¶ 9.

Regardless of the weaponization of misrepresented internal deliberations, SOC8 remains a well-respected authority and guidance document for international transgender healthcare.

### B. Threats Against WPATH and its Members are Amplified With Unauthorized Disclosures

Access to medically necessary healthcare—and basic respect—for transgender people is considered controversial in certain circles. Radix Decl. ¶ 15. This is a reality that WPATH has faced since its founding. *See id*. Despite receiving frequent threats, vitriol, and hate, WPATH has stood undeterred from its mission. *See id.* ¶ 16; Schechter Decl. ¶ 14. But politically motivated government scrutiny and unauthorized disclosures, as well as the resulting increases in harassment, have chilled WPATH's members' participation, reduced the willingness of other organizations to associate with WPATH, and forced WPATH to reevaluate programs in order to prevent further harm to its mission. *See* Radix Decl. ¶¶ 17–20; Decl. of Scott Leibowitz ¶¶ 18, 20–31, 36, 38–41.

Threats and harassment are frequent occurrences. Recent posts on the social media platform "X" have displayed WPATH members covered in blood, and demand they be locked up. *See* Lewis Decl. ¶ 24. Members have received serious, personalized threats to their health and safety. Schechter Decl. ¶ 15. Members have been illegally videotaped during educational presentations and had their intellectual property misused and edited in a manner that has led to threats of violence and threats to their professional practices. Leibowitz Decl. ¶ 24–27. Members and staff have been required to implement serious security measures in response to these threats and harassment. Radix Decl. ¶ 25; Schechter Decl. ¶ 15; Leibowitz Decl. ¶¶ 28–29, 31. Leibowitz Decl. ¶¶ 18, 20–31.

WPATH has suffered two data breach incidents, in which internal WPATH communications were disclosed from a confidential, WPATH-run forum without authorization, and then published, misrepresented, taken out of context, and used in an intentional campaign to

distort WPATH's work.  Radix Decl. ¶¶ 17–19.  These breaches had a significant and lasting consequence.  Knowing that their candid professional discussions could be stolen and distorted, WPATH members became understandably reluctant to engage openly on WPATH-provided platforms.  *See id.*; Schechter Decl. ¶ 13.  WPATH closed the platform in 2025.  *See* Lewis Decl. ¶ 19.

## II.    The FTC Follows the Trump Administration's Lead in Targeting WPATH and Other Proponents of Transgender Healthcare

On the first day of his second term, President Donald Trump announced and took action towards one of his Administration's key goals: banning the promotion and provision of medically necessary healthcare for transgender minors.  He issued Executive Order No. 14168, titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," which announced that the position of the Executive Branch and federal agencies would be to ignore and deny the existence of transgender individuals.  *See* Exec. Order No. 14168, 90 Fed. Reg. at 8615.  It directed federal agencies to take down any internal or external communications "that promote or otherwise inculcate gender ideology" and prohibited the use of federal funds "to promote gender ideology."  *Id.*  Eight days later, the President issued another executive order, titled "Protecting Children from Chemical and Surgical Mutilation."  *See* Exec. Order No. 14187, 90 Fed. Reg. at 8771.  This Executive Order mischaracterized and targeted WPATH in particular, calling SOC8 "junk science" and "lack[ing] scientific integrity," and directing executive agencies to rescind and amend all policies that rely on WPATH's guidance. *Id.*  It called on executive agencies to end "gender-affirming care," and referred to well-established and medically necessary medical treatments as "chemical and surgical mutilation," "maiming and sterilizing" children, and a "stain on our Nation's history."  *Id.*  In announcing this Executive Order, the President made his position clear in a social media post: "Our Nation will no longer

fund, sponsor, promote, assist, or support so-called 'gender-affirming care,' which has already ruined far too many precious lives." *See* Ex. 5.

Since then, the President and the White House have referred to promotion of transgender healthcare as promoting "anti-American, subversive, harmful, and false ideologies," *see* Exec. Order No. 14190, 90 Fed. Reg. at 8853, and "ideologically driven and financially motivated junk-science," *see* Ex. 6 at 1. The Trump Administration characterizes well-established medical treatments as "a grotesque social and scientific experiment on American children," and "immoral, unjust, and disproven practices." *See id*. It has banned agencies in the executive branch from funding, promoting, or even using words that it associates with "gender ideology" and from recognizing transgender individuals. *See* Exec. Order No. 14168.

The Administration has been open about the methods it is using to stop organizations from promoting or providing transgender healthcare. The White House has touted the "success" of these initiatives, pointing particularly to the accomplishments of its executive orders and administrative agencies' efforts to target and intimidate proponents of transgender healthcare. *See* Ex. 7. It has celebrated the closure of medical programs as resulting from "*the Trump Administration's relentless pressure*." *Id.* (emphasis added).

The Department of Health and Human Services ("HHS") and the Department of Justice ("DOJ") were the initial leaders in the agency actions against transgender healthcare. Among other actions, in May 2025, HHS issued "Treatment for Pediatric Gender Dysphoria, Review of Evidence and Best Practices" ("HHS Report"), a 400-page literature review that has been criticized for misrepresenting available research and relying on studies with flawed methodologies, and has since been reissued. *See Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Dep't of Health and Human Servs. (May 2025) (revised ed. November 2025),

https://opa.hhs.gov/gender-dysphoria-report; *see also*, Ex. 8.  The HHS Report contained an entire chapter largely dedicated to repeating misinformation about WPATH, including its allegedly "political" ideology.  *See id.* at 14, 157–87.  The DOJ has parroted similar erroneous claims in its own memoranda.  *See* Ex. 9 at 3.  It has also issued more than 20 subpoenas to organizations, doctors, and healthcare facilities promoting and/or providing healthcare for transgender minors— many of which have since been quashed by federal courts.  *See* Ex. 10; *see also*, *In re 2025 UPMC Subpoena*, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398 (D. Colo. Jan. 5, 2026); *In re 2025 Subpoena to Children's National Hospital*, 2026 WL 160792 (D. Md. Jan. 21, 2026);  *In re Admin. Subpoena No. 25-1431-019*, 2025 WL 2607784 (D. Mass. Sept. 9, 2025); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025); *In re Subpoena No. 25-1431-014*, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025).

Not to be left behind, the FTC, though traditionally a nonpartisan organization, has not shied from the President's directives.  Even before his appointment as the FTC's Chairman, Andrew Ferguson was committed to "[f]ight back against the trans agenda" and "[i]nvestigate" organizations and individuals who "pushed gender confusion."  Ex. 12; *see also Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 115 (D.D.C. 2025) ("*Media Matters II*") ("[W]hen Mr. Ferguson was only a candidate for the FTC Chairman position, he also stated that he had a 'track record of standing up to . . . the radical left'").  When elevated, he made statements underscoring his position that the FTC was a tool in the Trump Administration's political agenda.  *See* Ex. 13 at 4 ("No one voted for me . . . They voted for Donald Trump by the tens and tens and tens of millions after his enemies shot him in the face.").

The FTC has taken a starring role in the Trump Administration's vendetta against

8

medically necessary healthcare for transgender people—and WPATH.  It began looking into the possibility of using the FTC's powers to target healthcare for transgender minors in spring 2025, when, according to media reporting, then-FTC Senior Policy Advisor Jon Schweppe authored a memorandum stating that "[t]here is now considerable reason to believe that the doctors and medical providers pushing [healthcare for transgender] minors are knowingly deceiving parents by exaggerating [such care's] 'benefits' and downplaying its harmful side effects . . . .", and proposed an FTC workshop, titled "The Big Lie: The Dangers of Gender-Affirming Care for Minors" to further build on President Trump's executive orders. *See* Ex. 14.  Mr. Schweppe, who returned to the American Principles Project in January 2026, has had a years-long vendetta against transgender healthcare, and was even banned from the social media platform "X" in 2021 for tweeting: "Now we hope that governors will likewise be emboldened to continue the fight against the evil gender ideology being forced on America's children by joining Arkansas and Tennessee in banning the chemical castration and surgical mutilation of minors suffering from gender dysphoria." Ex. 15.

Seven days before the renamed "The Dangers of 'Gender-Affirming Care' for Minors," workshop ("the Workshop"), 149 FTC employees sent an anonymous Statement of Concern to Congress setting out their substantial opposition to this workshop. Ex. 16.  The letter challenged the FTC's jurisdiction over these issues and stated that "the announcement's use of charged language suggest the Commission has already taken a position opposing gender-affirming care for minors." *Id.*  It noted that the "FTC has not historically intervened in the confidential, individualized advice given across a series of professional, consent-based appointments protected by the doctor-patient relationship." *Id.*  In response, FTC Director of Public Affairs and Senior Policy Advisor Joe Simonson stated that "No sane person could endorse the needless mutilation

of children. Every American should be troubled by the possibility that parents and their children were misled about the use of medical 'therapies' that may have caused serious harm," and that "staff who oppose a workshop designed to better understand the concerns of tens of millions of parents, children, and medical professionals are free to resign." *Id.*

In its description of the Workshop, the FTC stated that it was planned to "focus on unfair or deceptive trade practices in 'gender-affirming care' for minors. Doctors, medical ethicists, whistleblowers, detransitioners, and parents of detransitioners will share perspectives grounded in research, expertise, and personal experience." Ex. 18. It noted that the FTC's "authority could be implicated if there is evidence that medical professionals or others omitted warnings about the risks or made false or unsupported claims about the benefits and effectiveness of gender-affirming care for minors," and that the Workshop would "help the FTC to understand whether consumers are being or have been exposed to false or unsupported claims about 'gender-affirming care' and to gauge the harms consumers may be experiencing." *Id.*

On July 9, 2025, the FTC held the invitation-only Workshop in Washington, D.C., which Mr. Simonson proclaimed as "[o]ne of the most important days for the FTC in recent history." Ex. 19. The rhetoric espoused by the FTC speakers and invited guests confirms that the purpose of the event was to attack science-based, medically necessary treatments. Chairman Ferguson tried to cover the purpose of the Workshop with claims that it was not political, framing it as a typical investigation for the FTC. But the Workshop's content, and his own speech, shows otherwise. Chairman Ferguson opened the Workshop by repeating the unsubstantiated claim that the Biden Administration had interfered with WPATH's SOC8, while simultaneously claiming that he is "not charged with passing moral judgment on anyone's ideology, lifestyle, or medical choices." *See* Ex. 21 at 2, 4 He stated that the Workshop was "about healing the wounds that proponents of

gender-affirming care may have inflicted on our nation's children and parents, and preventing the potential for future harm." *Id.* at 2. He characterized well-established hormone therapies as "a gateway drug to a lifetime of expensive hormone injections and sex change surgeries," pointing to the experiences of individuals who have detransitioned as evidence. *Id.* at 3. In his words, these stories "paint a troubling picture. Lured by the promise of a fail-safe cure for their mental health problems and kept in the dark about the permanent and irreversible effects of medical transitioning, these young people and their parents say they were coaxed to open their minds, their hearts and their wallets to the miraculous healing powers of puberty blockers, hormone injections, and sex change surgeries." *Id.* at 3–4. He credited Mr. Schweppe for putting together the Workshop, acknowledging that "Jon has worked on these issues sometimes quietly and subject to great criticism. Before we brought him onto the commission, he has been a tireless advocate for people who have suffered in this industry." *Id.* at 6.

No legitimate medical experts in transgender health, medical organizations supporting transgender healthcare, or even transgender individuals spoke at the Workshop. *See* Ex. 22; Leibowitz Decl. ¶ 36. Instead, it provided a platform solely to opponents of transgender healthcare, including speakers and panelists from organizations that are outspoken in their advocacy against transgender individuals' rights, access to healthcare, and personhood, such as the American Principles Project, the Heritage Foundation, Do No Harm Medicine, and Moms for Liberty. *See* Ex. 22. These speakers frequently made claims that well-established healthcare for transgender individuals is deceptive because of the speaker's own beliefs that only two genders exist, that gender is defined at conception, and cannot change. *See, e.g.*, Ex. 21 at 13, 31, 45. FTC moderators permitted and encouraged the politicization of these topics. For example, Annie Chiang, the attorney advisor to Chairman Ferguson and one of the attorneys participating in the investigation

into WPATH, moderated one of the panels, posing questions such as "how did politics and ideology creep into and ultimately capture this area of medicine?" *See id.* at 18.

Panelists also opined on the role of medical associations, offering recommendations for weaponizing the FTC towards the Administration's broader attack against transgender individuals, in a panel moderated by Commissioner Mark Meador. *See id.* at 74. Panelist Brandon Showalter, a journalist with The Christian Post, claimed that "the medical societies and the courts are the biggest thing that keeps things anchored in insanity here in America" and recommended that the FTC "put the screws to those who are writing these junk guidelines because they're just based in lies[.]" *Id.* at 83–84. Then-New York state Assistant Attorney General Glenna Goldis recommended *using FTC investigations* as a mechanism to pressure medical associations, stating that:

> Just the act of conducting thorough investigations in the course of pursuing a prosecution and making that public will be really helpful in exposing the medical associations to the public and to themselves so that they see the road back because they're at the point where they're going to start losing members. Pediatricians are going to think, "You know what? This is not representing me well, this group. They're actually making me look bad. I don't like what they're doing. I'm not going to pay dues anymore." They could lose other revenue streams as well.

*Id.* at 81. Notably, the FTC has since hired Ms. Goldis as a senior litigator to lead FTC investigations related to pediatric transgender healthcare. *See* Ex. 20.

WPATH featured prominently in the Workshop's discussions, although no WPATH member was invited to participate, nor was WPATH itself invited. Lewis Decl. ¶ 22. During the Workshop, WPATH was branded as "an advocacy organization." Ex. 21 at 33. Speakers and panelists leaned heavily on the records released in the third-party discovery in *Boe*, claiming that the decontextualized documents provided evidence of WPATH's "fraud." *Id.* at 20–21. The former Alabama Solicitor General, Edmund LaCour, who had led the *Boe* litigation, was a panelist.

12

*Id.* at 24.  Any discussion between WPATH and the Biden administration, or any other medical organization, was denounced as activism, fraud, and "credibility laundering."  *See id.* at 22.

In statements made to the media after the Workshop, Chairman Ferguson laid out his plan. He stated that he was "thrilled" about the DOJ's issuance of its subpoenas, "because, hearing from DOJ or the FTC if you're a business can be a very intimidating thing, and if you're breaking the law, a lot of times just hearing from the government that like … can curb illegal behavior on its own."  Ex. 23.  He then noted that, for the FTC, the next steps were that "[i]f people are making material misstatements, sue them. . . . . Sue them either for injunctions if they're violating existing rules, which they may be, or sue them for civil penalties."  *Id.*  While providing lip service to further investigation, Chairman Ferguson stated that "[i]f there is this material deception going on in this market, it is picking on the most vulnerable human beings in America at the worst possible moment of their lives and brutalizing them. . . And frankly, the ability of people to turn away from this and say 'no action should be taken' boggles my mind. So at the end of the day, it is the right thing to do."  *Id.*

Following the workshop, the FTC sought public comment "to better understand how consumers may have been exposed to false or unsupported claims about 'gender-affirming care,' especially as it relates to minors, and to gauge the harms consumers may be experiencing."  Ex. 24.  The comment period was open for 60 days and closed on September 26, 2025.  *See id.*  And in November 2025, when HHS announced the release of its updated version of the HHS report, Chairman Ferguson reposted the announcement, adding that "[t]his report is exactly why the @FTC is investigating these practices."  Ex. 25.  The Chairman's Attorney Advisor then reposted the Chairman's post, writing "Yes, what @AFergusonFTC said[.]"  Ex. 26.

Through these preliminary investigatory steps and statements, the FTC made clear that it

would leverage its significant power and resources to target proponents of medically necessary healthcare for transgender minors.

### III.    The FTC Issues Sweeping CID to WPATH

On January 16, 2026, WPATH received a CID that contained fifteen interrogatories and thirteen document requests, broadly calling for WPATH to produce records relating to all aspects of its work and operations, with time periods ranging from five years to four decades.  *See* Ex. 1. It described the subject of the investigation as:

> Whether the Organization or any other Person . . . have made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment . . . which, according to the Organization, purports to treat gender dysphoric or gender diverse minors, to consumers in violation of Sections 5 and 12 of the FTC Act . . . and whether FTC action to obtain monetary relief would be in the public interest.

*See* Ex. 1 at 3.

The CID requests are broad, ill-defined, exceedingly invasive, and reveal the FTC's predetermined viewpoint opposing WPATH's guidance and advocacy.  Much of the information sought is already public, but when asked, Commission staff stated that the FTC does not seek publicly available information.  Ex. 30.  As such, the real object of the CID is confidential, non-public information about WPATH, its members, stakeholders, and others that support its work, such as records of donations, identifying information regarding members, internal communications between WPATH leadership, members' internal discussions, conversations, and detailed records or information on every single statement that WPATH has made, to whom, and when, regarding healthcare for transgender minors.  *See* Ex. 1 at 3–5.

The language of the requests reveals the true purpose of the investigation: to stifle the internal debate and outward-facing advocacy and education that is fundamental to WPATH's core mission.  For example, the CID seeks production of every single representation that WPATH has

made—express or implied—about "Pediatric Gender Dysphoria Treatment"("PGDT"), including language, location, context, purpose, method and timing of the dissemination of the representations, the process used to create the statement, any material that could have been used to support the representation, and the identities of the persons or entities who received, contributed to, developed, evaluated, or substantiated each and every representation. *See, e.g.*, Ex. 1 at 4. (Interrogatory 7: "Any Covered Statements You have made, including but not limited to the exact wording, its location and context, the means of communication, and when dissemination occurred."). It seeks records of every single petition for redress that WPATH has made to a governing body or court. *See, e.g.*, *id.* at 5 (Document Request 8: "All testimony, advocacy, or other information provided to any legislature or regulator related to PGDTs"). And it seeks the names, statements, and descriptions of WPATH's associates. *See, e.g.*, *id.* at 5 (Document Request 4: "Regardless of time period, all Communications with Professional Medical Organizations related to SOC 8"; Document Request 9: "With respect to any workshop, townhall or other formal or informal session, or conference You hosted or organized related in any way to PGDTs: (a) all recordings and transcripts; (b) all Documents distributed to attendees or participants; and (c) Documents required to be signed by any attendee, participant, or speaker.")

The language of the CID, particularly in the context of the FTC's own public framing of the investigation, shows that it was crafted to fit the FTC's pre-determined, false narrative that the provision of evidence-based, scientific healthcare for transgender minors is deceptive and fraudulent. For example, the definition of "Covered Statement," includes "any representation, whether express or implied," that: (1) "PGDTs are safe, including without limitation the representation that a treatment is safe for muscle, bone, or brain development; (2) "PGDTs are proven effective, including without limitation the representation that PGDTs are supported by

*evidence-based science*;" (3) "PGDTs improve mental health;" (4) "PGDTs reduce the incidence of suicide, including without limitation the representation that PGDTs are life-saving;" (5) "PGDTs are fully or partly reversible, including without limitation the representation that a treatment is only a pause or otherwise do not cause permanent physical changes;" and (6) "PGDTs have few side effects." *Id.* at 6 (emphasis added). Setting aside their self-referential and circular structure, these definitions expose the viewpoint bias underpinning the CID and mimic the inflammatory, biased talking points of the Workshop.

The CID not only seeks information from the past, but it also imposes a continuing obligation of disclosure "until the date of full and complete compliance with this CID," *id.* at 3, sending a stark message to all members, donors, affiliates, and participants: any association with WPATH regarding the requested subject matter will be shared with the government. Because WPATH has already experienced the fallout from disclosures of members' internal discourse and debates, members are already less willing to speak and engage in the necessary free exchange of ideas and discourse when those communications and ideas are shared outside of WPATH members and spaces—particularly to a government that has expressed its desire to prosecute them for holding these opinions. Schecter Decl. ¶ 12–13; Leibowitz Decl. ¶ 26.

Despite WPATH's good faith efforts to engage with FTC's staff and raise the FTC's lack of jurisdiction and the constitutional issues inherent in the FTC's activities, communications show that neither the CID nor the investigation were truly negotiable or subject to change. Decl. of Schuyler Standley ¶ 10; Exs. 29–31. After the issuance of the CID, WPATH conferred with FTC staff on January 30 and February 3, to discuss the scope, burden, and unconstitutionality of the CID, as required by 16 C.F.R. § 2.I0(a)(2), and engaged in email correspondence. *See id.* FTC staff did not follow typical practice of providing extensions while good faith negotiations over the

scope of the CID were ongoing, unless WPATH agreed to waive its statutory right to a Petition to Quash. *See id.*

On February 9, 2026, following agency rules, WPATH filed a petition with the FTC to quash the CID. *See* Pet. to Quash Civil Investigative Demand, *In re Civ. Investigative Demand to World Pro. Ass'n for Transgender Health*, FTC File No. P264800 (Feb. 9, 2026). If it was not clear that the investigation was a false pretense for its pre-determined, false narrative, FTC Director of Public Affairs and Senior Policy Advisor Joe Simonson reposted a screenshot of an article about FTC's investigation of WPATH and the American Academy of Pediatrics, and both organizations' Petitions to Quash, writing that "[t]he partisan morons at Bloomberg believe investigating whether children had their breasts and genitalia improperly removed is 'an attack on transgender rights.'" Ex. 27. On February 18, 2026, WPATH filed this lawsuit.

### IV.    The CID and Investigation Have Harmed, and Will Continue to Harm, WPATH

Since the start of President Trump's second term, WPATH and its members have been targeted, harassed, and retaliated against by federal and state government entities for their viewpoints, speech, associations, and advocacy promoting science-based healthcare for transgender individuals. Radix Decl. ¶ 20. The Trump Administration's public stance against transgender healthcare—and WPATH itself—has fanned the flames of misinformation, conspiracy theories, politicized attacks, and harassment. *See* Leibowitz Decl. ¶¶ 18–22.

The FTC's investigation and issuance of the CID have already harmed WPATH and chilled its protected expression. WPATH leadership, including its President, Dr. Asa Radix, its President-elect, Dr. Loren Schechter, and Board of Directors member Dr. Scott Leibowitz, have all submitted declarations describing these effects. *See* Radix Decl. ¶¶ 21–22, 24; Schechter Decl. ¶¶ 17–20; Leibowitz Decl. ¶¶ 19, 38–41. They describe the impact of the FTC's investigation and CID,

stating that the potential for disclosure of their statements, particularly in light of past misrepresentations, has made them consider every word they speak and write, even on internal communications.  *See* Radix Decl. ¶ 21; Schechter Decl. ¶ 17; Leibowitz Decl. ¶¶ 38–41.  They describe how the CID has been an ever-present specter at WPATH leadership meetings, where they have expended countless hours, on a volunteer basis, considering the organization's response to the CID, and consulting with legal counsel regarding the same.  *See* Radix Decl. ¶¶ 21, 23; Schechter Decl. ¶¶ 18–20; Leibowitz Decl. ¶¶ 39–40.  After receiving the CID, WPATH has been stifled under the fear that each statement or action it takes to effectuate its mission, or any connection with members, supporters, organizations, government bodies, or the public at large, will be cited as Exhibit A in future FTC actions against WPATH, its members, or other groups similarly working to provide science-based healthcare to transgender individuals.  *See* Radix Decl. ¶¶ 21–22; Schechter Decl. ¶ 20; Leibowitz Decl. ¶ 41.  Ultimately, as a result of the CID and the FTC's investigation, WPATH has decided to pause certain educational offerings.  *See* Radix Decl. ¶ 24.

As Ms. Goldis indicated during the FTC workshop, the very fact of investigation jeopardizes organizations' and members' willingness to associate with WPATH, not only because their communications and records could be publicized, but because the FTC has made clear that it intends to unearth any organization or individual with connections to WPATH—and target them as well.

## ARGUMENT

A preliminary injunction is proper where a plaintiff (1) "is likely to succeed on the merits"; (2) "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) where "the balance of equities tips in [a plaintiff's] favor"; and (4) where the issuance of a preliminary injunction "is in the public interest."  *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir.

2022).  The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "[A] plaintiff 'need only establish a likelihood of success on the merits of one claim to obtain . . . injunctive relief.'"  *Media Matters II*, 805 F. Supp. 3d. at 119 (quoting *A.B.B. v. Morgan*, 548 F. Supp. 3d 209, 218 (D.D.C. 2020)).

Here, the FTC has far exceeded its jurisdiction by targeting a non-profit organization with no commercial activity, just to launch an investigation and issue a CID that violate the very core of the First Amendment.  Its actions retaliate against WPATH for engaging in constitutionally protected speech and association, seek to silence WPATH's differing viewpoint on transgender healthcare, and burden WPATH's ability to associate with its members and other organizations. The FTC's actions have already caused, and continue to cause, irreparable harm to WPATH by chilling its speech, associations, and expression.  And as the FTC is engaging in an unconstitutional course of conduct, lacking any legitimate justification or benefit to the public, the equities favor intervention to prevent further encroachment on WPATH's First Amendment rights.

## I.    WPATH is Likely to Succeed on the Merits of Its First Amendment Claims

In conducting this investigation and issuing the CID, the FTC has reached beyond its statutory jurisdiction—to investigate commercial practices—to engage in a flagrantly unconstitutional course of action.  The First Amendment guarantees the right to speak, associate, and petition without government retaliation, intimidation, or discrimination.  The FTC here has exercised its enormous power to target WPATH for its constitutionally protected promotion of medically necessary care for transgender minors—a viewpoint that the Trump Administration has publicly opposed.  WPATH is likely to succeed on the merits of its claims.

### A. The Investigation and CID are Retaliation for WPATH's Protected Expression

The First Amendment "prohibits government officials from subjecting individuals to

retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). To prevail on a claim for First Amendment retaliation, WPATH must show that "(1) [it] engaged in conduct protected under the First Amendment; (2) the [FTC] took some retaliatory action sufficient to deter a person of ordinary firmness in [WPATH]'s position from speaking again; and (3) a causal link between the exercise of a constitutional right and th[at] adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)).

WPATH is likely to prevail on each of these elements. *First*, WPATH's activities are protected by the First Amendment, as its statements, educational initiatives, publications, court filings, collaborations, and other programs are protected speech, association, and petitions. *Second*, the FTC's actions are sufficient to chill the speech of an ordinary organization, as the invasive investigation and sweeping CID seek, on threat of enforcement and litigation in federal court, internal and confidential information that is well-known to deter First Amendment activities. And WPATH has already experienced the chilling effect from the issuance of the CID. *Third*, retaliation is the cause of the FTC's investigation and CID, as shown by its willingness to push beyond jurisdictional boundaries to conduct an overbroad investigation, the statements of the FTC itself and its decisionmakers, and the context and timing of its actions. With these showings, WPATH is likely to succeed on its First Amendment retaliation claim.

### 1. WPATH has engaged in activities protected by the First Amendment

WPATH has unquestionably exercised its core First Amendment rights in effectuating its mission. *See* Background Section I. Its right to speak, associate, and petition concerning issues of profound public importance—healthcare for transgender people—receive the highest levels of First Amendment protection. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) ("The

general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."). WPATH is likely to succeed on this first element of its First Amendment retaliation claim.

The First Amendment "protects far more than just political speech and expression; the guarantee also secures the free flow of information for the promotion of 'the advancement of truth, science, morality, and arts in general.'" *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, —F. Supp. 3d—, 2026 WL 80796, at *2 (D.D.C. Jan. 11, 2026) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). It "protects scientific expression and debate just as it protects political and artistic expression." *Bd. of Trs. of Leland Stanford Jr. Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991). WPATH's rights to provide information to the public on transgender healthcare, and its coextensive rights to curate, opine, compile, and debate such information, are foundational First Amendment rights. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) ("[P]resenting a curated and 'edited compilation of [third party] speech' is itself protected speech.") (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 570 (1995)); *accord Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us . . . . That freedom is therefore a special concern of the First Amendment[.]"). For these reasons, when WPATH issues guidelines like SOC8, promotes debate and inquiry amongst its members, disseminates information to the public, and makes statements about issues arising in the space of transgender healthcare, *see* Exs. 2–4, it is engaging in protected First Amendment activity.

WPATH also engages in association protected by the First Amendment. It collaborates with other medical organizations, connects with its members across professional specialties, and

solicits feedback and input from other organizations and government actors.  *See* Background Section I.  These activities are undoubtedly protected by the First Amendment.  *NAACP v. Button*, 371 U.S. 415, 430 (1963) (affirming "the right 'to engage in association for the advancement of beliefs and ideas'" (quoting *NAACP v. Ala. ex. rel. Patterson*, 357 U.S. 449, 460 (1958))).

By filing lawsuits and amicus briefs in cases related transgender people's access to medically necessary healthcare, Lewis Decl. ¶ 18, WPATH is engaging in its protected right to petition.  This third category is similarly protected First Amendment activity.  *See Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011) ("The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs."); *Ukr.-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990) ("[The First Amendment] is violated if the Government affirmatively interferes with constitutionally protected litigation.").

## 2. The FTC's investigation and CID constitute sufficiently adverse action against WPATH

By initiating the investigation and issuing the CID, the FTC has taken "action sufficient to deter a person of ordinary firmness in [WPATH's] position from speaking again."  *Aref*, 833 F.3d at 258 (internal citation omitted).  Agency investigations and compulsory processes are no small matters, and "[s]cholarship cannot flourish in an atmosphere of suspicion and distrust."  *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957).  The scope and manner of a government investigation can chill even the most strident voices, and with a background threat of sanctions or legal process, violate First Amendment rights.  *See Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1064 (D.C. Cir. 1978) ("[A]ll investigative techniques are subject to abuse and can conceivably be used to oppress citizens and groups, rather than to further proper

law enforcement goals. In some cases, bad faith use of these techniques may constitute an abridgment of the First Amendment rights of the citizens at whom they are directed[.]"); *Sweezy*, 354 U.S. at 250 ("Merely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and associations in a measure of governmental interference in these matters."). The Supreme Court has therefore cautioned that "[i]t is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas[.]" *Sweezy*, 354 U.S. at 245. Where investigations or demands are coupled with the "the threat of invoking legal sanctions," they are "sufficient to deter protected speech." *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 28 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025) ("*Media Matters I*") (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

An FTC CID met the requirement of a retaliatory act this year and in this district. In *Media Matters II*, the non-profit research and news organization Media Matters sued the FTC for its issuance of a sweeping, burdensome CID, in part for First Amendment retaliation. 805 F. Supp. at 129. The court held that "a sweeping and burdensome CID calling for sensitive materials" could chill a person of ordinary firmness "from speaking again." *Id.* The Court noted that the CID's request of First Amendment-protected materials, there, a reporter's resources, in a "fishing expedition of a CID," could cause a reporter to be "wary of speaking again[.]" *Id.*

So too here. The FTC's investigation into WPATH and the issuance of this sweeping CID are sufficient to deter a person of ordinary firmness from expressive activity. Based on these requests, and the FTC's statement that it does not seek responsive, publicly available information, WPATH can only conclude that the FTC seeks confidential, internal information, such as member,

affiliate, and donor information, and internal communications, that are considered protected by the First Amendment.  The CID seeks exceedingly broad categories of information that delve into WPATH's speech (*e.g.* "descriptions of any pamphlets, posters, or other materials concerning PGDT that You disseminated to healthcare professionals, patients, and their families, to whom those materials were disseminated, for what purpose they were disseminated, and the dates when You disseminated the materials"; "All Documents You disseminated referencing the Covered Statements"); its associations (*e.g.* "all Communications with Professional Medical Organizations related to SOC 8"; "all Documents reflecting or constituting Communications with other organizations, institutions, or individuals regarding the development and publication of SOC 8"); its members and donors (*e.g.* "Regardless of time period, the process for developing and issuing SOC 8, including every individual or entity that participated in development and issuance, and any funding sources"; "Documents required to be signed by any attendee, participant, or speaker" from "any workshop, townhall, or other formal or informal session, or conference You hosted or organized in any way related to PGDTs" ); and its petitions (*e.g.* "All investigations and lawsuits involving You and either the Covered Statements or PGDTs, including but not limited to any lawsuit in which You are amicus.").  Ex. 1 at 3–6.  These types of requests are substantially similar to those *Media Matters II* found to be a "fishing expedition," *see* 805 F. Supp. 3d at 130 (listing CID requests) and also seek access to information protected by the First Amendment.  *See AFL-CIO v. FEC*, 333 F.3d 168, 177–78 (D.C. Cir. 2003) ("[P]ublic disclosure of the associations' confidential internal materials would 'intrude[] on the privacy of association and belief guaranteed by the First Amendment,' and seriously interfere with internal group operations and effectiveness.") (quoting *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)).

        In other ways, the CID issued to WPATH has additional chilling effects beyond those

discussed in *Media Matters II*.  The FTC's CID here is forward-looking—it seeks information on WPATH's speech, associations, and petitions that have not yet occurred, but will occur "until the date of full and complete compliance with this CID."  Ex. 1 at 3.  As the FTC gets to determine when compliance with the CID is complete, WPATH may be required to hand over records for until an unknown future date.  Until then, an ordinary organization in WPATH's shoes, or a professional member of WPATH, would be considering the fact that anything related to healthcare for transgender minors—and likely healthcare for all transgender people—will be viewed and scrutinized by the FTC and potentially shared with other agencies conducting law enforcement investigations.  No doubt that required disclosure would impact such a person's decision to participate in WPATH activities.

"[W]hile [WPATH's] actual response to a defendant's conduct is not dispositive, it provides some evidence of the tendency of that conduct to chill First Amendment activity." *Media Matters II*, 805 F. Supp. 3d. at 131 (quoting *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (cleaned up)).  The FTC has already chilled WPATH's expressive activities.  WPATH's sworn declarations set out that WPATH's leadership and members are considering the FTC's scrutiny when they speak, issue a statement, or decide on WPATH's courses of action, or even speak to colleagues. *See* Radix Decl. ¶¶ 21–22; Schechter Decl. ¶¶ 18–20; Leibowitz Decl. ¶¶ 39–41.  After the issuance of the CID, WPATH paused certain educational and certification programs out of fear that the continuation of those expressive activities would lead to risks for WPATH and its members through invasive disclosures.  Radix Decl. ¶ 24.  WPATH has previously experienced the chilling effect that disclosures of such information have had on its protected expression, and its members' willingness to engage in the kind of open discussions and debates that are core to WPATH's mission. *See* Radix Decl. ¶ 19; Schechter Decl. ¶ 17; Leibowitz Decl. ¶¶ 38–41.  The

threat of similar disclosures has already imposed a significant chilling effect on its members, and any further action taken by the FTC will likely further this harm. *See* Leibowitz Decl. ¶¶ 18–19, 38–41.

Despite the FTC's protestations in other cases that the CID does not incur similar punishments, "the fact that the CID is enforceable in federal court also bolsters the conclusion that someone of ordinary firmness would be deterred from speaking." *Media Matters II*, 805 F. Supp. 3d at 131. WPATH has no doubt that the FTC will seek to enforce the CID should WPATH decline to comply or bring separate enforcement actions against WPATH resulting from its investigation. The FTC has prejudged the falsity of any support of medically necessary treatments for transgender minors and seeks to go after organizations and medical professionals for violating Sections 5 and 12 of the FTC Act. It has stated its plans to do so to the public. *See* Ex. 23. In the background, the FTC is also clearly gearing up for further actions. It has already hired one of the panelists that was openly hostile to transgender healthcare in its Workshop, Ms. Goldis, to "spearhead investigations into any potential harms from so-called 'gender affirming care.'" Ex. 20. It has also listed three positions for attorneys specifically focusing "on unfair and deceptive practices impacting children and families, including investigations relating to pediatric gender dysphoria treatment." Ex. 28. The likelihood that the FTC will seek federal court action against WPATH arising out of this CID and investigation is accordingly high.

The FTC is seeking an extraordinary breadth of information, underpinned by the threat of judicial enforcement of the CID and legal action, for the express purpose of bringing enforcement actions against organizations—like WPATH—and medical professionals—like WPATH's member—that promote or practice healthcare for transgender minors. Not only is this action sufficient to deter an ordinary actor from engaging in protected speech, WPATH itself has put

forth information that its protected activities are already chilled by the investigation and issuance of the CID.  Accordingly, WPATH will likely succeed on the second prong of First Amendment retaliation.

### 3. There is a causal link between FTC's animus and its investigation and CID

There is little room for doubt "that the adverse action against [WPATH] would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019). Through the FTC's documents, the public statements of Chairman Ferguson, Commissioner Meador, and other FTC staff, and the face of the CID itself, WPATH is likely to show that the investigation and CID were motivated by animus towards WPATH's stance on transgender healthcare and were intended to effectuate the Administration's stated goal of ending access to medically necessary healthcare for transgender minors.

When assessing causation, "direct evidence of retaliatory animus is not required[.]" *Goodwin v. District of Columbia*, 579 F. Supp. 3d 159, 174 (D.D.C. 2022) (cleaned up) (internal citations omitted).  Courts may also consider "circumstantial evidence, including proximity in time between the protected speech and government's adverse actions, the defendant's expression of hostility to the protected speech, and the absence of a proffered legitimate alternative explanation for the action can support a finding that protected speech caused the agency's response." *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 24, 2025).  The FTC's retaliatory motive is shown on multiple grounds.

*First*, the FTC's reach beyond its jurisdiction is a demonstration of retaliatory motive.  The FTC is an organization of limited investigative and enforcement authority.  It may only investigate "persons, partnerships," or "corporations," meaning entities "organized to carry on business for [their] own profit or that of [their] members."  15 U.S.C. §§ 44–46.  WPATH, a non-profit

organization that exists to effectuate a mission of access to well-established healthcare for transgender people, *see* Lewis Decl. ¶ 3, is not "organized to carry on business for [its] own profit or that of [its] members." 15 U.S.C. § 44; *see Cmty. Blood Bank of Kansas City Area, Inc. v. FTC*, 405 F.2d 1011, 1018 (8th Cir. 1969) ("Congress did not intend to bring within the reach of the Commission any and all non-profit corporations regardless of their purposes and activities."). As the underlying investigation targets WPATH, 15 U.S.C. § 57b-1's slightly broader authorization, permitting requests "relevant to unfair or deceptive acts or practices in or affecting commerce," cannot escape the fact that the underlying investigation is outside of the FTC's power and jurisdiction. This is not to mention the fact that the CID seeks information about WPATH's First Amendment-protected, non-commercial speech, which exceeds the bounds of even 15 U.S.C. § 57b-1's authorization.

*Second*, the statements of the FTC and prominent decisionmakers in the agency show that the FTC is conducting this investigation, and issued the CID, in order to punish and silence WPATH for its speech. *See* Background Section II. From the beginning, the FTC's decision to undertake this investigation was predicated on the Trump Administration's antagonism towards transgender healthcare and the support of newly empowered FTC decisionmakers with track records of opposing transgender healthcare. Ex. 18. The Workshop, first titled "The Big Lie," was the brainchild of an FTC decisionmaker who devoted much of his work to opposing transgender healthcare and exposed the FTC's predetermined, erroneous position that promoting well-established healthcare for transgender minors was deceptive and fraudulent. Exs. 14–15, 21. In setting up the Workshop, the FTC engaged in the exact one-sided dissemination of information that it claims to be investigating, for example, intentionally curating the speakers to uplift individuals with professed animus towards WPATH and transgender healthcare, while excluding

neutral experts, proponents of transgender healthcare, and transgender individuals. Ex. 22; Leibowitz Decl. ¶ 36. Although WPATH and its guidelines were frequent topics of discussion, WPATH was not invited to participate or attend the Workshop. Lewis Decl. ¶ 22. The FTC further showed its unwillingness to hear alternative perspectives when, in response to the FTC employees' formal Statement of Concern regarding the Workshop, FTC Director of Public Affairs Joe Simonson stated that "[n]o sane person could endorse the needless mutilation of children" and that "staff who oppose a workshop designed to better understand the concerns of tens of millions of parents, children, and medical professionals are free to resign." Ex. 16. The content of the Workshop further shows the FTC's animus, with the Chairman's first substantive words of his speech repeating the debunked theory that WPATH's SOC8 was improperly influenced by the Biden Administration, and the subsequent statements of panelists and speakers repeatedly vilifying WPATH. *See* Ex. 21.

After the Workshop concluded, both Chairman Ferguson and Commissioner Meador stated that they believed they had at least sufficient information to begin investigating, with Chairman Ferguson cheering the efforts of the DOJ in conducting its own investigations, and the chilling effect that such an investigation would have on transgender healthcare. Ex. 23. Even the FTC's Request for Public Comment, opened after the Workshop concluded, repeated the harmful and erroneous accusation that WPATH had "loosen[ed] its restrictions and standards regarding [gender-affirming care] for minors. Ex. 24.

Key players in the FTC have also spoken publicly about their intent to target organizations that promote transgender healthcare and about their disagreement with WPATH's mission and WPATH's guidelines. *See* Background Section II. This is particularly clear in the case of Chairman Ferguson, who has promised to "[f]ight back against the trans agenda" and

"[i]nvestigate" those who "pushed gender confusion." Ex. 12. When the HHS Report was released—containing substantial misinformation and unfounded accusations levied at WPATH—Chairman Ferguson publicly linked the FTC's investigation of the Report, Ex. 25, and his statement was shared by another FTC attorney directly involved in the investigation of WPATH (who was also a moderator in the Workshop). Ex. 26; Ex. 30.

*Third*, the FTC lacks any plausible justification for the breadth of the CID. The burden of the CID here is entirely unnecessary, as an abundance of information is available on WPATH's website that is responsive to the CID, including information on its organization, membership benefits, statements, and methodology. *See* Radix Decl. ¶ 10. WPATH's tax statements are public as well—not to mention that its communications have been released on public litigation dockets. Lewis Decl. ¶ 16. The FTC has access to all of this information. But instead of making precise requests to target its outstanding questions after assessing these public materials, the FTC issued a sweeping CID that seeks a nearly boundless amount of information from WPATH. Its requests for confidential, internal information evince an intent to scare WPATH, its members, and its associates, to infringe on WPATH's First Amendment rights, *see* Argument Section I.A.2. The scope of the demands therefore provides further evidence of the motivating animus behind the FTC's actions.

*Fourth*, the temporal proximity between WPATH's speech and advocacy, and the FTC's adverse acts, is indicative. This investigation and CID arise during a time where WPATH has been repeatedly demonized by the White House and targeted with a pattern of state and federal litigation, and during the first year of Chairman Ferguson's leadership—the year in which he promised to "figh[t] the trans agenda." Ex. 12. The Trump Administration, including its agencies and departments, has engaged in a broader "campaign" targeting WPATH. *See* Background

Section II. From banning federal agencies from relying upon its guidelines to other investigations targeting WPATH, the FTC's own investigation and issuance of this CID is in lockstep with the Trump Administration's publicly stated goal to punish those that promote or provide medically necessary healthcare to transgender minors. *See id.* Moreover, WPATH has openly spoken out about the Trump Administration's targeting of transgender healthcare, including the HHS Report, *see* Ex. 4, which Chairman Ferguson has stated forms the basis of this investigation. *See* Ex. 25. The fact that the FTC is conducting the investigation now, as part of a coordinated agency effort to target proponents of transgender healthcare, is probative of the causal link between its animus and its adverse actions.

Taken together, this evidence shows that the FTC's animus towards WPATH's exercise of its constitutional rights caused the investigation and CID issued to WPATH. Accordingly, WPATH is likely to prevail on its First Amendment retaliation claim.

### B. The CID and Investigation are Unconstitutional Viewpoint Discrimination

WPATH is likely to succeed on its second First Amendment claim, as the FTC's investigation and CID constitute unconstitutional viewpoint discrimination.

"[V]iewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). The First Amendment "'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.'" *Sullivan*, 376 U.S. at 270 (quoting *United States v. Associated Press*, 52 F.Supp. 362, 372 (D.C.S.D.N.Y.1943) (Learned Hand, J)). For this reason, while "the government can "'say what it wishes' and 'select [] the views that *it* wants to express,'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (internal citation omitted), "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Vullo*, 602 U.S. at 180. The government is presumed to be acting

unconstitutionally when enforcing laws against speech if "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the [enforcement]." *Waln v. Dysart School District*, 54 F.4th 1152, 1162 (9th Cir. 2022) (internal citation omitted); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional."). In such circumstances, courts must "scrutinize" the "application of state power" to determine whether it is being used to silence a particular viewpoint. *Vullo*, 602 U.S. at 188 (quoting *Patterson*, 357 U.S. at 463).

The FTC's investigation, and issuance of the CID are discrimination based on viewpoint. The Trump Administration and the FTC itself have publicly stated their opposition to well-established, science-based healthcare for transgender minors (and transgender adults as well). The FTC had used intentionally inflammatory language and provided a one-sided forum for organizations and individuals who are open advocates against transgender healthcare, demonstrating that they have prejudged the "falsity" of WPATH's speech simply because they disagree with WPATH's perspective. When the FTC's own employees issued their formal concerns regarding the bias of the Workshop, the FTC's spokesman told them to quit. There is no question that the FTC and its leadership disagree with WPATH's viewpoint on transgender healthcare, but to target it in order to suppress and silence its contrary viewpoint is patently unconstitutional.

It is particularly concerning that the FTC, and the White House, base their erroneous conclusions about WPATH in large part because both (incorrectly) believe that WPATH is a partisan organization with guidelines shaped by the Biden Administration. Exs. 6, 9, 21, 24. The FTC, its Chairman, its sole remaining Commissioner, its spokespeople, and its staff have repeated this theory several times over, stemming from certain decontextualized communications between

32

WPATH and Admiral Levine during the SOC8 editing process.  *See* Background Section I.B. They have extrapolated from a single point of feedback from a government official—during a public comment period, no less—that the entire, two hundred and sixty page SOC8 is ideologically captured and not based on scientific evidence. This absurd conclusion stems from its animosity towards WPATH's legitimate associations with experts and the FTC's loud opposition to anything that it perceives as left-wing.  To be clear, while Admiral Levine's feedback was not determinative of any WPATH decision regarding SOC8, WPATH has a First Amendment right to associate with and petition government officials, regardless of party.  The fact that WPATH is not actually a partisan organization does not diminish the viewpoint discrimination, as the FTC's actions "caus[e] precisely th[e] same harm" either way. *Heffernan v. City of Paterson*, 578 U.S. 266, 273–74 (2016).  To target WPATH because of an erroneous perception of partisanship and its association with a member of the Biden Administration is viewpoint discrimination in its purest form.

The fact that the FTC *knows* that the investigation and issuance of a CID can be used to suppress or silence organizations supporting transgender healthcare compounds the unconstitutionality of its actions.  *See* Ex. 21 at 81; Ex. 23.  Both Chairman Ferguson and the FTC's newest attorney, Glenna Goldis, have applauded the use of investigations as a method of intimidating organizations promoting transgender healthcare.  *See* Ex. 23; Ex. 21 at 81.  The FTC has also followed this playbook over the last year when targeting other organizations that the Trump Administration opposes.  *See, e.g.*, *Media Matters II*, 805 F. Supp. 3d at 105; *Newsguard Technologies v. FTC*, No. 26-cv-00353, ECF 1 (D.D.C. Feb. 6, 2026); *see also*, Ex. 11 (discussing the "radical distortion of consumer protection law by the F.T.C").  WPATH is not the only organization promoting medically necessary healthcare for transgender individuals that the FTC

has targeted with its unconstitutional CIDs.  *See Endocrine Society v. FTC*, No. 1:26-cv-00512, ECF 1 (D.D.C. Feb. 17, 2026); *Am. Acad. of Pediatrics v. FTC*, 1:26-cv-00508, ECF 1 (D.D.C. Feb. 17, 2026).

The "freedom of speech prohibits the government from telling people what they must say," because "[a]t the heart of the First Amendment lies the principle that each person should decide for [themselves] the ideas and beliefs deserving of expression, consideration, and adherence." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)).  The FTC and the Trump Administration are welcome to state their own views on transgender healthcare and to support the HHS Report as a contrary authority.  But the FTC cannot punish or suppress WPATH's different viewpoint through use of its investigatory powers and threat of its enforcement powers.  WPATH is therefore likely to succeed on its viewpoint discrimination claims as well.

### C.  The FTC's Investigation and CID Abridge the Freedom of Association

For many of the reasons already outlined above, the FTC's investigation and sweeping, overbroad CID abridge WPATH's freedom of association.  The FTC's Workshop and public statements regarding WPATH, in combination with the invasive requests in the CID regarding member, donor, and affiliate information, send a clear message to the public: interacting with WPATH, supporting WPATH, and relying on, referencing, or disseminating WPATH's guidelines is equivalent to risking liability for fraud and deception or becoming the target for invasive information requests and harassment by the FTC.  It tells WPATH's past and future associates, members, and listeners that the FTC is watching and will come after them too.  But "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action."  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (alterations omitted) (quoting *Patterson*, 357 U.S. at 462).  The

government is not permitted to require disclosures in a manner that abridges the freedom of association without meeting exacting scrutiny. *Id.* at 608.

To meet exacting scrutiny, "there must be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest.'" *Id.* at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* And "[n]arrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'because First Amendment freedoms need breathing space to survive.'" *Id.* at 609 (alterations omitted) (quoting *Button*, 371 U.S. at 433).

As set forth above, the CID compels WPATH to provide information on its members, attendees of its events, meetings, and workshops, as well as its donors, collaborating organizations—both from the past several years and in the near future. *See* Ex. 1, *see also*, Argument Section I.A.2. It compels WPATH to provide information about its own internal communications and the internal, private speech of its members, and the names of anyone and everyone that it has spoken to, at what time, and the content of those communications. *See id.*

WPATH has provided substantial evidence that the FTC's sole interest in this order is retaliation and viewpoint discrimination, *see* Argument Section I.A–B, which are not legitimate government interests. But even if this Court disagrees, the FTC cannot have a legitimate interest in this investigation and compulsory process because WPATH falls outside of its investigative jurisdiction, and the information sought by the CID is not "in commerce" or related to a legitimate investigation. *See* Argument Section I.A.3. Without jurisdiction, the FTC cannot have a legitimate or substantial interest in making these requests to WPATH, let alone provide a narrowly-tailored investigation and compulsory process—which, as discussed in Argument Section I.A.2, it clearly

has not.  *See Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 166 (D.D.C. 2025) (finding that a government action with "*no* legitimate interests in the disclosures compelled" fails exacting scrutiny) (emphasis in original).  As the government has no legitimate interest in this investigation and CID, it fails exacting scrutiny, and WPATH is likely to succeed on its First Amendment associational claim as well.

## II.    WPATH Has Been, and Will Continue to Be, Irreparably Harmed by the FTC's Actions

The FTC's actions in conducting the investigation and issuing the CID have caused WPATH irreparable harm.  Absent this Court's intervention, it will continue to do so.

WPATH's constitutional injuries are sufficient to demonstrate irreparable harm.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks and citations omitted).  As discussed above, WPATH has already experienced, and will continue to experience, violations of its First Amendment rights that are incapable of being redressed even if WPATH ultimately prevails in this action.  Dr. Radix and Dr. Leibowitz have both testified to these harms, including the impact of the CID and investigation on WPATH's decision making, its implementation of a pause of certain educational opportunities, and the fact that the organization's leadership is now considering the FTC's scrutiny each time WPATH decides to speak or act.  *See* Radix Decl. ¶ 21; Leibowitz Decl. ¶¶ 18–19, 38–41.  It also harms WPATH's overarching mission, as Dr. Leibowitz testified, because government scrutiny and pressure on scientists, clinicians, and transgender patients and their families, only hurts the scientific process and provision of individualized healthcare.  Leibowitz Decl. ¶¶ 18, 35 ("The actions of FTC, politicians, and other critics of gender care directly impact the lives of young people in a harmful way").  Where the government's rhetoric and scrutiny leads to mistrust and

skepticism of healthcare providers, public health as a whole is harmed. Leibowitz Decl. ¶ 18 ("Government efforts that have politicized gender affirming care, in particular for minors, have had substantial harmful and dangerous effects on me in my capacity as a physician and child and adolescent development specialist, as well as on my colleagues, my patients, their parents and caregivers, their families, and the field at large.").

WPATH's leadership and operations have additionally been harmed through the investigation and issuance of the CID. *See* Radix Decl. ¶¶ 20–23; Lewis Decl. ¶ 23. Although WPATH has been the target of government and state investigations before, it fears that the FTC's investigation will empower individuals and organizations that oppose WPATH and its mission to target it, and its members, with increased harassment and threats. Radix Decl. ¶ 20; Leibowitz Decl. ¶ 23. Its leadership has been forced to shift the valuable, time that they would normally use towards forwarding the mission of WPATH to determining WPATH's response to the investigation and CID, speaking with legal counsel, and dealing with increased security measures. Radix Decl. ¶ 23; Lewis Decl. ¶ 26; Leibowitz Decl. ¶ 39–40. And WPATH, which already operates on a modest budget as a non-profit organization, has been forced to expend valuable resources hiring additional legal counsel to respond to the FTC's unconstitutional actions. Lewis Decl. ¶ 15.

The associational and reputational harms that the FTC's investigation and CID have caused WPATH cannot be overstated. WPATH is an internationally recognized organization that is dedicated to promoting well-established, science-based guidance for transgender medical care. Lewis Decl. ¶ 3. Its core purpose is to help professionals dedicated to this same mission collaborate, discuss, and debate, which WPATH believes is key for quality research and medical care. Lewis Decl. ¶ 8; Leibowitz Decl. ¶ 26. Between the Workshop, the statements of FTC

officials, and now the investigation and CID, the FTC has derided WPATH as a politically-motivated entity, its offerings as unscientific, and its members as child abusers. *See* Ex. 21; Ex. 24. WPATH's mission is irreparably harmed when the government touts disinformation and legitimizes conspiracy theories through official investigation. Leibowitz Decl. ¶¶ 19–23. The FTC's investigation has sent a clear message to organizations that would otherwise work with WPATH: that their continued association with the organization will lead to investigation and enforcement actions.

Each of these harms are independently devastating and cannot be redressed through the typical course of litigation. WPATH has been irreparably harmed by the FTC's unconstitutional actions, and this harm will continue absent this Court's intervention.

## III.    The Balance of the Equities Favors WPATH

"[T]he balance of equities and public interest factors merge if the government is the opposing party," *Media Matters for Am.*, 138 F.4th at 585, so this Court "must 'weigh[] the benefits to [WPATH] from obtaining an injunction against the harms to the government and the public from being enjoined.'" *Id.* (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022)).

The equities here strongly favor granting an injunction. The FTC's actions (taken without jurisdiction in the area it is pursuing) violate WPATH's First Amendment rights, and "enforcement of an unconstitutional [action] is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)); *Pursuing Am.'s Greatness*, 831 F.3d at 511 ("[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional [action]."). Moreover, the consequences of this investigation and CID on WPATH—and the public—are severe. WPATH has already experienced the chilling effect that comes from a sweeping investigation and CID

seeking its internal, confidential information.  The public too is harmed by the unconstitutional actions of the FTC.  Loss of open scientific and medical discourse, along with government interference with individualized care and doctor-patient decision-making, harms public health and access to quality, competent medical care.  *See AAP v. U.S. Dep't of Health & Hum. Servs.*, 2026 WL 80796, at *2 ("In the realm of public health policy, where evidence-based research can make the difference between lives well-lived and chronic illness or even death, assuring such public access to information and debate is acutely important.").

In comparison, the FTC's interests here are minimal.  The FTC is an agency tasked with investigating and enforcing violations of antitrust law and consumer harms by commercial entities, not non-profits like WPATH and its non-commercial speech.  There is little, if any, legitimate interest for the FTC to extend an investigation beyond its jurisdiction.  Furthermore, absent serious invasions of WPATH's constitutional rights, the remaining information that the FTC seeks is publicly available.  The balance of the equities weighs in favor of WPATH.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court issue a preliminary injunction barring Defendants from implementing or enforcing the Civil Investigative Demand served on WPATH on January 16, 2026, or any similar order, request, or action, and taking further actions interfering with, retaliating against, or abridging WPATH's exercise of its First Amendment rights.


Dated: February 25, 2026                    Respectfully Submitted,

                                            */s/ Abbe David Lowell*
                                            Abbe David Lowell [Bar No. 358651]
                                            Schuyler J. Standley (*pro hac vice* pending)
                                            Isabella M. Oishi [Bar No.  90018056]
                                            LOWELL & ASSOCIATES, PLLC

1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
SStandley@lowellandassociates.com
IOishi@lowellandassociates.com

*Attorneys for WPATH*