UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION, *et al*,<br><br>*Defendants*. | Case No. 26-cv-00532-JEB |

**DECLARATION OF DR. SCOTT LEIBOWITZ IN SUPPORT OF WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH'S MOTION FOR PRELIMINARY INJUNCTION**

I, Scott Leibowitz, declare as follows:

1. I am a member of the Board of Directors of the World Professional Association for Transgender Health ("WPATH"). If called upon to testify as to the facts set forth herein, I could and would testify competently thereto.

2. I am a board-certified child and adolescent psychiatrist and have been practicing in the field of gender care since 2008 when I first began working with transgender young people and their families at Boston Children's Hospital, the country's first multidisciplinary gender clinic with an established treatment protocol in a pediatric center.

3. I subsequently worked at the gender development clinic at Lurie Children's Hospital of Chicago from October 2013 – July 2016, and then as medical director of the gender clinic at Nationwide Children's Hospital in Columbus, Ohio from November 2016 – December 2024 where I was also a clinical associate professor at The Ohio State University College of

Medicine. I made the personal decision to give notice to Nationwide Children's Hospital in September 2024, after the Ohio law that banned certain treatments went into effect in August 2024. My 18 years of academic contributions had put me on a track to be a full Clinical Professor at the time of my departure. Additionally, I chose to leave my position because I saw no path for the research initiatives that my clinic was involved in to proceed in a way that would contribute to the evolving evidence base on outcomes.

4.     Since my departure from my academic and hospital position in December 2024, I have been developing a private consultation practice to serve the needs of parents, caregivers, young adults, families with transgender/gender diverse (TGD) youth, and individuals who have de-transitioned and/or experienced identity shifts. Parents often seek me out due to my balanced approach to these issues and ability to understand multiple perspectives on any one issue. My approach to gender care for young people is deliberative, comprehensive, and inclusive of parent and family perspectives in nearly all circumstances. I believe that some adolescents are mature enough to have a clear sense of who they are and can understand and participate in a risk-versus-benefit analysis (along with their parents) of treatments with both short-and-long-term implications. I believe other adolescents cannot and this may be for a variety of reasons.

5.     I am currently on the Board of Directors for WPATH and have served in the position since 2022; my current term on the Board will end in November of this year.

6.     I also served as co-lead for the Standard of Care 8th edition ("SOC8") Adolescent chapter, which was published in September 2022.

7.     A deliberate approach to care that involves obtaining a comprehensive biopsychosocial diagnostic assessment—the foundational recommendation in the WPATH SOC8 Adolescent chapter—helps to appreciate the psychological profile, family dynamics, social

development factors, and psychiatric diagnoses that may or may not exist in any given treatment frame. This guides treatment priorities and decisions, which may or may not include certain treatments for gender dysphoria depending on the individual circumstances.

8. My role as physician is to help parents and young people understand the quality of the available evidence base, and its gaps and limitations, when approaching complex clinical decisions.

9. Assessments in child and adolescent psychiatry settings (for all youth, including transgender youth) take place over a period of time, and are iterative processes, often intertwined with therapy, which help clarify the various internal and external factors impacting a young person's development. This subsequently guides understanding of the adolescent's decision-making capacity, along with any degree of parental/caregiver support (or lack thereof).

10. I believe that characterizing all adolescents as a one-size-fits-all, immature, and impulsive monolithic group who will universally regret their decisions is not a true reflection of the developmental reality in clinical practice. Similarly, characterizing all transgender adolescents who do not receive their desired treatments as high-risk and/or suicidal is also not a true reflection of the reality in clinical practice.

11. I acknowledge and discuss publicly the gaps in evidence and the demographic trends of adolescents presenting for care over the last two decades, including the fact that many young people with significant mental health issues are first acknowledging a different gender identity in adolescence (as opposed to childhood), and believe that treatment recommendations should only be made in the context of an adolescent's consistent experience over a long period of time (years).

12. I have co-authored over 30 academic papers, which include Institutional Review Board (IRB)-approved research done on my own patients. I helped secure philanthropy funding for long-term research project that would collect long-term outcome data on the TGD youth patient population, recognizing the important contributions to scientific advancement and clinical practice that longitudinal data has on the evolving evidence base. One goal of the research project was to demonstrate that a deliberate and comprehensive process is important for patient outcomes, both for the young people who received treatments and those who did not. This research effort can no longer achieve this goal due to the political bans on care.

13. For carefully identified young people with gender dysphoria, gender care treatments can be beneficial with family support, optimized mental health, and sufficient maturity (all criteria in the WPATH SOC8 Adolescent chapter) to participate in a risk-versus-benefit analysis of treatments that have short-and-long-term implications.

14. The diagnosis of gender dysphoria is necessary but not sufficient alone to recommend treatments with long-term implications.

15. I believe it is important to have discussions about regret and the experiences of detransitioned people with adolescents and their families prior to beginning any treatments that have led to that particular outcome in others. When adolescents cannot or refuse to participate in such discussions, I do not believe they are mature enough to assent to such treatments.

16. Research on demographic trends, treatment efficacy, mental health outcomes, quality of life, and intensity/consistency of gender dysphoria is highly important and, when not forbidden or impossible to conduct, contributes to the ongoing evolving evidence base.

17. My appraisal of the current evidence base for treatments is that it demonstrates that some adolescents benefit from gender affirming medical treatments in the short-to-medium term,

and that for the segment of the population who have experienced harm (in the form of regret), their decisions appear to have been made in haste retrospectively without participating in a process that I believe is important—the same process recommended in the WPATH SOC8.

**Harmful Effects of Politicization by the FTC and Other Agencies/Politicians on Providers**

18. Government efforts that have politicized gender affirming care, in particular for minors, have had substantial harmful and dangerous effects on me in my capacity as a physician and child and adolescent development specialist, as well as on my colleagues, my patients, their parents and caregivers, their families, and the field at large.

19. The FTC's laser-focused campaign to universally discredit all physicians and specialists in this field starts when politicians and others refer to the care as child mutilation or suggest it is similar to performing a lobotomy. To suggest that I, or any of my colleagues who are serving this patient population for years, are mutilating children or recommend treatments synonymous with performing a lobotomy is ludicrous, nonsensical, and harmful to our practices, research, and patients.

20. When politicians and/or other critics of gender care use the term "gender ideology," as I understand it, they are falsely claiming that a person's underlying gender identity cannot be a naturally occurring, valid entity. Rather, it means that there is always an underlying mental health issue at the root of a person's declaration of gender. This is also false, harmful, and not a reflection of the clinical reality.

21. When politicians and/or other critics of gender care state that there is "no evidence of benefit" and "only evidence of harm," they are mischaracterizing the research and using their platforms to sow doubt and mistrust against anyone who provides gender care to young people. They are ignoring the complexity of the issue and that there are some young people who benefit

from care. They are also ignoring the fact that the stated harms are: 1) often value-judgments that differ from person to person; and 2) experienced differently among subpopulations seeking care (e.g. those with complex mental health issues versus those who don't have such a profile).

22. These gross mischaracterizations have led to a blanket mistrust of me and my colleagues' authority as experts in this field by parents of patients seeking our services.

23. When the government makes these types of statements, it emboldens critics of gender care to target and harass clinicians and researchers like me.

24. For example, in May 2025, at a closed academic professional society annual meeting of the American Psychiatric Association, members of an ideological activist group (who managed to register for the conference), livestreamed my presentation to the public and shared handouts of my presentation slides there without my consent, breaking the code of conduct for the meeting. This has had a profound chilling effect on me, as I am now reluctant to express myself and/or disseminate handouts in these forums.

25. When I present in an academic setting, I frame my discussions of complex issues for my colleagues. Sharing my discussions and statements outside of their context has led to misinterpretations, misinformation, and threats directed at me and my colleagues.

26. Closed forums for the exchange of scientific ideas are critically important for scientific advancement. When the integrity of a forum for the exchange of scientific ideas is compromised, or where participants think that their statements will be shared outside of the forum, it creates fear in academics and scientists participating in these conferences and impedes scientific advancement and debate. And when academics and scientists avoid bringing up complex issues out of fear, we have been accused of suppressing discussion by the very individuals whose actions lead to the threats in the first place.

27.     Scientists and physicians are often not able to refute public mischaracterizations of their work because of understandable policies by their employers. I have experienced this myself, in a circumstance where I was unable to refute mischaracterizations and distortions of my beliefs, practices, and patients made in public testimony. Similarly, they are not able to refute public mischaracterizations of patient accusations because they are bound by HIPAA and these circumstances are most accurately represented in a confidential electronic health record.

28.     In the last 4 years, I have been the direct recipient of threats sent to my personal social media page, and in the public domain on social media. When I was employed, additional safety measures needed to be put into place to protect me and my colleagues.

29.     At home, I have had to take extra steps necessary to ensure my security as well. My family members and friends are constantly worried for my safety.

30.     In clinical practice, since 2019, parental and patient fears around the politics is raised in nearly every appointment. This amounts to thousands of additional collective clinical hours spent discussing parental-raised fears and parent-initiated continency plans in response to the unnecessary politicization of issues. This conservative estimate of time reflects my caseload alone.

31.     Many additional hundreds of hours of non-clinical time spent discussing security issues, the wellbeing of colleagues, legal planning, and policy updates took away from my ability to work on research, education, and clinical efforts supporting this patient population.

**Harmful Effects of Politicization by FTC and Other Agencies on Young People and Families**

32.     In my 4 plus years of clinical experience practicing in the politically toxic environment in Ohio, when parents and caregivers experience political threats to their decision-making rights, particularly when they are accused of being "criminals" and "groomers," the

political threats themselves impact their approach to the decision at hand. I have worked with hundreds of parents experiencing these threats.

33. In my experience, some parents retreat from making a decision that might be in the best interest of their child while other parents feel pressured to make decisions prematurely.

34. These political threats must be discussed and accounted for in the clinical treatment frame to protect the integrity of the decision-making process from outside political influences.

35. The actions of FTC, politicians, and other critics of gender care directly impact the lives of young people in a harmful way.

**Harmful Effects of the FTC's Statements, Investigation, and Issuance of the Civil Investigative Demand on My Practice, Safety, and Expression**

36. I became aware of the FTC's investigation into gender care when it hosted a "workshop" in July 2025. The workshop did not provide a balanced discussion of gender care, but the composition of the panels, the panelist and speakers' statements, made it clear to me that the "workshop" was politically motivated, sowed misinformation, and promoted fringe opinions.

37. I learned about the FTC's Civil Investigative Demand ("CID") on January 17, 2026.

38. Since I learned about the CID, I have feared that my statements to my colleagues will be misrepresented and distorted like they have in the past if WPATH is forced to disclose internal discussions and information to the FTC.

39. The CID and the FTC's broader investigation is a frequent topic of conversation among my WPATH colleagues, and before making decisions or statements, we have considered the fact that what we say or do could be disclosed to the FTC because of the CID.

40. In Board of Directors meetings, the FTC's investigation and the CID have been considered in our planning for future events, statements, and activities.

41. I have spent countless hours carefully choosing my words during professional interactions, because I fear that the FTC's plan is to go after WPATH members next.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in on February 24, 2026.

_____
**DR. SCOTT LEIBOWITZ**