UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

THE WORLD PROFESSIONAL
ASSOCIATION FOR TRANSGENDER
HEALTH,

     *Plaintiff*,           No. 1:26-cv-00532-JEB

     v.

FEDERAL TRADE COMMISSION, et al.,

     *Defendants*.

**BRIEF OF ILLINOIS, MASSACHUSETTS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON AS AMICI CURIAE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

ALLYSON SLATER
 *Director, Reproductive Justice Unit*
ADAM M. CAMBIER
 *Assistant Attorney General*
MORGAN CARMEN
 *Assistant Attorney General*
1 Ashburton Pl.
Boston, MA 02108
Tel: (617) 727-2200
allyson.slater@mass.gov
adam.cambier@mass.gov
morgan.carmen@mass.gov

KWAME RAOUL
Attorney General
State of Illinois

ALEEZA STRUBEL
 *Complex Litigation Counsel*
ELIZABETH B. SCOTT
 *Assistant Attorney General*
ELENA S. METH
 *Assistant Attorney General*
115 South LaSalle St.
Chicago, IL 60603
Tel: (773) 914-3046
aleeza.strubel@ilag.gov
elizabeth.scott@ilag.gov
elena.meth@ilag.gov

*Additional counsel listed on signature page*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION AND STATEMENT OF INTERESTS ............................................................. 1

ARGUMENT ........................................................................................................................ 2

    I.       The FTC's Actions Have the Potential to Undermine the Reliability of
            WPATH Guidance on Which Clinicians and Medicaid Administrators in
            Amici States Rely to Ensure the Provision of Safe, Effective, and Quality
            Healthcare Consistent with State Standards. ............................................................. 2

         A.    As regulators of the practice of medicine, Amici States employ legal
                safeguards to ensure high-quality healthcare. ............................................ 3

         B.    Amici States and our clinicians regularly evaluate and rely on medical
                guidance and policy statements issued by professional organizations ...................... 5

         C.    The FTC's CID to WPATH may harm clinicians in Amici States as well as
                state Medicaid administrators by undermining their ability to provide safe,
                high-quality healthcare. ............................................................................. 7

    II.      The FTC's Attacks on WPATH Set a Dangerous Precedent That Endangers
            Future Efforts to Ensure the Health and Well-Being of All Americans. ...................... 10

CONCLUSION .................................................................................................................. 13

i

## TABLE OF AUTHORITIES

**Cases**

*Am. Acad. of Pediatrics v. Kennedy*, No. 1:25-cv-11916 (D. Mass. Jan. 19, 2026)..................... 11

*Barsky v. Board of Regents of Univ. of N.Y.*, 347 U.S. 442 (1954) ...........................................3-4

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806 (1997) ................................ 3

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ................................................................................... 4

*Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) ........................... 3

*Linder v. United States*, 268 U.S. 5 (1925).................................................................................. 3

*Massachusetts v. Trump*, No. 1:25-cv-12162 (D. Mass. Aug. 1, 2025) ........................................ 2

*Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357 (2025)........................................................ 3

*Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) ....................................................... 3

*Oregon v. Kennedy*, No. 6:25-cv-02409 (D. Or. Dec. 23, 2025)................................................... 2

*United States v. Skrmetti*. 605 U.S. 495 (2025) .......................................................................... 4

*Whalen v. Roe*, 429 U.S. 589 (1977)............................................................................................ 3

**Statutes**

225 Ill. Comp. Stat. 60/3................................................................................................................ 4

410 Ill. Comp. Stat. 210/2.............................................................................................................. 5

755 Ill. Comp. Stat. 5/11-1 ........................................................................................................... 5

Conn. Gen. Stat. § 1-1d.................................................................................................................. 5

Wash. Admin. Code Title 246 ....................................................................................................... 4

**Other Authorities**

*About WPATH*, WPATH (last visited Mar. 11, 2026), https://wpath.org/about/mission-and-vision/
.................................................................................................................................... 5, 6

ii

Am. Coll. Cardiology, *American College of Cardiology Comments on New Dietary Guidelines for Americans* (Jan. 7, 2026), https://www.acc.org/about-acc/press-releases/2026/01/07/22/59/american-college-of-cardiology-comments-on-new-dietary-guidelines................................................................................................................................. 12

*As Chair, FTC Commissioner Touts He'd Pull Back on AI and Fight Trans Care*, Punchbowl News (Dec. 6, 2024), https://perma.cc/R2XQ-GXBD ........................................................................... 7

Bobby Mukkamala, *Slashing NIH funding imperils the foundation of medical research*, Am. Med. Ass'n (Aug. 1, 2025), https://www.ama-assn.org/about/leadership/slashing-nih-funding-imperils-foundation-medical-research....................................................................................... 12

*Clinical Practice Guidelines We Can Trust*, Inst. of Med. (2011) ................................................. 8

David Johnson & Humayun J. Chaudhry, *The History of the Federation of State Medical Boards*, 98 J. Med. Reg. 20 (2012) ...................................................................................................... 4

E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1-S258 ........................................................... 5-6

*Establishing the SOC8 Revision Committee and the Chairs and Lead Evidence Team*, WPATH (last visited Mar. 11, 2026), https://wpath.org/publications/soc8/revision-committee/.......... 5-6

Evi Arthur, *AAP has been leading voice on childhood vaccine recommendations since 1930s*, Am. Acad. of Pediatrics (July 30, 2025), https://publications.aap.org/aapnews/news/32762/ ........ 11

*FTC Announces Workshop on Exploring Unfair or Deceptive Trade Practices in "Gender-Affirming Care" for Minors,* Fed. Trade Comm'n (June 9, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/06/ftc-announces-workshop-exploring-unfair-or-deceptive-trade-practices-gender-affirming-care-minors ....................................................................... 7-8

*History and Purpose*, WPATH (last visited Mar. 11, 2026), https://wpath.org/publications/soc8/soc8-history/...................................................................... 5

*How Do the 2025-2030 Dietary Guidelines Measure Up For CV Health?*, Am. Coll. Cardiology (Mar. 1, 2026), https://www.acc.org/latest-in-cardiology/articles/2026/03/01/01/from-the-member-sections-dietary-guidelines ...................................................................................... 12

Jeffrey S. Flier, *Publishing Biomedical Research: a rapidly evolving ecosystem*, 66 Perspectives in Bio. & Med. 358, 363 (2023), https://doi.org/10.1353/pbm.2023.a902032 ......................... 8

Jon Cohen, *The Trump administration says some approved childhood vaccines need better studies. Scientists disagree*, Science (Jan. 8, 2026), https://www.science.org/content/article/trump-administration-says-some-approved-childhood-vaccines-need-better-studies ........................ 10

Megan Messerly, *Trump shares video highlighting discredited theory linking vaccines to autism*, Politico (Sept. 8, 2025), https://www.politico.com/news/2025/09/08/trump-shares-video-highlighting-discredited-theory-linking-vaccines-to-autism-00551311 ................................. 10

*Methodology for the Development of SOC8*, WPATH (last visited Mar. 11, 2026), https://wpath.org/publications/soc8/methodology/#development ............................................... 6

News Release, Am. Heart Ass'n, *New Dietary Guidelines Underscore Importance of Healthy Eating* (Jan. 7, 2026), https://newsroom.heart.org/news/releases-20260107-691586 ............. 12

*OHP Coverage of Gender-Affirming Treatment, effective January 1, 2024*, Oregon Health Authority, Health Systems Division, https://www.oregon.gov/oha/HSD/OHP/Announcements/Gender-Affirming-Care1223.pdf ... 9

Patricia J. Zettler, *Toward Coherent Federal Oversight of Medicine*, 52 S.D. L. Rev. 427 (2015), https://perma.cc/GCB5-URVV .......................................................................................... 4

*President's Proposed 26.2% Cut to Department of Health and Human Services Budget Devastating to Fight Against Cancer*, Am. Cancer Soc'y Cancer Action Network (May 2, 2025), https://www.fightcancer.org/releases/president%E2%80%99s-proposed-262-cut-department-health-and-human-services-budget-devastating-fight ......................................... 12

*Provider Policies & Procedures: Gender Affirmation Surgery*, Husky Health Connecticut, https://www.huskyhealthct.org/providers/provider_postings/policies_procedures/Gender_Affirmation_Surgery.pdf ...................................................................................................................... 9

*Understanding the Impact of Federal Cuts to mRNA Vaccine Research*, Am. Lung Ass'n (Sept. 17, 2025), https://www.lung.org/blog/mrna-vaccines-cuts .................................................. 12-13

Will Weissert, *Dr. Trump? The president reprises his COVID era, this time sharing unproven medical advice on autism*, Associated Press (Sept. 23, 2025), https://apnews.com/article/trump-doctor-vaccines-autism-tylenol-covid-disinfectants-22f5bcfe2fd3c18fdd412419941541f8 ... 11

**Constitutional Provisions**

U.S. Const. amend. X ................................................................................................................. 3

**INTRODUCTION AND STATEMENT OF INTERESTS**

Illinois, Massachusetts, California, Colorado, Connecticut, Delaware, District of Columbia, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington ("Amici States") submit this brief in support of Plaintiff World Professional Association for Transgender Health's ("WPATH") motion for a preliminary injunction. As an exercise of our well-established police powers, Amici States regulate the practice of medicine within our borders, working to ensure that safe and effective medical care is available to our residents and that practitioners are held to the high standards necessary to provide such care. In developing the standards and guidelines that govern the medical profession, state licensing boards and other regulatory bodies regularly look to guidance promulgated by professional organizations like WPATH. The reliability of this guidance—and the confidence Amici States, our clinicians, and Medicaid administrators have that such guidance is developed based on robust evidence and is grounded in the best interests of patients—is thus a critical part of the states' efforts to ensure that quality healthcare is available to their citizens.

The Federal Trade Commission's ("FTC") targeting of reputable organizations that inform the standard of care simply because the Administration's policy choices run counter to the scientific consensus threatens to undermine Amici States' role as the primary regulators of medicine and hampers our clinicians' and state Medicaid administrators' ability to rely on the guidance of organizations like WPATH in providing healthcare. In pursuit of the FTC's improper purpose, its Civil Investigative Demand ("CID") to WPATH seeks vast troves of information regarding its public statements, deliberative processes, personnel, internal and external communications, political advocacy, and more. By bringing the immense pressure of the federal investigative apparatus to bear on WPATH, the FTC attempts to coerce WPATH into taking

1

considerations other than evidence and patient interests into account in developing medical guidance. This, in turn, would make that guidance less reliable when clinicians in Amici States look to it to provide safe, high-quality healthcare consistent with the strict standards to which our states hold practitioners. In that way, the FTC improperly inserts itself into the process of developing standards of care and upsets the balance between state and federal authority in this area of traditional state police powers.

Moreover, while this particular case is about the provision of transgender youth healthcare, if the FTC is successful in pressuring reputable evidence-driven scientific organizations to change medical recommendations the Administration disfavors, that would have significant downstream effects on patient health and forward-looking research in other medical fields for years to come.

## **ARGUMENT**

I.  **The FTC's Actions Have the Potential to Undermine the Reliability of WPATH Guidance on Which Clinicians and Medicaid Administrators in Amici States Rely to Ensure the Provision of Safe, Effective, and Quality Healthcare Consistent with State Standards.**

Amici States have spent the last century developing legal guardrails to ensure medical care is safe, effective, and evidence-based, including by reviewing and relying on guidance developed by professional medical and scientific organizations like WPATH. As part of the Administration's ongoing campaign to curtail transgender youth healthcare—including by usurping states' traditional and longstanding authority to oversee the regulation of the practice of medicine, *see Oregon v. Kennedy*, No. 6:25-cv-02409 (D. Or. Dec. 23, 2025) and *Massachusetts v. Trump*, No. 1:25-cv-12162 (D. Mass. Aug. 1, 2025)—the FTC has targeted WPATH, a leading professional organization in the field of transgender healthcare, along with other organizations that have informed the standard of care for transgender youth. By challenging the evidence-based guidelines

2

of the leading reputable professional organizations in transgender youth healthcare, the FTC seeks to intimidate a reliable resource on which clinicians and Medicaid administrators in Amici States rely to ensure safe and effective healthcare, consistent with state standards. This interferes with Amici States' reliance interests and imposes additional costs and burdens to ensure public health and well-being for our citizens.

### A. As regulators of the practice of medicine, Amici States employ legal safeguards to ensure high-quality healthcare.

It is well settled that states have the general authority to enact laws and policies aimed at protecting the health and welfare of their residents. *See Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."). Specifically reserved to the states are all rights and powers "not delegated to the United States," commonly referred to as "traditional state police powers." U.S. Const. amend. X; *see Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (internal quotation marks omitted). These powers include "primary responsibility over matters of health and safety, including the regulation of the practice of medicine." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 364 (2025) (internal quotation marks omitted); *see also De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) ("[W]e begin by noting that the historic police powers of the State include the regulation of matters of health and safety."); *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977); *Linder v. United States*, 268 U.S. 5, 18 (1925). States therefore have a "legitimate concern for maintaining high standards of professional conduct" in the practice of medicine within their borders. *Barsky v. Board of Regents of Univ. of N.Y.*, 347 U.S. 442, 451

(1954). Indeed, the Supreme Court has explained that "[t]here can be no doubt the government 'has an interest in protecting the integrity and ethics of the medical profession.' . . . Under our precedents it is clear the State has a significant role to play in regulating the medical profession." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (internal citations omitted). States' role and power to regulate medicine within their borders necessarily extends to the states' ability to make policy judgments about the health and well-being of their residents, a principle most recently recognized by the Supreme Court in *United States v. Skrmetti*. 605 U.S. 495, 524 (citing *Gonzales*, 550 U.S. at 163).

As states, we exercise our power to regulate medicine in a variety of ways, starting at the most basic level by defining the scope and contours of medical practice and requiring medical licenses for all practitioners. Fundamental requirements for obtaining a medical license across states include extensive education and residency requirements in addition to passing a licensing exam. *See, e.g.,* 225 Ill. Comp. Stat. 60/3; Wash. Admin. Code Title 246. And because Amici States have a strong interest in ensuring that our residents receive safe and effective healthcare, we have implemented legal guardrails on the provision of healthcare. All states have had boards that oversee the licensing of medical professionals since the nineteenth century. David Johnson & Humayun J. Chaudhry, *The History of the Federation of State Medical Boards*, 98 J. Med. Reg. 20, 23–24 (2012). State boards regulate the medical profession by disciplining licensees who act illegally or unethically and by promulgating regulations that circumscribe how licensed practitioners conduct medical practice. Patricia J. Zettler, *Toward Coherent Federal Oversight of Medicine*, 52 S.D. L. Rev. 427, 450–52 (2015), https://perma.cc/GCB5-URVV. Amici States have also passed laws and enacted regulations that ensure patients are appropriately informed of risks and require their voluntary informed consent for all medical care. This is especially true for youth,

4

whose parents or legal guardians retain the authority to provide informed consent with limited exceptions. *See, e.g.,* Conn. Gen. Stat. § 1-1d (establishing informed consent requirements for youth); 755 Ill. Comp. Stat. 5/11-1; 410 Ill. Comp. Stat. 210/2 ("Any parent . . . may consent to the performance upon his or her child of a health care service by a physician licensed to practice medicine in all its branches, a chiropractic physician, a licensed optometrist, a licensed advanced practice registered nurse, or a licensed physician assistant or a dental procedure by a licensed dentist.").

**B.      Amici States and our clinicians regularly evaluate and rely on medical guidance and policy statements issued by professional organizations.**

To ensure the safe provision of healthcare in our states, Amici States and our clinicians, as well as several state Medicaid administrators, look to the recommendations of medical and scientific experts and organizations like WPATH. Specifically, clinicians in Amici States recognize WPATH for its subject matter expertise on transgender healthcare. *About WPATH*, WPATH (last visited Mar. 11, 2026), https://wpath.org/about/mission-and-vision/. WPATH publishes the Standards of Care and Ethical Guidelines ("SOC"), "which articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of gender dysphoria and help professionals understand the parameters within which they may offer assistance to those with these conditions." *Id*. WPATH has been developing and revising the SOC since the organization was founded in 1979. *History and Purpose*, WPATH (last visited Mar. 11, 2026), https://wpath.org/publications/soc8/soc8-history/. The SOC was most recently revised in 2022 ("SOC8") and is the result of an evidence-based methodological approach. *Id*.; *Establishing the SOC8 Revision Committee and the Chairs and Lead Evidence Team*, WPATH (last visited Mar. 11, 2026), https://wpath.org/publications/soc8/revision-committee/; E. Coleman, et al.,

5

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1-S258 ("E. Coleman, et al., *SOC8*").

Over 170 doctors, scholars, researchers, and experts in transgender healthcare were involved in the development of the SOC8. *Establishing the SOC8 Revision Committee and the Chairs and Lead Evidence Team*, WPATH (last visited Mar. 11, 2026), https://wpath.org/publications/soc8/revision-committee/. The SOC8 underwent seven stages of review, including systematic literature reviews, recommendation reviews and discussions, grading of recommendation approvals, and independent checking of references for the chapters that were ultimately published in the SOC8. *Methodology for the Development of SOC8*, WPATH (last visited Mar. 11, 2026), https://wpath.org/publications/soc8/methodology/#development. WPATH used the "Delphi Method," which requires agreement of 75% of the SOC8 reviewing team members to approve any recommendations. *Id*. Recommendations that did not achieve 75% agreement went back to the research and drafting teams for revisions and were voted on again once modified. *Id*. If a recommendation did not reach 75% agreement after three rounds of voting, the recommendation was removed from consideration. *Id*.

The SOC8 is transparent about the evidence it relies on, and WPATH discloses both the quality of the evidence as well as the strength of the SOC8's recommendations. *Id*.; E. Coleman, et al., *SOC8*. Further, WPATH and the SOC8 only encourage healthcare providers to practice evidence-based medicine, as they are already obligated to do. *See generally*, E. Coleman, et al., *SOC8*; *About WPATH*, WPATH (last visited Mar. 11, 2026), https://wpath.org/about/mission-and-vision/. The SOC8 thus ensures that the delivery of all healthcare is safe, individualized, and centered around the patient. *See*, E. Coleman, et al., *SOC8*.

Given the longstanding reliability of WPATH's guidance, clinicians in Amici States frequently consult its clinical practice guidelines and other statements to ensure the provision of safe and effective transgender youth healthcare. As described above, WPATH employs a rigorous process involving experts in their specialty fields who study and review all medical treatment options and available, peer-reviewed scientific studies to make thoroughly vetted recommendations regarding vital transgender youth healthcare. With WPATH evidence-based guidance and recommendations as a resource, Amici States' healthcare providers can confidently deliver high-quality transgender healthcare to youth pursuant to stringent guidelines and based on the most current scientific evidence available.

**C.     The FTC's CID to WPATH may harm clinicians in Amici States as well as state Medicaid administrators by undermining their ability to provide safe, high-quality healthcare.**

The FTC's improper inquiry into WPATH is based on nothing more than its disapproval of the organization's recommendations. Indeed, FTC Chairman Andrew Ferguson publicly announced his disagreement with the so-called "trans agenda" and promised to use the FTC to "[i]nvestigate the doctors, therapists, hospitals, and others" who "push[] gender confusion." *See As Chair, FTC Commissioner Touts He'd Pull Back on AI and Fight Trans Care*, Punchbowl News (Dec. 6, 2024), https://perma.cc/R2XQ-GXBD. Additionally, on July 9, 2025, the FTC convened the workshop titled "The Dangers of 'Gender-Affirming Care' for Minors." In announcing the workshop, the FTC confirmed that its purpose was to "follow[] President Trump's executive order ending the federal government's previous support for gender-affirming care." *FTC Announces Workshop on Exploring Unfair or Deceptive Trade Practices in "Gender-Affirming Care" for Minors,* Fed. Trade Comm'n (June 9, 2025), https://www.ftc.gov/news-events/news/press-

releases/2025/06/ftc-announces-workshop-exploring-unfair-or-deceptive-trade-practices-gender-affirming-care-minors.

This animus-driven inquiry threatens to deprive the residents of Amici States of the evidence-based, objective, and reliable resources developed by WPATH. Specifically, patients and providers in Amici States consider recommendations from WPATH to engage in evidence-based clinical decision making. Practicing clinicians make complex treatment decisions based on a wide range of factors, including the strength of the available scientific evidence that supports certain treatments as well as recommendations from subject matter experts. Requiring individual clinicians in Amici States to stay abreast of the countless new developments in scientific and medical research would be a fruitless demand: every year, more than 30,000 scientific journals publish about 2 million biomedical research papers. Jeffrey S. Flier, *Publishing Biomedical Research: a rapidly evolving ecosystem*, 66 Perspectives in Bio. & Med. 358, 363 (2023), https://doi.org/10.1353/pbm.2023.a902032. This means that "an internist would have to read 33 articles 365 days a year to stay up to date" in their field. *Clinical Practice Guidelines We Can Trust*, Inst. of Med., 34 (2011) ("IOM Guidelines"). The need to critically analyze each individual article or paper "place[s] clinicians at an increasing risk of drowning in doubtful data." *Id.* (internal quotation marks omitted). Clinical guidelines and recommendations, such as those published by WPATH, thus play a crucial role in ensuring that Amici States and our practicing clinicians can evaluate and synthesize the best available evidence, practical knowledge provided by subject matter experts, and other factors relevant in treating certain medical conditions, thereby ensuring the availability of safe and effective healthcare. Indeed, several state Medicaid administrators reference and rely on WPATH to establish their own coverage guidelines related to transgender healthcare. For example, in Oregon, Medicaid coverage criteria for transgender healthcare

explicitly incorporates the SOC8. *See OHP Coverage of Gender-Affirming Treatment, effective January 1, 2024*, Oregon Health Authority, Health Systems Division, https://www.oregon.gov/oha/HSD/OHP/Announcements/Gender-Affirming-Care1223.pdf. And in Connecticut, Medicaid program guidelines for determining the medical necessity of gender-affirming surgery also explicitly incorporate the SOC8. *See Provider Policies & Procedures: Gender Affirmation Surgery*, Husky Health Connecticut, https://www.huskyhealthct.org/providers/provider_postings/policies_procedures/Gender_Affirmation_Surgery.pdf. Because the WPATH guidelines are thoroughly reviewed and standardized, they reduce unnecessary uncertainty in medical and coverage decision making and, in doing so, improve healthcare quality, safety, and patient outcomes.

The FTC's decision to target WPATH for its research and clinical recommendations regarding transgender youth healthcare risks undermining the accuracy of professional guidance on transgender youth healthcare and the thoroughness of the process that reputable organizations like WPATH use to develop their recommendations and guidelines, which may negatively impact the practice of medicine across the country. Specifically, WPATH's ability to create unbiased, evidence-based recommendations on which the Amici States rely would be severely undermined if federal agencies could target and threaten it with investigation for making those recommendations. Less frequently updated standards of care—or no new standards at all—would mean less overall guidance for clinicians, potentially leading to decreased public understanding or lower awareness of evidence supporting emerging treatments, poorly informed clinical judgment, worse individual patient outcomes, and a decline of overall public health. Further, clinicians in Amici States as well as state Medicaid administrators would be less able to trust that any recommendations made by WPATH and other professional organizations are reliable when those

9

recommendations are made in the shadow of improper investigations fueled by political pressure and improper influence, as would happen here if the FTC's actions proceed unchecked. Clinicians in Amici States will be forced to spend time to assure residents and providers that certain healthcare supported by WPATH remains clinically recommended as well as safe and effective, and Amici States will be hard-pressed to fill the void left by these professional organizations that will be impeded in their efforts to provide reliable guidance.

## II.    The FTC's Attacks on WPATH Set a Dangerous Precedent That Endangers Future Efforts to Ensure the Health and Well-Being of All Americans.

While the FTC's inappropriate efforts to intimidate WPATH arise from its disapproval of transgender youth healthcare, the unprecedented investigative powers it invokes here are not so cabined and—if sanctioned by this Court—could lead to a misuse of authority and threaten the evidence-based development of healthcare guidelines and policies in a broad array of fields. To give several examples for context, the Administration has repeatedly made statements boosting the discredited theory linking vaccines and autism, *see, e.g.*, Megan Messerly, *Trump shares video highlighting discredited theory linking vaccines to autism*, Politico (Sept. 8, 2025), https://www.politico.com/news/2025/09/08/trump-shares-video-highlighting-discredited-theory-linking-vaccines-to-autism-00551311, and earlier this year the United States Department of Health and Human Services ("HHS") reduced the recommended schedule of childhood vaccines from 17 to 11 vaccinations despite widespread scientific consensus that the vaccines in question were effective and had been held to rigorous standards, *see, e.g.*, Jon Cohen, *The Trump administration says some approved childhood vaccines need better studies. Scientists disagree*, Science (Jan. 8, 2026), https://www.science.org/content/article/trump-administration-says-some-approved-childhood-vaccines-need-better-studies. The American Academy of Pediatrics ("AAP")—an

10

organization that, like WPATH, has been targeted by the FTC with a CID concerning its statements on transgender youth healthcare—has promulgated evidence-based guidance and recommendations for childhood vaccines for nearly a century, Evi Arthur, *AAP has been leading voice on childhood vaccine recommendations since 1930s*, Am. Acad. of Pediatrics (July 30, 2025), https://publications.aap.org/aapnews/news/32762/, and AAP is in active litigation against HHS challenging the changes to the vaccine schedule and related agency actions as baseless, *see Am. Acad. of Pediatrics v. Kennedy*, No. 1:25-cv-11916-BEM, Dkt. 180-1 (D. Mass. Jan. 19, 2026) (proposed fourth amended complaint). If the Court were to approve the FTC's far-reaching inquiry into WPATH's decision making on transgender youth healthcare—and, as the FTC hopes to accomplish, to use the burden of being under investigation and the threat of enforcement in order to *shape* that decision making—there would be little to stop the FTC from misusing its authority to influence medical and scientific organizations' guidance and recommendations regarding childhood vaccines as well.

Other examples abound of the Administration advancing healthcare policies and positions that sit at odds with leading medical and scientific organizations. President Trump has urged pregnant women not to use Tylenol because of unproven links to autism, conflicting with longstanding recommendations from the American College of Obstetricians and Gynecologists stating that the medication is safe during pregnancy. Will Weissert, *Dr. Trump? The president reprises his COVID era, this time sharing unproven medical advice on autism*, Associated Press (Sept. 23, 2025), https://apnews.com/article/trump-doctor-vaccines-autism-tylenol-covid-disinfectants-22f5bcfe2fd3c18fdd412419941541f8. In its updates to dietary guidelines earlier this year, the Administration recommended consumption of high-fat animal products and whole-fat dairy products, such as red meat and whole milk. The Administration did so despite science-based

11

recommendations from the American Heart Association and the American College of Cardiology that encourage limited consumption of these products, which are linked to increased cardiovascular risk. Press Release, Am. Coll. Cardiology, *American College of Cardiology Comments on New Dietary Guidelines for Americans* (Jan. 7, 2026), https://www.acc.org/about-acc/press-releases/2026/01/07/22/59/american-college-of-cardiology-comments-on-new-dietary-guidelines; News Release, Am. Heart Ass'n, *New Dietary Guidelines Underscore Importance of Healthy Eating* (Jan. 7, 2026), https://newsroom.heart.org/news/releases-20260107-691586; *see also How Do the 2025-2030 Dietary Guidelines Measure Up For CV Health?*, Am. Coll. Cardiology (Mar. 1, 2026), https://www.acc.org/latest-in-cardiology/articles/2026/03/01/01/from-the-member-sections-dietary-guidelines. And the president of the American Medical Association issued a statement decrying the Administration's slashing of the research budget of the National Institutes for Health by 40% as "endangering the health of millions whose illnesses could have been treated had we stayed on course." Bobby Mukkamala, *Slashing NIH funding imperils the foundation of medical research*, Am. Med. Ass'n (Aug. 1, 2025), https://www.ama-assn.org/about/leadership/slashing-nih-funding-imperils-foundation-medical-research. The head of the American Cancer Society Cancer Action Network made a similar statement regarding budget cuts for HHS and the Centers for Disease Control and Prevention. *President's Proposed 26.2% Cut to Department of Health and Human Services Budget Devastating to Fight Against Cancer*, Am. Cancer Soc'y Cancer Action Network (May 2, 2025), https://www.fightcancer.org/releases/president%E2%80%99s-proposed-262-cut-department-health-and-human-services-budget-devastating-fight. So too with the American Lung Association, which warned of "devastating consequences" from the Administration's decision to cancel funding for mRNA vaccine research and development. *Understanding the Impact of Federal Cuts to mRNA*

12

*Vaccine Research*, Am. Lung Ass'n (Sept. 17, 2025), https://www.lung.org/blog/mrna-vaccines-cuts.

Amici States rely on professional organizations like these to inform statewide standards to ensure that our residents can receive safe, high-quality, effective healthcare. But if the FTC is allowed to use the threat of enforcement action as a cudgel against reputable medical and scientific organizations when it disagrees with an organization's recommendations, everyone would suffer: The organizations would find themselves forced to consider the political ramifications of their guidance, impeding their ability to make recommendations based solely on their expert review and understanding of the evidence. States that count on the reliability of that guidance to set medical standards would find their power to regulate medicine in the best interests of their residents interfered with by federal priorities. And individuals who seek out medically appropriate, critical care may find themselves unable to access it not because it is unsafe or ineffective, but solely because the federal government disfavors it. What's more, these possible consequences could snowball over time; federal efforts to influence or control the guidelines developed by professional organizations today threaten to restrict the research and scientific developments those organizations shepherd, in turn hampering Amici States' ability to deliver life-saving treatments to our populations tomorrow.

## CONCLUSION

Plaintiff's motion for a preliminary injunction should be granted.

13

Dated: March 17, 2026

Respectfully submitted,

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts
*/s/ Adam M. Cambier*
ALLYSON SLATER
 *Director, Reproductive Justice Unit*
ADAM M. CAMBIER
 *Assistant Attorney General*
MORGAN CARMEN
 *Assistant Attorney General*
1 Ashburton Pl.
Boston, MA 02108
Tel: (617) 727-2200
allyson.slater@mass.gov
adam.cambier@mass.gov
morgan.carmen@mass.gov

**KWAME RAOUL**
Attorney General
State of Illinois
*/s/ Aleeza Strubel*
ALEEZA STRUBEL
 *Complex Litigation Counsel*
ELIZABETH B. SCOTT
 *Assistant Attorney General*
ELENA S. METH
 *Assistant Attorney General*
115 South LaSalle St.
Chicago, IL 60603
Tel: (773) 914-3046
aleeza.strubel@ilag.gov
elizabeth.scott@ilag.gov
elena.meth@ilag.gov

**ROB BONTA**
Attorney General
State of California
1300 I Street
Sacramento, CA 95814

**PHILIP J. WEISER**
Attorney General, State of Colorado
Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

**WILLIAM TONG**
Attorney General
State of Connecticut
165 Capitol Avenue
Hartford, CT 06106

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

**BRIAN L. SCHWALB**
Attorney General of the District of Columbia
400 6th St. NW
Washington, D.C. 20001

**AARON M. FREY**
Attorney General of Maine
6 State House Station
Augusta, ME 04333-0006

14

**ANTHONY G. BROWN**
Attorney General of Maryland
200 Saint Paul Place
Baltimore, Maryland 21202

**DANA NESSEL**
Michigan Attorney General
P.O. Box 30212
Lansing, MI 48909

**KEITH ELLISON**
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

**AARON D. FORD**
Attorney General
of Nevada
100 North Carson Street
Carson City, NV 89701

**JENNIFER DAVENPORT**
Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

**LETITIA JAMES**
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

**DAN RAYFIELD**
Attorney General of Oregon
1162 Court Street NE
Salem, OR 97301

**PETER F. NERONHA**
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

**CHARITY R. CLARK**
Vermont Attorney General
109 State Street
Montpelier, VT 05609

**JAY JONES**
Attorney General
Commonwealth of Virginia
202 N. 9th Street
Richmond, VA 23219

**NICHOLAS W. BROWN**
Attorney General
State of Washington
P.O. Box 40100
Olympia, WA 98504

15

## <u>CERTIFICATE OF SERVICE</u>

I, Morgan Carmen, hereby certify that I have this day, March 17, 2026, served the foregoing document upon all parties of record, by electronically filing to all ECF-registered parties.


*/s/ Morgan Carmen*