IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE WORLD PROFESSIONAL
ASSOCIATION FOR TRANSGENDER
HEALTH,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION et al.,

*Defendants*.

Civil Action No. 1:26-CV-00532 (JEB)

**DEFENDANTS' OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

    A.    Statutory And Regulatory Framework..................................................................... 3

    B.    Recent Developments In Pediatric Gender Dysphoria Treatment......................... 5

    C.    The Commission's Investigation Of PGDT ........................................................... 9

LEGAL STANDARD.......................................................................................................16

ARGUMENT ....................................................................................................................16

I.       WPATH IS NOT LIKELY TO PREVAIL ON THE MERITS........................................16

    A.    This Court Lacks Authority To Hear WPATH's Pre-Enforcement Challenge .... 17

        1.    Congress Channeled WPATH'S Claims Into The FTC Act's
              Exclusive Judicial-Review Scheme .............................................................18

        2.    WPATH Has No Cause of Action ...........................................................22

    B.    WPATH's First Amendment Retaliation Claim Is Meritless .............................. 23

        1.    WPATH Cannot Show Its Speech Caused the CID..................................24

        2.    The CID Has Not Chilled WPATH's Speech...........................................37

        3.    A Retaliatory-Investigation Claim Is Not Cognizable..............................39

    C.    WPATH Is Not Likely To Prevail On Its Other Constitutional Claims ............... 40

        1.    The CID Is Not Viewpoint-Discriminatory ..............................................40

        2.    The CID Does Not Burden WPATH'S Associational Rights ...................42

II.     THE EQUITIES DISFAVOR INJUNCTIVE RELIEF.......................................................43

III.   AT A MINIMUM, THE COURT SHOULD REQUIRE A BOND AND STAY
       ANY INJUNCTION .......................................................................................................44

CONCLUSION.................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
840 F. Supp. 2d 327 (D.D.C. 2012) ........................................................................ 44

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ................................................................................................ 23

*Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*,
367 F.3d 932 (D.C. Cir. 2004) ............................................................................... 20

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ............................................................................... 20

*Am. Meat Inst. v. USDA*,
968 F. Supp. 2d 38 (D.D.C. 2013) ......................................................................... 44

*Am. Med. Ass'n v. FTC*,
638 F.2d 443 (2d Cir. 1980) ................................................................................... 28

*Am. Motors Corp. v. FTC*,
601 F.2d 1329 (6th Cir. 1979) ............................................................................... 17

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ................................................................................................ 42

*Anheuser-Busch, Inc. v. FTC*,
359 F.2d 487 (8th Cir. 1966) ................................................................................. 17

*Archer v. Chisholm*,
870 F.3d 603 (7th Cir. 2017) ................................................................................. 39

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ......................................................................... 24, 37

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ................................................................................................ 23

*Ass'n of Nat'l Advertisers, Inc. v. FTC*,
627 F.2d 1151 (D.C. Cir. 1979) ....................................................................... 30, 32

*Atl. Richfield Co. v. FTC*,
546 F.2d 646 (5th Cir. 1977) ................................................................................. 17

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023) .................................................................................. 19, 20, 21

*Belle Fourche Pipeline Co. v. United States*,
   751 F.2d 332 (10th Cir. 1984) .................................................................................. 17

*Blue Ribbon Quality Meats, Inc. v. FTC*,
   560 F.2d 874 (8th Cir. 1977) .................................................................... 5, 17, 28

*Breaux v. City of Garland*,
   205 F.3d 150 (5th Cir. 2000) .................................................................................. 39

*California Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) .................................................................................. 28, 35

*Camreta v. Greene*,
   563 U.S. 692 (2011) .................................................................................. 22

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) .................................................................................. 43

*Citizens for Resp. & Ethics in Wash. v. FEC*,
   971 F.3d 340 (D.C. Cir. 2020) .................................................................................. 22

*City of Rancho Palos Verdes v. Abrams*,
   544 U.S. 113 (2005) .................................................................................. 23

*Constantine v. Rectors & Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) .................................................................................. 36

*Corr. Servs. Corp. v. Malesko*,
   534 U.S. 61 (2001) .................................................................................. 22

*DeVillier v. Texas*,
   601 U.S. 285 (2024) .................................................................................. 22

*DoorDash, Inc. v. City of New York*,
   754 F. Supp. 3d 556 (S.D.N.Y. 2024) .................................................................................. 43

*Feature Films for Families, Inc.*,
   150 F.T.C. 866 (Sep. 23, 2010) .................................................................................. 28

*FEC v. Lance*,
   635 F.2d 1132 (5th Cir. 1981) .................................................................................. 4

iii

*Fed. Law Enf't Officers Ass'n v. Ahuja*,
  62 F.4th 551 (D.C. Cir. 2023) ................................................................ 19

*Fed. Mar. Comm'n v. Port of Seattle*,
  521 F.2d 431 (9th Cir. 1975) ................................................................. 27

*First Resort, Inc. v. Herrera*,
  860 F.3d 1263 (9th Cir. 2017) ............................................................... 29

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
  778 F.3d 142 (D.C. Cir. 2015) ................................................................. 4

*FTC v. Cement Inst.*,
  333 U.S. 683 (1948) ............................................................................. 32

*FTC v. Church & Dwight Co.*,
  665 F.3d 1312 (D.C. Cir. 2011) ............................................................... 4

*FTC v. Cinderella Career & Finishing Sch., Inc.*,
  404 F.2d 1308 (D.C. Cir. 1968) ........................................................ 32, 37

*FTC v. Claire Furnace Co.*,
  274 U.S. 160 (1927) ........................................ 2, 4, 17, 18, 21, 22, 23, 44

*FTC v. Ernstthal*,
  607 F.2d 488 (D.C. Cir. 1979) ............................................................... 27

*FTC v. Facebook, Inc.*,
  581 F. Supp. 3d 34 (D.D.C. 2022) .................................................. 32, 33, 37

*FTC v. Invention Submission Corp.*,
  965 F.2d 1086 (D.C. Cir. 1992) ............................................................. 3, 4

*FTC v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001) .......................................................... 4, 5, 27

*FTC v. Match Grp., Inc.*,
  2023 WL 3181351 (D.D.C. May 1, 2023) ................................................... 4

*FTC v. Monahan*,
  832 F.2d 688 (1st Cir. 1987) ................................................................. 27

*FTC v. Nat'l Comm'n on Egg Nutrition*,
  517 F.2d 485 (7th Cir. 1975) ................................................................. 28

*FTC v. Nat'l Urological Grp., Inc.*,
    645 F. Supp. 2d 1167 (N.D. Ga. 2008) ...................................................................... 9

*FTC v. Owens-Corning Fiberglas Corp.*,
    626 F.2d 966 (D.C. Cir. 1980) ................................................................................. 4

*FTC v. Standard Oil of Cal.*,
    449 U.S. 232 (1980) ................................................................................................ 44

*FTC v. Texaco, Inc.*,
    555 F.2d 862 (D.C. Cir. 1977) ................................................................................. 5

*Gen. Fin. Corp. v. FTC*,
    700 F.2d 366 (7th Cir. 1983) ................................................................... 2, 4, 17, 18

*Gonzalez v. Trevino*,
    602 U.S. 653 (2024) ................................................................................................ 24

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
    879 F.3d 101 (4th Cir. 2018) ................................................................................... 29

*Green v. U.S. Dep't of Just.*,
    54 F.4th 738 (D.C. Cir. 2022) .................................................................................. 16

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) ................................................................................................ 22

*Hamilton v. Geithner*,
    666 F.3d 1344 (D.C. Cir. 2012) ............................................................................... 36

*Harris v. Wackenhut Servs., Inc.*,
    648 F. Supp. 2d 53 (D.D.C. 2009) ........................................................................... 33

*Hartman v. Moore*,
    547 U.S. 250 (2006) ..................................................................................... 24, 37, 39

*In re Architect of Capitol Emp. Disp.*,
    2024 WL 3359515 (D.D.C. July 10, 2024) ............................................................. 33

*In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.*,
    2023 WL 8112947 (Nov. 17, 2023) ......................................................................... 29

*In re Grand Jury Procs.*,
    220 F.3d 568 (7th Cir. 2000) ................................................................................... 42

*In re Mar. 19, 2014 Civ. Investigative Demand Issued to Police Protective Fund, Inc.*,
  157 F.T.C. 1913 (May 22, 2014) ................................................................................... 27

*In re NBTY, Inc.*,
  151 F.T.C. 201 (2011) ................................................................................................... 9

*In re POM Wonderful LLC*,
  155 F.T.C. 1 (2013) ...................................................................................................... 9

*J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*,
  39 F.4th 489 (8th Cir. 2022) ....................................................................................... 39

*John Doe Co. v. CFPB*,
  849 F.3d 1129 (D.C. Cir. 2017) ................................................................................. 19

*L.W. ex rel. Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) ................................................................................... 6, 40

*LabMD, Inc. v. FTC*,
  776 F.3d 1275 (11th Cir. 2015) .................................................................................. 20

*Lakkis v. Lahovski*,
  994 F. Supp. 2d 624 (M.D. Pa. 2014) ........................................................................ 36

*Maryland v. King*,
  567 U.S. 1301 (2012) .................................................................................................. 43

*Matal v. Tam*,
  582 U.S. 218 (2017) .................................................................................................... 40

*Media Matters for Am. v. Bailey*,
  2024 WL 3924573 (D.D.C. Aug. 23, 2024) ............................................................... 24

*Media Matters for Am. v. FTC*,
  805 F. Supp. 3d 105 (D.D.C. 2025) ............................................................... 22, 38, 39

*Media Matters for Am. v. FTC*,
  2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ....................................................... 32, 38

*Media Matters for Am. v. Paxton*,
  138 F.4th 563 (D.C. Cir. 2025) ............................................................................ 21, 40

*Moore v. Garnand*,
  83 F.4th 743 (9th Cir. 2023) ....................................................................................... 39

*Nat'l Ass'n of Immigr. Judges v. Owen*,
139 F.4th 293 (4th Cir. 2025) ................................................................................ 20

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ...................................................................................... 40, 41

*Nieves v. Bartlett*,
587 U.S. 391 (2019) ............................................................................................ 24

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................................ 45

*Nuclear Info. & Res. Serv. v. NRC*,
509 F.3d 562 (D.C. Cir. 2007) ...................................................................... 31, 32

*Patten v. District of Columbia*,
9 F.4th 921 (D.C. Cir. 2021) .............................................................................. 19

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ............................................................................................ 40

*Rehberg v. Paulk*,
611 F.3d 828 (11th Cir. 2010) ............................................................................ 39

*Reisman v. Caplin*,
375 U.S. 440 (1964) ...................................................................................... 17, 23

*Reps. Comm. for Freedom of the Press v. AT&T Co.*,
593 F.2d 1030 (D.C. Cir. 1978) .................................................................... 39, 40

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ............................................................................................ 42

*Rosenberger v. Rectors & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) ............................................................................................ 40

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .............................................................................................. 4

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ............................................................................... 16

*Sivella v. Twp. of Lyndhurst*,
2021 WL 3356934 (3d Cir. Aug. 3, 2021) .......................................................... 39

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) ................................................................................................ 16

*Thompson v. Hall,*
    426 F. App'x 855 (11th Cir. 2011) ......................................................................... 39

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ................................................................. 18, 19, 20, 21, 22

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ............................................................................................ 43, 45

*United States v. Fokker Servs. B.V.,*
    818 F.3d 733 (D.C. Cir. 2016) .............................................................................. 24

*United States v. Morton Salt Co.,*
    338 U.S. 632 (1950) ............................................................................................ 3, 5, 26

*United States v. Skrmetti,*
    605 U.S. 495 (2025) ....................................................................... 6, 8, 15, 31

*United States v. Sturm, Ruger & Co.,*
    84 F.3d 1 (1st Cir. 1996) ........................................................................................ 27

*United Steelworkers of Am. v. Marshall,*
    647 F.2d 1189 (D.C. Cir. 1980) ....................................................................... 32, 41

*Waggel v. George Wash. Univ.,*
    957 F.3d 1364 (D.C. Cir. 2020) ............................................................................. 33

*Wearly v. FTC,*
    616 F.2d 662 (3d Cir. 1980) ........................................................................ 5, 17, 23

*Weinberger v. Hynson, Westcott & Dunning, Inc.,*
    412 U.S. 609 (1973) ............................................................................................... 27

*White v. Lee,*
    227 F.3d 1214 (9th Cir. 2000) ............................................................................... 40

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) .............................................................................. 44

*Youssef v. Lynch,*
    144 F. Supp. 3d 70 (D.D.C. 2015) ........................................................................ 33

*Ziglar v. Abbasi*,
 582 U.S. 120 (2017) ....................................................................................................... 22

## Statutes

15 U.S.C. § 44 ........................................................................................................... 28, 35

15 U.S.C. § 45 ............................................................................................................ 3, 19, 30

15 U.S.C. § 46 ................................................................................................................... 3

15 U.S.C. § 57b-1 ............................................................ 1, 3, 4, 5, 15, 18, 20, 25, 28

## Rules

D.C. Cir. R. 36 ............................................................................................................. 22

## Regulations

16 C.F.R. § 2.1 .................................................................................................................. 3

16 C.F.R. § 2.4 ............................................................................................................. 3, 18

16 C.F.R. § 2.7 ........................................................................................................... 3, 4, 18

16 C.F.R. § 2.10 ............................................................................................................ 16

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ...................................... 36

Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025) ...................................... 36

## Other Authorities

ABC News, *Transgender Kids Pioneer Early Changes to Identity, Body* (Aug. 29, 2011),
 https://perma.cc/NX8N-3R8P. ............................................................................... 8

Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*,
 N.Y. Times (Feb. 4, 2026),
 https://perma.cc/B2EW-G54H. ............................................................................... 7

Azeen Ghorayshi, *U.S. Study on Puberty Blockers Goes Unpublished Because of Politics, Doctor Says*, N.Y. Times (Oct. 23, 2024),
 https://perma.cc/V4KH-4HTT. ............................................................................... 8

Chloe Cole, *I'm a Detransitioner*, N.Y. Post (Mar. 11, 2025),
 https://perma.cc/3HV7-GN68. ............................................................................... 9

FTC, *Health Products Compliance Guidance* (Dec. 2022),
    https://perma.cc/58E9-9WPU .............................................................................. 10

FTC, Press Release, *FTC Releases Agenda for Workshop on Unfair or Deceptive Trade
    Practices in "Gender-Affirming Care" for Minors* (June 25, 2025),
    https://perma.cc/BB4C-J6TE ................................................................................ 10

H. Cass, *Independent Review of Gender Identity Services for Children and Young People*,
    (Apr. 2024),
    https://perma.cc/RDN3-WBYR. ............................................................................. 6

Jennifer Block, *How Did Planned Parenthood Become One of the Country's Largest Suppliers of
    Testosterone?*, The Free Press (Aug. 7, 2024),
    https://perma.cc/TB9T-27YA ................................................................................. 9

Kareen M. Matouk & Melina Wald, *Gender-affirming Care Saves Lives*,
    Colum. Univ. Dep't of Psychiatry (Mar. 30, 2022),
    https://perma.cc/6K7N-8PY6 ................................................................................. 6

Kate Stringer, *The Benefits of Gender-affirming Care*, Wash. Sch. of Pub. Health
     (Mar. 31, 2023), https://perma.cc/FRP8-UMT7 .................................................... 6

*Leaked Discussions Reveal Uncertainty About Transgender Care*, The Economist
    (Mar. 5, 2024), https://perma.cc/78ZN-7TGV ....................................................... 9

*New Estimates Show 300,000 Youth Ages 13-17 Identify as Transgender in the US*,
    UCLA Sch. of L. Williams Inst. (June 10, 2022), https://perma.cc/KBZ9-7G86 ..... 6

*NHS Stops Prescribing Cross-sex Hormones to Children*, Daily Mail (Mar. 8, 2026),
    https://perma.cc/Y4JS-AW6P ................................................................................ 7

*Position Statement on Gender Surgery for Children and Adolescents*, Am. Soc'y of Plastic
    Surgeons (Feb. 3, 2026),
    https://perma.cc/849S-ZJQ2.................................................................................. 7

Robin Respaut & Chad Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*,
    Reuters (Oct. 6, 2022),
    https://perma.cc/QFS9-SYN. ................................................................................. 5

*SOC-8 History and Purpose*, WPATH,
    https://perma.cc/ANU2-A8S9................................................................................ 14

*The Future of the COPPA Rule: An FTC Workshop – Session 1* (Oct. 7, 2019),
    https://perma.cc/ZS2Z-4SBN................................................................................ 10

x

U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria*
(Nov. 19, 2025), https://perma.cc/59ZF-L3B5 (HHS Report)...................................... 6, 7, 9, 25

*Who Paid for Gender—Affirming Care?*, Forbes (Nov. 1, 2024),
https://perma.cc/SQJ5-SCWJ...................................................................................... 14

*WPATH and USPATH Respond to American Society of Plastic Surgeons (ASPS) Position
Statement*, WPATH (Feb. 4, 2026),
https://perma.cc/5BGZ-68UU ...................................................................................... 14

**INTRODUCTION**

This is the second case before the Court in which a plaintiff challenges an administrative subpoena relating to Pediatric Gender Dysphoria Treatment (PGDT).  It fares no better than the first.

Congress equipped the Federal Trade Commission with various investigative tools to protect the public from unfair and deceptive trade practices, including from false or unsubstantiated medical claims.  One of these tools is the Civil Investigative Demand (CID), an administrative subpoena that allows the agency to gather information from *any* person or entity that *may* have information about violations of the laws and regulations the agency administers.  15 U.S.C. § 57b-1.  Importantly, a CID is not self-executing, meaning that it imposes no legal consequences on its recipient unless enforced by a federal court in a separate lawsuit brought by the agency.

Far from sounding "alarm bells," Mem. of L. in Supp. of Pl.'s Mot. for Prelim. Inj., Dkt.3-1 (Mot.) at 1, the Commission's actions in this case have followed a routine investigative course. Faced with mounting evidence of misleading representations about and accounts of serious, life-altering risks to children and teenagers from PGDT, the FTC convened a workshop and reviewed extensive public input.  The Commission then issued a CID to World Professional Association for Transgender Health (WPATH) to request more information, a decision that fits comfortably within the bounds of the FTC Act's text and established agency practice.

Although WPATH does not dispute the allegations of harm and wrongdoing made by doctors and patients at the FTC workshop and concedes the "plausible justification" for CIDs generally, Mot. 30, it takes special aim at this CID in a pre-enforcement posture, accusing the FTC of "broadcasting its opposition to" and seeking to "silenc[e] and punish[]" WPATH for its support of PGDT, Mot. 1.  Those efforts lacks merit, and WPATH's arguments for preliminary relief do not withstand scrutiny.

Most fundamentally, WPATH has not demonstrated likelihood of success on the merits. For nearly a century, the Supreme Court has consistently recognized that a federal court may not

resolve disputes about an administrative subpoena until the agency pursues an enforcement action, *e.g.*, *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927); *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983), and that longstanding principle applies with equal force here.  Even if this Court had jurisdiction, WPATH's claims fail on the merits.  Agencies do not violate the First Amendment when performing an ordinary investigation authorized by Congress, and WPATH's retaliation argument clashes with the presumption of regularity that attaches to government action. Nor has WPATH shown that the challenged action—an administrative subpoena carrying no legal penalty for noncompliance—would deter an organization with substantial financial resources from speaking.  At root, WPATH's retaliation theory would transform any investigation into unlawful retaliation whenever an agency chooses to seek information on a subject it has publicly addressed. Nothing could be less consonant with the statutory scheme of the FTC Act and binding precedent.

WPATH's fallback arguments are similarly unpersuasive.  Contrary to WPATH's contention, the CID does not discriminate based on viewpoint.  Viewpoint discrimination requires an actual suppression of speech, but the CID merely requests information without burdening any protected speech.  For similar reasons, the CID does not abridge WPATH's freedom of association. Not only is that claim premature, but WPATH has also not shown that the CID, which merely requests information about potentially unsubstantiated medical claims, burdened its associational rights.

The remaining preliminary-injunction factors likewise support denial.  WPATH will not suffer irreparable harm from denying the requested relief because the CID would not infringe its First Amendment rights.  By contrast, it is a well-settled rule that an injunction exceeding a district court's authority likely inflicts irreparable harm on the government.  A preliminary injunction, which would disrupt enforcement of the FTC Act, would harm the public too.

The Court should deny the preliminary injunction.

**BACKGROUND**

**A.  Statutory And Regulatory Framework**

Section 5 of the FTC Act prohibits "persons, partnerships, or corporations" from engaging in "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  Congress "empowered and directed" the Commission "to prevent" these unfair or deceptive acts or practices, *id.* § 45(a)(2), and thus authorized the agency "to investigate … any person, partnership, or corporation engaged in or whose business affects commerce," *id.* § 46(a).  *See* 16 C.F.R. § 2.1 (describing how investigations are initiated); *id.* § 2.4 (the Commission "encourages the just and speedy resolution of investigations," and "will … employ compulsory process when in the public interest").  To fulfill this "continuing duty," the Commission "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."  *United States v. Morton Salt Co.*, 338 U.S. 632, 639, 642–43 (1950).

To aid the agency in conducting its investigations, the FTC Act authorizes the Commission to issue CIDs to "any person" who may have "any information" relevant to potential violations of the laws enforced by the Commission.  15 U.S.C. § 57b-1.  The issuance of a CID is not a final agency action.  *See, e.g.*, *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992).  Instead, it is simply one step in an ongoing investigation, which initiates a process of discussion and negotiation.  This process is "cooperative[]": the Commission expects CID recipients "to engage in meaningful discussions with staff to prevent confusion or misunderstandings regarding the nature and scope of the information and material being sought."  16 C.F.R. § 2.4.

That cooperative process involves negotiations between a CID recipient and FTC staff "to discuss compliance and to address and attempt to resolve all issues," including legal objections to a CID.  *Id.* § 2.7(k).  The FTC's regulations authorize FTC staff to modify a CID's terms following those meet-and-confer negotiations.  *Id.* § 2.7(*l*).  CID recipients are required to participate in the meet-and-confer process before filing a petition to quash the CID.  *Id.* § 2.7(k).

3

The petition-to-quash process offers the Commission an opportunity to address any remaining objections to a CID. *Id.* § 2.10; *see* 15 U.S.C. § 57b-1(f)(1). The process builds on the meet-and-confer negotiations. 16 C.F.R. § 2.7(k) (the Commission generally "will consider only issues raised during the meet and confer process."); *id.* § 2.10(a)(2) (requiring a "statement representing that counsel for the petitioner has conferred with Commission staff ... in good faith to resolve by agreement the issues raised by the petition"). FTC staff may reply to the petition, and the Commission generally has 40 days to rule on a petition; the CID compliance deadline is suspended during the pendency of a petition to quash. *Id.* § 2.10(a)(4), (b), (c); *see* 15 U.S.C. § 57b-1(f)(2). Taken together, these administrative procedures allow the parties to identify and address disputes before judicial review of any remaining objections in an enforcement action.

If that administrative process fails to resolve any disputes between the CID recipient and FTC staff, the Commission may file a petition for enforcement in a federal district court. 15 U.S.C. § 57b-1(e); *see Invention Submission Corp.*, 965 F.2d at 1088–91. The court hearing a CID enforcement action (and any subsequent appellate court) may address and resolve a wide range of issues, ranging from routine discovery disputes, *see, e.g.*, *FTC v. Match Grp., Inc.*, 2023 WL 3181351 (D.D.C. May 1, 2023), to claims of trade secrets and attorney-client privilege or work-product protection, *see, e.g.*, *FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142 (D.C. Cir. 2015); *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966 (D.C. Cir. 1980), to issues of statutory construction, *see, e.g.*, *FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001), and assertions that the scope of the investigation prompting the CID was not properly authorized by a Commission resolution, *see FTC v. Church & Dwight Co.*, 665 F.3d 1312 (D.C. Cir. 2011). Similarly, a district court may adjudicate constitutional challenges and objections to an agency CID in an enforcement action. *E.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 208–09 (2020); *FEC v. Lance*, 635 F.2d 1132, 1140–42 (5th Cir. 1981) (en banc).

Critically, a CID is not self-executing, and a recipient incurs no penalty or other legal detriment for failing to comply with a CID before a court orders enforcement. *Gen. Fin. Corp.*, 700 F.2d at 368; *see, e.g.*, *Claire Furnace*, 274 U.S. at 174 (explaining "the defendants cannot

4

suffer" until the government brings an enforcement action); *Wearly v. FTC*, 616 F.2d 662, 665 (3d Cir. 1980) ("[A] subpoena from the FTC is not self-enforcing.").

The scope of the Commission's authority to investigate and to issue CIDs "reaches further than [its] regulatory power." *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876 (8th Cir. 1977). If the Commission "has reason to believe" that the recipient "may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce," the FTC Act gives the Commission broad authority to seek information from "any person" through a CID. 15 U.S.C. § 57b-1(c). Thus, the Commission may seek information from entities that are not suspected of any wrongdoing or even subject to the laws at issue. More generally, this circuit has consistently held that administrative agencies have "wide latitude in asserting their power to investigate by subpoena" and that "an individual may not normally resist an administrative subpoena on the ground that an agency lacks regulatory jurisdiction if the subpoena is issued at the investigational stage." *Ken Roberts Co.*, 276 F.3d at 586.

Nor must the Commission be certain that a CID recipient possesses relevant information. The FTC Act demands only a "reason to believe" that the recipient "may have" relevant information. 15 U.S.C. § 57b-1(c). That permissive standard reflects the FTC's broad investigative power. The Supreme Court has stressed the Commission's "power to get information from those who best can give it," analogizing the FTC's authority to that of a grand jury in a criminal investigation. *Morton Salt*, 338 U.S. at 642. And the D.C. Circuit has recognized "the important governmental interest in the expeditious investigation of possible unlawful activity." *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977) (en banc).

### B.  Recent Developments In Pediatric Gender Dysphoria Treatment

New diagnoses of gender dysphoria in children are on the rise in the United States. Robin Respaut & Chad Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*, Reuters (Oct. 6, 2022), https://perma.cc/QFS9-SYN8. About 42,000 children across this country received

5

that diagnosis in 2021 alone—"nearly triple the number" reported only four years prior. *Id.* Other estimates indicate that, as of 2022, at least 300,000 adolescents in the United States between 13 to 17 years old identify as transgender. *New Estimates Show 300,000 Youth Ages 13-17 Identify as Transgender in the US*, UCLA Sch. of L. Williams Inst. (June 10, 2022), https://perma.cc/KBZ9-7G86.

At the same time, medical treatments for gender dysphoria have rapidly proliferated. *E.g.*, U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria*, at 9 (Nov. 19, 2025), https://perma.cc/59ZF-L3B5 (HHS Report). One category of medical treatments— Pediatric Gender Dysphoria Treatment (PGDT)—treats gender dysphoric children with medical interventions that at least some consider "experimental." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 488 (6th Cir. 2023), *aff'd sub nom.*, *United States v. Skrmetti*, 605 U.S. 495 (2025). PGDT "includ[es] but [is] not limited to pubertal suppression, hormone therapy, and surgery (*e.g.*, subcutaneous mastectomy, vaginoplasty, metoidioplasty, and phalloplasty)." Dkt.3-8 at 7. Certain proponents of PGDT insist that pubertal suppression, hormone therapy, and surgical procedures (like mastectomies) lead to improved mental health outcomes, such as lowering suicidality, depression, and anxiety. *See, e.g.*, Kareen M. Matouk & Melina Wald, *Gender-affirming Care Saves Lives*, Colum. Univ. Dep't of Psychiatry (Mar. 30, 2022), https://perma.cc/6K7N-8PY6; Kate Stringer, *The Benefits of Gender-affirming Care*, Wash. Sch. of Pub. Health (Mar. 31, 2023), https://perma.cc/FRP8-UMT7.

Proliferation of PGDT procedures raises significant concerns. For starters, recent reports have indicated weak scientific evidence and lack of substantiation for PGDT. The Cass Report, a now-famous international government-commissioned review of PGDT, concluded that "[t]his is an area of remarkably weak evidence." H. Cass, *Independent Review of Gender Identity Services for Children and Young People*, at 13 (Apr. 2024), https://perma.cc/RDN3-WBYR. Similarly, a peer-reviewed report from the Department of Health and Human Services found that PGDT's "purported benefits are based on poor quality evidence." HHS Report at 23. On the heels of these

and other reports, the American Society of Plastic Surgeons issued a position statement in February 2026, declaring:

> [T]he overall evidence base for gender-related endocrine and surgical interventions is low certainty, and in light of recent publications reporting very low/low certainty of evidence regarding mental health outcomes, along with emerging concerns about potential long-term harms and the irreversible nature of surgical interventions in a developmentally vulnerable population, ASPS concludes there is insufficient evidence demonstrating a favorable risk-benefit ratio for the pathway of gender-related endocrine and surgical interventions in children and adolescents. ASPS recommends that surgeons delay gender-related breast/chest, genital, and facial surgery until a patient is at least 19 years old.

*Position Statement on Gender Surgery for Children and Adolescents*, Am. Soc'y of Plastic Surgeons, at 3 (Feb. 3, 2026), https://perma.cc/849S-ZJQ2. The American Medical Association soon followed suit, stating that, "[i]n the absence of clear evidence, the AMA agrees with ASPS that surgical interventions in minors should be generally deferred to adulthood." Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*, N.Y. Times (Feb. 4, 2026), https://perma.cc/B2EW-G54H. Likewise, the United Kingdom's National Health Service announced on March 8, 2026, that it "will stop prescribing powerful cross-sex hormones to [new PGDT patients] under the age of 18," based on the potentially permanent consequences and the lingering questions about the long-term effects of PGDT, such as "breast cancer, heart disease, stroke and impaired sexual function," as well as potential "long term effects … on teenage brain development." *NHS Stops Prescribing Cross-sex Hormones to Children*, Daily Mail (Mar. 8, 2026), https://perma.cc/Y4JS-AW6P. At least six other countries have recently followed suit, and several others are conducting reviews of their positions on PGDT. *See* HHS Report at 9, 63–65.

Certain statements by PGDT proponents tend to confirm this view. For example, WPATH continues to depict PGDT as "medically necessary" in its most recent standards of care. Ex. 1, *WPATH's Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S5, S18 (2022) (SOC-8). But its internal emails appear to

suggest that it made this decision not based on any objective scientific criteria, but for the purpose of securing insurance coverage and avoiding regulation of PGDT.  Ex. 2, *Boe v. Marshall*, No. 2:22-cv-0184 (M.D. Ala. Oct. 9, 2025), Dkt.700-10 at 32–34, 42–43.  Emails from Johns Hopkins researchers reveal that WPATH also tried to suppress scientific analysis of this issue, refusing to allow publication of studies WPATH itself had commissioned because the results showed a lack of support for PGDT.  Ex. 3, *Voe v. Mansfield*, No. 1:23-cv-864 (M.D.N.C. Oct. 11, 2024), Dkt.143-28 at 2 (emails reporting that WPATH was "trying to restrict [their] ability to publish" their finding that there was "little to no evidence about children and adolescents" undergoing PGDT).  Taking a page from that same book, another prominent PGDT provider even admitted to withholding data from a multimillion-dollar federally funded study because the data showed "[p]uberty blockers [as a treatment for gender dysphoria] did not lead to mental health improvements."  Azeen Ghorayshi, *U.S. Study on Puberty Blockers Goes Unpublished Because of Politics, Doctor Says*, N.Y. Times (Oct. 23, 2024), https://perma.cc/V4KH-4HTT.

Relatedly, there is evidence that advocates of PGDT may have mispresented the supposed risks associated with foregoing such care.  WPATH's SOC-8, for example, states that "[a]ccess to gender-affirming medical treatment is associated with a substantial reduction in risk of suicide attempt."  Ex. 1 at S174.  As one prominent PGDT provider put it, "[w]e often ask parents, would you rather have a dead son than a live daughter?"  ABC News, *Transgender Kids Pioneer Early Changes to Identity, Body* (Aug. 29, 2011), https://perma.cc/NX8N-3R8P.  Yet during oral argument in *United States v. Skrmetti*, counsel representing a PGDT provider and adolescent PGDT patients conceded that PGDT has not been shown to prevent suicide.  Tr. of Oral Arg. 89:3–17.  Even one of WPATH's own Board members submitted a declaration in this case acknowledging the "gaps in evidence" regarding PGDT and admitting that "characterizing all transgender adolescents who do not receive their desired treatments as high-risk and/or suicidal is also not a true reflection of the reality."  Dkt.3-6 ¶¶ 10-11.

Patients, providers, and others have increasingly come forward with evidence that PGDT may harm teenagers.  One young woman, for example, filed a medical malpractice suit, alleging

that taking testosterone she received after only a "thirty-minute consult" caused "constant vocal pain, joint pain, and frustrating and sometimes painful sexual dysfunction." Jennifer Block, *How Did Planned Parenthood Become One of the Country's Largest Suppliers of Testosterone?*, The Free Press (Aug. 7, 2024), https://perma.cc/TB9T-27YA. Whistleblowers formerly working to provide and support PGDT have similarly asserted that institutions providing PGDT ignored or suppressed concerns that PGDT harmed minors in their care. *E.g.*, HHS Report at 202–09 (collecting whistleblower accounts).

Patients and their families have also alleged false statements and material omissions were communicated to them about PGDT's safety and efficacy. *E.g.*, Chloe Cole, *I'm a Detransitioner*, N.Y. Post (Mar. 11, 2025), https://perma.cc/3HV7-GN68. These allegations have raised serious questions whether PGDT patients could give informed consent to the treatments. Indeed, even some proponents of PGDT have suggested that children are *incapable* of understanding the often grave and "irreversible" consequences of PGDT, making it "impossibl[e]" to "gain[] their informed consent." *Leaked Discussions Reveal Uncertainty About Transgender Care*, The Economist (Mar. 5, 2024), https://perma.cc/78ZN-7TGV.

### C. The Commission's Investigation Of PGDT

Against that backdrop, the FTC began to investigate whether "false or unsubstantiated representations" have been made and "unfair practices" have been committed "in connection with the marketing and advertising of [PGDT]." Dkt.3-8 at 2. That investigation has followed the FTC's standard and long-established practices. Much like in prior investigations into healthcare sector entities, the FTC began by evaluating representations made to consumers about PGDT's purported benefits and the substantiation for those representations. *See e.g.*, *In re POM Wonderful LLC*, 155 F.T.C. 1, 2 (2013) (addressing claims that products could treat, prevent, or reduce the risk of heart disease and prostate cancer); *In re NBTY, Inc.*, 151 F.T.C. 201, 203–06 (2011) (similar for dietary supplements promoting children's eye and brain development); *FTC v. Nat'l Urological*

*Grp., Inc.*, 645 F. Supp. 2d 1167, 1190 (N.D. Ga. 2008) (similar for products purporting to cause weight loss and sexual enhancement).

Consistent with its usual approach, *see, e.g.*, *The Future of the COPPA Rule: An FTC Workshop – Session 1* (Oct. 7, 2019), https://perma.cc/ZS2Z-4SBN, the Commission then held a public, live-streamed workshop on July 9, 2025.  The purpose of the workshop was to "help the FTC to understand whether consumers are being or have been exposed to false or unsupported claims about 'gender-affirming care' and to gauge the harms consumers may be experiencing." FTC, Press Release, *FTC Releases Agenda for Workshop on Unfair or Deceptive Trade Practices in "Gender-Affirming Care" for Minors* (June 25, 2025), https://perma.cc/BB4C-J6TE.  During the workshop, Chairman Andrew Ferguson explained that the FTC is "not charged with passing moral judgment on anyone's ideology, lifestyle, or medical choices."  Dkt.3-28 at 5.  Instead, "the FTC is the federal government's guardian against false and deceptive health claims," and it has a "statutory mandate" "to protect vulnerable people from deceptive claims about health and cures." *Id.* at 5; *see also, e.g.*, FTC, *Health Products Compliance Guidance* at 1 (Dec. 2022), https://perma.cc/58E9-9WPU (providing "guidance from FTC staff on how to ensure that claims about the benefits and safety of health-related products are truthful, not misleading, and supported by science").  Thus, the Commission must "ensure that those who make claims about [PGDT] are held to the same standard we apply to every other person engaged in commerce."  Dkt.3-28 at 6.

To that end, the workshop hosted medical and other professionals, as well as former patients and their families, who—the Commission believed—could provide helpful information, given their extensive personal experience with or expertise in PGDT.  The information provided by the workshop's participants reinforced three main concerns raised in public reporting.

*First*, participants contended that PGDT is not evidence-based and lacks substantiation. For instance, an experienced endocrinologist noted that "[p]roper long-term studies [of PGDT] haven't been done" and that "[m]ultiple systematic reviews of evidence have found poor quality of evidence of benefit."  *Id.* at 36.  Another participant explained that "the leading authority on gender medicine in the United States is of course WPATH," which "publishes a document called

10

the standards of care, which are essentially clinical recommendations" that have been "embed[ded] … in virtually every relevant aspect of US healthcare." *Id.* at 21 ("In short, in the United States, gender medicine is WPATH and WPATH is gender medicine."). To illustrate, the participant explained that "state Medicaid authorities and commercial insurers incorporate WPATH standards of care in their determinations of covered benefits," "[h]ospitals conduct WPATH-aligned trainings ... and operate specialized pediatric gender clinics that rely or claim to rely on WPATH standards," and "hospitals and medical schools integrate WPATH-aligned standards into their residency fellowship and continuing medical education programs." *Id.*

As that participant saw it, WPATH's standards of care are unreliable. They do "not rely on systematic reviews of evidence" and are "not … evidence-based." *Id.* Far from relying on the best evidence for SOC-8, WPATH "prevented" Johns Hopkins researchers "from publishing [the] results" of a survey WPATH itself commissioned simply because the survey found that "the evidence for pediatric transition was extremely weak." *Id.*; *see* Ex. 3, *Voe v. Mansfield*, No. 1:23-cv-864 (M.D.N.C. Oct. 11, 2024), Dkt.143-28 at 3–4. Moreover, "WPATH violated other key requirements of trustworthy guideline development," by "fail[ing] to manage conflicts of interest [and] stacking the guideline panel with clinicians who are personally, professionally, and financially invested in medical transition." Dkt.3-28 at 21. And it ultimately "eliminated age minimums for transition procedures for political reasons, while WPATH's leaders privately admitted to including medical necessity statements [in SOC-8] for the purpose of insurance coverage and for winning legal battles." *Id.*

*Second*, participants suggested that PGDT risks serious, permanent, and irreversible harms to patients. One former patient stated that taking cross-sex hormones caused worsened mental health, vocal cord damage, liver damage, and urinary incontinence, while a mastectomy resulted in persistent "[e]xtreme slicing sensations." *Id.* at 12–13. One mother described her daughter's experience with PGDT, which ended with her daughter committing suicide while undergoing the treatment. *Id.* at 10–12. Medical doctors discussed severe potential consequences of testosterone prescribed by PGDT providers, including mental health issues like "aggression, anger,"

11

"dissociative identity disorder," "self-destructive behavior," and "suicidal ideation"—"similar as to what can be found in anabolic steroid abuse." *Id.* at 33.  Doctors also observed that cross-sex hormones and puberty blockers can "disrupt[] … normal brain development" or "normal bone development," as well as result in an "early menopause-like state," "sexual dysfunction," "infertility," "hypertension," and "potential risks for the reproductive tract of ovarian, breast, [and] uterine cancer." *Id.*; *see id.* at 43–44.

*Third*, workshop participants recounted alleged misrepresentations or significant omissions they personally experienced related to PGDT.  Some parents, for example, claimed that PGDT providers implied their children would commit suicide if not administered PGDT.  *E.g.*, *id.* at 9, 55.  As Commissioner Mark Meador summarized at the end of the workshop, the Commission "repeatedly heard from parents and individuals gravely impacted by [PGDT] gone wrong, who suffered the harms of misrepresentations about the effects of these medical interventions." *Id.* at 85.

The Commission then issued a Request for Information on PGDT—another common step in FTC investigations—"to better understand how consumers may have been exposed to false or unsupported claims about [PGDT], especially as it relates to minors, and to gauge the harms consumers may be experiencing."  Dkt.3-31 at 4.  In response, the Commission received over 8,000 comments—many critical and some supportive of PGDT.  The comments often referred to medical organizations and their standards of care, including WPATH and its SOC-8.  For example, consumers stated their belief that "[a]ll doctors and providers subscribe to the WPATH Standards of Care," *Comment from Lyons, Eve* (Aug. 9, 2025), https://perma.cc/FQF4-AJTQ, which they understood to be "rigorous," *Comment from Long, Andrew* (Aug. 15, 2025), https://perma.cc/3TTV-QQDV, and "evidence-based," *Comment from Anonymous* (Sep. 25, 2025), https://perma.cc/L3FA-94PU (noting that "[t]he guidelines of … WPATH … follow evidence-based care for" children with gender dysphoria "for optimal best outcomes and prevention of suicide"); *Comment from Sytsama-Ramos, Rachael* (Aug. 21, 2025),

12

https://perma.cc/3A8S-PY9C (expressing the view that WPATH's standards of care "have been founded through empirically validated research methods with longitudinal follow-ups").

In reliance on WPATH's representations, consumers shared their view that PGDT leads to the "best outcomes and prevent[s] … suicide," *Comment from Anonymous, supra*; *Comment from Lyons, Eve*, *supra* (noting that PGDT "saves lives").  Some consumers, again in reliance on WPATH guidelines, were also led to believe that PGDT "ha[s] been proven to be safe and reversible," *Comment from Anonymous* (Aug. 17, 2025), https://perma.cc/A2CY-LTTL; *see also Comment from Hellinga, Richard* (July 29, 2025), https://perma.cc/ULQ9-WM5U (asserting that "HRT and puberty blockers are safe, effective treatments for children" on the basis of those treatments' support by "major medical associations, including … WPATH"); *Comment from Anonymous* (July 29, 2025), https://perma.cc/WV7N-TD5D (relying on "[t]houghtful standards … in place for gender care, including gate keeping guidelines, from WPATH [that] … have been developed by science and medical professionals who are not politically motivated").

On the other hand, numerous comments expressed serious concern over the lack of evidence supporting SOC-8 and PGDT.  A physician, for example, took the view that "information from [WPATH] is non-scientific," noting that "[a] number of European countries have placed serious restrictions on" PGDT.  *Comment from Cranston, MD, Robert* (Aug. 6, 2025), https://perma.cc/JWS9-HEFU (referencing the Cass Report).  And he explained that PGDT "can cause severe long-term damage to the persons affected, including infertility, sexual dysfunction, osteoporosis," and other medical issues, "and do not alter the long-term life satisfaction or prevent psychological distress."  *Id.*; *Comment from Garfield-Jaeger, Pamela* (Sep. 25, 2025), https://perma.cc/VA9P-J9QY (commenting as a licensed therapist who observed that PGDT patients "were more suicidal after getting" PGDT and "were harmed psychologically and physically" due to those treatments).

Over the ensuing months, FTC staff reviewed all 8,000-plus comments.  The Commission subsequently took another conventional investigatory step: it sought to identify organizations and

individuals who may possess relevant information about potential deceptive representations or unfair practices related to PGDT.

WPATH fit the bill for several reasons. It purports to be the "the leading global professional organization for clinicians, researchers, and experts in the field of transgender healthcare." *WPATH and USPATH Respond to American Society of Plastic Surgeons (ASPS) Position Statement*, WPATH (Feb. 4, 2026), https://perma.cc/5BGZ-68UU. WPATH has over 3,000 members, Compl. ¶ 20, and, in recent years, has reported average annual revenue exceeding $2 million.[1] Unsurprisingly, many WPATH members may have a financial interest in PGDT. *See, e.g.*, *Who Paid for Gender—Affirming Care?*, Forbes (Nov. 1, 2024), https://perma.cc/SQJ5-SCWJ. And WPATH seemingly promotes its members' financial interests, including by operating a provider directory that allows users to view "Certified Members" only. *Provider Directory Search*, WPATH, https://perma.cc/N6DK-URBA. WPATH has also "urg[ed] health care systems to provide [PGDT] … and eliminate any exclusions from their policy documents and medical guidelines that preclude coverage" of PGDT. Ex. 1 at S18.

Moreover, WPATH promulgated SOC-8, a widely cited set of guidelines regarding PGDT. WPATH has described SOC-8 as "clinical guidance" that reflects "a professional consensus about the psychiatric, psychological, medical, and surgical management of transgender people," Dkt.3-2 ¶ 9; *SOC-8 History and Purpose*, WPATH, https://perma.cc/ANU2-A8S9 (describing SOC-8 as "primarily a document for health professionals" but noting that it "may also be used by individuals, their families, and social institutions to promote optimal health for" individuals with gender dysphoria); *see also, e.g.*, Ex. 1 at S5. Though WPATH claims that SOC-8 was "developed [based on] thorough evaluation of evidence," Dkt.3-11 at 2, and reflects "professional consensus," Dkt. 3-2 ¶ 9, its guidelines contain numerous highly contested statements. Consider, for example, WPATH's representations that:

- Use of puberty blockers "is fully reversible";

---

[1] *See World Professional Association for Transgender Health, Inc.*, ProPublica, https://perma.cc/4NRN-XBDH.

- Use of "chest binding … [is] reversible";

- PGDT is "not considered experimental [or] cosmetic";

- "hysterectom[ies]," "bilateral mastectom[ies]," "genital reconstruction," "hair removal … for gender affirmation," "facial surgery and body contouring," "puberty blocking medication and … hormones" are "[m]edically necessary";

- "[t]here is strong evidence demonstrating the benefits in quality of life and well-being of" PGDT, "including endocrine and surgical procedures";

- PGDT "is associated with a substantial reduction in the risk of suicide attempt."

Ex. 1 at S18, S54, S112, S174; *cf., e.g.*, p. 7, *supra* ("ASPS concludes there is insufficient evidence demonstrating a favorable risk-benefit ratio for the pathway of gender-related endocrine and surgical interventions in children and adolescents.").

WPATH has promoted SOC-8 in a variety of fora, including courts, workshops, conferences, and training programs. *E.g.*, Br. of Amici Curiae Am. Acad. of Pediatrics (Sep. 3, 2024), *Skrmetti*, 605 U.S. at 495. In light of all of these factors, it is unsurprising that (as noted above), WPATH's work in this area was discussed at the workshop and was frequently mentioned in the public comments.

On January 15, 2026, the Commission issued CIDs to WPATH and two other medical organizations, both of which have filed separate lawsuits advancing similar claims. *See Am. Acad. of Pediatrics (AAP) v. FTC*, No. 1:26-cv-0508 (D.D.C.); *Endocrine Society v. FTC*, No. 1:26-cv-0512 (D.D.C.). The CID sought information on various issues relevant to the investigation, such as representations about PGDT by WPATH and others, and included interrogatories to help the Commission determine whether WPATH's activities fall within the scope of the FTC's enforcement jurisdiction. *See* Dkt.3-8 at 1–17.

After Commission staff met and conferred with WPATH about the CID, WPATH filed a petition to quash. *See* Mot. 17. WPATH's compliance period is stayed pending resolution of the petition. 15 U.S.C. § 57b-1(f)(2). If the Commission denies the petition in whole or in part, it will

15

"specify new terms for compliance, including a new return date." 16 C.F.R. § 2.10(b). Under the Commission's rules, a decision on the petition is due by March 23, 2026. *See id.* § 2.10(c).

Mere days after filing its petition—and before the Commission had decided it—WPATH brought this lawsuit and moved for a preliminary injunction.

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (citation omitted). Thus, "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id*. at 346 (citation omitted). "The balance of the equities and the public interest 'merge when, as here, the Government is the opposing party.'" *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (citation omitted).

## ARGUMENT

WPATH satisfies none of the requirements for a preliminary injunction. Most fundamentally, WPATH has not demonstrated that it is likely to succeed on the merits. The Supreme Court has repeatedly recognized that a district court lacks jurisdiction to hear a dispute over an administrative subpoena until the agency seeks judicial enforcement, which the FTC has not done. Nor has WPATH established a likely violation of the First or Fourth Amendments. Plus, the remaining equitable factors tip decisively in favor of the FTC. The Court should deny the preliminary injunction.

## I.    WPATH IS NOT LIKELY TO PREVAIL ON THE MERITS

WPATH has not shown that it is likely to succeed on the merits—the most important factor in the preliminary-injunction analysis, *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022). Because the FTC Act requires a party to raise any challenges to a CID in an enforcement action brought by the Commission, this Court lacks subject-matter jurisdiction over the dispute.

And even apart from that, WPATH is unlikely to succeed on the merits of its First and Fourth Amendment claims.

### A. This Court Lacks Authority To Hear WPATH's Pre-Enforcement Challenge

For nearly a century, the Supreme Court and lower courts have consistently held that parties should resolve disputes about administrative subpoenas in an enforcement action initiated by the agency. *See Claire Furnace*, 274 U.S. at 174; *Reisman v. Caplin*, 375 U.S. 440, 443 (1964) (upholding dismissal of pre-enforcement challenge to IRS summons). Relying on *Claire Furnace* and *Reisman*, courts of appeals have repeatedly rejected pre-enforcement challenges to FTC and other federal agency CIDs and subpoenas. *See Gen. Fin. Corp.*, 700 F.2d at 368 (explaining that a plaintiff "must wait till the government sues … since that is the method of judicial review of FTC investigations that Congress has prescribed"); *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334–35 (10th Cir. 1984); *Wearly*, 616 F.2d at 668; *Am. Motors Corp. v. FTC*, 601 F.2d 1329, 1335–37 (6th Cir. 1979); *Blue Ribbon Quality Meats*, 560 F.2d at 876–77; *Atl. Richfield Co. v. FTC*, 546 F.2d 646, 651 (5th Cir. 1977); *Anheuser-Busch, Inc. v. FTC*, 359 F.2d 487, 490–91 (8th Cir. 1966) (Blackmun, J.).

A consistent and straightforward principle runs through these cases. Recipients of agency CIDs or subpoenas may not seek equitable relief in a pre-enforcement posture because, even if their administrative challenge fails, they have an adequate remedy at law: challenging the CID or subpoena in an enforcement action. *E.g.*, *Atl. Richfield*, 546 F.2d at 649. And this principle serves important purposes for subpoena recipients and agencies alike. On the one hand, it protects CID and subpoena recipients from legal penalties until they have an opportunity to raise their objections in an enforcement proceeding in federal court. On the other, it ensures that agencies may conduct investigations consistent with congressional directives, allows the parties to narrow and resolve disputes prior to litigation, and prevents premature judicial intervention without the factual context that an enforcement action would provide.

17

A preliminary injunction here would depart from this familiar and well-established doctrine (one that WPATH conspicuously ignores) for two main reasons. First, Congress has precluded pre-enforcement review of CIDs under the claim-channeling doctrine articulated in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Second, WPATH has failed to state a valid cause of action.

### 1. Congress Channeled WPATH'S Claims Into The FTC Act's Exclusive Judicial-Review Scheme

In *Thunder Basin*, the Supreme Court explained that Congress may establish a statutory scheme that channels judicial review to an exclusive jurisdictional mechanism, divesting district courts of their ordinary federal-question jurisdiction. 510 U.S. at 218. A statute channels review when (i) a preclusive intent is "fairly discernible in the statutory scheme," and (ii) the claims at issue "are of the type Congress intended to be reviewed within" that scheme. *Id.* at 207, 212 (citation omitted). The presence of those factors indicates Congress's intent to channel certain challenges to agency actions "to a single review process," streamlining investigations and enforcement proceedings. *Id.* at 211. The FTC Act satisfies both *Thunder Basin* conditions.

**a.** To start, Congress's preclusive intent is "fairly discernable" in the FTC Act. *See id.* at 207 (citation omitted). The FTC Act and its implementing regulations create an interdependent scheme to protect CID recipients. That scheme allows recipients to: discuss and negotiate the CID with FTC staff to resolve or narrow disputes, 16 C.F.R. §§ 2.4, 2.7(k); petition the Commission to quash the CID, 15 U.S.C. § 57b-1(f); and obtain judicial review of the CID, including any objections, when the FTC seeks to enforce it, *id.* § 57b-1(h). Simply put, CIDs are not self-executing, and recipients face no penalties for noncompliance until the court rules in an enforcement action. *See Gen. Fin. Corp.*, 700 F.2d at 368–69. This process permits parties to narrow disputed issues without unnecessarily embroiling district courts in abstract disputes. The FTC's exercise of its "discretion" in deciding whether to seek enforcement—and if so, which specifications to pursue—crystalizes the issues in dispute, sparing the court "much unnecessary labor and discussion." *Claire Furnace*, 274 U.S. at 174.

18

The FTC Act's statutory structure, which includes several other provisions authorizing judicial review, reinforces Congress's choice to provide an exclusive review mechanism for CIDs. For example, the Commission's final cease-and-desist orders are subject to review only in the courts of appeals. *See* 15 U.S.C. § 45(b); *see also id.* § 45(*l*) (providing district court review for violations of the FTC's final orders); *id.* § 45(m) (providing district review for violations of certain FTC rules). The "comprehensive nature" of these review provisions reveals Congress's preclusive intent. *Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 558 (D.C. Cir. 2023).

The fact that the FTC Act does not channel review of enforcement actions related to CIDs to a court of appeals, but to district court (with subsequent appellate review), further reflects Congress's intent to preclude pre-enforcement review. Although Congress "typically chooses" to channel claims to the courts of appeals, *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023), it is free to choose other methods as well, and sometimes does so. For instance, *John Doe Co. v. CFPB*, 849 F.3d 1129 (D.C. Cir. 2017) (per curiam), a binding D.C. Circuit decision, applied *Thunder Basin* to a CID scheme materially identical to the one at issue here. *Id.* at 1134. And in any event, the case for claim channeling in this case "is even stronger than it was in *Thunder Basin*" precisely because the FTC Act "channels claims into the district court." *Patten v. District of Columbia*, 9 F.4th 921, 927–28 (D.C. Cir. 2021).

**b.** Similarly, WPATH's claims are squarely "of the type Congress intended to be reviewed within" the FTC Act's statutory structure. *See Thunder Basin*, 510 U.S. at 212 (citation omitted). *Thunder Basin* identified three factors to consider when evaluating whether a litigant's claims are of the type that Congress intended to be reviewed within the statutory structure: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim is "outside the agency's expertise." *Axon*, 598 U.S. at 186 (citation omitted). Here, the answer to all three questions is no. Unlike *Axon*'s "structural constitutional" challenge to an agency's "power generally," WPATH challenges a "specific substantive decision" on which FTC has considerable expertise. *Id.* at 192-93.

19

*First*, precluding this pre-enforcement challenge would not foreclose meaningful judicial review because WPATH can raise—and a federal court can resolve—all objections in a CID enforcement action. *See* 15 U.S.C. § 57b-1(h). Indeed, as explained above, this traditional mechanism—endorsed by numerous courts, including the Supreme Court—has always governed challenges to administrative subpoenas and provides meaningful judicial review.

*Thunder Basin* does not recognize an exception for First Amendment claims, and the D.C. Circuit and other courts have applied *Thunder Basin* in that context. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755–56 (D.C. Cir. 2019); *Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 936–37 (D.C. Cir. 2004); *see also LabMD, Inc. v. FTC*, 776 F.3d 1275, 1280 (11th Cir. 2015) ("[N]one of our cases suggest that First Amendment retaliation claims must be treated differently than other constitutional claims under *Thunder Basin* …."). Nor does *Thunder Basin* provide an exception for cases alleging ongoing harm. *See, e.g.*, *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 312 (4th Cir. 2025). To the contrary, channeling schemes *presume* that such harm will exist. As the Supreme Court observed in *Axon*, exclusive review mechanisms often "require parties to wait before appealing, even when doing so subjects them to 'significant burdens.'" 598 U.S. at 191–92 (citation omitted). *Thunder Basin* similarly accepted the possibility of harms from "delayed judicial review," 510 U.S. at 207, even when such harms are irreparable and "onerous," *id.* at 205, 218.

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025), does not disturb that conclusion. *Paxton* considered a CID issued by a *state* official and did not implicate any federal statutory scheme. The *Thunder Basin* framework—which addresses "challenges to federal agency action," *Axon*, 598 U.S. at 185—simply did not apply. Thus, the question presented in *Paxton* was simply whether "ongoing" harm satisfies the Article III standing and ripeness requirements. 138 F.4th at 579–80. That issue is analytically distinct from the *Thunder Basin*/*Axon* inquiry, which presupposes the existence of ongoing harm and excepts only structural claims of the kind that WPATH has not asserted here. More broadly, Congress had good reason to channel issues about federal agency CIDs to enforcement proceedings while permitting Section 1983 suits to challenge

20

state CIDs.  That approach ensures that both state and federal subpoena recipients may present their constitutional claims in a federal forum before legal penalties accrue.

*Second*, there is nothing "collateral" about WPATH's claims.  A claim is "collateral" only when it involves a challenge to "the structure or very existence of an agency."  *Axon*, 598 U.S. at 186, 189.  *Axon* distinguished that kind of "fundamental, even existential" claim, *id.* at 180, from party-specific claims that an agency should not have taken a specific action, *id.* at 192—precisely the kind of claim WPATH raises here.  Unlike in *Axon*, WPATH challenges something "particular about how [the FTC's] power was wielded" and objects to a "specific substantive decision"—namely, the issuance of the CID—rather than the Commission's "power generally."  *Id.* at 189, 193.  WPATH's challenge also implicates "procedural or evidentiary matters," *id.*, such as the breadth of the CID and the relevance of certain specifications to the investigation's goals.  Mot. 23–27.  Thus, WPATH's claims directly "relate to the subject" of an action to enforce the CID, which courts routinely adjudicate in enforcement actions.  *See Axon*, 598 U.S. at 193; p. 17, *supra*.

*Third*, questions about the scope and application of CIDs fall directly within the FTC's expertise, and the agency should decide whether to narrow its CID before commencing an enforcement action.  Those types of questions raise "considerations of agency policy," in which the FTC has "competence and expertise."  *Axon*, 598 U.S. at 194 (citations omitted).  The FTC routinely issues CIDs and has considerable experience negotiating with CID recipients and resolving petitions to quash.  And the Commission has authority to consider any objections, including constitutional arguments, in a petition to quash, when those objections are "intertwined with or embedded in" the FTC's areas of expertise.  *Id.* at 195.  Indeed, the Commission evaluates those constitutional arguments in determining whether to bring an enforcement action and—if so—on what grounds.  *See Claire Furnace*, 274 U.S. at 174 (recognizing the significance of the "exercise [of] ... discretion" in "examining" FTC subpoenas).

At any rate, the expertise inquiry is not demanding.  In *Thunder Basin*, the Supreme Court found this factor satisfied after noting that an agency had "addressed constitutional questions in previous enforcement proceedings" and that the "statutory and constitutional claims … [could] be

21

meaningfully addressed" in a subsequent federal court proceeding. *Thunder Basin*, 510 U.S. at 215. The same two conditions exist here.

To be sure, another judge of this Court recently reached a different conclusion about these channeling arguments. *See Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025). But that decision "is not binding." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (citation omitted). The same is true of the divided D.C. Circuit panel's unpublished order declining to stay that decision pending appeal. *See Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 351 (D.C. Cir. 2020); D.C. Cir. R. 36(e)(2). And, as the FTC has explained in its pending appeal of that ruling, the district court's decision is mistaken in several respects, including because it is at odds with nearly a century of Supreme Court and appellate precedent. Appellants' Br. 19–36, *Media Matters for Am. v. FTC*, No. 25-5302 (D.C. Cir. Jan. 5, 2026).

## 2.    WPATH Has No Cause of Action

WPATH also fails to assert a valid cause of action. The organization does not allege that it has a cause of action under the Administrative Procedure Act and instead relies solely on an implied equitable cause of action, asserting that its claims arise under the First Amendment. *See* Compl. ¶¶ 5, 131-53, Dkt.1. But "[c]onstitutional rights do not typically come with a built-in cause of action." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). And the Supreme Court has warned federal courts to hesitate before implying constitutional or statutory causes of action. *E.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 134–35 (2017); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring).

That hostility to implied causes of action stems from the inherent limitations on the "traditional equitable powers" of federal courts. *Ziglar*, 582 U.S. at 133. Those powers are limited to relief that was "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999), and pre-enforcement injunctions against agency CIDs and subpoenas were not available at equity, *e.g.*, *Claire Furnace*, 274 U.S. at 174.

22

Additionally, the equitable power to "enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). In *Exceptional Child Center*, the Supreme Court relied on the Medicaid Act's implicit preclusion of private enforcement in declining to employ federal courts' equitable powers. *Id.* at 327–29. Likewise here, the FTC Act provides no express cause of action, and Congress's choice of an administrative process, followed by an enforcement action, as the sole remedy for CID recipients impliedly restricts equitable collateral attacks. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005) ("The provision of an express, private means of redress in the statute itself … indicat[es] that Congress did not intend to leave open a more expansive remedy."); *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (same). Unsurprisingly, the Supreme Court and lower courts have frequently grounded their dismissals of pre-enforcement CID challenges in the absence of equitable grounds and the availability of an adequate remedy at law. *See Reisman*, 375 U.S. at 443; *Claire Furnace*, 274 U.S. at 174; *Wearly*, 616 F.2d at 665.

*     *     *

Although WPATH (like other CID recipients) would prefer immediate review, Congress weighed the policy factors and channeled CID disputes to enforcement actions. And the regime Congress adopted considers the interests of CID recipients, including through the implementation of the petition-to-quash process. WPATH is "under no compulsion" to "turn over the documents" and faces no "penalties" until the FTC pursues—and prevails in—an enforcement proceeding. *Wearly*, 616 F.2d at 667. By contrast, permitting pre-enforcement challenges would carry serious and disruptive consequences, potentially allowing any subpoena recipient to halt law enforcement investigations simply by raising speculative constitutional claims.

### B. WPATH's First Amendment Retaliation Claim Is Meritless

WPATH argues that the FTC likely "violated the First Amendment by retaliating against its constitutionally protected speech." Mot. 19. To prevail on that claim, WPATH must show that: (1) it "engaged in conduct protected under the First Amendment"; (2) the FTC "took some

23

retaliatory action sufficient to deter a person of ordinary firmness in [WPATH's] position from speaking again"; and (3) there is "a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Although the Commission does not dispute that WPATH engages in some protected First Amendment conduct, WPATH cannot establish any causal link between its speech and the CID or any chilling effect from the CID. Nor has WPATH demonstrated that chill arising from an allegedly retaliatory investigation is actionable, and none of its cited authority supports that proposition.

### 1.    WPATH Cannot Show Its Speech Caused the CID

To show causation, WPATH must demonstrate that, *at a minimum*, the CID "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). Although the Court need not reach the issue because WPATH cannot show causation under any standard, the requisite showing is more robust: WPATH must demonstrate that there was no reasonable basis for the CID. *See id.* at 399–400 (requiring lack of probable cause for a retaliatory arrest); *Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *12–13 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons). In making that but-for showing, WPATH must overcome the "longstanding presumption of regularity" that attaches to government action. *Hartman v. Moore*, 547 U.S. 250, 263 (2006). That presumption is at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order" that "judicial intrusion … should be minimal." *Id.* Excessive judicial interference "could 'chill law enforcement,' cause delay, and 'impair the performance of a core executive constitutional function.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (citations omitted).

Thus, to establish a likelihood of success on the merits of its retaliation claim, WPATH must at least marshal enough evidence to displace the presumption of regularity and demonstrate that the Commission would not have issued the CID but for a retaliatory motive. Because the

Commission acted for nonretaliatory reasons and WPATH's purported evidence of retaliation is unavailing, WPATH's retaliation theory fails.

**a.** The Commission issued the CID to WPATH as part of a broad investigation into a high-priority issue squarely within the FTC's bailiwick: false or unsubstantiated medical claims about the safety and effectiveness of certain treatments for pediatric gender dysphoria.

Several compelling reasons justified the Commission's investigation into PGDT and ultimately WPATH. To begin, as illustrated both by publicly available reporting and the Commission's own initial investigatory steps, which have included hosting a workshop and issuing a request for public comment, significant questions have arisen about the scientific basis for various claims about PGDT's safety and effectiveness. *See* Background Section B, *supra*. As former Commissioner Holyoak recognized, "there are serious questions about the risks and purported benefits" of PGDT. Dkt.3-28 at 47.

There is also significant reason to believe that children and parents may have been victimized by false or unsubstantiated statements about PGDT. Through its investigation, the FTC heard from patients and parents, who testified about a significant disconnect between what they were told and what they experienced. *See* Background Section C, *supra*. After reviewing these troubling comments, which reinforced concerns already highlighted in public reporting, the Commission decided to seek additional information.

It did so by issuing CIDs to three entities, including WPATH, that are prominent in this field. *See, e.g.*, HHS Report at 146 (explaining that the "most influential sources of clinical guidance" on PGDT in the United States are WPATH, AAP, and Endocrine Society). The FTC had ample "reason to believe" that WPATH "may have" information "relevant to ... unfair or deceptive acts or practices." 15 U.S.C. § 57b-1(c). After all, WPATH is a large membership organization, some of whose members may have a financial interest in PGDT. WPATH has developed a much-cited set of guidelines regarding PGDT, which is frequently relied on by "state licensing boards" and "[p]racticing clinicians." States' Amicus Br. 1, 8. As described above,

WPATH has also promoted PGDT extensively in multiple contexts, and both the FTC's workshop and numerous public comments addressed its work in this area. *See* Background Section C, *supra*.

Recent reporting also suggests that WPATH, in particular, may have information relevant to the Commission's investigation. As noted, newly released documents suggest that WPATH at times acted not on objective scientific criteria or "professional consensus," but to preserve insurance coverage and avoid regulatory scrutiny of PGDT, while also attempting to suppress publication of commissioned research showing little to no evidence supporting such interventions for children and adolescents. *See* pp. 14–15, *supra*. WPATH seemingly does not dispute the authenticity of these communications, complaining instead that these records are "decontextualized." Mot. at 12; *see id.* at 4, 32. While that may ultimately prove true, the FTC is not required to take WPATH's word for it. At a minimum, WPATH is highly likely to possess information about whether other entities have disseminated false or unsubstantiated claims regarding PGDT.

To be sure, the Commission has not yet determined whether WPATH or anyone else has violated the FTC Act. As Chairman Ferguson explained, the purpose of the investigation is to "understand what sorts of claims are being made about these treatments, what sort of science supports them, what the risks associated with those treatments are, and whether vulnerable populations may have been subject to deception in the administration of those treatments." Dkt.3-28 at 6–7. The Commission is asking "the same sorts of questions [it] would ask about any health claim." *Id.* at 7. And although the "FTC cannot make policy decisions limiting [PGDT] for minors," as then-Commissioner Holyoak put it, "what [it] can and should do is protect children from deceptive statements regarding such treatments." *Id.* at 48.

Entities like WPATH may prefer to operate in secret or believe that the FTC need not investigate these topics. But the FTC is authorized to investigate "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43. Far from demonstrating causation, the undisputed evidence refutes it.

26

**b.** WPATH's attempt to adduce evidence of retaliation is equally misplaced. The purported evidence generally falls into five categories, none of which—either independently or taken together—demonstrates retaliation.

***1. Jurisdiction to Investigate.*** Tellingly, WPATH's lead claim in support of its retaliation theory—that FTC acted "beyond its jurisdiction" in issuing the CID, Mot. 27—fails as a matter of law. More specifically, WPATH argues that it is a nonprofit entity beyond the FTC's enforcement jurisdiction. Mot. 27-28. That argument is wrong several times over.

To start, WPATH's self-identification is not dispositive. The Supreme Court has recognized that an agency has the power to investigate whether an organization is subject to its regulatory jurisdiction. *See, e.g.*, *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 627 (1973) (agency's "jurisdiction to determine whether it has jurisdiction is as essential to its effective operation as is a court's like power"); *Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 434 (9th Cir. 1975) (similar). The FTC therefore "is not obliged to prove its jurisdiction" even "in a subpoena enforcement proceeding"—let alone in this pre-enforcement posture. *FTC v. Ernstthal*, 607 F.2d 488, 490 (D.C. Cir. 1979); *accord Ken Roberts Co.*, 276 F.3d at 586. Indeed, courts have "repeatedly admonished that questions concerning the scope of an agency's substantive authority to regulate are not to be resolved in subpoena enforcement proceedings." *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5 (1st Cir. 1996). Even if there were "uncertainties" about the basis for the Commission's investigation, it would "not provide a cognizable basis" to challenge a CID "designed to produce the very information that may be needed to shed light upon those questions." *Id.* at 6; *accord FTC v. Monahan*, 832 F.2d 688, 689 (1st Cir. 1987) (Breyer, J).

Given that authority, the Commission is "not required to take at face value an organization's claim that it is a charitable organization and can require it to produce documents and other information to enable the Commission to make that determination for itself." *In re Mar. 19, 2014 Civ. Investigative Demand Issued to Police Protective Fund, Inc.*, 157 F.T.C. 1913, 1916 (May 22, 2014). To the contrary, the FTC regularly investigates self-described nonprofits, and

27

several of the CID's specifications are tailored to assess whether WPATH is a true nonprofit or whether it is carrying on business "for its own profit or that of its members." 15 U.S.C. § 44; *see* Dkt.1-1 at 6–8. The FTC has previously used the type of information sought by the CID to establish jurisdiction over professed nonprofits, including in the medical field. *E.g., California Dental Ass'n v. FTC*, 526 U.S. 756, 759 (1999); *Am. Med. Ass'n v. FTC*, 638 F.2d 443, 448 (2d Cir. 1980), *aff'd*, 455 U.S. 676 (1982); *see also FTC v. Nat'l Comm'n on Egg Nutrition*, 517 F.2d 485, 487–88 (7th Cir. 1975).

Even taken at face value, WPATH's assertion that it has a nonprofit mission and does not work "for its own profit or that of its members," Mot. 28, is not sufficient to show that WPATH lies beyond the FTC's jurisdiction. An entity need not "devote itself entirely to its members' profits" to qualify as a corporation under the FTC Act. *California Dental*, 526 U.S. at 766; *Am. Med. Ass'n*, 638 F.2d at 448. Instead, a "proximate relation to lucre must appear"—a standard that encompasses numerous factors, such as whether the entity "engages in lobbying, litigation, marketing, and public relations for the benefits of its members' interests." *California Dental*, 526 U.S. at 766–67.

More fundamentally, the FTC Act does not limit the agency to requesting information from potential wrongdoers only. The Commission's authority to investigate is far broader than its enforcement authority. *See Blue Ribbon Quality Meats*, 560 F.2d at 875–76. Thus, even if WPATH were immune from an enforcement action (a point the Commission does not concede), it is emphatically *not* immune from CIDs. The FTC may issue a CID to "any person," including a nonprofit, who "the Commission has reason to believe … may … have any information[] relevant to unfair or deceptive acts or practices." 15 U.S.C. § 57b-1(c)(1); *see id.* § 57b-1(a)(6) (defining "person" to include a "partnership, corporation, association, or other legal entity"). That is why the FTC issues CIDs to nonprofits, and those entities may need to respond even if they are not ultimately subject to the FTC's enforcement authority. *E.g., In re Feature Films for Families, Inc.*, 150 F.T.C. 866, 870 (Sep. 23, 2010) (explaining that FTC "can require production … from an entity … not subject to the Commission's enforcement authority if" that production "furthers

28

the investigation of possibly illegal conduct by entities … subject to" FTC's jurisdiction); *In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.*, 2023 WL 8112947, at *2 (Nov. 17, 2023) (same).

As a fallback, WPATH confusingly claims that the entire "underlying investigation is outside of the FTC's power and jurisdiction." Mot. 28. Not so. The FTC is authorized to enforce the FTC Act's prohibitions on "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a), and the FTC is investigating here whether "[WPATH] *or any other Person*" has violated the FTC Act. Pl.'s Ex. 1, Dkt.1-1 at 2 (emphasis added). And because the FTC has ample reason to believe that WPATH may have information about whether certain entities have violated the FTC Act by making unsubstantiated medical claims, *see* Background Section C, *supra*, it may seek information from WPATH (regardless of whether it may bring an enforcement action against WPATH). If nothing else, as the author of the SOC-8—a widely discussed set of materials addressing PGDT—WPATH likely has information about the scientific substantiation (if any) of PGDT.

For similar reasons, WPATH is wrong that the Commission lacks authority to seek information about WPATH's purported "non-commercial speech." Mot. 28. Again, the FTC has authority to assess its jurisdiction. And determining whether a statement is non-commercial is a fact-intensive, statement-by-statement inquiry that cannot be conducted without knowing the statement's precise wording, intended purpose, and audience. *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (The "commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." (citation omitted)); *accord Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101, 108–09 (4th Cir. 2018). One of the CID's objectives is to allow the FTC to make that inquiry. *See* Dkt.3-8 at 4-5.

At any rate, even if some of WPATH's statements were non-commercial and did not themselves violate the FTC Act, such statements could still be relevant to determining whether violations of the FTC Act occurred. For example, a researcher's email discussing the risks of a

29

product or the absence of studies showing its benefits would be relevant to a substantiation claim even if the email itself is not commercial speech.

**2. *Ordinary Commission Practice.*** The FTC's reliance on its customary investigatory practices, including its decision to hold a workshop and to issue a request for public comment, is not circumstantial evidence of animus. The FTC has taken those same steps on numerous prior occasions. *See* pp. 9–10, *supra*. And it is well-established that the Commission may "engage in dialogue with concerned citizens." *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1173 (D.C. Cir. 1979). Far from showing unconstitutional motive, the Commission's measured investigation in the months preceding the issuance of the CID only supports its validity.

WPATH broadly complains that the FTC did not conduct the workshop discussion in a neutral manner, *see* Mot. 29, but that perspective is far from unusual. It is hardly surprising that the representatives of an industry whose practices the FTC seeks to examine would insist that they were subjected to excessive criticism. In reality, however, the testimony introduced at the workshop, which, as WPATH concedes, included opposition to certain gender-dysphoria treatments, as well as criticism of WPATH and its clinical guidance, *see* Mot. 9, 29, only provides additional grounding for the FTC's investigation. WPATH also contends that it was improper for the workshop to consider "the experiences of individuals who have detransitioned." Mot. 11. This counterintuitive suggestion is unsupportable. WPATH's own declarant asserts that "it is important to have discussions about regret and the experiences of detransitioned people," including "with adolescents and their families prior to beginning any treatments that have led to that particular outcome in others." Dkt.3-6 ¶ 15.

In any event, the Request for Public Comment opened shortly after the workshop offered ample opportunity for all interested parties to provide their views. *See* Dkt.3-31. WPATH also complains that the Request "erroneous[ly] accus[ed]" WPATH of "loosen[ing] its restrictions and standards regarding [PGDT] for minors." Mot. 29. Initially, WPATH cites no authority for the proposition that a supposed inaccuracy of this type is somehow circumstantial evidence of unconstitutional retaliation. Regardless, WPATH fails to identify any inaccuracy in that statement,

which was supported by a citation to an article in the New York Times. *See* Dkt.3-31 at 5; *see also, e.g.*, *Skrmetti*, 605 U.S. at 537 (2025) (Thomas, J., concurring) ("WPATH relaxed its recommendations in 2012, and began permitting cross-sex hormones for children under the age of 16."); *id.* ("WPATH further relaxed its recommendations when it published the eighth (and current) version of its standards of care in 2022.").

WPATH also argues, based on an anonymous letter from some (purported) FTC employees, that the workshop was improper because the FTC lacked jurisdiction and the topic was too politically charged. *See* Mot. 9-10, 29. But unnamed agency employees cannot veto FTC investigations. And on the merits, their concerns are unfounded. As Chairman Ferguson explained, "the FTC is the federal government's guardian against false and deceptive health claims," and the Commission has brought "dozens of enforcement actions" against "businesses and individuals who have made claims about their health products and services that were not backed by scientific evidence." Dkt.3-31 at 3; Dkt.3-28 at 6. That "many people feel passionately about this issue" says nothing about the propriety of FTC's investigation; "if a medical claim is false or misleading, it is the commission's sworn duty to protect American citizens from that claim no differently than it would for any other false or misleading claim." Dkt.3-28 at 6. As then-Commissioner Holyoak put it, the FTC has authority over "unfair or deceptive practices related to gender-affirming care," and it "should use" that authority to protect children, who may be particularly vulnerable to deceptive or misleading medical claims. *Id.* at 47.

*3. Statements by law enforcement officials about potential violations of law.* WPATH points to statements from Chairman Ferguson and Commissioner Meador, attempting to recast them as hostility toward WPATH and its advocacy. *E.g.*, Mot. 29, 31. That attempt is without substance.

WPATH's argument rests on the mistaken premise that it is somehow improper for Chairman Ferguson and Commissioner Meador to publicly discuss potential violations of the laws enforced by the Commission. Courts have long rebuffed efforts to treat similar comments as evidence of bias or pre-judgment. *E.g.*, *Nuclear Info. & Res. Serv. v. NRC*, 509 F.3d 562, 571

31

(D.C. Cir. 2007) ("[A] mere showing that an official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute" is not a basis for disqualification. (citation omitted)); *FTC v. Cement Inst.*, 333 U.S. 683, 700 (1948) (similar).

That makes good sense. "Given the roles that agency officials must play," it is commonplace for them to develop views on how the laws they enforce may apply and to identify conduct that may violate those laws. *Nuclear Info. & Res. Serv.*, 509 F.3d at 571; *see United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980) ("When Congress creates an agency with an express mission ... the agency officials will almost inevitably form views on the best means of carrying out that mission."). Indeed, agency officials need "to formulate policy" and to "engage in dialogue with concerned citizens." *Ass'n of Nat'l Advertisers*, 627 F.2d at 1173–74; *see also id.* at 1177 (Leventhal, J., concurring) (recognizing that "even judges are not disqualified … because they have previously" expressed a view "on legal issues"). And the FTC is fully "authorized … to alert the public to suspected violations of the law." *FTC v. Cinderella Career & Finishing Sch., Inc.*, 404 F.2d 1308, 1314 (D.C. Cir. 1968). WPATH's contention that agency officials may not "hold policy views on questions," by contrast, "would eviscerate the proper evolution of policymaking," barring action by any official "who has opinions on the correct course of his agency's future action." *Ass'n of Nat'l Advertisers*, 627 F.2d at 1174. It would also improperly "immunize" from enforcement activity any entity that law enforcement officials considered a potential lawbreaker. *Cement Inst.*, 333 U.S. at 701–02.

Consistent with these authorities, this Court has already declined to adopt a materially identical theory to the one WPATH advances here. A few years ago, Facebook sought to disqualify then-Chairwoman Lina Khan from a proceeding against the company, alleging that she had "an 'axe to grind' against [Facebook] ... given the views articulated in her past work," which included her "views on Facebook's monopoly status." *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 64 (D.D.C. 2022) (Boasberg, J.); *see also Media Matters for Am. v. FTC*, 2025 WL 2988966, at *15–17 (D.C. Cir. Oct. 23, 2025) (Walker, J., dissenting) (cataloguing Khan's statements about her investigation "targets"). The Court rejected that argument, reasoning that Khan's role as an FTC

32

Commissioner was analogous to "that of a prosecutor," who is "necessarily permitted to be zealous in [her] enforcement of the law." *Facebook*, 581 F. Supp. 3d at 63–64 (citation omitted).  Although "Khan [had] undoubtedly expressed views about Facebook's monopoly power," this Court found no "personal animosity against Facebook" "beyond [Khan's] own views about antitrust law." *Id.* at 64.

In short, Khan's "belief in the validity of the allegations" against Facebook was not any cause for concern.  *Id.*  And there is no reason to believe that Facebook could have changed the outcome simply by styling its argument as a constitutional retaliation claim rather than a disqualification request.  The same logic applies here.  Just as in *Facebook*, the selected comments on which WPATH relies demonstrate—at most—that Chairman Ferguson and Commissioner Meador have expressed opinions about potential violations of the FTC Act.  But unlike Facebook, WPATH requests far broader relief than the court declined to impose there—an injunction barring *any* investigation instead of mere recusal.

It is also notable that WPATH nowhere mentions former Commissioner Holyoak.  *See* Dkt.3-28 at 47–49.  Her support for the investigation—in combination with the absence of *any* allegations that she harbored improper motive—further confirms the investigation's legitimacy.

WPATH next turns to statements by *non*-decisionmakers, including a couple FTC staffers and a *separate* agency, without alleging that any of them participated in issuing the CID.  Mot. 10-13, 29-31.  Remarks from "non-decisionmakers are not generally direct evidence of retaliation." *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020); *accord Youssef v. Lynch*, 144 F. Supp. 3d 70, 101 (D.D.C. 2015).  The only way such statements could even conceivably enter the analysis is if the non-decisionmaker was involved in the decisionmaking process.  *E.g.*, *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009), *aff'd*, 419 F. App'x 1 (D.C. Cir. 2011) (concluding that "comments made by … non-decisionmakers[] are inadmissible" where "plaintiff [had] failed to proffer evidence … that the speakers had any influence, or even had any input, on the [relevant] decision"); *In re Architect of Capitol Emp. Disp.*, 2024 WL 3359515, at *3 (D.D.C. July 10, 2024) (disregarding comments by "non-decisionmakers").

WPATH has not contended that any of these individuals had any involvement in the issuance of the CID.

At any rate, the FTC staffers' comments are innocuous on their face. For instance, one staffer merely observed that it was appropriate to "*investigat[e]* whether children had their breasts and genitalia improperly removed." Dkt.3-34 at 2 (emphasis added). Another individual (who was not an FTC employee at the time and was not hired by the FTC until after the CID was issued) suggested that revealing the prevalence of "deceptive activity" to the public through enforcement activity, such as "seeking injunctions," could be a catalyst for potentially beneficial change. Dkt.3-28 at 82–83; *contra* Mot. 29. Even if these cherrypicked statements from non-decisionmakers were relevant, none of them suggests retaliation against WPATH. Instead, they merely condemned unfair and deceptive trade practices relating to PGDT. *See* Dkt.3-23 at 4 (FTC staffer stating that "[n]o sane person could endorse the *needless* mutilation of children" and that "[e]very American should be *troubled by the possibility* that parents and their children were misled about" PGDT (emphasis added)).

*4. Scope of the CID.* WPATH argues that the CID's scope somehow shows retaliatory animus. But the CID is no broader than what the FTC typically issues during investigations. *See, e.g.*, *FTC v. Cigna Group*, No. 1:25-mc-0004, Dkt.1-2 (D.D.C. Jan. 15, 2025) (43 specifications); *FTC v. It Media, Inc.*, No. 2:16-cv-9483, Dkt.1-2 (C.D. Cal. Dec. 12, 2016). In fact, the CID sent to WPATH has *fewer specifications* and seeks *less information* than CIDs sent to other nonprofits or in other investigations involving healthcare claims. *E.g.*, Mot. to Quash Civ. Investigative Demand, Ex. P, *Police Protective Fund*, 157 F.T.C. 1913, https://perma.cc/2L5J-PM87; Pet. to Enforce Civ. Investigative Demand, Ex. 3, *FTC v. Kushly, LLC*, No. 2:20-mc-0036 (D. Ariz. July 30, 2020) (22 interrogatories and 15 document requests, many with subparts), https://perma.cc/QQJ9-GFXT; Pet. for an Order Enforcing Civ. Investigative Demand, Ex. 2, *FTC v. Redwood Sci. Techs.*, No. 2:17-cv-07921 (C.D. Cal. Oct. 13, 2017) (22 interrogatories and 16 document requests, many with subparts), https://perma.cc/5BSC-8ATQ; Pet. to Limit or Quash

34

Civ. Investigative Demand, Ex. 1, *In re Lexium Int'l, LLC*, 162 F.T.C. 1212 (2016) (42 interrogatories and 36 document requests, many with subparts), https://perma.cc/Q6PG-D4LA.

Likewise, the CID's specifications flow from the Commission's goal of investigating whether WPATH or any other persons are making deceptive or unsubstantiated claims about the safety and efficacy of treatments for gender dysphoria in violation of the FTC Act.  The CID requests relevant information about the statements WPATH has made in support of these treatments, "to whom" they were made, and the substantiation for the statements.  Dkt.1-1 at 4-6. Other specifications relating to (i) financial incentives WPATH may have for its statements, *see e.g.*, Dkt.1-1 at 5 (requesting information on any "financial relationships[] or partnerships relating to PGDT between" WPATH and "pharmaceutical compan[ies]" or a "clinic, hospital system, or individual clinician"), and (ii) benefits WPATH provides to its members, *id.* at 4 (such as "discounts," "financing," "legal advocacy," "lobbying," "education and training" programs, or "certification[s]"), bear directly on FTC's jurisdiction and whether WPATH operates "for its own profit or that of its members."  15 U.S.C. § 44; *see California Dental*, 526 U.S. at 760 (ostensible nonprofit that "lobbies and litigates in its members' interests" "carries on business for the profit 'of its members'" under the FTC Act).

WPATH's unsupported suggestion that retaliation can be inferred because FTC issued a CID instead of searching for information "on WPATH's website" or in "communications . . . released on public litigation dockets" should be rejected out of hand.  Mot. 30.  First, WPATH itself has admitted that, per Commission staff, the CID "does not seek publicly available information." Mot. 14 (citing Dkt.3-37).  At any rate, it would be absurd to conclude that retaliation can be inferred whenever an agency seeks information not already in the public domain.  FTC cannot be faulted for relying on the investigatory tools that Congress gave it rather than scouring the internet.

**5. *Temporal proximity.***    Last, WPATH claims that "the temporal proximity between WPATH's speech and advocacy, and the FTC's adverse acts, is indicative" of retaliation.  Mot. 30.  This argument is difficult to understand.  WPATH makes no effort to identify any protected

activity that is temporally proximate to the CID's issuance.  It is impossible to find a temporal connection to an unknown event.  *See Lakkis v. Lahovski*, 994 F. Supp. 2d 624, 634 (M.D. Pa. 2014) (concluding that allegations "not anchored in time" cannot "enable a fact-finder to infer a causal link.").  Instead, WPATH complains that President Trump issued an executive order that criticized the SOC-8.  *See* Mot. 6.  But the SOC-8 was published in 2022, and the cited executive orders were issued in January 2025.  *See* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025); Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).  Further, WPATH identifies no legal authority for its implicit assumption that the Orders, or the actions of other government entities, can be attributed to the FTC for purposes of a retaliation claim.[2]  Even if such conflation were permissible, the Orders (and the SOC-8) predate the challenged action by over a year— "negat[ing] any inference [of] a causal connection."  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005); *see Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (explaining that even "a three-month period" may "be too lengthy" for temporal proximity).

More fundamentally, the Administration may express its views on what constitutes good medical practice.  And an administration's view that some of those practices may disserve the public interest while also potentially violating federal law does not transform an investigation of them into retaliation.  Otherwise, a President's criticism of Big Tech, pharmaceutical companies, or payday lenders would render those sectors immune from investigation.  The inescapable

---

[2] For example, WPATH notes that certain courts have quashed subpoenas issued by the Department of Justice to "organizations, doctors, and healthcare facilities promoting and/or providing healthcare for transgender minors."  Mot. 8.  But WPATH offers no legal or factual support for its suggestion that those subpoenas, which were issued in June 2025, have anything to do with a CID issued more than six months later by a different agency.  Even if somehow relevant to this case, the cited decisions are not binding and are subject to ongoing challenges in any event.  Moreover, the subpoenas issued in those cases involve a distinct statutory regime with no bearing on the viability of a CID issued under the FTC Act.  WPATH's attempted conflation of all of these cases further exposes its sweeping and untenable view that no federal agency can investigate any form of lawbreaking concerning PGDT.

36

implication of WPATH's arguments is that the current Administration—in its entirety—is simply powerless to investigate any unfair or deceptive practices relating to PGDT, and ultimately to protect the public from such practices.  That is not the law.

*    *    *

In sum, WPATH's purported evidence does not support an inference of retaliation.  By contrast, the Commission has proffered undisputed evidence of a nonretaliatory purpose for issuing the CID: advancing its broad investigation into whether WPATH or other entities have violated the FTC Act by making deceptive or unsubstantiated claims about the safety and efficacy of certain medical treatments for gender dysphoria.  At bottom, WPATH's position is that the First Amendment bars the federal government from investigating any potential wrongdoing relating to PGDT.  This Court would not credit that argument from any other industry, *see, e.g.*, *Facebook*, 581 F. Supp. 3d at 64, and it should not do so here.

### 2.    The CID Has Not Chilled WPATH's Speech

WPATH has also failed to show that the CID is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking." *See Aref*, 833 F.3d at 258.  The organization has raised only a generic retaliatory investigation claim, and the Supreme Court has expressly questioned whether the "adverse consequences of a retaliatory investigation would *ever* justify recognizing such an investigation as a distinct constitutional violation," *Hartman*, 547 U.S. at 262 n.9 (emphasis added).  The scope of the CID reflects the ordinary bounds of FTC investigations, *contra* Mot. 23–24, and WPATH has not asserted any unusual injury from the CID.  Instead, it points to alleged harms common to all CID recipients—such as fears of "scrutin[y] by the FTC," the prospect that the investigation might "impact … a person's decision to participate in WPATH activities," and the possibility of legal "risks for WPATH and its members" in federal court.  *Id.* at 25–26.  But invoking routine and practical effects of an FTC investigation does not demonstrate a chilling effect.  *See Cinderella Career & Finishing Sch., Inc.*, 404 F.2d at 1316 ("The practical effect of the Commission's initial press release, in this or any other complaint proceeding, is

37

undoubtedly deleterious to the respondents' economic, business, and community status....
Unfortunate though this result may be, we are convinced that this damage does not constitute a
transgression of the appellees' legal rights."). And WPATH's claim of chill is implausible, given
the organization's size and substantial resources. *See* p. 14, *supra*.

Some of WPATH's alleged harms are also entirely speculative and unconnected to the
CID. For example, WPATH itself suggests that the CID will deter its members from "engag[ing]
in the kind of open discussions and debates that are core to WPATH's mission." Mot. 25. That
theory depends on a chain of assumptions—without evidentiary support—about how third parties
might react to the CID.

Nor can the district court decision in *Media Matters of America v. FTC* bear the weight
placed on it. *See* Mot. 23–25; 805 F. Supp. 3d at 111–12. That decision, as well as the stay panel's
subsequent ruling, does not bind this Court. *See* p. 22, *supra*. In its pending appeal before the
D.C. Circuit, the Commission has explained that the district court's analysis of Media Matters'
retaliation claim rested on a series of errors. *See* Appellants' Br. 36–54, *Media Matters*, No. 25-
5302 (D.C. Cir. Jan. 5, 2026).

In any event, the reasoning of *Media Matters* is inapt here. The retaliation ruling "turned
on facts unique to Media Matters," and the court stressed that the "likelihood" of another CID
recipient in the same investigation prevailing on a similar claim would "depend on entirely
different facts." *See* Docket Order, *Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137 (D.D.C.
Dec. 16, 2025) (Sooknanan, J.). The stay panel majority also described *Media Matters* as involving
"unique factual circumstances" and expressed skepticism that not even other CID recipients in the
same investigation "could plausibly … seek similar relief." *Media Matters*, 2025 WL 2988966,
at *11. The narrow and factbound determination in *Media Matters* is especially irrelevant to
WPATH, a CID recipient in a wholly different investigation.

If anything, *Media Matters* further reveals the weakness of WPATH's case. The district
court there relied primarily on the fact that Media Matters had previously prevailed in litigation

asserting that state officials issued subpoenas to retaliate for a specific 2023 article. *Media Matters*, 805 F. Supp. 3d at 113–15. WPATH alleges nothing comparable here.

### 3. A Retaliatory-Investigation Claim Is Not Cognizable

Because WPATH's retaliation claim fails, this Court need not decide whether a retaliatory *investigation* claim, such as the one asserted here, is cognizable. If the Court does reach that question, it should hold that WPATH will likely not prevail on it.

The Supreme Court expressly left open this question, and the D.C. Circuit has declined to answer it. *See Hartman*, 547 U.S. at 262 n.9; *Paxton*, 138 F.4th at 584–85. Although the *Media Matters* district court found support for a retaliatory investigation claim in *Paxton*, 805 F. Supp. 3d at 132–33, *Paxton* did not address the issue because the defendant there forfeited the argument, *see* 138 F.4th at 584. One federal court of appeals has assumed that a retaliatory investigation claim could arise in extraordinary circumstances, *see Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (explaining that, although no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of a given investigation could violate the First Amendment), and several other courts of appeals have suggested that courts should not recognize the claim at all, *see Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Breaux v. City of Garland*, 205 F.3d 150, 157–61 (5th Cir. 2000); *see also J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("[W]e have never recognized a retaliatory-investigation claim of this kind. Nor have other courts around the country."); *Sivella v. Twp. of Lyndhurst*, 2021 WL 3356934, at *3 (3d Cir. Aug. 3, 2021). And the Eleventh Circuit has squarely held that the initiation of a retaliatory investigation "does not implicate a federal constitutional right." *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *accord Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam).

WPATH's reliance on *Reporters Committee for Freedom of the Press v. AT&T Co.*, 593 F.2d 1030 (D.C. Cir. 1978), is doubly flawed. *See* Mot. 22–23. First, *Reporters Committee* preceded the Supreme Court's decision in *Hartman* and the modern doctrinal framework on this

39

issue. Second, *Reporters Committee* stands for the unremarkable proposition that, "*in theory*," "subpoenas issued in bad faith may *in some cases* abridge First Amendment rights," if a plaintiff "establishes a *clear and imminent* threat of" government misconduct and "lay[s] an adequate foundation for such judicial intervention." *Id.* at 1071 (emphasis added). Like the plaintiff in that case, WPATH comes nowhere close to "meet[ing] this heavy burden." *See id.*

At the very least, the open questions about the existence of retaliatory-investigation claims "suggest that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing." *Skrmetti*, 83 F.4th at 471. In other words, even the most sweeping and aggressive position on the issue is that *conducting* an investigation in certain unusually abusive ways could give rise to a constitutional claim—an allegation not present here. *See White v. Lee*, 227 F.3d 1214, 1220, 1233 (9th Cir. 2000) (addressing a challenge to government conduct during an investigation, which included threatening and defamatory actions not alleged here).

### C.   WPATH Is Not Likely To Prevail On Its Other Constitutional Claims

WPATH also contends that the CID constitutes unlawful viewpoint discrimination, Mot. 31–34, and abridges its freedom of association, *id.* at 34–36. Both contentions are misplaced.

#### 1.   The CID Is Not Viewpoint-Discriminatory

The First Amendment generally prohibits the "government from proscribing speech … or even expressive conduct … because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Viewpoint discrimination occurs when the government regulates speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Importantly, viewpoint discrimination requires an actual restriction of or regulation on speech. *See id.* at 828–29. But the Free Speech Clause does not apply "[w]hen government officials are 'engaging in their own expressive conduct.'" *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) (citation omitted). That straightforward principle "makes sense," *id.*, because "imposing a requirement of viewpoint-neutrality on government speech would be paralyzing," *Matal v. Tam*,

582 U.S. 218, 234 (2017).  Although a government official may not "use the power of the State to punish or suppress disfavored expression," *Vullo*, 602 U.S. at 188, the First Amendment "does not require government to maintain viewpoint-neutrality when its officers and employees speak about" a policy initiative.  *Id.* at 187 (citation omitted).

Contrary to WPATH's contention, the FTC's issuance of the CID does not amount to "discrimination based on viewpoint," Mot. 32.  The CID merely requests information about potentially deceptive and misleading medical claims; it does not "punish or suppress disfavored expression," *see Vullo*, 602 U.S. at 188.  After all, the CID is not self-executing and imposes no legal consequence for noncompliance.  Nothing in the CID prevents WPATH from continuing to promote its views on PGDT.  Even assuming that the FTC "disagree[s] with WPATH's viewpoint on transgender healthcare," Mot. 32, the Supreme Court has unmistakably held that government officials may express a viewpoint when discussing a policy action, *Tam*, 582 U.S. at 234; *accord United Steelworkers*, 647 F.2d at 1208.

Nor was the investigation motivated by any partisan affiliations WPATH might have. *Contra* Mot. 32–33.  The Commission sought to investigate unsubstantiated medical claims about PGDT and received substantial evidence that WPATH's standards of care may be unreliable and may pose a risk of serious harm to patients.  *See* pp. 10–15, *supra*.  And to the extent that FTC "ha[s] applauded the use of investigations," Mot. 33, the statements cited by WPATH simply endorse the Commission's viewpoint-neutral duty of protecting the public from false or deceptive medical claims.  *See, e.g.*, Dkt.3-30 (former patient describing PGDT as "blatant consumer fraud"); Dkt.3-28 at 82 (FTC workshop participant suggesting that revealing the prevalence of "deceptive activity" with "thorough investigations" and "injunctions" could restore public trust "in medical institutions").  Because FTC has not targeted WPATH based on viewpoint or suppressed any of WPATH's speech, the viewpoint-discrimination claim is not likely to succeed.

## 2. The CID Does Not Burden WPATH'S Associational Rights

WPATH's argument that the CID abridges its freedom of association is equally unavailing. The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Government action may infringe the freedom to associate if it "seek[s] to impose penalties or withhold benefits from individuals because of their membership in a disfavored group," "attempt[s] to require disclosure of the fact of membership in a group seeking anonymity," or "tr[ies] to interfere with the internal organization or affairs of the group." *Id.* at 622–23; *see Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021). The right to associate "is not, however, absolute," and "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623.

WPATH's freedom-of-association claim falters on several fronts. To start, the claim is premature. WPATH has not identified any disputed materials on a "document-by-document basis" that implicate its associational privilege, *see In re Grand Jury Procs.*, 220 F.3d 568, 571 (7th Cir. 2000), and it would be impossible to do so before the CID-enforcement stage. Nor has the CID "impose[d] penalties" on or "withh[e]ld benefits" from WPATH, compelled disclosure of WPATH's membership in an anonymous group, or "interfere[d] with" WPATH's "internal organization or affairs." *See Roberts*, 468 U.S. at 622–23.

WPATH's principal authority for its associational-privilege argument, *Americans for Prosperity Foundation v. Bonta*, only reinforces that no First Amendment violation has occurred. *See* Mot. 34–35. There, the Supreme Court faulted the State of California for implementing a sweeping disclosure regime that required "tens of thousands of charities" to submit their confidential donor lists, even though "less intrusive alternatives"—"such as a *subpoena* or audit letter" issued to a particular entity—were available. *Bonta*, 594 U.S. at 613–14 (emphasis added). But this case involves the very tools identified in *Bonta* as permissible alternatives. The FTC did

42

not impose a generally applicable disclosure requirement on an entire class of organizations; it issued an administrative subpoena to a specific entity that it had reason to believe possessed information about potential FTC Act violations. And although WPATH was free to utilize the privilege log procedure provided in the CID, *see* Dkt.1-1 at 8, it has pointed to no specific document—or even category of documents—that is confidential and in dispute.

The CID likewise does not impinge on WPATH's "protected right to petition." *Contra* Mot. 22, 24, 33. An administrative subpoena does not prevent its recipient from bringing lawsuits, lobbying "governing bod[ies]," or "petition[ing]" concerning issues of profound public importance." Mot. 15, 20. WPATH may continue to engage in all those activities. WPATH's independent decision to "pause[] certain educational and certification programs" and to speak more cautiously to ensure compliance with the FTC Act, *id.* at 25, does not transform the CID into a restriction on petitioning. At bottom, WPATH asks this Court to endorse a "right to lobby *in secret*"—a right the First Amendment does not recognize. *DoorDash, Inc. v. City of New York*, 754 F. Supp. 3d 556, 577 (S.D.N.Y. 2024).

## II.    THE EQUITIES DISFAVOR INJUNCTIVE RELIEF

Beyond likelihood of success on the merits, WPATH has not satisfied the other requirements for a preliminary injunction. WPATH has not shown irreparable harm, and both the equities and public interest weigh decisively against relief.

"[T]he Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the [courts'] authority." *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). By contrast, the only potentially irreparable harm identified by WPATH consists of meritless constitutional injuries, which fall far short of the D.C. Circuit's "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). And the Supreme Court has long held that the ordinary

43

burdens associated with responding to an administrative subpoena do not alone constitute irreparable harm. *Claire Furnace*, 274 U.S. at 174; *see FTC v. Standard Oil of Cal.*, 449 U.S. 232, 244 (1980).

Nor do WPATH's purported reputational injuries, *see* Mot. 37–38, show irreparable harm. "The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and thus recoverable. *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). The D.C. Circuit has explained that an alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Thus, when a harm is "based on independent market variables such as how [a company's] customers and/or retailer consumers might react," that harm does not flow directly from the challenged action. *Am. Meat Inst. v. USDA*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014). To the extent that WPATH claims additional harm from stalled work on gender dysphoria treatment and "[l]oss of open scientific and medical discourse," Mot. 39, that harm stems from WPATH's own choices or speculation about the actions of third parties. In all events, the alleged injuries are monetary—the paradigmatic example of *reparable* harm.

An injunction would also disserve the public, which benefits from the robust enforcement of the FTC Act. *See Standard Oil*, 449 U.S. at 242. The public interest carries particular importance in an investigation like this one, which addresses allegations that deceptive or unsubstantiated medical claims have harmed parents and children. Enjoining the FTC's ability to investigate inflicts grievous harm on the public and the agency—a harm compounded by the likelihood that an injunction would invite a barrage of copycat pre-enforcement challenges.

## III.   AT A MINIMUM, THE COURT SHOULD REQUIRE A BOND AND STAY ANY INJUNCTION

As set forth above, no injunctive relief is warranted here. But if the Court decides to grant an injunction (it should not), WPATH could obtain—at most—a preliminary injunction against the enforcement of this particular CID. *See* Order, *Media Matters for Am. v. FTC*, No. 1:25-cv-

44

1959 (Aug. 15, 2025), Dkt. 35 (ordering only that "Defendants are enjoined from implementing or enforcing the Civil Investigative Demand served ... to Media Matters").  Although WPATH's proposed order requests far more extensive relief, *see* Dkt.3-39, WPATH's motion barely mentions that relief, let alone mounts an argument in favor of it.  In all events, WPATH certainly cannot seek to bar actions involving "*other … organization[s]*."  *Id.* at 2 (emphasis added); *see CASA, Inc.*, 606 U.S. at 844.

Upon the issuance of any injunction, the Court should also require a bond under Rule 65(c) commensurate with the scope of relief granted.  And because Defendants have satisfied the requirements for a stay, *see Nken v. Holder*, 556 U.S. 418, 434 (2009), they respectfully request that the Court stay any injunction pending appeal, or, at a minimum, enter a seven-day administrative stay to allow Defendants to consider seeking relief from the Court of Appeals.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion for preliminary injunction.

45

Dated: March 19, 2026

Respectfully submitted,

OF COUNSEL:

LUCAS CROSLOW
*General Counsel*
ALEX POTAPOV
*Deputy General Counsel*
ETHAN D. BECK
*Counsel to the General Counsel*

CHRISTOPHER MUFARRIGE
*Director*, Bureau of Consumer Protection
KATHERINE WHITE
*Deputy Director*, Bureau of Consumer Protection

Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2110
ebeck@ftc.gov

BRETT A. SHUMATE
*Assistant Attorney General, Civil Division*

DANIEL F. MUMMOLO
*Counsel to the Assistant Attorney General*

*/s/ John Bailey*
JOHN BAILEY
*Counsel to the Assistant Attorney General*

United States Department of Justice
Civil Division
950 Pennsylvania Ave. NW
Washington, DC 20005
Phone: (202) 514-6054
Email: daniel.f.mummolo@usdoj.gov

*Attorneys for Defendants*