**factiviUNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, <br><br>      *Plaintiff*, <br><br>     *v.* <br><br> FEDERAL TRADE COMMISSION; ANDREW N. FERGUSON, in his official capacity as Chairman of the Federal Trade Commission; MARK R. MEADOR, in his official capacity as Commissioner of the Federal Trade Commission; and JOHN DOES 1-3, in their official capacities as Commissioners of the Federal Trade Commission, <br><br>     *Defendants*. | Civil Action No. 1:26-cv-00532-JEB <br><br><br> **Hearing Requested** |

**REPLY IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.      The FTC's Threshold Objections Are Meritless.................................................... 2

        A.      WPATH's Claims Are Not Precluded by the FTC Act .......................... 3

                1.      Congress Did Not Intend Agency Review of WPATH's
                        Constitutional Claims.................................................................... 3

                2.      WPATH's Claims Are Not the Type Congress Intended
                        to be Reviewed Within the FTC Act's Statutory Structure ........ 4

        B.      WPATH's Equitable Claims Are Properly Presented ............................ 7

II.     WPATH Will Likely Succeed on the Merits of Its First Amendment Claims ................... 9

        A.      WPATH is Likely to Succeed on Its Retaliation Claim ........................ 9

                1.      WPATH Has Shown a Causal Link Under Any Standard.......................... 9

                2.      WPATH's Evidence Shows a Causal Link Between
                        Protected Speech and the FTC's Actions................................. 14

                3.      The FTC has Chilled WPATH's Speech and Association.......................... 19

                4.      WPATH's Retaliatory Investigation Claim is Cognizable ...................... 20

        B.      The CID and Investigation are Unconstitutional Viewpoint
                Discrimination............................................................................. 21

        C.      The CID Violates Freedom of Association.......................................... 23

III.    The Equities and the Public Interest Favor a Preliminary Injunction.............................. 24

IV.     The Court Should Not Stay Its Decision or Require a Bond ........................................... 25

CONCLUSION................................................................................................................. 25

i

**TABLE OF AUTHORITIES**

**Cases**

*Alexander v. Sandoval*,
532 U.S. 275 (2001)................................................................................................ 8

*Am. Acad. of Pediatrics v. FTC*,
1:26-cv-00508 (D.D.C. Feb. 17, 2026)................................................................ 22

*Am. Fed. Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019)............................................................................. 6

*Am. Med. Ass'n v. FTC*,
638 F.2d 443 (2d Cir. 1980)................................................................................ 14

*\*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)...................................................................................... 23, 24

*Archer v. Chisholm*,
870 F.3d 603 (7th Cir. 2017) .............................................................................. 21

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016)............................................................................. 19

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)............................................................................................. 7

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023)................................................................................ 3, 5, 6, 7

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)........................................................................................ 19, 20

*Bell v. Hood*,
327 U.S. 678 (1946)............................................................................................. 7

*Blue Ribbon Quality Meats, Inc. v. F.T.C.*,
560 F.2d 874 (8th Cir. 1977) .............................................................................. 15

*Breaux v. City of Garland*,
205 F.3d 150 (5th Cir. 2000) .............................................................................. 21

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999)............................................................................................. 14

*CFPB v. Accrediting Council for Indep. Colleges & Schs.*,
854 F.3d 683 (D.C. Cir. 2017)....................................................................... 13, 15

*City of Rancho Palos Verdes v. Abrams*,
  544 U.S. 113 (2005) ........................................................................................... 7

*Corr. Servs. Corp. v. Malesko*,
  534 U.S. 61 (2001) ............................................................................................. 7

*DeVillier v. Texas*,
  601 U.S. 285 (2024) ........................................................................................... 7

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012) ............................................................................................... 3

*Endocrine Soc'y v. FTC*,
  No. 1:26-cv-00512 (D.D.C. Feb. 17, 2026) ...................................................... 22

*Ex parte Young*,
  209 U.S. 123 (1908) ...................................................................................... 2, 7

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ......................................................................................... 14

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) ........................................................................................... 3

*FTC v. Cinderella Career & Finishing Schs., Inc.*,
  404 F.2d 1308 (D.C. Cir. 1968) ....................................................................... 20

*FTC v. Claire Furnace Co.*,
  274 U.S. 160 (1927) ........................................................................................... 8

*FTC v. Facebook, Inc.*,
  581 F. Supp. 3d 34 (D.D.C. 2022) ............................................................. 17, 18

*FTC v. Nat'l Comm'n on Egg Nutrition*,
  517 F.2d 485 (7th Cir. 1975) ........................................................................... 14

*Gonzalez v. Trevino*,
  602 U.S. 653 (2024) ......................................................................................... 10

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ......................................................................... 25

*Harris v. Wackenhut Servs., Inc.*,
  648 F. Supp. 2d 53 (D.D.C. 2009) ................................................................... 18

*Hartman v. Moore*,
  547 U.S. 250 (2006) .................................................................................... 10, 21

*In re Architect of Capitol Emp. Disp.*,
  No. 1:23-cv-2334, 2024 WL 3359515 (D.D.C. July 10, 2024) .............................................. 18

*In re Murchison*,
  349 U.S. 133 (1955) .................................................................................................................. 6

*J.T.H. v. Missouri Dep't of Social Servs. Childs. Div.*,
  39 F.4th 489 (8th Cir. 2022) ................................................................................................... 21

*John Doe Co. v. CFPB*,
  849 F.3d 1129 (D.C. Cir. 2017) ............................................................................................... 5

*LabMD, Inc. v. FTC*,
  776 F.3d 1275 (11th Cir. 2015) ................................................................................................ 6

*Media Matters for Am. v. Bailey*,
  No. 24-cv-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024) ....................................... 10

*\*Media Matters for Am. v. FTC*,
  805 F. Supp. 3d 105 (D.D.C. 2025) ................................................................................. passim

*\*Media Matters for Am. v. FTC*,
  No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ............................................. passim

*\*Media Matters for Am. v. Paxton*,
  138 F.4th 563 (D.C. Cir. 2025) ........................................................................................... 8, 20

*Media Matters for Am. v. Paxton*,
  732 F. Supp. 3d 1 (D.D.C. 2024) ............................................................................................ 19

*Meredith v. Fed. Mine Safety & Health Rev. Comm'n*,
  177 F.3d 1042 (D.C. Cir. 1999) .............................................................................................. 21

*N.A. Building Trades Unions v. Dep't of Def.*,
  783 F. Supp. 3d 290 (D.D.C. 2025) ........................................................................................ 25

*NAACP v. Ala. ex rel. Patterson*,
  357 U.S. 449 (1958) ........................................................................................................... 21, 23

*Nat'l Council of Nonprofits v. OMB*,
  775 F.Supp.3d 100 (D.D.C. Feb. 25, 2025) ........................................................................... 25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) ................................................................................................................ 22

*Newsguard Techns. v. FTC*,
  No. 26-cv-00353 (D.D.C. Feb. 6, 2026) ................................................................................. 23

iv

*Nieves v. Bartlett*,
   587 U.S. 391 (2019) ............................................................................................ 9, 10

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................ 25

*Patten v. District of Columbia*,
   9 F.4th 921 (D.C. Cir. 2021) ..................................................................................... 4

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) .......................................................................... 24, 25

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
   807 F. Supp. 3d 1295 (W.D. Wash. Oct. 27, 2025) ................................................. 1

*Rehberg v. Paulk*,
   611 F.3d 828 (11th Cir. 2010) ................................................................................ 21

*Reisman v. Caplin*,
   375 U.S. 440 (1964) .................................................................................................. 8

*Reps. Comm. for Freedom of the Press v. AT&T*,
   593 F.2d 1030 (D.C. Cir. 1978) .............................................................................. 20

*Slaughter v. Trump*,
   791 F. Supp. 3d 1 (D.D.C. July 17, 2025) .............................................................. 19

*Thunder Basin Coal Company v. Reich*,
   510 U.S. 200 (1994) ..................................................................................... 2, 3, 4, 5

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ................................................................................................ 25

*Twitter, Inc. v. Paxton*,
   56 F.4th 1170 (9th Cir. 2022) ................................................................................... 8

*United States v. Fokker Servs. B.V.*,
   818 F.3d 733 (D.C. Cir. 2016) ................................................................................ 10

*Waggel v. George Washington Univ.*,
   957 F.3d 1364 (D.C. Cir. 2020) .............................................................................. 18

*Wearly v. FTC*,
   616 F.2d 662 (3rd Cir. 1980) .................................................................................... 8

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ................................................................................ 20

*Youssef v. Lynch,*
    144 F. Supp. 3d 70 (D.D.C. 2015)........................................................................ 18

*Ziglar v. Abbasi,*
    582 U.S. 120 (2017)......................................................................................... 7

**Statutes**

15 U.S.C. § 44............................................................................................ 14

15 U.S.C. § 45............................................................................................. 6

15 U.S.C. § 46........................................................................................... 15

15 U.S.C. § 57b-1 ................................................................................. 4, 6, 7, 15

28 U.S.C. § 1331......................................................................................... 3

**Other Authorities**

126 Cong. Rec. 1177-1242 (daily ed. Feb. 7, 1980)......................................... 15

Exec. Order No. 14,187, 90 Fed. Reg. 8771 (Feb. 3, 2025) ....................... 1, 22

FTC Improvements Act of 1980, PL 96-252, 94 Stat 374 (May 28, 1980)................. 15

**INTRODUCTION**

On January 28, 2025, President Trump decreed that transgender healthcare for youth "must end." Exec. Order No. 14,187, 90 Fed. Reg. 8771, 8771 (Feb. 3, 2025). Following that decree, government agencies have issued dozens of sprawling subpoenas to providers of such care. Court after court has held those subpoenas issued for an "improper purpose," namely, to "end the very practice [the government] claims to be merely investigating." *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1303 (W.D. Wash. Oct. 27, 2025); *see also* ECF No. 3-1 at 8 (collecting cases).

The investigation and civil investigative demand ("CID") challenged here are no different. Ending transgender healthcare for minors requires silencing the organization that publishes the standard for such care. President Trump's decree described transgender healthcare as "spurred by guidance" from Plaintiff World Professional Association for Transgender Health ("WPATH"). 90 Fed. Reg. at 8,771. The challenged CID seeks all WPATH's communications regarding that guidance, even though WPATH is outside of the FTC's regulatory jurisdiction. That is not a good-faith effort to investigate suspected misconduct. It is a fishing expedition designed to intimidate and retaliate against WPATH for its speech and to deter similar activity in the future.

The FTC contends that this Court lacks jurisdiction until it pursues an enforcement action, an argument recently rejected by another judge in this District. *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 125 (D.D.C. 2025) ("*Media Matters II*"). For good reason: the alleged retaliator should not decide whether and when to open the courthouse door. The threatened enforcement of the CID is already chilling WPATH's speech and association. Nothing suggests that Congress intended to give the FTC discretion to prevent a court from reviewing a constitutional challenge to its actions or to delay addressing the ongoing harms caused by its unconstitutional actions. And Supreme Court precedent has long recognized federal courts'

jurisdiction over equitable claims enforcing constitutional rights. *Ex parte Young*, 209 U.S. 123, 156 (1908).

The FTC's other arguments fare no better. WPATH will likely succeed on its claims of First Amendment retaliation, viewpoint discrimination, and the violation of its right to associate. The FTC concedes that WPATH has engaged in conduct protected by the First Amendment. The evidence demonstrates that WPATH's protected conduct caused the FTC to initiate this investigation and issue its CID. Never before has the FTC asserted jurisdiction to investigate organizations that do not sell products, but instead provide only non-commercial clinical guidelines. The FTC Chairman who signed WPATH's CID promised to "push back on the trans agenda." Ex. 16. Such statements, and the FTC's atypical investigation, demonstrate that the FTC's unprecedented assertion of jurisdiction is motivated by antipathy to the ideas WPATH expresses and not any real issue of consumer protection or commercial trade for which the FTC is supposed to regulate. The Court should not permit the FTC to rifle through all WPATH's records in the hope that it might somewhere show some act by some other entity that the FTC will regard as deceptive.

The chilling of WPATH's speech and ability to associate in pursuit of its mission causes ongoing and irreparable harm. The FTC identifies no countervailing interest. It has no legitimate interest in violating the First Amendment. This Court should thus grant a preliminary injunction.

## ARGUMENT

### I.    The FTC's Threshold Objections Are Meritless

The FTC attempts to avoid judicial scrutiny on two grounds: first, that Congress intended exclusive agency review under *Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994); and second, that WPATH lacks a cause of action. Neither contention has merit.

## A.  WPATH's Claims Are Not Precluded by the FTC Act

This Court has "original jurisdiction of all civil actions arising under the Constitution."  28 U.S.C. § 1331.  The FTC argues that Congress divested this Court of "ordinary federal-question jurisdiction" over WPATH's constitutional challenge by channeling this type of case to the agency for review.  ECF No. 32 at 18.  Another judge in this District recently rejected that argument, *Media Matters II*, 805 F. Supp. 3d at 119-24, and the D.C. Circuit denied the FTC's request for a stay, finding no likelihood of success on appeal, *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *5 (D.C. Cir. Oct. 23, 2025) ("*Media Matters III*").

Statutes displace district-court jurisdiction only where Congress makes its intent to channel claims for agency review "fairly discernible," and the claims are "of the type Congress intended to be reviewed within th[e] statutory structure."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 207, 212).  The FTC satisfies neither criterion.  And as a factual matter, the FTC's review of WPATH's objection is now complete.  After filing its opposition, the FTC denied WPATH's petition to quash the CID. *See* Ex. 32.  The "next step for review" of WPATH's First Amendment claims "is in district court." *Media Matters III*, 2025 WL 2988966, at *5.  The only question is whether this Court should address the First Amendment harms to WPATH now, "or instead must wait until the Commission initiates an enforcement proceeding—a step that might never happen."  *Id.* (citation omitted)

### 1. Congress Did Not Intend Agency Review of WPATH's Constitutional Claims

There is no indication, let alone a fairly discernable intent that Congress intended the FTC Act to channel WPATH's First Amendment claims for exclusive agency review.  *See Media Matters II*, 805 F. Supp. 3d at 119-20.  Typically, statutes divest district courts of jurisdiction by creating a comprehensive scheme where "[t]he agency effectively fills in for the district court, with

3

the court of appeals providing judicial review." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 12-14 (2012); *Thunder Basin*, 510 U.S. at 210-11. The FTC Act does not do that. Instead, it explicitly provides for district court review of petitions to enforce CIDs. 15 U.S.C. § 57b-1(e) (h). It would be "highly unusual" to infer congressional intent to divest district-court jurisdiction from a statute that authorizes it. *Media Matters II*, F. Supp. 3d at 120.

Moreover, the FTC Act's provisions concerning judicial review are not "comprehensive." ECF No. 32 at 19. The Act contains no provision addressing how a CID-recipient can seek judicial review of constitutional claims or unfavorable rulings on petitions to quash. *Media Matters II*, F. Supp. 3d at 123-24. That silence says "nothing about Congressional intent with respect to district court lawsuits by regulated parties." *Id.* at 124. Both the lack of a comprehensive review scheme and the ongoing First Amendment harms WPATH will continue to suffer absent prompt review distinguish the precedent on which the FTC relies. In *Patten v. District of Columbia*, 9 F.4th 921 (D.C. Cir. 2021), the D.C. Circuit found channeling where a statute authorized plaintiffs to seek "judicial review" of an agency's "final arbitral determination" under the "Administrative Procedure Act." *Id.* at 927. Here, in contrast, WPATH would not have any opportunity for judicial review unless and until "the Commission initiates an enforcement proceeding—a step that might never happen." *Media Matters III*, 2025 WL 2988966, at *5. There is no basis to conclude that Congress intended to permit "the party that has issued a demand that is causing concrete and ongoing First Amendment injury to dictate when, if ever, judicial review can commence." *Id.*

### 2. WPATH's Claims Are Not the Type Congress Intended to be Reviewed Within the FTC Act's Statutory Structure

The lack of any discernable intent to channel claims for FTC review is dispositive. But the FTC also fails *Thunder Basin*'s second prong. It cannot show that WPATH's claims would be the

"type Congress intended to be reviewed within th[e] statutory structure." *Thunder Basin*, 510 U.S. at 212. .  Courts ask three questions to make this determination: (1) "could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim"; (2) "'is the claim wholly collateral to [the] statute's review provisions'"; and (3) "is the claim 'outside the agency's expertise'"? *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212-13).  "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.*

First, allowing the FTC to "dictate when, if ever, judicial review can commence could deprive parties of all meaningful judicial review." *Media Matters III*, 2025 WL 2988966, at *5. "Congress rarely allows claims about agency action to escape effective judicial review." *Axon*, 598 U.S. at 186.  Absent jurisdiction here, however, WPATH will have no opportunity to obtain judicial review of its First Amendment challenge.  Awaiting a hypothetical FTC enforcement action provides no meaningful review because "letting the alleged retaliator decide whether a First Amendment retaliation claim will ever be heard would not provide meaningful relief to those suffering from ongoing concrete injuries because of that retaliation." *Media Matters II*, 805 F. Supp. 3d at 125; *accord Media Matters III*, 2025 WL 2988966, at *5.  The FTC would be free to let the CID linger like a proverbial sword of Damocles, forcing WPATH to confront the continual threat that the FTC might seek enforcement tomorrow to disclose every WPATH communication, affiliate, and donor from today.  WPATH requires meaningful review of that "here-and-now injury." *Axon*, 598 U.S. at 191 (citations omitted).  The need for such review, moreover, distinguishes *John Doe Co. v. CFPB*, 849 F.3d 1129 (D.C. Cir. 2017) (per curiam), where the plaintiff could already raise its constitutional challenge in a "pending" enforcement action. *Id.* at 1134.

The FTC contends that "*Thunder Basin* does not recognize an exception for First Amendment claims." ECF No. 32 at 20. But the question is whether *Thunder Basin* applies to WPATH's claims at all. The absence of meaningful review is powerful evidence that it does not. *Media Matters III*, 2025 WL 2988966, at *5; *Media Matters II*, F. Supp. 3d at 124. The Court need not infer a broad First Amendment "exception" to recognize that *Thunder Basin*'s test, by its own terms, does not apply here. The FTC's citations are also distinguishable. *See LabMD, Inc. v. FTC*, 776 F.3d 1275, 1279 (11th Cir. 2015) (involving a challenge to an ongoing administrative proceeding under 15 U.S.C. § 45, which explicitly provides for review in a court of appeals, not a district court) ( (citing 15 U.S.C. § 45(c)); *Am. Fed. Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 757-58 (D.C. Cir. 2019) (finding Federal Labor Relations Authority review no "less meaningful than district court review in this case"). Those cases provide no basis for inferring that meaningful judicial review exists here.

Second, WPATH's claims are "wholly collateral" to the FTC Act's review scheme. *Axon*, 598 U.S. at 192-93. WPATH challenges the Commission's "power to proceed" with a CID that violates the First Amendment. *Id.* at 192. The FTC Act provides no alternative mechanism for WPATH to seek review of such challenges. Insofar as the Act addresses such challenges in the context of a motion to enforce by the FTC, it too envisions judicial review. 15 U.S.C. § 57b-1(h).

Third, the FTC has no special expertise in the issues raised in WPATH's claims. *Axon*, 598 U.S. at 194-95. WPATH challenges the constitutionality of issuing a CID that targets WPATH for its protected First Amendment rights. Such "'standard' issue[s] of . . . constitutional law" do not relate "at all to 'considerations of agency policy.'" *Id.* at 188 (quoting *Free Enter. Fund*, 561 U.S. at 490-91). Indeed, FTC Commissioners are particularly unsuited to review whether their *own actions* violate the First Amendment. *Cf. In re Murchison*, 349 U.S. 133, 136 (1955) ("[N]o

man can be a judge in his own case."). Chairman Ferguson, who signed the CID, Ex. 1, also denied WPATH's petition to quash, Ex. 32. The FTC Act does not envision that such denials will constitute the final word. It requires judicial review before any enforcement. 15 U.S.C. § 57b-1(e), (h). "[W]here the agency was already afforded an opportunity to consider the constitutional harms caused by its demand—so that the only question is timing, not forum—there is no agency-expertise benefit to waiting." *Media Matters III*, 2025 WL 2988966, at *5.

The three factors, taken together, show that the FTC Act's "statutory review scheme" does not "reach[] the claim in question." *Axon*, 598 U.S. at 186; *Media Matters II*, 805 F.3d at 124.

### B. WPATH's Equitable Claims Are Properly Presented

The FTC next argues that WPATH "fails to assert a valid cause of action" for equitable relief. ECF No. 32 at 22. But the Supreme Court has recognized district courts' jurisdiction over equitable claims arising under the Constitution for more than two centuries. *See Ex parte Young*, 209 U.S. at 145; *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njuctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."); *Bell v. Hood*, 327 U.S. 678, 684 (1946) (similar). The cases the FTC cites involve damages claims. *See DeVillier v. Texas*, 601 U.S. 285, 291 (2024) ("action for just compensation" under the Takings Clause); *Ziglar v. Abbasi*, 582 U.S. 120, 125 (2017) (*Bivens*). But the Supreme Court has distinguished damages claims from requests for "injunctive relief," which provide a "proper vehicle for altering an entity's policy." *Malesko*, 534 U.S. at 74.

The FTC next argues that any equitable cause of action to enforce constitutional rights must be "subject to express and implied statutory limits." ECF No. 32 at 23. That makes no sense. Congress cannot impose statutory limits on First Amendment rights. The cases the FTC cites considered only limits on statutory rights, not constitutional rights. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015) (Medicaid Act); *City of Rancho Palos Verdes v. Abrams*,

544 U.S. 113, 115 (2005) (Telecommunications Act); *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (Title VI). In contrast, statutory procedures may provide no "meaningful redress" for the "ongoing injuries," such as First Amendment harms, a party suffers "while challenging a subpoena." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 583 (D.C. Cir. 2025) ("*Media Matters I*").

Finally, the FTC urges that WPATH cannot assert equitable claims because it has an "adequate remedy at law." ECF No. 32 at 23 (citing *Reisman v. Caplin*, 375 U.S. 440 (1964)); *FTC v. Claire Furnace Co.*, 274 U.S. 160 (1927); *Wearly v. FTC*, 616 F.2d 662, 665 (3rd Cir. 1980)). But the precedent the FTC cites found an adequate remedy at law because the plaintiff would "suffer no injury while testing the summons." *Reisman*, 375 U.S. at 449; *accord Claire Furnace*, 274 U.S. at 174; *Wearly*, 616 F.2d at 665. The D.C. Circuit recently rejected that reasoning in cases where a plaintiff "suffer[s] ongoing injuries due to the campaign of retaliation against them." *Media Matters I*, 138 F.4th at 583; *see also Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1178 (9th Cir. 2022); *Media Matters II*, 805 F. Supp. 3d at 128-29 (similarly distinguishing *Claire Furnace*). Where a plaintiff's First Amendment "injuries are ongoing, . . . they cannot get meaningful redress by challenging the CID later." *Media Matters I*, 138 F.4th at 583.

The FTC's adequate remedy assertion contradicts the United States' recent position before the Supreme Court. The government argued that a "subpoena recipient faces an imminent injury," because even the "'threatened commencement of suits to enforce [a] statute' is an 'injury.'" Br. for the United States as Amicus Curiae at 18, *First Choice Women's Resource Ctrs., Inc. v. Platkin*, No. 24-781 (U.S. Aug. 28, 2025) (quoting *Ex parte Young*, 209 U.S. at 158). The recipient of a non-self-enforcing subpoena thus "need not wait for state officials to commence the proceedings." *Id.*; *see also id.* at 12. If district courts have jurisdiction over challenges to threatened state

8

enforcement, they have equal jurisdiction over challenges to threatened federal enforcement.

## II.   WPATH Will Likely Succeed on the Merits of Its First Amendment Claims

### A.   WPATH is Likely to Succeed on Its Retaliation Claim

WPATH will likely prevail on all three elements of its retaliation claim: (1) protected First Amendment activity, (2) adverse actions that would deter a person of ordinary firmness from speaking again, and (3) a causal link between the two.  ECF No. 3-1 at 20.  The FTC concedes WPATH engaged in substantial First Amendment-protected activities.  The only question is thus whether WPATH is likely to succeed in proving that its protected conduct caused the FTC's adverse actions, and whether those actions reasonably chill speech.  Extensive evidence supports WPATH on both issues.  The FTC stretched its statutory jurisdiction to serve broad demands on multiple non-profit entities that all fall on one side of a scientific dialogue.  That pattern shows a motivation to intimidate speech with which the FTC disagrees.  And expansive demands for confidential internal information, from a federal agency, will of course chill the speech of an ordinary organization.  The FTC's contrary arguments fail.[1]

### 1.   WPATH Has Shown a Causal Link Under Any Standard

The FTC's actions and statements show that it would not have initiated an investigation of WPATH "absent the retaliatory motive."  *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019); *see* ECF No. 3-1 at 27-31.  Never before has the FTC asserted jurisdiction to investigate a medical non-profit that publishes standards of care and does not participate in *any* consumer transactions.  Its decision to do so here results from hostility to WPATH's expression of ideas that the FTC dislikes, as demonstrated by the FTC's repeated statements.  The FTC cannot excuse retaliatory conduct by

---

[1] The FTC makes numerous assertions that lack evidentiary substantiation.  This Court should disregard those unsupported assertions.  On a motion for a preliminary injunction, "[e]vidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented."  *See* 11A Wright & Miller's Federal Practice & Procedure § 2949 (3d ed. 1998).

claiming any speech it dislikes is deceptive.

The FTC attempts to resist WPATH's showing of causation by proposing a heightened standard that has no basis in precedent.  WPATH, it claims, must show "there was no reasonable basis for the CID."  ECF No. 32 at 24.  The FTC bases this standard on the Supreme Court's decision in *Hartman v. Moore*, 547 U.S. 250, 262-63 (2006), which generally requires plaintiffs in retaliatory prosecution and arrest cases to show a lack of probable cause.  *See Nieves*, 587 U.S. at 404 (extending "no probable cause" requirement to retaliatory arrest).  The FTC swaps "probable cause" with "reasonable basis," but provides no citation to any precedent extending *Hartman* in this way.  Nor could it.  *Hartman* addressed "the presumption of regularity *accorded to prosecutorial decisionmaking*" in the unique context of criminal cases.  *Hartman*, 547 U.S. at 263 (emphasis added); *see also United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (describing the "Executive's primacy in criminal charging decisions").  It says nothing about civil investigations.  Because "reasonable basis" requires a lesser showing than "probable cause," the standard the FTC proposes gives even greater deference to civil investigations.  That makes no sense.  And even the Supreme Court has recognized that arrests can be retaliatory when probable cause exists, such as where "similarly situated individuals not engaged in the same sort of protected speech had not been" arrested, or "no one has ever been arrested for engaging in a certain kind of conduct."  *Gonzalez v. Trevino*, 602 U.S. 653, 657 (2024); *see also*, *Media Matters for Am. v. Bailey*, No. 24-cv-147 (APM), 2024 WL 3924573, at *12 (D.D.C. Aug. 23, 2024) (collecting cases).

Even if this Court applies the "no reasonable basis" standard, WPATH has more than met its burden.  "[N]o one has even been" investigated by the FTC for publishing a standard of care in a peer-reviewed medical journal. *Gonzalez*, 602 U.S. at 657.    When the FTC launched its

investigation, 149 FTC employees protested that the "FTC has not historically intervened" in such issues. Ex. 16. Indeed, the FTC lacks jurisdiction to investigate non-profits for providing scholarly guidance independent of any consumer transaction. ECF No. 3-1 at 27-28. The FTC cannot have a reasonable basis for taking actions outside of its jurisdiction.

The FTC proffers three purportedly "reasonable" bases for its investigative steps against WPATH: (1) to evaluate whether WPATH "violated the FTC Act by making deceptive or unsubstantiated claims about the safety and efficacy of certain medical treatments for gender dysphoria," ECF No. 32 at 37; (2) to obtain information on whether others have violated the FTC Act, *see id.* at 29; and (3) to assess "the scientific substantiation (if any) of PGDT," *id.* The FTC provides no affidavit or declaration supporting these bases for its investigation. None have merit.

First, the FTC's claim that it is investigating whether WPATH violated the FTC Act is contrary to its own guidance. The same Health Products Compliance Guide that the FTC invokes, *id.* at 10, explains that the "FTC doesn't regulate the content or accuracy of statements made in independently written and published books, articles, or other non-commercial literature," ECF-32 at 10 (citing FTC, *Health Products Compliance Guidance* at 1 (Dec. 2022). Instead, the FTC prohibits "deceptive use of such materials in the marketing of *products*." *Id.* (emphasis added). Time and again, the Guidance makes clear that the FTC's authority "turns largely on whether the materials have been created or are being used by a marketer *specifically for the purpose of promoting its product*." *Id.* WPATH does not market products. It publishes "non-commercial literature," like SOC8, that the FTC "doesn't regulate." *Id.*

That SOC8's statements about medical necessity may be relevant to "insurance coverage," ECF No. 32 at 26, or impact regulation of transgender healthcare, does not change that SOC8, and WPATH's other relevant statements, are the *type* of non-commercial literature that the FTC

11

"doesn't regulate." The FTC's invocation of two heavily redacted email chains from the *Boe v. Marshall*, No. 2:22-cv-0184 (M.D. Ala.) and *Voe v. Mansfield*, No. 1:23-cv-864 (M.D.N.C.) dockets is thus beside the point. Those emails do not support the inferences the FTC seeks to draw. If the FTC reviewed the full dockets in those cases, including the United States' prior brief, it would find substantial evidence contradicting its arguments. *See* Ex. 33. The FTC's one-sided review is characteristic of its broader bias.

Even if the Court accepts the FTC's framing, the "remedy to be applied is more speech." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring), *overruled on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969). Other medical experts can disagree with SOC8's statements about medical necessity and highlight any flaws in its evidence and methodology. That ordinary scientific process is not aided by a sprawling investigation by a regulator that has not previously engaged with the issues.

Second, the FTC's invocation of potential violations by "*any other Person*" is a pretext. ECF No. 32 at 29. Neither the FTC's brief nor the CID identify any such violation with specificity. Even if the FTC had identified a violation, it would not provide a reasonable basis for the scope of the CID the FTC served. The FTC seeks boundless information from WPATH stretching back four decades, including donor and membership records, internal communications, and essentially every statement that WPATH has made regarding SOC8. *See* ECF No. 2 at 14; Ex. 1 at 3-5. The FTC cannot seriously contend that everything WPATH has ever said and every donation it has received is relevant to some other entity's deceptive marketing of unspecified products.

Third, the FTC's desire to assess the "scientific substantiation (if any) of PGDT" and whether WPATH's guidelines are unsubstantiated or deceptive, ECF No. 32 at 29, tacitly concede that the FTC targets WPATH for its speech. The FTC admits that WPATH has published a "widely

12

discussed set of materials addressing PGDT." *Id.* It "does not dispute" that such publication is "protected First Amendment conduct." *Id.* at 24. A desire to analyze the "substantiation" of that protected speech is not a reasonable basis for a *fraud* investigation, particularly where the FTC has never previously regulated such speech. If the FTC seeks to assess "the scientific substantiation" of SOC8, it can review SOC8's 70 pages of references and extensive methodology section. *See* ECF No. 32-1 (Opp. Ex. 1) at 181-254. It should not require a CID demanding WPATH's every communication. The expansive mandate the FTC proposes would transform consumer fraud investigations into a powerful tool for punishing disfavored speech. The FTC would need only identify some basis for believing speech incorrect, and thus potentially deceptive, to justify subjecting the speaker to exacting disclosure requirements. That cannot be the law.

The FTC's "serious questions" regarding transgender healthcare misunderstand an ongoing scientific dialogue. ECF No. 32 at 9. The FTC attributes views to the American Medical Association, *id.* at 7, which it has since rejected, *see* Ex. 34. The FTC mischaracterizes a *New York Times* article. ECF No. 32 at 8, (claiming study withheld due to its outcome, when article states that it was slowed due to concerns about weaponization and funding cuts). And it relies heavily on a statement by the American Society of Plastic Surgeons, even though that statement acknowledges that it conducted no "independent systematic evidence assessment." *Id.* at 7 (*Position Statement on Gender Surgery for Children and Adolescents*, ASPS, at 2 (Feb. 3, 2026)).

Agencies are "not afforded 'unfettered authority to cast about for potential wrongdoing.'" *CFPB v. Accrediting Council for Indep. Colleges & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017). The FTC's purported bases for its investigation and CID stray far beyond its traditional role and cannot be reconciled with the CID it actually served. They are simply pretexts for seeking to punish and silence speech with which the FTC disagrees.

13

### 2. WPATH's Evidence Shows a Causal Link Between Protected Speech and the FTC's Actions

WPATH has provided substantial circumstantial evidence demonstrating a causal link between its protected conduct and the FTC's actions, including the FTC's apparent lack of jurisdiction over WPATH, the pervasive bias demonstrated in the investigation's preliminary stages, the unjustified scope of the CID, and the temporal proximity between WPATH's protected speech and the Executive Branch's targeting of transgender healthcare.

**Jurisdiction.** "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). The FTC has authority to regulate entities "organized to carry on business for its own profit or that of its members." 15 U.S.C. § 44. That does not include WPATH, whose publicly available website, bylaws, financial statements, and sworn declarations show that its activities have no "proximate relation to lucre." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 766-67 (1999). The FTC suggests that some WPATH members "may have a financial interest in PGDT," apparently because they receive payment for providing medical care. ECF No. 32 at 14. But that meager showing falls far short of the evidence that has previously justified FTC jurisdiction. *See Cal. Dental*, 526 U.S. at 769 (for-profit subsidiaries engaged in "advantageous insurance and . . . financing arrangements" and "lobbying, litigation, marketing, and public relations for the benefit of its members' interests"); *Am. Med. Ass'n v. FTC*, 638 F.2d 443, 448 (2d Cir. 1980) (lobbying); *FTC v. Nat'l Comm'n on Egg Nutrition*, 517 F.2d 485, 487-88 (7th Cir. 1975). WPATH provided sworn testimony that it does not engage in for-profit activity, and promotes "evidence based care, education, research, public policy, and respect in transgender health." *See* ECF 3-2 ¶ 7. The FTC's contrary speculation cannot support its overreach.

14

The FTC's investigatory power extends to "corporations" "whose business affects commerce," 15 U.S.C. § 46; and even the issuance of CIDs must still bear a connection to the FTC's regulatory authority. *Id.* § 57b-1. Ignoring the plain language of § 46, the FTC insists that its investigative powers are "far broader" than its enforcement authority. ECF No. 32 at 28. But it would make no sense to authorize the FTC to conduct roving investigations untethered to its enforcement powers. The FTC's citations also predate the addition of 15 U.S.C. § 57b-1 to the FTC Act in 1980. *See id.* (citing *Blue Ribbon Quality Meats, Inc. v. F.T.C.*, 560 F.2d 874, 875 (8th Cir. 1977)); *see also* FTC Improvements Act of 1980, PL 96-252, 94 Stat 374 (May 28, 1980). Congress made these changes to the FTC's investigatory mechanisms substantially in response to the FTC's abuse of its subpoena power. 126 Cong. Rec. 1177-1242 (daily ed. Feb. 7, 1980).

The FTC's arguments regarding its prior investigations into "into healthcare sector entities" demonstrate the irregularity of its investigation into WPATH and the CID at issue. It cites only investigations concerning the sale and marketing of health care *products*. *See* ECF No. 32 at 9-10 (citing investigations concerning "products" and "dietary supplements"). The FTC cites no prior case in which it has investigated a non-profit entity that does not sell or advertise products. Its own employees have explained that it "has not historically intervened" in this context. Ex. 16.

The FTC argues that it must investigate and issue demands to WPATH to determine whether it has jurisdiction to investigate and issue demands to WPATH. ECF No. 32 at 27. This logic is circular and unpersuasive. Federal courts "stand guard . . . against abuses of the subpoena enforcement process." *Accrediting Council*, 854 F.3d at 689 (cleaned up). The FTC must have some theory of its jurisdiction before it launches an investigation. Its failure to identify any plausible theory here is powerful evidence that it has abused its CID authority. Even if some investigation could be justified to evaluate potential jurisdiction, it would not be the CID the FTC

15

has issued. That CID requests information far beyond what the FTC would need to assess jurisdiction. And in denying WPATH's motion to quash, the FTC declined to limit the CID to information related to jurisdiction. *See* Ex. 32 at 3-5.

**Atypical and biased procedures and statements.** The FTC's preliminary investigative steps and the statements of its decisionmakers and staff provide additional evidence of causation. ECF No. 3-1 at 28-30. The FTC's Workshop was one-sided and failed to acknowledge contrary views. The statements of decisionmakers and staff, including Chairman Ferguson, also display animus towards WPATH and the very idea of transgender healthcare. Similar comments by these officials have been found to be "precisely the sorts of comments that courts in this District have considered as evidence of retaliatory intent." *Media Matters II*, 805 F. Supp. 3d at 135.

The FTC defends its procedures as "far from unusual." ECF No. 32 at 30. But the past workshops it cites convened an array of panelists with a range of views on issues under consideration. *See* Ex. 35-36. The "Workshop on Unfair or Deceptive Trade Practices in 'Gender-Affirming Care' for Minors," in contrast, included only speakers who had criticized transgender healthcare for minors. *See* ECF No. 3-1 at 11-12. It was organized by an agency official who had long advocated against transgender healthcare, *id.* at 9; Ex. 21 at 6, and was even banned from Twitter for posting about "evil gender ideology being forced on America's children," *see* Ex. 15. The workshop's transcript further shows that moderators, including staff members that worked on WPATH's investigation, encouraged a one-sided dialogue. *See* ECF No. 3-1 at 11-12. That 149 FTC employees protested the Workshop, asserting that its "charged language suggest[s] that the Commission has already taken a position," Ex. 16, only underscores that the FTC did not follow typical practices. The FTC's assertion that "unnamed agency employees cannot veto FTC investigations," ECF No. 32 at 31, misses the point. Those employees' statements about the

16

atypical nature of the FTC's procedures are simply evidence that the CID was motivated by disagreement with WPATH's protected speech.  The First Amendment limits FTC investigations, not the evidence that shows a First Amendment violation.

The statements of FTC staff and Commissioners provide additional support for causation. Their words speak for themselves.  *See, e.g.*, Ex. 12 (Ferguson promising to "[f]ight back against the trans agenda" and "[i]nvestigate" organizations and individuals who "pushed gender confusion."); Ex. 16 ("No sane person could endorse the needless mutilation of children.").  The FTC contends that it is not "improper" for Chairman Ferguson to "publicly discuss potential violation of the laws."  ECF No. 32 at 31.  But Chairman Ferguson did not state that the "trans agenda" violated the FTC Act.  Nor would such a statement make any sense.  An "agenda" is a set of ideas, which the FTC Act cannot regulate consistent with the First Amendment.  Chairman Ferguson's statement that he would "[f]ight back against the trans agenda" is evidence that the CID he issued is motivated by animosity towards that agenda, *not* any "potential violation of the laws."[2]  And Annie Chiang, quoted at ECF No. 3-1 at 11-12, was present for WPATH's meet-and-confers with Commission staff, *see* Standley Decl. ¶ 4.

The FTC's reliance on *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 62 (D.D.C. 2022), is misplaced.  *Facebook* considered the distinct issue of recusal from a specific decision, much of which preceded the relevant official's involvement.  *Id.*  It says nothing about whether Chairman Ferguson's statements, in an investigation he indisputably initiated, are probative evidence of First

---

[2] Former Commissioner Melissa Holyoak's support for the investigation does not cure any bias. ECF No. 32 at 25-26, 33.  She left the Commission two months before the CID issued.  Her pre-recorded statements in the Workshop mention WPATH specifically, repeating the misinformation that "WPATH further relaxed its guidelines for minors in 2022," and that WPATH's "changes do not necessarily reflect widely accepted practices," because "there really are no widely accepted practices" in transgender healthcare.  ECF 3-28 at 48–49.  Her speech reflected, at minimum, a pre-judged stance against transgender healthcare for minors, and one-sided review of the evidence.

Amendment retaliation.  And it affirms that Commissioners' "behavior is not 'immunize[d] from judicial scrutiny in cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law.'"  *Id.* at 64 (citation omitted).

Nor can the FTC rely on any purported distinction between "decisionmakers" and "non-decisionmakers."  The FTC's cases show only that non-decisionmakers' comments are not direct evidence of *discrimination* under federal civil rights statutes, not that they are irrelevant to causation on First Amendment retaliation claims.  *See Waggel v. George Washington Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020); *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009); *In re Architect of Capitol Emp. Disp.*, No. 1:23-cv-2334, 2024 WL 3359515, at *3 (D.D.C. July 10, 2024); *Youssef v. Lynch*, 144 F. Supp. 3d 70, 101 (D.D.C. 2015).  Regardless, Chairman Ferguson was a decisionmaker, whose statements are probative under any standard.

**Scope of the CID.**  The scope and burden of the CID further prove retaliatory intent, as the burden is unnecessary and unrelated to any legitimate investigative needs.  ECF No. 3-1 at 30. The FTC contends that the CID to WPATH has "*fewer specifications*" than others it has issued. ECF No. 32 at 34 (emphasis in original).  But such counting does not determine a CID's breadth or burden.  A single specification demanding "all Communications" about SOC8, a 260-page publication, can be more burdensome than 100 targeted requests.  The FTC's inability to trace the breadth of its CID to any legitimate investigative need is further evidence of retaliatory intent.

**Temporal proximity.**  Finally, the temporal proximity between WPATH's protected conduct, the Administration's whole-of-government effort targeting transgender healthcare, and the FTC's retaliatory acts are further evidence of a causal link.  *See Media Matters II*, 805 F. Supp. 3d at 136 (finding temporal proximity where "Chairman Ferguson wasted no time after taking

office" in initiating the investigation).  The FTC argues that SOC8 and President Trump's Executive Order targeting transgender healthcare predate the CID "by over a year."  ECF No. 32 at 36.  But that ignores that the FTC began investigating in May 2025, *see* Ex. 14, ECF 3-21, and announced its workshop in June 2025, *see* Ex. 37, just three months after President Trump fired two FTC Commissioners appointed by the prior administration, *Slaughter v. Trump*, 791 F. Supp. 3d 1, 8 (D.D.C. July 17, 2025), *cert. granted before judgment*, 146 S. Ct. 18 (2025).  The proximity between the FTC's conduct and WPATH's protected activity is much closer than the FTC admits.

\* \* \*

Taken together, the evidence shows that the FTC exceeded its statutory power, bucked its typical procedures, and moved quickly to serve an expansive CID on the proponents of ideas that FTC officials had promised to "fight."  That more than meets WPATH's burden of a causal link.

### 3.   The FTC has Chilled WPATH's Speech and Association

The FTC's investigation of WPATH and issuance of the CID are "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up).  The FTC seeks to scrutinize WPATH's speech, publications, research, discussions, memberships, and collaborations until the compliance period ends.  *See* ECF No. 3-1 at 23-25.  An organization of ordinary firmness would be deterred from speaking and associating, on issues of public importance, in the face of the FTC's threat that it will seek "legal sanctions," even unsuccessfully.  *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 28 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (finding investigations and "legal sanctions" "sufficient" to deter speech) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

The FTC responds, somewhat contradictorily, that such deterrence is both the "routine and practical effect[] of an FTC investigation," ECF No. 32 at 37, and is also "speculative" and "implausible" as to WPATH, *id.* at 38.  Those arguments defy D.C. Circuit precedent holding that

misuse of investigative powers chills the target's exercise of First Amendment rights. *Media Matters I*, 138 F.4th at 580; *Reps. Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1064 (D.C. Cir. 1978). The FTC's single citation supporting its argument predates the CID authority it relies on and concerns injuries resulting from a press release about an investigation, not First Amendment harms. *See FTC v. Cinderella Career & Finishing Schs., Inc.*, 404 F.2d 1308, 1315 (D.C. Cir. 1968). Nor can the FTC dismiss WPATH's evidence as "speculative." WPATH has provided affidavits spelling out its ongoing harms, which the FTC does not dispute. The FTC's invocation of WPATH's "substantial resources," *i.e.*, "annual revenue exceeding $2 million," ECF No. 32 at 14, 38, is a *non sequitur* that hardly shows that WPATH's speech cannot be chilled by a federal agency with an annual budget of over $400 million, *see* Ex. 38.

### 4.  WPATH's Retaliatory Investigation Claim is Cognizable

Finally, the FTC argues that even if WPATH could prove retaliation in violation of the First Amendment, it would not matter, because a "retaliatory *investigation* claim" is not "cognizable." ECF No. 32 at 39-40. That assertion cannot be squared with precedent. Investigations like the one undertaken by the FTC involve the "threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," *Bantam Books*, 372 U.S. at 67, which fit neatly within the requirements for a retaliatory act, *see e.g.*, *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) (finding that HUD's overbroad and lengthy investigation, coupled with intimidating investigative tactics, was sufficient to silence a person of ordinary firmness); *Reporters Committee*, 593 F.2d at 1065 ("[B]ad faith use of [investigative techniques] may constitute an abridgment of the First Amendment rights."). *Media Matters II* also recognized the cognizability of this claim where the FTC's investigation involved "a sweeping and burdensome CID calling for sensitive materials." 805 F. Supp. 3d at 129. While *Media Matters II* rested in part on the impact of requesting "a reporter's resource materials," *see id.*, the FTC's overbroad investigation into

20

WPATH seeks a similarly sensitive class of materials—the identities of members and associates, *see NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958).

The FTC argues that WPATH's reliance on *Reporter's Committee* is "doubly flawed" because it preceded the Supreme Court's decision in *Hartman* and acknowledged a cause of action only "*in theory*." ECF No. 32 at 39-40. But *Hartman* merely reserved without deciding whether "the expense or other adverse consequences of a retaliatory investigation" are sufficient to establish "a distinct constitutional violation." 547 U.S. at 262 n.9. That "reservation" does not alter the state of preexisting law. And *Reporter's Committee* acknowledged that bad-faith investigations, even by criminal authorities, could violate the First Amendment. 593 F.2d at 1065. Other courts have since identified such instances of bad-faith investigation, including by the FTC. *Media Matters II*, 805 F. Supp. 3d at 129. The FTC identifies no principled reason for ignoring First Amendment retaliation simply because it occurs in the context of an investigation.

The remaining authority cited by the FTC consists primarily of out-of-circuit qualified-immunity decisions finding that retaliatory investigation claims are not clearly established. *See J.T.H. v. Missouri Dep't of Social Servs. Childs. Div.*, 39 F.4th 489, 491 (8th Cir. 2022); *Archer v. Chisholm*, 870 F.3d 603, 619-20 (7th Cir. 2017); *Rehberg v. Paulk*, 611 F.3d 828, 837-39, 850 (11th Cir. 2010). This case does not raise issues of qualified immunity because WPATH seeks only declaratory and injunctive relief. *Meredith v. Fed. Mine Safety & Health Rev. Comm'n*, 177 F.3d 1042, 1049 (D.C. Cir. 1999). The sole non-qualified-immunity case the FTC cites is *Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000), which found only that employees had not suffered an adverse employment action, another issue not presented here. *Id.* at 158-61.

## B. The CID and Investigation are Unconstitutional Viewpoint Discrimination

WPATH is likely to prove that the FTC's CID discriminates based on viewpoint. WPATH has already submitted substantial evidence of such discrimination. The FTC is not "merely

21

request[ing] information" about whether "WPATH's standards of care may be unreliable." ECF No. 32 at 41. President Trump has already labeled the standards "Junk Science," characterizing them as a "radical and false claim" about healthcare that "will be a stain on our Nation's history" and "must end." 90 Fed. Reg. at 8,771. Chairman Ferguson promised to "[f]ight back against the trans agenda." Ex. 12. As 149 FTC employees observed, such "charged language" shows the FTC has "already taken a position opposing gender-affirming care for minors." Ex. 16. No good-faith investigation begins by announcing what it will find. And the CID is designed to overwhelm and intimidate. It does not specify communications of concern. It demands "all" communications about SOC8, "[r]egardless of time period." Ex. 1 at 6. And the FTC issued similar CIDs to other organizations who have advanced the same viewpoint, *see Endocrine Soc'y v. FTC*, No. 1:26-cv-00512, ECF 1 (D.D.C. Feb. 17, 2026); *Am. Acad. of Pediatrics v. FTC*, 1:26-cv-00508, ECF 1 (D.D.C. Feb. 17, 2026). Such broad demands, served on one side of a debate, send the message that the government will target any proponent of the viewpoint that top officials have already promised to "fight" and "end." That "discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

The FTC responds that "government officials may express a viewpoint." ECF No. 32 at 41. But WPATH does not challenge the FTC's expression. It challenges the FTC's improper actions to take its "viewpoint" and then to leverage its investigative power to intimidate and harass the opposite viewpoint. "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Vullo*, 602 U.S. at 180. The CID does exactly that. It subjects WPATH to an impossible disclosure obligation, so that WPATH and other organizations fear that the FTC will scrutinize anything they say.

The FTC's assertion that "[n]othing in the CID prevents WPATH from continuing to

22

promote its views," ECF No. 32 at 41, is just wrong.  WPATH submitted declarations explaining that members are reluctant to communicate privately for fear that WPATH may be "forced to disclose internal discussions and information to the FTC."  ECF 3-4 ¶ 21; ECF 3-5 ¶ 17; ECF 3-6 ¶¶ 38-41.  That same fear deters "other medical associations from collaborating with" WPATH. ECF 3-4 ¶ 22.  The struggle to communicate internally and externally inhibits physicians' ability to "provid[e] care to their patients as well as advanc[e] medical knowledge."  ECF 3-5 ¶ 13; *accord* ECF 3-4 ¶ 18; ECF 3-6 ¶ 26.  The FTC ignores this testimony, which demonstrates that the CID has already succeeded in suppressing disfavored speech.

The FTC knows and intends that its investigation will suppress speech.  Chairman Ferguson and others have applauded the use of investigations as a method of intimidating organizations promoting transgender healthcare.  *See* Ex. 23 at 8; Ex. 21 at 81-82.  And the FTC has deployed this playbook against other speech it disfavors.  *See, e.g.*, *Media Matters II*, 805 F. Supp. 3d at 129-31; *Newsguard Techns. v. FTC*, No. 26-cv-00353, ECF 1 (D.D.C. Feb. 6, 2026); *see also* Ex. 11 (discussing the "radical distortion of consumer protection law by the F.T.C."). That context further underscores that the CID seeks to suppress speech rather than investigate.

### C.  The CID Violates Freedom of Association

The Supreme Court has long held that "'compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action.'"  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *NAACP*, 357 U.S. at 462).  The CID compels exactly that disclosure.  It requires WPATH to identify the "healthcare professionals, patients, and their families" who have received materials from WPATH, as well as "every individual or entity that participated in the development and issuance" of SOC8.  Ex. 1 at 4-5.  Such demands are subject to "'exacting scrutiny'" and violate the First Amendment absent a "'substantial relation between the disclosure requirement and a

23

sufficiently important government interest.'" *Bonta*, 594 U.S. at 607.

The FTC cannot satisfy exacting scrutiny. It does not even acknowledge the standard. It notes that its subpoena is narrower than the "sweeping disclosure regime" in *Bonta*, which applied to thousands of charities. ECF No. 32 at 42. But that argument identifies no "sufficiently important government interest" underlying this CID's disclosure requirement, much less a "substantial relation" between that interest and the disclosure sought. *Bonta*, 594 U.S. at 607. The FTC's assertions regarding its investigative authority show that it lacks any "sufficiently important government interest." The FTC proclaims that it can investigate "merely on suspicion" and request information from WPATH about potential violations by "other entities." ECF No. 32 at 26. But mere *suspicions* about *others'* conduct cannot substantiate any interest in compelling disclosure of WPATH's affiliates. Even if the FTC had concerns about specific affiliates—and it has identified none—that would not bear a "substantial relation" to its expansive request to identify *all* affiliates.

WPATH has produced evidence that the CID's demand for information about affiliates will deter association. ECF 3-4 ¶¶ 17-19, 22; ECF 3-5 ¶ 13. The CID "'creates an unnecessary risk of chilling'" and violates the First Amendment. *Bonta*, 594 U.S. at 616.

## III.    The Equities and the Public Interest Favor a Preliminary Injunction

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (cleaned up). The FTC cannot dismiss the chilling effect on WPATH's First Amendment rights as "meritless constitutional injuries." ECF No. 32 at 43. Nor can the FTC recast that injury as lost business opportunity resulting from "WPATH's own choices or speculation about the actions of third parties." *Id.* at 44. WPATH's declarations show harm to its First Amendment rights, resulting directly from the challenged CID. ECF 3-5 ¶ 17; ECF 3-4 ¶ 21; ECF 3-6 ¶¶ 38-41. The ongoing chilling effect on WPATH's First Amendment freedoms to speak, associate, and

petition demonstrates irreparable harm.

No countervailing interest outweighs that harm. Unconstitutional government actions are never in the public interest. *Pursuing Am.'s Greatness*, 831 F.3d at 511; *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). The FTC's invocation of *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), is meritless. ECF No. 32 at 43. *CASA* concerned requests that "extend[] beyond the parties" before the court. *Id.* at 843. The injunction requested here does not. ECF No. 1 at 44.

### IV.    The Court Should Not Stay Its Decision or Require a Bond

Neither a stay nor a bond is appropriate. The FTC has not met its burden for a stay under *Nken v. Holder*, 556 U.S. 418, 434 (2009). It shows neither likelihood of success on appeal nor that the equities tip in its favor. And any stay would prolong the CID's harm to WPATH.

Next, the Court should exercise its "'discretion to require no bond at all.'" *N.A. Building Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025). The FTC does not attempt to show "any tangible financial harm" it would suffer due to the requested injunction. *Id.*; *Nat'l Council of Nonprofits v. OMB*, 775 F.Supp.3d 100, 130 (D.D.C. Feb. 25, 2025). It merely requests a bond "commensurate" with the relief granted. ECF No. 32 at 45. Requiring no bond is "commensurate" with the FTC's showing of no harm. Moreover, a bond would "unduly burden" WPATH and "potentially impair" its "ability to seek judicial relief." *N.A. Building Trades Unions*, 783 F. Supp. 3d at 315. Plaintiff is a "non-profit organization" with a "modest budget." ECF No. 1 ¶ 27. A substantial bond would threaten its ability to vindicate its First Amendment rights.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court issue a preliminary injunction barring Defendants from enforcing the CID or any similar order, request, or action, and taking further actions that interfere with, retaliate against, or abridge WPATH's exercise of its First Amendment rights.

Dated: March 30, 2026                    Respectfully Submitted,

*/s/ Abbe David Lowell*
Abbe David Lowell [Bar No. 358651]
Caleb Hayes-Deats [Bar No. 1643213]
Schuyler J. Standley [admitted *pro hac vice*]
Isabella M. Oishi [Bar No.  90018056]
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
SStandley@lowellandassociates.com
IOishi@lowellandassociates.com

*Attorneys for Plaintiff WPATH*

26