# Exhibit 32

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**     **Andrew N. Ferguson, Chairman**
                       **Mark R. Meador**

| | |
|---|---|
| **In the Matter of** | ) |
| | ) |
| | ) **File No. P264800** |
| **CIVIL INVESTIGATIVE DEMAND TO** | ) **PUBLIC** |
| **WORLD PROFESSIONAL ASSOCIATION FOR** | ) |
| **TRANSGENDER HEALTH** | ) |
| **DATED JANUARY 15, 2026** | ) |
| | ) |

**ORDER DENYING PETITION TO QUASH**
**CIVIL INVESTIGATIVE DEMAND**

**<u>By FERGUSON, Chairman</u>:**

The World Professional Association for Transgender Health (WPATH) petitions the Commission to quash in its entirety a Civil Investigative Demand (CID) issued on January 15, 2026, in connection with the Commission's investigation into whether WPATH or any other person has made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment (PGDT)—medical interventions for minors with gender dysphoria, including but not limited to pubertal suppression, hormone therapy, and surgery.

WPATH requests that the Commission quash the CID because (1) the Commission lacks jurisdiction over nonprofits like WPATH; (2) the CID violates WPATH's First Amendment rights; and (3) the CID is unduly burdensome, overly broad, and vague. *Petition*, at 4-5. For the reasons set forth below, we deny WPATH's petition.

## I.     BACKGROUND

WPATH describes itself as a 501(c)(3) nonprofit membership organization whose mission is to "promote evidence-based care, education, research, public policy, and respect in transgender health." *Petition*, at 1. Because WPATH is an international organization, with regional affiliate organizations in Europe and the United States, it notes that it provides "guidance and content for professionals operating in locations with different cultures, governance, and laws." *Id.*

WPATH's activities include offering access to the *International Journal of Transgender Health*, which it describes as an "independently owned, peer-reviewed medical journal"; hosting educational events; holding educational and research symposia, courses, and workshops; and providing a certification program and courses to members through its Global Education Institute.

*Id.* at 2. WPATH says that it has recently discontinued certain education and mentorship programs as a result of receiving the CID. *Id.*

WPATH says that it also commissions, provides, and periodically updates its Standards of Care, which it describes as articulating "a professional consensus about the psychiatric, psychological, medical, and surgical management of transgender and gender diverse people." *Id.* In September 2022, the *International Journal of Transgender Health* published the Standards of Care, Version 8 (SOC-8). *Id.*

On January 15, 2026, under the authority of two Commission resolutions authorizing the use of compulsory process, the Commission issued a CID to WPATH pursuant to Section 20 of the FTC Act, 15 U.S.C. § 57b-1. *Petition* Ex. 1. The WPATH CID was issued as part of the Commission's investigation into whether WPATH or any other person has made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of PGDT to consumers in violation of Sections 5 and 12 of the FTC Act, and whether FTC action to obtain monetary relief would be in the public interest. *Id.*

The CID to WPATH seeks information pertaining to the following: WPATH's membership requirements, composition, benefits, and services; WPATH's education, training, or certification programs; WPATH's PGDT-related workshops, townhalls, and conferences; each type of PGDT advertised, marketed, promoted, addressed, or referred to in documents disseminated by WPATH; the dissemination of and substantiation for any Covered Statement, a term defined in the CID to mean six specific representations; the development and issuance of SOC-8, including related communications with Professional Medical Organizations or other organizations, institutions, or individuals; WPATH's financial relationships or partnerships relating to PGDT with any (a) pharmaceutical company, (b) medical device manufacturer, or (c) clinic, hospital system, or individual clinician; all investigations and lawsuits involving Covered Statements or PGDT, including where WPATH is amicus; any studies involving PGDT that WPATH sponsored, conducted, or contributed to; any review or research WPATH commissioned or requested from the Johns Hopkins University Evidence-Based Practice Center; PGDT-related information WPATH provided to any legislature or regulator; WPATH's financial statements; and WPATH's records retention policy, among other subjects. *Id.* at 3-5. The relevant time period for WPATH's responses is from January 1, 2021, to the date of full and complete compliance with the CID, but certain specifications apply regardless of time period. *Id.* at 3.

The CID attached two resolutions: (1) the Resolution Directing Use of Compulsory Process in a Non-Public Investigation of Dietary Supplements, Foods, Drugs, Devices, or Any Other Product or Service Intended to Provide a Health Benefit or to Affect the Structure or Function of the Body, issued by the Commission on August 9, 2019; and (2) the Resolution Directing Use of Compulsory Process Regarding Acts or Practices Affecting Children, issued by the Commission on September 2, 2021. *Id.* at 15-16.

WPATH had two meet-and-confer sessions with Commission staff, on January 30 and February 3, 2026. *See Petition* Ex. 2, at 1-4 (Statement of Counsel Pursuant to 16 C.F.R. § 2.10(a)(2)). During those meet-and-confers, WPATH purports to have raised objections to the

2

**PUBLIC**

CID based on the Commission's statutory authority, the CID's scope and vagueness, and the First Amendment. *Id.* at 2-4. But WPATH does not appear to have offered any proposals to modify the CID's specifications in a manner that would address its concerns while providing the Commission the information it needs. *See generally id.* The return date of the CID was February 16, 2026. *See Petition* Ex. 1, at 1. Commission staff proposed a production schedule that would have extended the CID's return date, conditional on WPATH agreeing to accept service, forgo any petition to quash, and continue engaging with Commission staff in good faith. *Petition* Ex. 5, at 2. Instead, WPATH timely filed the instant petition on February 9, 2026.

## II.    ANALYSIS

### A.  The Commission Has Authority to Serve a CID on Any Legal Entity.

WPATH first argues that, to the extent that the CID is predicated on an investigation into WPATH, the CID should be quashed because WPATH is a non-profit organization that does not fall within the FTC's investigative or enforcement jurisdiction. *Petition*, at 5-8. WPATH next argues that, to the extent that the CID is predicated on an investigation into *other* persons or entities, the CID should be quashed because it seeks information that is not relevant to the investigation. *Id.*

WPATH's argument confuses the Commission's enforcement authority with its broader investigatory authority.[1] The plain language of the FTC Act makes clear that the Commission has the authority to issue this CID as part of its investigation. Section 20 authorizes the Commission to serve a CID on any "person." 15 U.S.C. § 57b-1(c)(1).[2] "Person" for purposes of Section 20 is defined as "any natural person, partnership, corporation, association, or *other legal entity*, including any person acting under color or authority of State law." *Id.* § 57b-1(a)(6) (emphasis added). Prior Commission decisions have recognized that Section 20 authorizes the Commission to obtain information from any "legal entity," irrespective of whether the entity falls within the definition of "corporation" in Section 4 of the FTC Act. *See In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.*, No. 222-3073, 2023 WL 8112947, at *2 (Nov. 17, 2023) ("[T]he plain language of Section 20 permits the Commission to serve a CID on any legal entity, regardless of whether it is a 'corporation' within the meaning of Section 4[.]"); *In re Mar. 19, 2014 Civ. Investigative Demand Issued to Police Protective Fund, Inc.*, 157 F.T.C. 1913, 1915-18 (May 22, 2014); *In re Feature Films for Families, Inc.*, 150 F.T.C. 866, 870 (Sep. 23, 2010) (Commission "can require production of material from an entity that is not subject to

---

[1] As discussed more fully below, identifying whether the Commission has such enforcement authority is a proper purpose of a CID. Until and unless WPATH complies with the CID and produces information and documents sufficient to show the Commission that it lacks enforcement authority over WPATH, the Commission cannot concede that it lacks enforcement authority over WPATH.

[2] Section 20(c)(1) provides: "Whenever the Commission has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), or to antitrust violations, the Commission may, before the institution of any proceedings under this subchapter, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such documentary material for inspection and copying or reproduction, to submit such tangible things, to file written reports or answers to questions, to give oral testimony concerning documentary material or other information, or to furnish any combination of such material, answers, or testimony." 15 U.S.C. § 57b-1(c)(1).

the Commission's enforcement authority if that material furthers the investigation of possibly illegal conduct by entities that are subject to the agency's jurisdiction, such as for-profit telefunders making calls on [the CID recipient's] behalf"). Given that it is a "501(c)(3) non-profit membership organization," *Petition*, at 1, WPATH cannot credibly argue that it is not a "legal entity." Therefore, regardless of whether the Commission may enforce Section 5 of the FTC Act against WPATH, WPATH is a "legal entity" that falls within the definition of "person" under Section 20 of the FTC Act and therefore is subject to the Commission's investigatory jurisdiction and may properly be issued a CID.

WPATH's citations to *National Federation of the Blind v. FTC*, 420 F.3d 331 (4th Cir. 2005), *Community Blood Bank of Kansas City Area, Inc. v. FTC*, 405 F.2d 1011 (8th Cir. 1969), *American Medical Ass'n v. FTC*, 638 F.2d 443 (2d Cir. 1980), *FTC v. National Commission on Egg Nutrition*, 517 F.2d 485 (7th Cir. 1975), *FTC v. AmeriDebt, Inc.*, 343 F. Supp. 2d 451 (D. Md. 2004), and *FTC v. Grand Canyon Education, Inc.*, 745 F. Supp. 3d 803 (D. Ariz. 2024), are thus beside the point. Those cases all involved the analytically separate question of whether the Commission could take *enforcement* action against the entities, not whether the Commission could issue CIDs to them.

The law is clear that an agency has the power to investigate to determine whether an organization is subject to its regulatory jurisdiction. *See, e.g.*, *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 627 (1973) (agency's "jurisdiction to determine whether it has jurisdiction is as essential to its effective operation as is a court's like power"); *Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 434 (9th Cir. 1975) ("[E]ach independent regulatory administrative agency has the power to obtain the facts requisite to determining whether it has jurisdiction over the matter sought to be investigated."). As discussed in prior Commission decisions, the Commission "possesses the authority to investigate whether its jurisdiction extends to" the CID recipient. *Feature Films for Families*, 150 F.T.C. at 871; *see also Childhood Leukemia Found., Inc.*, 2023 WL 8112947, at *4; *Police Protective Fund, Inc.*, 157 F.T.C. 1913 at 1919-20.

WPATH asserts that it does not operate for its own profit or for the profit of its members, and that it meets all the requirements of a "true" nonprofit. *Petition*, at 6. But, as we explained in *Police Protective Fund*, "the Commission is not required to take at face value an organization's claim that it is a charitable organization and can require it to produce documents and other information to enable the Commission to make that determination itself." 157 F.T.C. at 1916. Here, as in *Police Protective Fund*, the Commission will conduct a careful examination to determine whether WPATH is in fact carrying on business "for its own profit or that of its members." *Id.* at 1915 (citing 15 U.S.C. § 44). For example, interrogatories 1-3 ask about WPATH's membership requirements, composition, benefits, and services; interrogatory 4 and document request 7 ask about WPATH's education, training, or certification programs; interrogatory 9 and document request 11 seek information about financial relationships or partnerships between WPATH and any (a) pharmaceutical company, (b) medical device manufacturer, or (c) clinic, hospital system, or individual clinician; and document request 12 seeks WPATH's financial statements. *Petition* Ex. 1, at 3-5. Information and documents responsive to these specifications will enable the Commission to conduct a fact-intensive inquiry into how WPATH actually operates, including examination of "the primary purpose of the

4

organization, the extent to which funds or other benefits may have been conferred on related for-profit companies or individuals, and the extent to which the organization may have been used by individuals or for-profit entities as a device to seek monetary gain." *Police Protective Fund*, 157 F.T.C. at 1917-18. For purposes of this inquiry, "'[t]he extent to which an entity confers benefits on private interests is relevant even if those benefits are not in the form of 'profits' as that term is traditionally understood." *Id.* at 1918.[3]

As the CID's "Subject of Investigation" field makes clear, the Commission is investigating both WPATH *and* other persons. *Petition* Ex. 1, at 1. WPATH claims that, to the extent that the underlying investigation is of other persons, the CID seeks irrelevant information. *Petition*, at 5. But to quash Commission compulsory process on the basis of relevance, a petitioner must show that "the information sought is [not] 'reasonably relevant' to the agency's inquiry." *FTC v. Anderson*, 631 F.2d 741, 745 (D.C. Cir. 1979) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)). This is a high bar: "The standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudicatory one." *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1090 (D.C. Cir. 1992); *see also In re Civ. Investigative Demand to Intuit Inc.*, 170 F.T.C. 486, 489 (Aug. 17, 2020) ("The standard for the relevance of administrative compulsory process is … broader and more relaxed than would be in an adjudicatory discovery demand." (cleaned up)). The evaluation of reasonableness "need not be limited to information necessary to prove a specific charge; [the Commission] can demand, instead, any documents or information 'relevant to the investigation—the boundary of which may be defined quite generally' by the Commission." *Intuit*, 170 F.T.C. at 489 (quoting *Invention Submission Corp.*, 965 F.2d at 1090). The D.C. Circuit, addressing FTC subpoenas, has explained that "the test is satisfied if the documents sought are 'not plainly irrelevant' to the investigative purpose." *FTC v. Carter*, 636 F.2d 781, 788 (D.C. Cir. 1980) (citation omitted). "The [Commission's] own appraisal of relevancy must be accepted so long as it is not 'obviously wrong.'" *FTC v. Bisaro*, 757 F. Supp. 2d 1, 6 (D.D.C. 2010) (quoting *Invention Submission Corp.*, 965 F.2d at 1089; citing *FTC v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977)).

Applying these standards here, we conclude that WPATH's relevance challenge is meritless. Although WPATH is correct in asserting that the CID seeks information about "WPATH's organization, operations, statements, programs, opinions, and positions," *Petition*, at 8, the Commission's investigation encompasses broader concerns such as whether WPATH's statements, opinions, and positions have provided the basis for other persons to make false or unsubstantiated representations or engage in unfair practices related to the marketing or advertising of PGDT. Information responsive to the CID is plainly relevant to these concerns.

---

[3] *See also FTC v. Gill*, 183 F. Supp. 2d 1171, 1184-85 (C.D. Cal. 2001) (company was "not a legitimate nonprofit organization" where evidence showed individual defendant lived in corporate office, paid personal expenses from corporate account, and otherwise commingled assets); *In re Ohio Christian Coll.*, 80 F.T.C. 815, 848 (1972) ("Profit, for the purpose of Section 4 of the Federal Trade Commission Act, is not limited to dividends, gains or direct reward."); *cf. Liu v. SEC*, 591 U.S. 71, 84 (2020) (expenses such as "extraordinary salaries" may amount to "dividends of profit under another name").

### B. The CID Does Not Violate WPATH's First Amendment Rights.

WPATH argues that issuance of the CID is improper viewpoint discrimination and retaliation in violation of the First Amendment. *Petition*, at 8-13. WPATH further argues that disclosure of the nonpublic member information, communications, and donor information sought in the CID would chill WPATH's activities, and that the relevant CID specifications are content-based and rooted in viewpoint discrimination. *Id.*

### 1. Retaliation Claim

WPATH argues that the Commission issued the CID in retaliation for its protected speech, in violation of the First Amendment. *Id.* To support this claim, WPATH points to Executive Orders 14168 and 14187 and the FTC's July 9, 2025, workshop titled "The Dangers of 'Gender-Affirming Care' for Minors" as evidence of the Commission's purported retaliatory intent. *Petition*, at 9 nn.3-5.[4]

As an initial matter, to the extent that WPATH is alleging a retaliatory investigation by the Commission, it appears unlikely that such a claim is even cognizable. The Supreme Court and the U.S. Court of Appeals for the District of Columbia Circuit have declined to resolve the question. *See Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584-85 (D.C. Cir. 2025). Several courts of appeals have suggested that such claims should not be recognized. *See Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Breaux v. City of Garland*, 205 F.3d 150, 157-61 (5th Cir. 2000); *see also J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("[W]e have never recognized a retaliatory-investigation claim of this kind. Nor have other courts around the country ...."); *Sivella v. Township of Lyndhurst*, No. 20-2342, 2021 WL 3356934, at *3 (3d Cir. Aug. 3, 2021). And the U.S. Court of Appeals for the Eleventh Circuit has squarely held that "a retaliatory investigation" "does not implicate a federal constitutional right." *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam) (same).

Even if a retaliatory investigation claim were theoretically cognizable—which only one federal court of appeals appears to have assumed—it could arise only in extraordinary circumstances. *See Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (recognizing that while no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of a given investigation could violate the First Amendment (cleaned up)). Such extraordinary circumstances might include "campaigns of harassment and

---

[4] WPATH also cites *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 129 (D.D.C. 2025), for the proposition that issuance of a "sweeping and burdensome CID calling for sensitive materials" can be a retaliatory action. *Petition*, at 10. *Media Matters* is, however, a non-precedential decision in a preliminary posture that is currently on appeal. In any event, the reasoning of *Media Matters* is inapplicable here. As Judge Sooknanan explained, the retaliation ruling in *Media Matters* "turned on facts unique to Media Matters" and the "likelihood that" another CID recipient in the same investigation could prevail on a similar claim would "depend[] on entirely different facts." Docket Order, *Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137 (D.D.C. Dec. 16, 2025). The stay panel majority, too, described *Media Matters* as involving "unique factual circumstances" and expressed skepticism that even other CID recipients in the same investigation "could plausibly … seek similar relief." *Media Matters*, 2025 WL 2988966, at *11. *Media Matters* is even less relevant to a CID recipient in a wholly different investigation, such as WPATH.

6

humiliation," *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003), threats of arrest, *Lacey v. Maricopa County*, 693 F.3d 896, 909-10, 917 (9th Cir. 2012), or "other means of coercion, persuasion, and intimidation" such as a substantial fine, *White v. Lee*, 227 F.3d 1214, 1228 & n.8 (9th Cir. 2000) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). None of which is present in the Commission's investigation. WPATH faces no threat of fines or arrest. CIDs are not self-executing, and WPATH will incur no penalty or other legal detriment for failing to comply unless the Commission first files a petition for enforcement in a federal court and the court, after considering WPATH's arguments, rules for the Commission and orders WPATH to respond. *See, e.g.*, *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983); 15 U.S.C. § 57b-1(e) (CID enforcement provision). WPATH's statement of counsel acknowledges that, far from harassing or coercing WPATH, Commission staff has met and conferred twice to address WPATH's concerns and has modified certain specifications in response to those concerns. *See Petition* Ex. 2, at 1-5; *id.* Ex. 6, at 2. And, as discussed in more detail below, none of WPATH's asserted harms are sufficient to show a chilling effect, much less rise to the level of extraordinary circumstances.

Even assuming that a retaliatory investigation claim is cognizable, WPATH did not provide adequate evidence to support its claim. To prevail on a retaliation claim, a party must show (1) that it engaged in conduct protected under the First Amendment, (2) that there is "a causal link between the exercise of the constitutional right and the adverse action taken against [the organization]"—*i.e.*, a retaliatory action, and (3) that the Commission's "retaliatory action [was] sufficient to deter a person of ordinary firmness in [the organization's] position from speaking again"—*i.e.*, a chilling effect. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up). For purposes of this Order, the Commission assumes without deciding that WPATH engages in some protected First Amendment activities. WPATH's petition fails, however, to establish the other two prongs: it has not shown a causal link between the CID and its First Amendment protected activities, and it has not shown that the CID has caused a sufficient chilling effect.

### a. Retaliatory Action

WPATH fails to demonstrate a causal link between its speech and the CID. *Aref*, 833 F.3d at 258. To show causation, WPATH must demonstrate at a minimum that the CID "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).[5] In making that but-for showing, WPATH must overcome the "longstanding presumption of regularity" that attaches to government action. *Hartman*, 547 U.S. at 263. That presumption is at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order." *Id.* For that reason, to meet this prong, WPATH must put forward sufficient evidence to displace the presumption of regularity and demonstrate that the but-for cause of the CID was WPATH's protected activity. WPATH has not met this burden.

---

[5] In fact, the requisite showing is more robust: WPATH actually must demonstrate that there was no reasonable basis for the CID. For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *Nieves*, 587 U.S. at 399-400. The same logic applies here too. *See Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at *12-13 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons). As discussed in the accompanying text, however, WPATH has not satisfied even the basic but-for standard.

WPATH appears to argue that the CID is driven by the administration's animus against transgender and gender diverse individuals. *Petition*, at 9. But investigating a healthcare claim is not an attack on patients who may have underwent that treatment. If anything, an FTC investigation or potential enforcement action related to misleading statements by a healthcare provider is undertaken *in defense* of these individuals.

WPATH's citations to Executive Orders 14168 and 14187, *id.*, fail to establish that the executive orders were a but-for cause of the CID. Neither executive order so much as mentions the FTC, much less directs or encourages the FTC to investigate WPATH or proponents of PGDT more generally. In addition, both executive orders were issued in January 2025. The CID to WPATH was issued a year later, in January 2026. A "lengthy time lapse … negates any inference" of a causal connection. *Constantine*, 411 F.3d 474, 501 (4th Cir. 2005) (cleaned up); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (temporal proximity can support causation "only where the two events are very close in time" and even "a three-month period" may "be too lengthy" (cleaned up)).

The July 9, 2025, FTC workshop cited by WPATH actually indicates that the Commission acted for *non*-retaliatory reasons when issuing the CID. In particular, Chairman Ferguson's remarks at the workshop (1) discussed reporting in the *New York Times* about how the Biden Administration pressured WPATH to change its forthcoming guidelines due to political rather than scientific concerns; (2) mentioned a report commissioned by the UK's National Health Service noting that WPATH's clinical guidelines overstate the strength of evidence in recommending medical transition for adolescent children; and (3) highlighted the need for the Commission to "examine whether some of the practices in gender-affirming care are deceptive and require greater scrutiny by the FTC." Andrew N. Ferguson, Chairman, FTC, *Welcome Keynote at the Dangers of "Gender-Affirming Care" for Minors* (July 9, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-The-Dangers-of-Gender-Affirming-Care-for-Minors-Transcript.pdf; *see also id.* at 5 ("I acknowledge that many people feel passionately about this issue, but if a medical claim is false or misleading, it is the [C]ommission's sworn duty to protect American citizens from that claim no differently than it would for any other false or misleading claim."); *id.* ("We are not here to pass judgment on anyone. We are here to ensure that those who make claims about gender-affirming care are held to the same standard we apply to everyone else who engages in commerce. We are here to ensure that everyone can make an informed choice about their own path to healing without fear of being deceived by those who stand to profit from certain medical interventions.").

Following the workshop, the FTC issued a Request for Public Comment "to better understand how consumers may have been exposed to false or unsupported claims about 'gender-affirming care' (GAC), especially as it relates to minors, and to gauge the harms consumers may be experiencing."[6] By the September 26, 2025, comment deadline, the agency

---

[6] Press Release, FTC, *FTC Requests Public Comment Regarding "Gender-Affirming Care" for Minors* (July 28, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/07/ftc-requests-public-comment-regarding-gender-affirming-care-minors.

received close to 8,000 responsive comments.[7] Numerous commenters referenced WPATH or SOC-8.[8] After considering the perspectives provided at the workshop and in the public comments, the Commission issued the CID to investigate potential deceptive or unfair practices related to the marketing or advertising of PGDT.

### b. Chilling Effect

WPATH supports its claims of a chilling effect by providing a declaration from its Executive Director, Leo Lewis. The declaration expresses Mr. Lewis's belief that WPATH staff, members, and partners "will communicate less (and less openly) if WPATH is forced to disclose their documents, identities, and communications to the FTC"; expresses concern that new members will be deterred from joining WPATH due to concerns that their membership information and private communications could subject them to harassment, even when they specifically request anonymity; provides examples of WPATH members and staff being "harassed, intimidated, and subjected to threats of harm"; notes that "[a]s a result of receiving the CID, WPATH decided to temporarily cease offering certain educational programs"; and expresses concern that medical experts who work with WPATH "would think twice before volunteering their expertise if their confidential feedback could be shared with the world." *Petition* Ex. 3, at 5-7. None of these asserted harms, however, are sufficient to show evidence of a chilling effect.

---

[7] *See Request for Public Comment Regarding "Gender-Affirming Care" for Minors*, regulations.gov, https://www.regulations.gov/docket/FTC-2025-0264.

[8] For example, consumers stated their belief that "[a]ll doctors and subscribers subscribe to the WPATH Standards of Care," *Comment from Lyons, Eve* (Aug. 11, 2025), https://perma.cc/FQF4-AJTQ, which they understood to be "rigorous," *Comment from Long, Andrew* (Aug. 15, 2025), https://perma.cc/3TTV-QQDV, and "evidence-based," *Comment from Anonymous* (Sep. 25, 2025), https://perma.cc/L3FA-94PU (noting that "[t]he guidelines of … WPATH … follow evidence-based care for" children with gender dysphoria "for optimal best outcomes and prevention of suicide"); *Comment from Sytsama-Ramos, Rachael* (Aug. 21, 2025), https://perma.cc/3A8S-PY9C (expressing the view that WPATH's standards of care "have been founded through empirically validated research methods with longitudinal follow-ups").

In reliance on WPATH's representations, consumers shared their view that PGDT leads to the "optimal best outcomes and prevent[s] … suicide," *Comment from Anonymous, supra*; *Comment from Lyons, Eve, supra* (noting that PGDT "saves lives"). Some consumers, again in reliance on WPATH guidelines, were also led to believe that PGDT "ha[s] been proven to be safe and reversible," *Comment from Anonymous* (Aug. 17, 2025), https://perma.cc/A2CY-LTTL; *see also Comment from Hellinga, Richard* (July 29, 2025), https://perma.cc/ULQ9-WM5U (asserting that "HRT and puberty blockers are safe, effective treatments for children" on the basis of those treatments' support by "major medical associations, including … WPATH"); *Comment from Anonymous* (July 29, 2025), https://perma.cc/WV7N-TD5D (relying on "[t]houghtful standards … in place for gender care, including gate keeping guidelines, from WPATH [that] … have been developed by science and medical professionals who are not politically motivated"). On the other hand, numerous comments expressed serious concern over the lack of evidence supporting SOC-8 and PGDT. A physician, for example, took the view that "information from [WPATH] is non-scientific," noting that "[a] number of European countries have placed serious restrictions on" PGDT. *Comment from Cranston, Robert* (Aug. 6, 2025), https://perma.cc/JWS9-HEFU (referencing the Cass Report). And he explained that PGDT "can cause severe long-term damage to the persons affected, including infertility, sexual dysfunction, osteoporosis," and other medical issues, "and do not alter the long-term life satisfaction or prevent psychological distress." *Id.*; *Comment from Garfield-Jaeger, Pamela* (Sep. 25, 2025), https://perma.cc/VA9P-J9QY (commenting as a licensed therapist who observed that PGDT patients "were more suicidal after getting" PGDT and "were harmed psychologically and physically" due to those treatments).

As Commission staff has already explained, the Commission is subject to very strict statutory and regulatory requirements regarding use and disclosure of data produced by CID recipients. *See Petition* Ex. 5, at 2; 15 U.S.C. § 57b-2; 16 C.F.R. § 4.10. Although WPATH expresses concern that its information will not be kept confidential, *Petition*, at 13, WPATH fails to acknowledge that unauthorized disclosure of information obtained by the FTC is a criminal offense for FTC officers and employees. 15 U.S.C. § 50. In addition, the Commission is only permitted to share CID responses with other federal law enforcement agencies if the receiving agency certifies that "such information will be maintained in confidence and will be used only for official law enforcement purposes." *Id.* § 57b-2(b)(6). Moreover, the receiving agency is also subject to the same use restrictions as the Commission. *Id.* WPATH insinuates that Commission staff may nonetheless disclose confidential information, *Petition*, at 13, but "the sheer possibility that a government agent will fail to live up to her duties" is not enough to establish a chilling effect. *See Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018). Accordingly, WPATH's concerns about CID responses being made public and subsequently used to harass, intimidate, threaten, or embarrass WPATH staff, members, donors, partners, or volunteers are overblown.

WPATH asserts that the costs of responding to the CID have had a chilling effect on "WPATH's ability to effectuate its mission." *Petition*, at 10. But the costs associated with retaining counsel, instituting a litigation hold, and responding to the CID are standard for any entity served with a CID. *See Texaco*, 555 F.2d at 882 ("Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest."); *cf. FTC v. Standard Oil*, 449 U.S. 232, 244 (1980) ("The expense and annoyance of litigation is part of the social burden of living under government." (cleaned up)). Likewise, Mr. Lewis's declaration also fails to provide adequate details about why WPATH thought it necessary to cease offering certain educational programs as a result of receiving the CID. *Petition* Ex. 3, at 7. Subjective responses are not dispositive in determining whether the CID is likely to "deter a person of ordinary firmness." *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) ("While the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive."); *cf. Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002) (finding that a person of ordinary firmness would have been deterred where defendants stopped plaintiff's vehicle with their guns drawn, detained plaintiff for an extended period, seized plaintiff's property and did not return it, and charged plaintiff with a criminal misdemeanor); *see id.* (discussing other cases where courts found "various concrete intimidating tactics would have deterred ordinary persons," such as a county board's decision to withhold legal notice advertising, release of confidential information regarding a rape investigation, and denial of a land use permit).

WPATH further complains that the petition to quash process "has forced WPATH to articulate the violations of its First Amendment rights" and "will alert the public to the investigation, and further subject WPATH to harassment." *Petition*, at 10. But as the Commission has long explained, "[t]he Commission believes that the administrative interpretations of its laws and rules embodied in the motions and the applications, and the Commission's response thereto should be disclosed without delay." Miscellaneous Rules, 42 Fed. Reg. 64135 (Dec. 22, 1977); *see also* Rules of Practice, 77 Fed. Reg. 59294, 59300 (Sep. 27, 2012) ("The Commission continues to believe that publication of past proceedings will guide future petitioners and provide

10

predictability to the determination process."). WPATH's complaint about the petition to quash process "alert[ing] the public to the investigation," *Petition*, at 10, also rings somewhat hollow in light of WPATH's decision to generate publicity by issuing three separate press releases—one about the petition to quash, one about its subsequent decision to file a collateral challenge even before the Commission's deadline for resolving this petition to quash, and one about its motion for a preliminary injunction in the collateral challenge.[9]

### 2. Viewpoint-Discrimination Claim

WPATH argues that issuance of the CID is improper viewpoint discrimination. *Petition*, at 9. Though failing to flesh out its argument adequately,[10] WPATH appears to contend that the CID constitutes viewpoint discrimination because the administration disfavors transgender and gender diverse individuals, as well as WPATH's advocacy for the rights and healthcare of those individuals. *Id.* at 9-10.

"[T]he test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part and concurring in the judgment); *accord Zukerman v. USPS*, 961 F.3d 431, 446 (D.C. Cir. 2020). Here, the Commission has not "use[d] the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). Nor has the Commission engaged in "informal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation.'" *White*, 227 F.3d at 1228; *see also Gen. Fin. Corp.*, 700 F.2d at 368 ("[T]here are no sanctions for failing to comply with a subpoena of this type unless and until a district court enters an order under section 20(e) of the Act, 15 U.S.C. § 57b-1(e), directing compliance."). At this stage of the matter, the Commission is merely seeking information needed to evaluate the Commission's jurisdiction and to assess whether law violations have occurred, including whether WPATH or any other persons are making deceptive claims about the safety and efficacy of PGDT. There has been no "pattern of unlawful favoritism" here, *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002), and WPATH does not allege that similarly situated entities received more favorable treatment. Indeed, the CID sent to WPATH actually has fewer specifications and seeks less information than other CIDs sent to

---

[9] *See* Press Release, WPATH, WPATH Files Petition to Quash FTC Investigation (Feb. 9, 2026), https://wpath.org/wp-content/uploads/2026/03/02.09.2026-WPATH-Petition-to-Quash-FTC-Investigation.pdf; Press Release, WPATH, WPATH Takes Stand for First Amendment Rights of Medical Community; Files Complaint to Stop FTC Investigation (Feb. 19, 2026), https://wpath.org/wp-content/uploads/2026/03/02.19.2026-WPATH-Files-Complaint-to-Stop-FTC-Investigation.pdf; Press Release, WPATH, WPATH Files Request for Preliminary Injunction in Effort to Stop Retaliatory FTC Investigation (Mar. 4, 2026), https://wpath.org/wp-content/uploads/2026/03/03.04.2026-WPATH-FTC-Prelim-Injunction.pdf.

[10] Under 16 C.F.R. § 2.10(a)(1), a petition to quash or limit compulsory process "shall set forth all assertions of protected status or other factual and legal objections to the Commission compulsory process, including *all appropriate arguments*, affidavits, and other supporting documentation" (emphasis added). WPATH falls short of this standard: it only makes two fleeting references to viewpoint discrimination "without offering any support, explanation, or reasoned argument." *In re Postal Careers Inst., Inc.*, 125 F.T.C. 1317, 1319 (1998). Despite these deficiencies, however, we explain why WPATH's viewpoint-discrimination claim is not a basis to quash the CID.

other nonprofits or purported nonprofits[11] or in other investigations involving healthcare claims.[12]

### 3.   Freedom of Association Claim

WPATH argues that disclosure of the nonpublic member information, communications, and donor information sought in the CID would chill WPATH's activities, and that the information requested by the CID "falls squarely" within the First Amendment protections of the right to associate, speak, and petition. *Petition*, at 10-13.

WPATH's claim is premature. The cases it cites all involved situations where the entity was subject to a court order requiring production of the documents in question, the entity was being threatened with penalties for noncompliance, or the disclosure had already taken place. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449, 453 (1958) (state circuit court ordered production of the records sought by the state, including membership lists); *Jones v. Unknown Agents of Fed. Election Comm'n*, 613 F.2d 864, 868-69 (D.C. Cir. 1979) (FEC agents had already conducted field interviews of campaign contributors); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 603 (2021) (state attorney general sent deficiency letters, then threatened to suspend the entities' registrations and fine their directors and officers); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1153-54 (9th Cir. 2010) (court order required production in response to opposing party's requests for production of documents under the Federal Rules of Civil Procedure); *Black Panther Party v. Smith*, 661 F.2d 1243, 1250-54 (D.C. Cir. 1981) (court order required responses to opposing party's interrogatories under the Federal Rules of Civil Procedure). Here, by contrast, the Commission has not sought enforcement of the CID. The Commission has not yet decided whether it will do so at all, and if so, as to which specifications (or even portions of specifications). *See Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) ("Compliance with the subpoenas could be a hardship but it is one the plaintiffs can prevent by defending successfully against the Commission's [process] enforcement action").

Relatedly, WPATH's argument is too underdeveloped for the Commission to evaluate at this juncture. WPATH makes a sweeping assertion that 11 interrogatories and 10 document requests seek the "First Amendment-protected information of WPATH's members, associates, donors, and participants." *Petition*, at 11-12. Yet it fails to explain how each of these specifications would chill associational rights, whose associational rights would be chilled, what

---

[11] *See, e.g.*, Pet. to Quash Civil Investigative Demand Ex. B, *Childhood Leukemia Found.*, 2023 WL 8112947 , https://www.ftc.gov/system/files/ftc_gov/pdf/2223073-PTQ.pdf (28 interrogatories and 55 document requests, many with subparts); Mot. to Quash Civil Investigative Demand Ex. P, *Police Protective Fund*, 157 F.T.C. 1913, https://www.ftc.gov/system/files/documents/petitions-quash/police-protective-fund-inc./140422policeprotfundquash.pdf (76 interrogatories and 53 document requests, many with subparts).

[12] *See, e.g.*, Pet. to Enforce Civil Investigative Demand Ex. 3, *FTC v. Kushly, LLC*, No. 2:20-mc-00036 (D. Ariz. July 30, 2020), https://www.ftc.gov/system/files/documents/cases/01_petitionexhibitsproposed_order.pdf (22 interrogatories and 15 documents requests, many with subparts); Pet. for an Order Enforcing Civil Investigative Demand Ex.2, *FTC v Redwood Sci. Techs.*, No. 2:17-cv-07921 (C.D. Cal. Oct. 13, 2017), https://www.ftc.gov/system/files/documents/cases/redwood_2017-10-30_enforcement_petition.pdf (22 interrogatories and 16 document requests, many with subparts); Pet. to Limit or Quash Civil Investigative Demand Ex. 1, *In re Cellmark Biopharma LLC*, 162 F.T.C. 1212 (2016), https://www.ftc.gov/system/files/documents/petitions-quash/lexium-international-llc/160613petitiontoquash-lexium.pdf (42 interrogatories and 36 document requests, many with subparts).

(if any) responsive material it has for each specification, and why disclosure of the responsive material would result in harassment, membership withdrawal, discouragement of new members, or other consequences which objectively suggest an impact on, or chilling of, associational rights. For example, of the specifications that WPATH identifies as problematic, interrogatories 4-5 and document requests 7-9 simply require information about WPATH's operations and public statements; they do not ask WPATH to identify its members, associates, donors, or participants. *Id.* Ex. 1, at 3,5. As another example, WPATH's executive director states that the names, titles, and roles of the contributors to SOC-8 are publicly known, and also that many members have requested that their affiliation with WPATH remain confidential and anonymous. *Id.*, Ex. 3, at 4-5. Without knowing whether the responsive material (if any) relates to the publicly known SOC-8 contributors or instead to the members who have requested anonymity, the Commission cannot evaluate the associational interests at stake.

In addition, without more details about what material WPATH claims is protected by the First Amendment, the Commission cannot apply the appropriate balancing test. In a recent case involving compelled disclosure of associational information, three Justices took the view that the applicable standard is "exacting scrutiny." *Bonta*, 594 U.S. at 607 (plurality opinion as to Part II-B-1).[13] Under that standard, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and the disclosure requirement must be "narrowly tailored to the interest it promotes." *Id.* (cleaned up). The Commission's important government interests furthered by this CID include investigating potential deceptive claims about PGDT, protecting children and families from deception, and investigating whether the Commission has enforcement authority over WPATH. But without more information about what responsive material WPATH has, the Commission cannot assess whether these important government interests are sufficient to overcome any claimed chilling effect, whether there are other means by which the Commission could obtain the information it needs for its investigation, and whether the claimed injury to WPATH's associational rights could be cured by narrowing the specifications, redacting certain information, putting in place use or disclosure restrictions, or taking other measures. *Cf. Dole v. Serv. Emps. Union, AFL-CIO, Loc. 280*, 950 F.2d 1456, 1458 (9th Cir. 1991) (concluding that the DOL could obtain union meeting minutes that recorded "discussions of a highly sensitive and political character" because the DOL had a compelling interest but upholding various restrictions on the DOL's use and disclosure of the meeting minutes).

WPATH is free to assert this claim in the concrete factual context of an enforcement proceeding, if one ever occurs. For the moment, however, its claim is both premature and insufficiently concrete.

### 4.  Right to Petition

WPATH argues that interrogatories 7 and 11 and document request 8 infringe on its right to petition. *Petition*, at 12. But three fleeting mentions of WPATH's right to petition, *Petition*, at

---

[13] More specifically, Chief Justice Roberts and Justices Kavanaugh and Barrett applied exacting scrutiny, Justice Thomas would have applied strict scrutiny, and Justices Alito and Gorsuch saw no need to decide between the two standards. 594 U.S. at 619-20 (Thomas, J., concurring in part and concurring in the judgment); 594 U.S. at 622-23 (Alito, J., concurring in part and concurring in the judgment).

8, 11-12, without any support, explanation, or reasoned argument do not rise to the standard required under 16 C.F.R. § 2.10(a)(2). *See supra* note 10. Nonetheless, we explain why WPATH's right to petition claim is not a basis to quash the CID.

Document request 8 seeks "[a]ll testimony, advocacy, or other information provided to any legislature or regulator related to PGDTs." *Petition* Ex. 1, at 5. To the extent that WPATH contends that disclosure of this information would chill its right to petition legislatures or regulators, that contention is without merit. Although WPATH has a First Amendment right to lobby government officials, it has "no First Amendment right to lobby *in secret*." *DoorDash, Inc. v. City of New York*, 754 F. Supp. 3d 556, 577 (S.D.N.Y. 2024); *see also Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, No. A-15-CV-134-RP, 2016 WL 5922315, at *7 (W.D. Tex. Oct. 11, 2016) (rejecting the contention "that there is a First Amendment right not only to lobby the government, but to do so secretly"). Similarly, interrogatory 8 seeks information about all investigations and lawsuits involving WPATH and either Covered Statements or PGDTs, including any lawsuit in which WPATH is amicus. *Petition* Ex. 1, at 4. As noted above, the First Amendment right to petition does not mean that there is a right to petition in secret.

In addition, WPATH fails to provide sufficient information with respect to its right to petition claim for interrogatory 7. Interrogatory 7 seeks information about any Covered Statements WPATH has made, *id.* at 4, but WPATH has offered no evidence indicating that *any* Covered Statements were made in the context of petitioning the government. In the absence of such information, the Commission has no grounds on which to assess WPATH's right to petition claim.

**C. The CID Is Not Overbroad, Unduly Burdensome, or Vague**

WPATH argues that the CID is unreasonably broad because it seeks information dating back to WPATH's founding in 1979 or information that goes beyond pediatric healthcare. *Petition*, at 13-14. WPATH additionally takes issue with what it calls the CID's "vague and subjective" terms and definitions—including the definition of "Covered Statement," the term "substantiated," the term "member," and the definition of "Pediatric Gender Dysphoria Treatment." *Id.* at 14-16. WPATH claims that these vague, subjective, and ambiguous terms mean that WPATH lacks sufficient notice of how it can comply with the CID. *Id.* at 16. None of these arguments has merit.

We conclude that the applicable time periods for the CID specifications are reasonably tailored to obtain the information that the Commission needs to conduct its investigation and is not unduly burdensome. For the overwhelming majority of the specifications, the applicable time period is January 1, 2021, until the date of full and complete compliance with the CID. *Petition* Ex. 1, at 3. WPATH does not argue that a five-year time period is unduly burdensome.

Eight of the twenty-eight specifications—specifically, interrogatories 8 and 13, and document requests 1-6—seek responsive information from before January 1, 2021. *Id.* at 4-5. These specifications seek information regarding the development and publication of SOC-8, the development and substantiation of any Covered Statements, studies that WPATH sponsored, conducted, or contributed to involving PGDT, and review or research that WPATH

14

commissioned or requested from the Johns Hopkins University Evidence-Based Practice Center. *Id.* Given that the information sought in those requests relate to particular publications or events, they are in effect time limited, making the absence of an explicit time limit for these specifications reasonable.

For example, according to SOC-8 Appendix A, multiple steps in the SOC-8 development process took place or started before January 1, 2021—including establishing the Guideline Steering Committee (July 19, 2017), selecting Chapter Members based upon expertise (March 2018), selecting the Evidence Review Team (May 2018), conducting systematic reviews (March 2019), and voting on the recommendation statements using a Delphi process (September 2019-February 2022).[14] Placing a time limitation that begins on January 1, 2021, on the specifications relating to SOC-8 (interrogatory 8, and document requests 4-5) would not make sense, given that relevant documents and information were generated earlier.

Similarly, a time limitation that begins on January 1, 2021, also does not make sense for document request 6, which seeks all documents and all communications related to any review or research WPATH commissioned or requested from the Johns Hopkins University Evidence-Based Practice Center. The emails introduced as summary judgment exhibits in *Voe v. Manfield* were written in August-September 2020, and they discuss reports of reviews that JHU's evidence review team submitted to WPATH "earlier this year"—*i.e.*, in 2020.[15]

Likewise, the specifications relating to the development and substantiation of any Covered Statements and WPATH's PGDT-related studies (interrogatory 13, and document requests 1-3) seek the production of reasonably relevant information. WPATH claims that its mission is to "promote evidence-based care, education, research, public policy and respect in transgender health." *Petition*, at 1. Examining the evolution of, and substantiation for, Covered Statements and WPATH's PGDT-related studies, regardless of time period, will help the Commission understand the extent to which this claim is accurate.

The mere fact that WPATH might have responsive documents dating back to 1979 does not render these specifications unreasonably broad. Absent a showing of disruption, the sheer amount of responsive materials does not demonstrate undue burden or overbreadth, since "to define the reasonableness of a subpoena based on the volume of items identified for production would be to require the government to ascertain, before issuing a subpoena, the extent of any wrongdoing. But ascertaining the extent of wrongdoing is itself a primary purpose for the issuance of the subpoena." *In re Subpoena Duces Tecum*, 228 F.3d 341, 350-51 (4th Cir. 2000); *see also FDIC v. Garner*, 126 F.3d 1138, 1145-46 (9th Cir. 1997) (mere allegation that subpoena called for thousands of financial documents and one million other documents was not sufficient to establish burden). Further, "[b]roadness alone is not sufficient justification to refuse enforcement" of agency process. *Texaco*, 555 F.2d at 882 & n.51 (citing *Adams v. FTC*, 296 F.2d 861, 867 (8th Cir. 1961)); *see also Genuine Parts Co. v. FTC*, 445 F.2d 1382, 1391 (5th Cir. 1971) (FTC should be accorded "extreme breadth" in conducting its investigations in order to

---

[14] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S247 (2022), https://doi.org/10.1080/26895269.2022.2100644.
[15] Intervenor-Defendants' Memorandum in Support of Motion for Summary Judgment Ex. 28, *Voe v. Mansfield*, No. 1:23-cv-864 (M.D.N.C. Oct. 11, 2024), Dkt. No. 143-28.

"'satisfy [itself] that corporate behavior is consistent with the law and the public interest'" (quoting *Morton Salt*, 338 U.S. at 652)). A recipient of process must make "a record . . . of the measure of [its] grievance rather than ask [a reviewing tribunal] to assume it." *Morton Salt*, 338 U.S. at 654.

With respect to WPATH's arguments about the CID seeking information that goes beyond pediatric healthcare, Commission staff's February 5, 2026, letter clarified that "the focus of this investigation is treatment provided to minors." *Petition* Ex. 6, at 2. To that end, Commission staff noted, "information not expressly limited to minors is or reasonably could be probative, however, with respect to communications made to minors and/or their parents, or other associated issues." *Id.* These modifications moot WPATH's arguments about the scope of the investigation exceeding pediatric healthcare.

WPATH also fails to provide adequate support for its claim of undue burden. Agency process is not unduly burdensome unless compliance "threatens to unduly disrupt or seriously hinder" the normal operations of the recipient's business. *Texaco*, 555 F.2d at 882. The test is "not easily met" because "[s]ome burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest." *Id.*

A CID recipient bears the burden of showing how a CID interferes with its ability to operate its business. *See Garner*, 126 F.3d at 1146 (rejecting claim of undue burden where recipient failed "to enunciate how these subpoenas constitute a 'fishing expedition'"); *see also FTC v. Standard Am., Inc.*, 306 F.2d 231, 235 (3d Cir. 1962) (finding no undue burden where subpoena recipients "did not adduce a single shred of evidence" to support their claim that compliance would result in "the virtual destruction of a successful business").

Although WPATH submitted an affidavit from its executive director, *Petition* Ex. 3, this affidavit fails to specify how compliance will impose an undue burden by seriously disrupting WPATH's operations. The affidavit merely claims that responding to the CID "would mean that I could no longer dedicate all my time to completing the daily tasks necessary to manage the important work of the association" and "would require the assistance of other team members, who would then be unable to function in their roles at WPATH." *Id.* at 4-5. WPATH makes no attempt to quantify how much time or employee resources it would take to search for and assemble responsive documents, beyond these conclusory and unsupported statements. The Commission routinely denies petitions to quash that lack an adequate evidentiary basis.[16] In short, WPATH has done little more than assert that the CID presents the type of burden expected from any form of compulsory process, without establishing that the burden is undue. *See FTC v. Shaffner*, 626 F.2d 32, 38 (7th Cir. 1980) ("[A]ny subpoena places a burden on the person to

---

[16] *See, e.g.*, *In re Civ. Investigative Demand to Spread Techs. LLC, Dated May 11, 2022*, No. 222-3050, 2022 WL 2967367, at *8 (July 18, 2022) (rejecting claim of undue burden based on "conclusory contentions regarding [petitioner's] resources, the breadth of its operations, or the burden and expense of responding"); *In re Auto Dealers*, 157 F.T.C. 1880, 1892-93 (Apr. 21, 2014) (noting that the CID recipient must make a factual record to support a claim of undue burden); *In re The College Network, Inc.*, 157 F.T.C. 1894, 1905 (Apr. 21, 2014) (denying petition to quash CID specification where recipient provided "no factual support" for its claimed burden); *In re Nat'l Claims Serv., Inc.*, 125 F.T.C. 1325, 1327-29 (June 2, 1998) (rejecting petitioner's burden argument that as a small company it could not afford the diversion of personnel and financial resources needed for compliance because it failed to substantiate its burden objection with any evidence).

whom it is directed. Time must be taken from normal activities and resources must be committed to gathering the information necessary to comply. Nevertheless, the presumption is that compliance should be enforced to further the agency's legitimate inquiry into matters of public interest.").

Finally, we are unpersuaded by WPATH's arguments about the CID's terms and definitions. "The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity." *Johnson v. Kraft Foods N. Am., Inc.*, 238 F.R.D. 648, 655 (D. Kan. 2006). In doing so, a party "should exercise reason and common sense to attribute ordinary definitions to terms and phrases," *id.* (quotation omitted), while avoiding "[h]yper-technical, quibbling, or evasive objections," *Avalos v. Carpenter*, No. 15-cv-00369, 2017 WL 387243, at *1 (E.D. Cal. Jan. 27, 2017).

Here, WPATH has not met its burden of showing that terms within the CID are impermissibly vague or ambiguous. It does not explain why it cannot interpret various terms, such as "question," "disprove," "safe," "few side effects," "proven effective," and "life-saving" using common sense and the ordinary usage of those words. In addition, long-standing Commission policy statements already provide guidance on terms such as "implied" representations and the necessary substantiation for advertising.[17] Finally, Commission staff has already provided clarification about terms such as "substantiated" and "member." *Petition* Ex. 6, at 1-2.

WPATH argues that the CID's definition of PGDT "makes little sense" because the terms "gender diverse" and "gender dysphoria" have different meanings; could be read to encompass all medical treatments received by gender diverse minors, including band-aids for scraped knees; and is based on WPATH's opinion and therefore circular. *Petition*, at 15-16. But the CID's definition of PGDT goes on to provide a non-exclusive list of examples: "pubertal suppression, hormone therapy, and surgery (*e.g.*, subcutaneous mastectomy, vaginoplasty, metoidioplasty, and phalloplasty)." *Petition* Ex. 1 at 6. In addition, Commission staff clarified in their February 5, 2026, letter that "social transition is not a 'medical intervention' within the CID's scope." *Petition* Ex. 6, at 2. Given these examples and clarification, we are not persuaded by WPATH's argument that it lacks sufficient notice of how to comply with the CID.

## III.    CONCLUSION

For the foregoing reasons, WPATH's petition to quash is denied.

**IT IS HEREBY ORDERED THAT** WPATH's Petition to Quash the January 15, 2026, Civil Investigative Demand be, and hereby is, **DENIED**.

---

[17] *See FTC Policy Statement on Deception* (Oct. 14, 1983), *appended to Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984), https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf; *FTC Policy Statement on Advertising Substantiation* (Nov. 23, 1984), *appended to Thompson Medical Co.*, 104 F.T.C. 648, 839 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987), https://www.ftc.gov/legal-library/browse/ftc-policy-statement-regarding-advertising-substantiation.

**PUBLIC**

**IT IS FURTHER ORDERED THAT** WPATH shall comply in full with the Commission's Civil Investigative Demand no later than 60 days after the Court's decision on WPATH's Motion for Preliminary Injunction in *WPATH v. FTC*, No. 1:26-cv-532 (D.D.C. filed Feb. 18, 2026), or at such other date, time, and location as the Commission staff may determine.

By the Commission.

April J. Tabor
Secretary

SEAL:
ISSUED: March 23, 2026