```
                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA


WORLD PROFESSIONAL ASSOCIATION      Civil Case
FOR TRANSGENDER HEALTH,             No. 26-00532 JEB

                 Plaintiff(s),      Washington, D.C.
          v.

FEDERAL TRADE COMMISSION, et al.,
                                    April 7, 2026
                 Defendant(s).
----------------------------------------------------------

                PRELIMINARY INJUNCTION HEARING
           BEFORE THE HONORABLE JAMES E. BOASBERG
             UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):   Schuyler Standley, Esquire
                        Caleb Hayes-Deats,Esquire
                        Abbe David Lowell, Esquire
                        Lowell and Associates, PLLC
                        1250 H Street Northwest
                        Suite 250
                        Washington, D.C. 2000




FOR THE DEFENDANT(S):   Daniel F. Mummolo, Esquire
                        John Bailey, Esquire
                        United States Department of Justice
                        950 Pennsylvania Avenue Northwest
                        Washington, D.C. 20530




REPORTED BY:            Tammy Nestor, RMR, CRR
                        Official Court Reporter
                        333 Constitution Avenue Northwest
                        Washington, D.C. 20001
                        tammy_nestor@dcd.uscourts.gov
```

The following proceedings began at 11:26 a.m.:

THE COURTROOM DEPUTY:  We are on the record in Civil Action 26-cv-532, World Professional Association for Transgender Health versus the Federal Trade Commission, et al.

Beginning with counsel for the plaintiff, please approach the lectern and state your name for the record.

MS. STANDLEY:  Good morning, Your Honor.  Schuyler Standley on behalf of WPATH.  I am joined by colleagues Caleb Hayes-Deats and Abbe Lowell.

THE COURT:  Okay.  Good morning to you.

THE COURTROOM DEPUTY:  And for the government.

MR. BAILEY:  Good morning, Your Honor.  John Bailey --

THE COURT:  Come on up.  Don't be shy, Mr. Bailey.

MR. BAILEY:  Good morning, Your Honor.  John Bailey for defendants.

THE COURT:  Thank you.

Okay.  We are here on WPATH's motion for preliminary injunction.  Obviously -- well, perhaps not obviously, but I will just state for the record that counsel were present, plaintiff's counsel, were present in the gallery for the argument that just took place in the suit by the Endocrine Society against the FTC, and government counsel was at the table during that argument.

So I don't think we need to reinvent the wheel here. I want to hear both sides of the same issues we heard. We may not be at the length we did it in the first matter, but, Ms. Standley, I'm interested in hearing, now that you have had the benefit of the earlier argument, points that you wish to make on these topics.

MS. STANDLEY:  Of course, Your Honor.  Let me get situated.

So to bring us back to, I think, the basics, this CID is a fulfillment of a promise and it was a promise made by then-Commissioner Ferguson to President Trump that he would fight the trans agenda and that he would investigate individuals who uphold opposing viewpoints on transgender healthcare to the administration.

This means that the mere issuance of the CID violated WPATH's First Amendment rights as it was retaliatory, viewpoint discriminatory, and burdens WPATH's freedom of association.  So that's why we ask this Court for a preliminary injunction.

THE COURT:  But so if I -- don't you agree that I need to conduct a balance here between considering improper purpose and proper purpose?  So you've given me improper purpose.  But why isn't there some proper purpose here, as the government stated in the last argument?

MS. STANDLEY:  I think there are several reasons.

The improper purposes that the government has engaged in are myriad, as you said, and the proper purposes that they have put forth are, frankly, pretextual.  The government sites things that WPATH has said or done, emails, but these things are all of the same things that a year previously, a brief by the DOJ in Boe v. Alabama rebut it and said that they weren't probative of any mal-intent or any lack of scientific guidance.

The only difference between the 2024 DOJ and the FTC early January 2025 is a change in administration.

THE COURT:  So you agree that different administrations can have different priorities, right?  And so, again, let me take the marijuana hypothetical I used in the prior argument, that if a bunch of dispensary owners have formed an association and are saying that people should consume marijuana multiple times a day, and the reason they are doing this is because they want to sell more marijuana, and the administration, the new administration, comes in and says we think excessive marijuana use is taking a big toll on society, we need to investigate this organization to show that what it's saying is false in deceiving consumers, can't they do that?

MS. STANDLEY:  I think we should start with the organization that you just named.  This is dispensary owners who formed an association, I'm guessing, to promote the use

of marijuana, right?  And that's not WPATH.  WPATH is an organization -- there are clinicians.  There are doctors.  There are also lawyers.  There are researchers.  There are students.  It's an organization that is so purely noncommercial that it sort of boggles the mind for why we are even here.

THE COURT:  But my point is that you have to look at the scale, that you have said the government came in with this agenda.  And I'm saying, right, maybe they did, maybe they didn't, but it seems they are allowed to have an agenda if there's enough proper purpose in what they are doing, in other words, if, in my hypothetical, the dispensary owners are speaking for a commercial purpose.

MS. STANDLEY:  Your Honor, I think the weighing test isn't quite the proper fit for where we are here.  This isn't a motion to quash.  This is a motion for a preliminary injunction.  And what we are saying is that the issuance of the CID evidenced by its scope, evidenced by the lack of jurisdiction or the great stretch of jurisdiction here is why this is retaliatory.

But we are not weighing -- I think the improper purpose/proper purpose test isn't where we are.  Where we are is retaliation.

THE COURT:  But actually, shouldn't the government's bar be lower for a CID than in a motion to quash?

MS. STANDLEY:  So let's put this on and say, I think, motions to quash would be for a CID.  And I think in Powell, that was a grand jury subpoena.  And what they have done is they have said administrative subpoenas like CIDs are somewhat analogous to the grand jury subpoena power.

So if we are taking in that reasonable basis framework, right, we accept that that is even relevant here, we'll put it within the Harbin v. Moore, the Nieves v. Bartlett framework and we go, okay, also needs to show no reasonable basis.  But that can actually be overcome just in the same way that a lack of probable cause can be overcome in this similar retaliatory framework by showing that this has never been done before.  And so I think one question to ask the FTC is what's their best case where they have gone after a --

THE COURT:  You are saying this isn't even a motion to quash, which implied to me that there should be a higher standard in a CID preliminary injunction than in a motion to quash, but shouldn't it be lower?  Because it's not even an enforcement action yet.  They have the ability to look and see -- I think I would sort of analogize CID to a criminal subpoena and a motion to quash like a motion to dismiss a criminal case, motion to dismiss an indictment.  Fair?

MS. STANDLEY:  I think under any framework, we can show you that the CID should go away, but --

THE COURT:  All right.  So why isn't there some evidence of proper purpose here?

MS. STANDLEY:  So I think we can -- first you can look at the scope of the CID.  There has to be some limiting principle to what the FDC can do to search for a justification for an investigation.  And the CID is so broad.  It asks for 50 years' worth of documents from WPATH.  And because WPATH is an organization focused entirely on transgender health, you can look at the CID and make a reasonable argument that it could cover pretty much every document in WPATH's possession.  That's a search for a justification that can't be permissible.

But I think you can also look at the purposes that they have put forward.  They have put forward three: A search for their own jurisdiction, which, frankly, Chairman Ferguson declined to narrow it in any way when he declined our petition to quash and the FTC declined our offer to provide -- at least point to documents at least in the publicly available sphere that would show them their lack of jurisdiction.

They have also said that WPATH could have violated the FTC Act.  But WPATH obviously is not an advertiser.  It's not advertising a product.  And the FTC has never done this before.

Then they say it could potentially lead to something

else.  But what?

THE COURT:  So do you -- what's your position on the question I asked the Endocrine Society earlier?  If I think there is some validity, some aspect of the CID that is valid, do you believe that I can narrow it or do you agree with the government that it's an all-or-nothing ballgame?

MS. STANDLEY:  Our position is that in this procedural posture, what you could do is you would issue the preliminary injunction quashing the CID but provide the government with space within that preliminary injunction to issue a subpoena that is narrowly tailored to their jurisdictional questions.  But that is a threshold issue, and it doesn't seem like they have met it here.

They can't articulate really any reason why WPATH would be within its power or if they have ever gone after organizations like WPATH before this.  You can look at their own guidance, the health products compliance guidelines.  They say that FTC does not have jurisdiction to regulate noncommercial scientific literature.  That's what they are trying to do here.

THE COURT:  What do you think of the government's statements earlier that in its workshop on pediatric transgender treatment, that there were people saying that guidelines and standards of care that were propounded by the Endocrine Society and by WPATH were deceptive, and

therefore, that provides them a basis to look for information that could bring WPATH within the ambit of the FTC's jurisdiction?

MS. STANDLEY:  So let me give you two answers to that.  The first is that the workshop is pretextal.  You look at the makeup of the workshop, you look at who organized it, and you look at the broader decision-maker over the whole thing, and it was a workshop that was created to shore up the viewpoint that the FTC already had.  They put together a panel of people that are well known to have animus towards transgender people in general, but also towards transgender healthcare.  They are entitled to a forum, but they are not necessarily the only basis that the FTC should listen to in considering an investigation.

And there's also a lot of information that we have put forward that says that the FTC has sort of pre-decided this before the workshop even exists.  The original title for the workshop was the big lie.  These are people that are on a workshop that were selected so that they could affirm the FTC's position already.  It wasn't necessarily an actual investigative journey.

And then I think the second part of it is that you have a lot of people saying on these panels that WPATH is somehow not science-based in issuing its guidelines.  But that's not the FTC's lane.  And there is so much evidence

that WPATH has put forward into the public domain that has rebutted these, that the DOJ rebutted, that plenty of organizations have rebutted.  They can look at their own briefing to find the answers to their questions instead of issuing an overly broad CID.

It seems incongruous when you have an organization like WPATH being targeted by an agency like the FTC that is focused on consumer protection and antitrust when WPATH isn't even in that sphere and the FTC can't point to a single case where they have done this before.

THE COURT:  So what do you think about a question I asked the Society's lawyer, do you think it's relevant that there is animus in some FTC statements towards trans individuals generally or as opposed to the treatment, or do you think that that's all one and the same?

MS. STANDLEY:  I think it's different, but both of them are relevant.  Both of them show an improper purpose. Animus towards a class of people certainly cannot be a reasonable basis for a CID, and it is evidence of retaliation.

And then you have, you know, disagreement about a treatment, let's say.  Let's put it that way, in kinder terms.  I think that's a little bit less attenuated to, you know, pure animus.  But it's also -- again, that's not the FTC's lane.  The FTC doesn't decide what is a good

healthcare treatment and what isn't.

And so I think -- let me give you an example.  I think this will help.  So the FTC cites one of its cases, FTC v. Pomegranate -- or POM Wonderful.  That went to the D.C. Circuit.  There is a great case about it.  And it describes a seller and a manufacturer of a pomegranate juice drink that created all of these studies about the heart health benefits of the pomegranate juice.  And then the pomegranate advertiser said let's say that some of these studies are good for us, let's just cite those, and some studies are bad for us, let's cite those -- let's not cite those.

And in this case, the FTC went after the seller and the advertiser of the pomegranate juice, it didn't go after the scientists, because the seller was the one who was saying, oh, the evidence is great for this product, buy it, it will help your heart, and the scientists just did their job evaluating the evidence.

THE COURT:  But is that line blurred if doctors are the ones engaging in the treatment?  In other words, it would be as if the sellers of the juice also manufactured it or the advertisers also manufactured it.

MS. STANDLEY:  So let me give you a little bit more information about WPATH's guidelines, and I think that will help us here as well.  The guidelines are guidelines, but

they are also guardrails.  So WPATH's guidelines can tell doctors and professionals not to do things, and all of it is recommendations.  It's saying consider these things when you are providing this treatment.  Consider these statements when you are providing therapy.

And those recommendations provide an evaluation of the evidence on both sides.  And so when these recommendations are used by individual doctors and patients, doctors are applying some recommendations, but it's not prescriptive.  It's not recommending a specific product. It's not recommending a specific brand of chest binder, for example.  It is providing the considerations that doctors need to take into account when they are giving individualized care.

And I think you can also look at WPATH as an organization.  Where the FTC has traditionally drawn its lines when it comes to commercial purpose of an organization is whether or not the organization itself is working on behalf of its members' profits.  That doesn't make sense when it comes to WPATH because WPATH is working on behalf of access to healthcare for transgender people and good healthcare.

So it can be used in things like medical malpractice cases to say that a doctor has provided bad services.  So for some doctors, it might say, no, you can't provide that

service, and that's a loss.

So the idea that it's working on behalf of its members' profits doesn't make sense when it comes to WPATH because that's not it.

THE COURT:  Okay.  Thank you.  I will give you a few minutes to rebut.  Thanks so much.

MS. STANDLEY:  Thank you.

THE COURT:  Mr. Bailey.

MR. BAILEY:  Thank you, Your Honor.  I just have a few points.  I'm not going to retread the ground that my colleague ably covered.

The first is on this discussion of improper purpose, and I think, as we made clear in our papers, we do not believe that there is evidence of any improper purpose here. And I am not going to attempt to get up and debunk every tweet going back to 2021 by random staffers, but there is one statement in particular that I would like to home in on because I think it's very important and I would like the full context to be clear from the record.

So in this case, this is ECF 319, this is a resume, I believe, that was pulled from a news website attributed to the commissioner of the FTC.  And so this was a statement -- this contains a statement that was discussed in the last matter and was also referenced by my colleague on the other side.  It was in her, I believe, her first opening.

So this document in the record.  It's a list of bullet points.  As I said, it's a resume-type document.  The heading is Protect Freedom of Speech and Fight Wokeness.

The fifth dash bullet point has two sentences, and I'm going to read that.  Fight back against the trans agenda.  Investigate the doctors, therapists, hospitals, and others who deceptively pushed gender confusion, puberty blockers, hormone replacement, and sex change surgeries on children and adults while failing to disclose strong evidence that such interventions are not helpful and carry enormous risks, period.

That statement is cited in WPATH's briefing at least five times and several other times in the matter that was just before the Court.

That is not a statement that shows animus towards a particular group or even a particular treatment.  It is a statement by an agency -- by a future agency official that shows they care about the FTC --

THE COURT:  Read the first sentence again.

MR. BAILEY:  Fight back against the trans agenda.

THE COURT:  Okay.  So that does not manifest any animus toward trans people, toward those supporting trans individuals?

MR. BAILEY:  Well, Your Honor, the next sentence, it explains what trans agenda means there.  That could mean a

lot of things.

THE COURT:  Right.  It's a pretty broad statement, isn't it?

MR. BAILEY:  I agree, Your Honor.  That's why I wanted to get up here and read that second sentence that immediately follows because I think it's clear that what this statement is focused on and what it is only focused on is deceptive and unfair treatments.

THE COURT:  I wonder then, what is the point of the first sentence?  I mean, why didn't you just cut the first sentence unless the point is a much broader attack or animus?

MR. BAILEY:  Your Honor, I think we are trying to understand what that first sentence means.  And I think the second sentence gives it content.  What agenda that is being discussed there is the pushing of treatments that do not have medical substantiation.

THE COURT:  Okay.  So let me give you also the opportunity that I gave your colleague, which was to explain in regard to WPATH and the prior one with Endocrine Society, so what evidence of commercial purpose or commercial speech do you have in regard to WPATH?

MR. BAILEY:  Sure, Your Honor.  So I think we have -- there's some evidence that suggests that WPATH may be subject to the FTC's enforcement jurisdiction.  Some of the

specifications in the CID go to that as well.  For instance, some of the evidence we cite in our brief is that on WPATH's website, they maintain a public searchable provider directory.  It can be filtered by WPATH's certified members. That suggests that they may be working in their members' financial benefits.  But that's just the first bucket which would go to show whether they are actually ultimately subject to their enforcement jurisdiction.

As my colleague described, agencies are entitled to investigate whether they have -- they are allowed to investigate in order to attempt to establish its own jurisdiction.

But I would like to set that aside because I understand you are asking about what commercial conduct in general is FTC concerned about and why might it relate to WPATH.

And so the commercial conduct at issue here, and this was brought up in comments at the workshop and then it was brought up in enumerable public comments that were solicited afterwards, our commercial medical providers that are providing medical treatments and there's allegations that these treatments -- that false or misleading representations about those treatments are being made to patients, that's the commercial conduct that FTC is concerned about, deceptive practices.

THE COURT:  And how is WPATH engaging in that?

MR. BAILEY:  Your Honor, as I said, the core concern is whether commercial providers are making unsubstantiated medical claims.  And so the exact place to look would be, which is the premier organization or the organization that purports to be premier and promulgates the standards?  Who substantiates these medical claims?

It is natural to start with organizations like WPATH or Endocrine Society.  When the FTC is concerned about whether commercial providers are making unsubstantiated medical claims, you would look to the organizations that are purporting to substantiate these treatments.

THE COURT:  Why wouldn't you look to the providers who are making the statements?  Why aren't you going after doctors or hospitals that are making the statements that you think are deceptive?

MR. BAILEY:  Absolutely, Your Honor.  This is just one piece of a larger investigation.  And FTC needs to start somewhere.

THE COURT:  Right.  So --

MR. BAILEY:  I mean, this is one -- this is the beginning of an investigation.

THE COURT:  Wouldn't you think it would start with the people it has identified as making the false statements?

MR. BAILEY:  Your Honor, I understand a lot of the

feedback that FTC received about individuals' experiences with these treatments, I'm not sure that it was so much reporting individuals by name, but rather members of the public generally sharing -- consumers generally sharing their experiences.

So this is just one step in the agency's -- the very first step forward to gather information. All right. Who do we need to go and issue a CID next, which provider, which commercial provider, that there's no doubt that they that are subject to our enforcement jurisdiction are we going to go to next?

THE COURT: But your CIDs are so much broader than that to WPATH. I mean, as they say, that could conceivably encompass every document they have. I mean, are you saying that the CID actually is tailored toward getting that information and that information only? You are not saying that?

MR. BAILEY: Your Honor, the CID is to some extent broad in that, yes, it's concerned about gathering information --

(There was an interruption by the court reporter.)

MR. BAILEY: The CID is broad in that it's concerned with both attempting to gather information that would go to whether WPATH is subject to the enforcement jurisdiction as well as information as to whether others may have -- who

those others might be, what have they done, and whether those individual commercial providers would be subject to an eventual enforcement action.

And, Your Honor, I think your hypothetical, the marijuana hypo, I think the most helpful way to understand that is if this marijuana trade organization that we have been talking about, if that was a trade organization of medical marijuana doctors and they were pro medical marijuana for everyone, anyone who has anxiety, whether you're 10, 12, or 20, medical marijuana for anxiety, and they promote these standards that say, you know, minors with anxiety should use medical marijuana, well, I think if we were concerned that doctors were making misrepresentations to parents about the substantiation for this sort of treatment, we don't know who those doctors are, where they are, or who they are making these statements to, I think we would start with the organization that's purporting to lay out the standards for this care.

THE COURT:  But if the doctors -- if the organization, in fact, was made up of doctors who were going to profit from marijuana sales because people would come to them to prescribe it, for example, then I might agree with you.  But I guess that's what I'm asking.  What's the evidence of the commercial purpose behind WPATH?

MR. BAILEY:  Well, I think -- I mean, there's --

THE COURT:  And I don't mean -- the organization, we all agree, is nonprofit, and the inquiry doesn't end there. I'm saying you've got to have some link to some commercial activity that you are seeking here, right?

MR. BAILEY:  Absolutely, Your Honor.  And we are concerned, the FTC is concerned, about unsubstantiated medical claims being made by commercial providers to consumers.  And WPATH, many of its members are providers. And so WPATH may have information about other entities that are making unsubstantiated medical claims in the course of providing commercial medical services, or it may itself have information that reveals whether its standards are substantiated that would relate to what other commercial providers are doing and whether there's substantiation there.

THE COURT:  And I understand that, so then we are back to that sort of weighing that I talked about, which is, shouldn't I be looking at the quantum of improper purpose and the quantum of proper purpose to decide whether improper purpose is the but-for cause of the issuance of the CIDs?

MR. BAILEY:  Your Honor, I agree with the latter part of that formulation.  I think we need to look at -- at best, it's a but-for cause.  I don't think it's really amenable to a kind of sliding scale.  I think the question is would FTC have taken this preliminary investigative step but for

constitutional animus.  And I don't think WPATH has come close to showing that.

And I think it's revealing that there were three CIDs issued to three different entities with very different speech and very different time periods, and now we have three almost identical preliminary injunction motions.  And it will be massively destabilizing if this is the new practice where anyone who --

THE COURT:  But haven't other courts quashed subpoenas relating to precisely this kind of activity initiated by DOJ?

MR. BAILEY:  I'm not sure if I would say precisely this kind of activity, but yes, sure.  I'm not going to deny that there have been other courts that have quashed subpoenas by a different agency.  I don't think that that's relevant at all here.

THE COURT:  Why doesn't that show a coordinated or common effort across the administration to retaliate against speech by people supporting pediatric trans care?

MR. BAILEY:  Well, I think it's notable, Your Honor, that the executive orders from January 2025 that WPATH points to, although one of those orders mention the WPATH's standards of care and directs various agencies to change how they regulate based on those standards, it doesn't direct FTC to do anything.  And there's nothing calling out an

investigation of WPATH.

And I think more broadly the administration, whether we look at it at an administration level or an agency level, they are allowed to have views on policy questions.  And I don't think you can just translate that into unconstitutional retaliation so easily.  I think the showing is much higher.

THE COURT:  And so you are not interested in working with WPATH at this juncture to come up with a narrower CID that targets precisely this commercial speech, commercial practice issue that we have been talking about?

MR. BAILEY:  No, I don't think so, Your Honor, because, as I said, one reason that FTC is entitled to this information by statute is that they might be subject to their enforcement jurisdiction as someone who is engaging in commercial speech.  But the FTC is entitled to treat WPATH as a witness that may have relevant information to the broader investigation.

And the second point I would make on that is, as my colleague alluded to, the way that this would work is the Commission would actually vote on whether to enforce, and importantly, they would vote on which specifications to enforce.  There is a narrowing that would happen if this process were -- a potential narrowing that would happen if this process were allowed to play out.

And so at this juncture where we don't really have a fulsome -- we don't have motion to quash briefing, I mean, we have references to it, the breadth -- the alleged breadth problems, but on this record, it would be inappropriate from our view to try to at this stage slice and dice what is just a CID that is not self-executing, and the Commission hasn't voted.

THE COURT: Okay. Thanks so much.

MR. BAILEY: Your Honor, briefly, I would just like to put on the record our request for a stay pending appeal while the solicitor general considers any request for appeal.

THE COURT: Wait. Sorry. Say that again.

MR. BAILEY: Your Honor, if the Court is inclined to grant relief, I just wanted to put on the record the request that's in our briefing that the Court grant a stay pending appeal while --

THE COURT: A stay would mean that they have to answer your CID. This is not the kind of case where a stay would be appropriate. Again, I don't know what I am going to do, but just to ask --

MR. BAILEY: I was more just trying to check a box rather than to make an argument.

THE COURT: That doesn't seem to me -- in other words, a case where the Court was -- where an ongoing

process be -- would proceed without this, I think, would not be the kind of case that a stay would be appropriate because nothing would be happening if I were to -- nothing is happening now.  Nothing would be happening if I issued -- if I granted the injunction because they don't have to answer it until this is resolved, right?

MR. BAILEY:  Yes.  I appreciate the Court's indulgence.

THE COURT:  All right.  Thanks.

Ms. Standley, I will give you a few minutes to rebut.

MS. STANDLEY:  Thank you, Your Honor.

So I think I want to first address the justifications that they have put forward.  I think the number one thing that stood out to me is when they are giving their justification for seeking doctors that, I guess, WPATH works with, that means that they are seeking our membership lists. Those are highly protected under the First Amendment.  This is a clear NAACP Alabama issue.  They have to meet exacting scrutiny to request that information, and they haven't done that here.

So if that is their justification, their justification to seek our membership list is so they can target our members with subpoenas and with enforcement actions, then they need to show why they need to get that from WPATH because what that's going to do -- this CID is

forward-looking.  This is going to say to every single person who wants to associate with WPATH, who wants to be a member, who wants to donate, that the FTC is going to bring an action against them, that the FTC is going after them and the FTC is going to read their communications.

And that leads to my second point, Your Honor, which is that if this is a substantiation that they are looking for, they are looking for information about whether or not the science is proper, then SOC 8 stands alone.  It has 70 pages of citations.  SOC 8 is the final version of WPATH's recommendations.  It gives all of the sources that it cites. If it wants to understand why WPATH is providing these recommendations, it can look at the sources.  So those don't really make sense as justifications.  And if that's the best that they have, then the evidence that we have shown of improper purpose swallows what they have shown for a proper purpose.

But that leads me to another point, Your Honor, which is, if we are going to the but-for cause standard, which we are fine with, the standard for that under Bostock is that, absent the retaliatory motive, this wouldn't have happened and --

THE COURT:  Right.  So, again, doesn't that bring us back to is there a legitimate basis because there is some commercial activity going on?

So their argument is, look, there are doctors who are contributing to these standards of care and these guidelines, and these doctors have some commercial interest in seeing them articulated in a certain way. And so why can't we explore that?

MS. STANDLEY: I think that wouldn't really make sense with the WPATH guidelines, Your Honor, because the WPATH guidelines has, I think, 170 authors. Some of them were doctors, but a lot of them are academics, clinicians, some are lawyers, and it went through this consensus process. So basically, you would have to have doctors from any number of specialties coming in agreeing on this one specific language for a recommendation and all agreeing on the same basis for their profit motive -- it just doesn't line up with what WPATH does.

THE COURT: But why don't they just need to think that there are certain doctors who are doing this in order to promote their practice?

MS. STANDLEY: I don't think they would get that information from WPATH. How would -- would they be looking into the internal emails of people doing the first draft of SOC 8? But it doesn't make sense.

THE COURT: Maybe.

MS. STANDLEY: It's so -- if that is their best reason for this CID, that can't be exacting scrutiny. They

can get that information from elsewhere.  They are looking for members and membership information.  If they can go into WPATH's internal emails, internal documents spanning back any number of years longer than the Media Matters court, the Media Matters court found to be at issue, it just can't be enough of a justification to overcome -- for example, I mean we can look at Chairman Ferguson.  Chairman Ferguson signed our CID.  Chairman Ferguson quashed our petition to quash. And if we go through the process that they just described, he would be one of two commissioners voting on what to enforce and what not to enforce.  That's not meaningful review, first of all, but it's also -- you would have the retaliator getting to make every single decision.

So if it's enough under the FTC's jurisdiction for them to say, well, if I go after this nonprofit which I disagree with and they have some reach of a justification under some commerce aspect, they could go after every single nonprofit that they disagree with.  They could issue these subpoenas which are burdensome from the outset.  You look at the language of the CID, and it says you are required to respond to this, you are required to meet and confer, you are required to get counsel.  I mean --

THE COURT:  That's right.  That's what CIDs are.

MS. STANDLEY:  They are, exactly.  But it's burdensome, and it's --

THE COURT:  All right.  Thank you.

MS. STANDLEY:  Thank you, Your Honor.

THE COURT:  I appreciate it.

Thank you very much, counsel.  I will work on this and do what I can.  Thanks, everybody.

(The hearing concluded at 12:05 p.m.)

- - -

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

4/8/26                    s/ Tammy Nestor
                          Tammy Nestor, RMR, CRR
                          Official Court Reporter
                          333 Constitution Avenue NW
                          Washington, D.C. 20001
                          tammy_nestor@dcd.uscourts.gov