# Exhibit 5

Q6OVCOED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CARTER COE, *et al*,

                Plaintiffs,

         v.                              26 Civ. 4641 (KPF)

TODD BLANCHE, *et al*,

                Defendants.              Teleconference
                                            Decision
------------------------------x
                                         New York, N.Y.
                                         June 24, 2026
                                         11:05 a.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                         District Judge

                         APPEARANCES

LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
     Attorneys for Plaintiffs
BY:  OMAR GONZALEZ-PAGAN
     -and-
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
BY:  CHASE STRANGIO

U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
     Attorneys for Government Defendants
BY:  LUKE MILLER
     SARAH WELCH

NIXON PEABODY LLP
     Attorneys for NYU Defendants
BY:  TIMOTHY SINI
     ZACHARY A. CUNHA
     LINDSAY MALESON

Q6OVCOED

(Teleconference)

(Case called)

THE DEPUTY CLERK:  Counsel, please state your name for the record, beginning with plaintiffs.

MR. STRANGIO:  Good morning, your Honor.

This is Chase Strangio, on behalf of plaintiffs.  And with me on the line is Omar Gonzalez-Pagan, also on behalf of plaintiffs.

THE COURT:  Good morning.  And thank you to both of you.

Are you able to hear me, Mr. Strangio?

MR. STRANGIO:  I am, your Honor.  Thank you very much.

THE COURT:  Thank you so much.

All right.  Representing the DOJ defendants, please.

MR. MILLER:  Good morning, your Honor.

This is Luke Miller and Sarah Welch, on behalf of the DOJ defendants.

THE COURT:  Good morning.  And thank you to both of you for appearing.

And representing the NYU defendants, please.

MR. CUNHA:  Good morning, your Honor.

Zachary Cunha, on behalf of the NYU defendants.  And I'm joined by my colleagues Timothy Sini and Lindsay Maleson.

THE COURT:  Okay.  Thank you all very much.

And so as I mentioned yesterday, I thought that the

most efficient thing to do today was to give you an oral decision as soon as I could get it together, and I will do that now.  I'm going to remind you, those of you who are listening, that there can be no recording and no rebroadcasting of this decision.

Additionally, let me note that I had asked for folks' indulgence until noon today.  But it's now 11:10, and I cannot guarantee that I will be done with my decision — because it is quite lengthy — at the noon hour.  So I'm going to understand that the agreement or at least the -- yes, the agreement between the parties not to require the production of materials exists for the length of this oral decision and the time it takes me to post an order that regards that decision.  So you'll have to tell me if you disagree with that, and no one is disagreeing with that.

All right.  I want to be very clear that, again, this was a very serious case, very well-argued.  I still think it is the most efficient use of everyone's time for me to give an oral decision, and I'm going to do that now.  But it is a rather lengthy decision.  And I'm going to ask you please to mute yourselves, to be comfortable, and to listen as I read this decision into the record.

Let me begin my decision by thanking those of you who are on this call and those of you who have assisted those on the call for the work that you've done in this case and, in

Q6OVCOED

particular, on this motion for a temporary restraining order. I'm fully aware that there were teams of attorneys and support staff behind the scenes.  I want them to know that their work on this matter on a very short schedule did not go unnoticed.

I also want to extend my thanks to the four oralists who were willing to give me nearly three hours of their time yesterday.

My experience has been that oral argument does not always aid me in arriving at a decision.  But yesterday's oral argument was helpful in clarifying several points, and let me speak to those points now.

To begin, I now have a clearer picture of the information as to which plaintiffs are resisting disclosure. That information comprises both their identities as transgender persons, and the very detailed sensitive records of the gender-affirming care that they have received.  And considering that information in its totality is significant.  After all, as plaintiffs' counsel noted, the records sought are unusually detailed and include — and I'm quoting from page 11 of the transcript — discussions of familial history, of mental health history, their problems in school, their psychological development, as well as whatever other medical conditions that they may have or experienced beyond gender dysphoria.

Counsel also correctly noted that these materials were sought for a period of six years, which for many of the minor

Q6OVCOED

plaintiffs represents a substantial percentage of their lives. The importance of protection of this information — and indeed ultimately of temporary injunctive relief — is clear when one considers the context in which the information was sought.

The complaint details the backstory to this litigation at paragraphs 41 through 115, and the Court will not repeat all of that information here. It suffices to note, however, that in the first few days of the current administration, multiple executive orders were issued that sought to identify, to demonize, and ultimately to eradicate an entire population of transgender people.

Pursuant to that policy, DOJ issued a flurry of civil administrative subpoenas to healthcare institutions that courts quashed or severely limited. And in doing so, these courts found, among other things, that the subpoenas were pretextual; that they were — and I quote from one decision — a smoke screen for the government's true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless investigations. This particular court decision is quoted in paragraph 79 of the complaint.

But undeterred by its disastrous showing in the courts, DOJ decided to issue nearly identical document requests in the form of grand jury subpoenas emanating from the Northern District of Texas, on which more later. The need for protection of plaintiffs' identifying and sensitive medical

information is further underscored by statements of counsel for NYU Langone, who noted that while the facility was expending significant time and resources to implement redactions to plaintiffs' medical records, with the specter of a later government request for deanonymization always in the background — and now I'm quoting from counsel — in an age of artificial intelligence and multiple points of data that are inherent in a complex medical record, counsel could not guarantee anonymization.  This exchange is at pages 74 and 75 of the transcript.

Separately, plaintiffs' counsel aided me in understanding the specifics of the relief sought and why this action cannot simply be dismissed as a motion to quash or an end-run around Rule 17(c).  Whether by accident or by design, the administration's policies *vis-à-vis* transgender persons embody a concerted effort to obtain deeply private information about an entire class of individuals without their knowledge or consent.

After the issuance of the executive orders and the Bondi and Shumate memoranda, DOJ attorneys on both the civil and criminal sides issued expansive document requests to third parties without prior notice to the individuals whose information was being sought.  It is only the fortuity of NYU's interpretation of the New York Shield Law that allowed plaintiffs in this case to seek redress for claimed

constitutional violations caused by the grand jury subpoena. And then, only then, did they learn of a completely different administrative subpoena that could have resulted in the turnover of this sensitive information without any opportunity for petition or redress.

This record makes plain the cold comfort of telling plaintiffs to pursue their claims under Federal Rule of Criminal Procedure 17(c).  They wouldn't even know where to begin.

In extrapolating from the metaphor offered by plaintiffs' counsel, protecting plaintiffs' constitutional rights in this environment is worse than a game of whack-a-mole; it's being forced to play the game blindfolded. And this is precisely the factual scenario for which the *Gonzales* case was designed.

Finally, I had the opportunity to examine the parties' positions concerning the interplay between Rule 6(e) and analogous grand jury secrecy requirements, and plaintiffs' constitutional rights.  Now, many in the gallery yesterday chuckled at Mr. Miller's invocation of the term "allegedly." But I appreciate the seriousness with which any government attorney takes his or her grand jury secrecy obligations.  The fact remains, however, that the government was not perfectly consistent in its reticence about the grand jury investigation, since counsel pointedly referenced Northern District of Texas

Q6OVCOED

Judge O'Connor as currently having some undefined role in the government's criminal investigation, and later volunteered that no patients would be prosecuted — this is the transcript at page 66 — and that the government, in fact, viewed these individuals as victims.

But, more fundamentally, this Court will not blind itself to reality. And, in this case, reality is the timeline of DOJ's efforts and, in particular, its efforts to recast discredited civil administrative subpoenas as grand jury subpoenas from a hand-picked faraway jurisdiction in order to minimize judicial review of constitutional infirmities.

Let me end my introductory comments with this observation: There was precious little on which the parties agreed yesterday, but one point of agreement was on the uniqueness of the facts of this case. Of course, the parties want me to draw different conclusions from that fact, but I agree with you that the facts of this case are unique. And the conclusions the Court reaches on this motion might not be transferable to other cases.

Ultimately, at this early stage, on this record, and given the paramount importance of preserving the privacy of the underlying identification and medical information, I am provisionally certifying a class in accordance with plaintiffs' request and granting plaintiffs' application for a temporary restraining order to enjoin DOJ from seeking sensitive health

Q6OVCOED

and identification information regarding class members.

Let me speak to the parties.  And I'll speak about them very summarily, because folks have read the complaint in this case.  But the plaintiffs and the similarly situated members of the proposed class are minors, their parents, and young adults who received gender-affirming care in New York City.

There are two sets of defendants here:  Defendant Blanche is the Acting Attorney General of the United States. Defendant United States Department of Justice is a federal executive agency, and I will refer to them as the DOJ defendants.  Defendants NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine are medical care providers and corporations organized under the laws of New York with their principal place of business in Manhattan.  I will refer to them as the NYU defendants.

In terms of factual background, as I mentioned, I will summarize as best I can the very extensive discussions that are in the complaint.

Through a series of executive orders and federal agency actions, this administration has carried out a systematic campaign to attack and dehumanize transgender people, as shown in complaint paragraphs 41 through 88.

On January 20th of 2025, President Trump issued Executive Order 14168, the Gender EO, to declare a national

Q6OVCOED

policy of recognizing only two birth-assigned sexes.  And on January 28th, 2025, he issued Executive Order No. 14187, the Denial of Care EO, to put an end to gender-affirming medical care for minors.

As one of several federal agencies tasked with implementing the EOs, DOJ has explored numerous legal avenues for limiting or ending the provision of gender-affirming medical care.  At first, DOJ issued civil administrative subpoenas under HIPAA to more than 20 healthcare institutions across the country seeking information about patients receiving gender-affirming medical care.  Before April 30th of 2026, every court to have considered motions regarding these subpoenas had granted the motions to quash or limit the subpoenas.  And, in several cases, DOJ had represented that anonymized data without patient-identifying information would be sufficient for purposes of those investigations.

Shifting tactics, on April 30th, 2026, DOJ filed a motion to enforce an administrative subpoena in the Northern District of Texas, which promptly granted the motion.  And having found a jurisdiction — indeed the only jurisdiction — that was receptive to its arguments, DOJ strategized to concentrate legal actions related to gender-affirming medical care in the Northern District of Texas.

The administration's anti-transgender policies and DOJ's legal actions have directly impacted healthcare

institutions in the New York City area, including the NYU defendants.  These defendants had established and maintained a transgender youth health program through which they have provided gender-affirming medical and psychosocial services for transgender youth.  They stopped providing these services in February 2026, in response to declarations and proposed rules by the administration that threatened their federal funding.

On May 7, 2026, NYU Langone Hospitals was among several health institutions in New York City to receive a grand jury subpoena from the United States Attorney's Office for the Northern District of Texas, seeking the identifying and detailed sensitive health information of all transgender persons who received medical care as treatment for their gender dysphoria while they were minors, as well as the identity of their parents, from January 1st of 2020 through May 5th of 2026.

The subpoena directed the NYU defendants to provide the requested records by 9 a.m. on June 10th, 2026.  Although it was issued by a grand jury in the Northern District of Texas, it curiously requested that the information be made available to a special agent in the Kansas City field office of the FDA Office of Criminal Investigations.

On May 11th, 2026, pursuant to New York state's Shield Law, the NYU defendants made public that they had received the subpoena through a public notice on their website, and they

sent virtually identical notices to affected patients, including plaintiffs and members of the proposed class, through an online portal known as MyChart.

On June 2nd of 2026, plaintiffs filed a complaint, as well as an emergency application for a TRO and provisional class certification, along with the supporting papers in this district.  The case was originally assigned to Judge Vargas. The complaint alleges three counts:  Violation of the Fifth Amendment due process clause's right to informational privacy against DOJ defendants; violation of the Fourth Amendment's protection against unreasonable and oppressive governmental intrusions on individual privacy against DOJ defendants; and breach of physician-patient confidentiality under New York Civil Practice Law and Rules Section 4504(a) against the NYU defendants.

Plaintiffs seek a declaration that the subpoena's request for the identifying and sensitive health information of plaintiffs and members of the proposed class violates their rights to privacy under the Fifth Amendment, and to be free from unreasonable searches and seizures under the Fourth Amendment.

They seek a declaration that any disclosure by the NYU defendants constitutes a breach of physician-patient confidentiality under New York law; they seek preliminary and permanent injunctive relief, preventing the DOJ defendants from

Q6OVCOED

seeking, receiving, using, retaining, or disseminating any identifying or sensitive health information; they seek preliminary and permanent injunctive relief preventing the NYU defendants from disclosing or producing any identifying or sensitive health information; they seek class certification, a waiver of the requirement for the posting of a bond, and an award of attorneys' fees and costs to plaintiffs.

In terms of class certification, the plaintiffs have identified a class and a subclass under Federal Rule of Civil Procedure 23(b)(2).  The class is defined at paragraphs 147 and 148 of the complaint, and I won't repeat them here.

On June 4th, 2026, the parties jointly stipulated to an extension of the deadline for the production of information and records until June 24th.  And then yesterday that was extended until today at noon, and now it extends until after this decision is issued and the order filed.

There was then filing from the parties on both the plaintiffs' motion for a TRO and the motion for a provisional class certification.  Judge Vargas granted two motions for leave to file amicus briefs, one by several states, and another by the City of New York.

Over the weekend, Judge Vargas understood that she had a conflict.  She adjourned the hearing.  The case was then reassigned to me.  And I scheduled the TRO hearing to take place, as it did, yesterday.

Q6OVCOED

I know the parties are aware of the standards for a temporary restraining order, and I'm therefore going to refer to them as briefly as I can.

A preliminary injunction should issue only where a plaintiff demonstrates a likelihood of success on the merits and a threat of irreparable harm absent relief. Courts also consider whether equity tips in the plaintiffs' favor; whether the public interest favors an injunction; and where, as here, the government is a party to the lawsuit, the equity and public interest factors merge.

One case for these propositions is *New York v. United States Department of Homeland Security*, 969 F.3d 42 (2d Cir. 2020).

That's all I'm going to say about the requirements for a temporary restraining order. I really don't think the parties have dispute about them.

The bigger issue is, of course, the antecedent issue of my jurisdiction to even consider plaintiffs' challenges. And that was the focus of yesterday's oral argument. Ultimately, this Court concludes that it has jurisdiction to evaluate plaintiffs' claims arising from the grand jury subpoena and to issue the requested relief.

Much discussion took place yesterday over the Second Circuit's 2006 decision in *New York Times Company v. Gonzales*, 459 F.3d 160. In that case, the Second Circuit suggested that

a district court in this circuit may properly exercise jurisdiction over claims arising from a grand jury subpoena, including one issued by another court in a different jurisdiction, by relying on its discretion to issue declaratory relief under the Declaratory Judgment Act.  That the Federal Rules of Criminal Procedure provide mechanisms to directly challenge the subpoena, including the filing of a motion to quash under Rule 17(c) in the district court overseeing the grand jury proceedings, does not preclude per se a declaratory judgment by the district court adjudicating the collateral civil challenge.

Indeed, the Second Circuit reasoned — and I'm now quoting from the decision at page 166 — Were we to adopt the government's theory and treat a motion to quash under Rule 17(c) as a special statutory proceeding, we would establish a precedent potentially qualifying a substantial number of federal rules of criminal and civil procedure as special statutory proceedings, and thereby severely limit the availability of declaratory relief.

In addition, the Second Circuit has separately recognized that a district court is entitled to use its inherent equity power to award temporary injunctive relief in appropriate circumstances in order to maintain the status quo, such as over claims pending before an administrative agency. Cases for this proposition include *Sheehan v. Purolator Courier*

*Corp.*, 676 F.2d 877 (2d Cir. 1981), and *FTC v. Dean Foods Company*, 384 U.S. 597 (1966).

Let me acknowledge — and I will — that *Gonzales* may not be directly on point.  Nonetheless, I am convinced that the Second Circuit's decision on the merits of the reporters' privilege in that case reflects its understanding that it and, by extension, the district court that adjudicated the merits and issued the summary judgment in the first phase of that case, had jurisdiction to evaluate a collateral challenge to a grand jury subpoena issued by a different jurisdiction and, therefore, the equitable power to issue the appropriate relief should the court agree with the merits of that collateral challenge.

To be sure, *Gonzales* discusses only declaratory relief, and that was mentioned by counsel for DOJ defendants yesterday.  But as plaintiffs point out, the underlying complaint in *Gonzales* also sought injunctive relief.  Nothing about the Second Circuit's decision in *Gonzales* limited the exercise of jurisdiction to the type of relief sought.

In any event, the very language of the Declaratory Judgment Act indicates that the prevailing party in a declaratory judgment may seek further relief in the form of damages or an injunction, meaning that the availability of declaratory relief does not preclude this Court's authority to issue an injunction based on the same considerations.  One case

for that proposition, I cite *Horn & Hardart Company v. National Rail Passenger Corp.*, 843 F.2d 546 (D.C. Cir. 1988).

Here, I observe that my jurisdiction to decide the collateral challenge and issue equitable relief is especially important given the insufficiency of Rule 17(c) in the unique circumstances of this case.

Plaintiffs seek to protect highly sensitive and comprehensive personal information about their transgender status, as well as detailed medical history from a concerted serial effort by this administration to identify and target a marginalized group.

The filing of a Rule 17(c) motion to quash the NYU subpoena in the Northern District of Texas would not have any effect on other grand jury or civil administrative subpoenas seeking the same information from NYU and other healthcare institutions in New York City, especially when, as we found out, plaintiffs have no way of learning of the existence of any subpoena. Like the aforementioned game of whack-a-mole, the government may simply switch their strategy and go after plaintiffs' private information under the guise of a different investigation.

Now, the Second Circuit addressed an analogous issue in *Gonzales*, and found there that a motion to quash under Rule 17(c) would not offer plaintiffs the same relief where — and I quote — It is unknown whether subpoenas have been issued, and

if so, whether the subpoenaed entities have already complied. Only an order enjoining the government from seeking plaintiffs' identifying and sensitive personal information is sufficiently protective of plaintiffs' privacy interests and enough to afford complete relief to plaintiffs in this case.

Separately, I have determined that I have subject matter jurisdiction over the case, and that plaintiffs have established standing to sue. I have subject matter jurisdiction under 28 U.S.C., Section 1331, because plaintiffs raise constitutional issues that invoke federal question jurisdiction. I also have subject matter jurisdiction under 28 U.S.C., Section 1346, as a civil action against the United States founded upon the Constitution, an act of Congress, or an executive regulation; as well as under 28 U.S.C., Section 1361, as an action to compel an officer or agency to perform a duty owed to plaintiffs. And I have supplemental subject matter jurisdiction over plaintiffs' state law claims under 28 U.S.C., Section 1367(a).

Turning now to the issue of standing, I find that plaintiffs satisfy all three elements: Injury, causation, and redressability for Article III standing. For one case on that proposition, I cite *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). In particular, plaintiffs here face an imminent risk that their identifying and sensitive health information will be disclosed today because of the subpoena. In the

Supreme Court's case of *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, the Supreme Court there found that a certainly impending injury satisfies the imminence requirement for establishing an injury-in-fact.

So moving away from the jurisdictional issues to the framework for resolving a TRO, I begin with the question of likelihood of success. And I'll turn first to plaintiffs' arguments under the Fifth Amendment.

To determine whether a constitutional violation has occurred, the Court must first identify the rights at stake. One case for this is *Hancock v. County of Rensselaer*, 882 F.3d 58 (2d Cir. 2018).

The plaintiffs here are identifying two distinct informational privacy rights: First, medical information; and second, information relating to one's transgender status. And in the Second Circuit's decision of *Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999), the circuit described it is beyond debate that for persons who wish to preserve privacy in the matter, transgender status is excruciatingly private. Plaintiffs have thus successfully identified a constitutional privacy right.

So in this setting, the constitutional violation occurs when the individual's interest in privacy outweighs the government's interest in breaching it, quoting again from *Hancock*. And where the government is acting in an executive

capacity, courts consider whether the action was so arbitrary as to shock the conscience. *Hancock* speaks to this, and it in turn cites *O'Connor v. Pierson*, 426 F.3d 187 (2d Cir. 2005).

*O'Connor* goes on to note that mere irrationality is not enough. Only the most egregious official conduct will subject the government to liability for a substantive due process violation based on executive action. A court applying a shocks-the-conscience test must always examine the Executive Branch's interest in breaching that privacy; and the stronger the individual interest, the more compelling the government actor's reasons must be.

Again, and for the next few passages, I am quoting from the *Hancock* decision: Courts apply a balancing test to the government's collection or publication of private personal information that is constitutionally protected. And here, the focus of the inquiry is on the government's interest in the information contained in the records and the manner in which those interests might be achieved, as well as the strength of the individual interest in privacy, and that adjusts how closely courts must scrutinize the government's offered justifications.

Here, I find that the balancing test favors plaintiffs' privacy interests.

First, the scope of information sought by the government here, which includes medical assessments, diagnoses,

informed consent records, and revelation of plaintiffs' transgender status, is significant. This level of detail places the information among the most personal and sensitive a medical provider can hold and squarely within the class of intimate material, warranting the strongest constitutional protection. I'm quoting here from a decision of the Eastern District of Pennsylvania: *In re: Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555.

As discussed above, the Court finds that even the provision of anonymized data would lead to the same result.

Second, the problem is compounded by the absence of adequate safeguards to prevent further disclosure of plaintiffs' private information. As I mentioned, I am sensitive to the requirements of Rule 6(e); and yet that rule contains numerous exceptions permitting enter and intra governmental dissemination of this information. And this absence of meaningful protection favors plaintiffs' privacy interests. Indeed, the government concedes to having worked with officials in Texas, where gender-affirming medical care for minors is banned, to establish detransition clinics. These were discussed at page 67 of the transcript.

Turning to the countervailing government interest, I note that the strength of plaintiffs' interest in privacy, which is significant here, adjusts how closely I must scrutinize the government's offered justifications.

Q6OVCOED

I recognize and respect the government's interest in carrying out criminal investigations using the grand jury's subpoena power.  I also reject plaintiffs' attempt to seek what amounts to be an adverse inference based merely on the government's invocation of Rule 6(e).  That said, the context surrounding this subpoena, including the various statements made by executive officers, the recent spate of similar and failed administrative subpoenas, the timeline that is before me, leaves me at pains to understand the precise nature of the government's interest and how any legitimate government interest would be served by the disclosure now sought.

Put someone differently, because I cannot conceive of a crime that would require the breadth of disclosure sought in the subpoena, identifying and sensitive medical information for an entire class of people for a six-year period, I have to find that the government's interest does not outweigh the plaintiffs' interest in privacy.  I also note that even were the government to articulate a cognizable and legitimate interest in the information it seeks, it would not overcome plaintiffs' strong privacy interest.  That's made clear by the Second Circuit's *Hancock* decision.

In sum, the individual's interest in privacy outweighs the government's interest in breaching it.  The enormous scope of information sought and the absence of necessary guardrails outweighs the ill-defined government's interest.  The subpoena,

Q6OVCOED

expressly targeting members of a particular and uniquely vulnerable group, both shocks the conscience and rises to the level of the most egregious official conduct under the *O'Connor* case.

I turn now to the parties' arguments under the Fourth Amendment.

Once again, I know that the parties are aware of the standards, but the Fourth Amendment's protections apply to the grand jury, which is without power to invade a legitimate privacy interest protected by the Fourth Amendment.  The *Calandra* decision, *United States v. Calandra*, 414 U.S. 338 (1974), is at issue here — it is discussed by the parties yesterday; as well, the case of *Trump v. Vance,* 480 F. Supp. 3d 460, a Southern District of New York decision that was affirmed by the Second Circuit in 977 F.3d 198.

Demands for information through a *subpoena duces tecum* may constitute a search forbidden by the Fourth Amendment if the terms are unreasonable.  That's recognized in the Second Circuit's 1973 decision in *In Re: Horowitz,* 482 F.2d 72.  It is quoting *Hale v. Henkel*, 201 U.S. 43 (1906).  Whether a particular intrusion is reasonable is measured in objective terms by examining the totality of the circumstances.  I'm quoting here from *Ohio v. Robinette*, 519 U.S. 33 (1996).

And this requires balancing the need to search against the invasion which the search entails.  Quoting here from *New*

Q6OVCOED

*Jersey v. T.L.O.*, 469 U.S. 325 (1985); and later on, a contextualized reasonableness analysis seeks to balance the intrusion on privacy caused by law enforcement against the justification asserted for it by the government.  Quoting here from *Caldarola v. County of Westchester*, 343 F.3d 570 (2d Cir. 2003).

Whether such an intrusion is reasonable depends on the context, including the nature, purposes, and scope of the inquiry.  There are many cases for this proposition.  One is *Oklahoma Press Publishing Company v. Walling*, 327 U.S. 186.  A subpoena that is irrelevant, abusive or harassing, overly vague or excessively broad is unreasonable.  Quoting here from the Fourth Circuit's 2007 decision in *In Re: Grand Jury, John Doe No. G.J.2005-2,* 478 F.3d 581.

Plaintiffs allege — returning to this case — that the government's subpoena constitutes an unjustifiable intrusion into their reasonable expectation of privacy under the Fourth Amendment.  And I find that on this record the claim is likely to succeed.  Specifically, I find that plaintiffs and members of the proposed class and NYU subclass have an objectively reasonable expectation of privacy in the sensitive medical records that the government's subpoena seeks.

During oral argument, the government acknowledged this point explicitly at pages 68 and 69 of the transcript.  And federal and state law, including HIPAA and New York's Shield

Law enshrine this privacy right.  And that's discussed at the plaintiffs' brief at page 20.

Further, in an analogous context, the Supreme Court has recognized that the patients have an objectively reasonable expectation of privacy in their medical records, even where held by a hospital.  In *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), the Court held that where the government conducts a warrantless search of such records, the plaintiffs do not consent to that search, and the government's primary purpose is to generate evidence for law enforcement purposes, the plaintiffs have an objectively reasonable expectation of privacy in their medical records, and the government must get a warrant to search the information.

Such is the case here.

Plaintiffs' disclosure of their sensitive health information to their physicians does not constitute a waiver of their privacy rights, and the government's subpoena does not overcome those privacy rights.  Nor, for that matter, am I satisfied that NYU could adequately anonymize the health records to protect plaintiffs' privacy rights.  As NYU's counsel acknowledged during oral argument, given the voluminous nature of the records and the ubiquity of personal identifying information therein, it is impossible to guarantee anonymization of plaintiffs' identities.

Finally, I'm persuaded by plaintiffs' argument that

Q6OVCOED

the reasoning in *United States v. Carpenter*, 585 U.S. 296 (2018), applies to this case.  *Carpenter* held that an individual maintains a reasonable expectation of privacy in his cell site location information — even though such information is held by a third party — because the information provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations.  I am quoting from page 311 of that decision.  And as the Supreme Court explained on that same page, such location records hold for many Americans the privacies of life.

Now, I acknowledge that lower courts have declined to extend *Carpenter* in technological contexts beyond the collection of cell site location information.  Nonetheless, I find *Carpenter*'s reasoning directly applicable to the unique circumstances here.

The records that the government's subpoena seeks — six years of aggregated treatment history, diagnoses, family information, and intimate personal detail — are precisely the kinds of privacies of life contemplated in *Carpenter*.  Of course, in *Carpenter* — and the government noted this yesterday — the Supreme Court was careful to recognize the unique nature of cell phone location records.  But as counsel repeatedly emphasized at oral argument — both sides said this — the government's subpoena in this case is also unique, the

facts of this case are also unique, and the subpoena seeks information that would allow the government to compile a sweeping profile of plaintiffs.

So in light of the government's acknowledgment that plaintiffs have an objectively reasonable expectation of privacy in this information, the statutory enshrinement of these privacy rights, and cases such as *Ferguson* and *Carpenter*, I find that plaintiffs have shown that they are likely to succeed in demonstrating a Fourth Amendment violation.

On the New York CPLR Section 4504 claim, it's not clear to me that plaintiffs will be likely to succeed on those merits, in particular because I think that state privilege law might not govern where a federal criminal subpoena compels disclosure.  So while I am finding a likelihood of success on the Fourth and Fifth Amendment claims, I am not finding one on the state law claims.

I turn now to the other TRO factors.

The plaintiffs have amply demonstrated the threat of irreparable harm absent relief.  They have shown that they're threatened with imminent violation of their constitutional rights in the absence of preliminary relief.  That's a quote from the case of *Airbnb, Incorporated v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019).  And that showing suffices for purpose of a TRO, as the Second Circuit recognized in *Mitchell v. Cuomo,* 748 F.2d 804 (2d Cir. 1984).

Specifically, plaintiffs in this case sought gender-affirming treatment under a reasonable assumption of absolute privacy.  If not enjoined, the subpoena would allow the government to obtain and disclose the most intimate details about plaintiffs' medical histories and personal lives — in particular, their transgender status.  It would risk all manner of irreparable harm, including by inflicting deep emotional harm, destroying trust in medical care, and spreading damage to families, peers, and others.  I'm quoting from *In re: Subpoena No. 25-1431-014,* the Eastern District of Pennsylvania decision reported at 810 F. Supp. 3d 555.

The injuries that I've just identified inhere in — and, indeed, appear to be the purpose of — the government's acquisition of plaintiffs' identifying and sensitive information, they are not limited to the possibility of public disclosure, even if the latter would exacerbate the harm.

The government, for its part, insists that the secrecy of grand jury proceedings renders concerns about the use and disclosure of patient information, a remote, speculative possibility.  But it could offer the Court few assurances at yesterday's hearing that the requested records would not be used to harm plaintiffs.

For example, there was no promise that the records would not be used to prosecute the parents of the patients or the doctors who facilitated treatment.  And there was some back

Q6OVCOED

and forth as to whether the minor plaintiffs would themselves face prosecution.  I'm hard-pressed for reasons to rely on the government's representations that even the patients would not be prosecuted, especially given the inability to comment on any aspect of the alleged investigation or the subpoena.

Turning now to the balance of equities and the public interest.  They are analyzed together because, as I mentioned, the government is a party to the case.  They weigh in favor of relief.

In the Southern District decision of *Coronel v. Decker*, 449 F. Supp. 3d 274 (S.D.N.Y. 2020), the Court found that where a grievous constitutional violation is alleged, the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld.

Here, the acquisition and disclosure of plaintiffs' identifying and sensitive personal information raise serious constitutional issues, especially the irreversible revelation of their highly intimate information to the government.  The equities thus weigh in favor of temporarily protecting plaintiffs from such disclosure while these legal issues are worked out.

So having determined that plaintiffs are likely to succeed on the merits of their Fifth and Fourth Amendment claims, that they've sufficiently demonstrated irreparable harm, and that the balance of equities and public interest tip

in their favor, I find that plaintiffs are entitled to preliminary injunctive relief.

The next and, I believe, final question before me is the scope of that relief.  And on that question, I provisionally certify plaintiffs' proposed class and NYU subclass, and grant classwide declaratory and injunctive relief.

Let me begin.

It is well-established that certain circumstances give rise to the need for prompt injunctive relief for a named plaintiff or on behalf of a class, and that the court may conditionally certify the class or otherwise award a broad preliminary injunction without a formal class ruling under its general equity powers.  I'm quoting from the Southern District 2012 decision in *Strouchler v. Shah*, 891 F. Supp. 2d 504.

Last year in *AARP v. Trump*, 605 U.S. 91, the Supreme Court confirmed that courts may issue temporary relief to a putative class, recognizing that exigent circumstances may impose practical constraints, and that preliminary relief is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a civil trial on the merits.  I'm quoting from pages 96 and 98 of that decision.  And, the Supreme Court reasoned, the purpose of such relief is merely to preserve the relative positions of the parties pending further proceedings.  This is from page 96.

In this Court's estimation, the Supreme Court's slightly more recent decision in *Trump v. CASA Inc.*, 606 U.S. 831, does not change or does not modify the district court's authority to issue provisional class certification and to grant classwide temporary relief.

As Judge McMahon in this district explained in *American Council of Learned Societies v. McDonald,* 792 F. Supp. 3d 448, *CASA* counsels us — and I'm quoting from her — that limited preliminary relief for a purported but still defined class of individuals is not the type of relief prohibiting the enforcement of a law or policy against anyone to which the decision in *CASA* applied.

Indeed, preliminary injunctive relief that relates solely to the pleaded classes is not broader than necessary to provide complete relief to each plaintiff with standing to sue.

At oral argument, the government may have misperceived the Supreme Court's obvious disfavor of universal or nationwide injunctions, and what is believed to be that particular procedural posture's circumvention of Rule 23's procedural protections in *CASA* to disallow any preliminary classwide relief.

Let me try that again.

I do think that the government overstated or misunderstood what the Supreme Court was complaining about in *CASA*.  And in my mind, they were complaining about the

nationwide injunction and not about class action.  Because in *CASA*, the Supreme Court specifically condemned universal injunctions as a class action workaround at page 850 of the decision.  And they even asked the rhetorical question:  Why bother with a Rule 23 class action when the quick fix of a universal injunction is on the table?

The government agreed that the plaintiffs need to make a Rule 23 showing to obtain classwide relief, and that is what plaintiffs have tried to do in this case.  My role as a district judge is to evaluate whether they had made a sufficient showing to satisfy the requirements of Rule 23 and warrant preliminary classwide relief.

And, ultimately, I find that they have made such a showing on a preliminary basis.  The proposed class and NYU subclass are likely to satisfy the Rule 23(a) requirements of numerosity, with well over 40 minor patients who sought gender-affirming medical care at NYU Langone alone; commonality, including common injuries arising from the imminent disclosure of identifying and sensitive health information; typicality, as plaintiffs' claims are typical of the proposed class and NYU subclass, especially given that the claims arise from the same course of conduct; and adequacy where there is no fundamental conflict between the named plaintiffs and other members of the putative classes — class and subclass; and where plaintiffs can't fairly and adequately

protect the interests of the class and subclass.

In addition, plaintiffs' proposed class and NYU subclass appear to meet the Second Circuit's additional requirement of ascertainability, because membership can be clearly and objectively ascertained based on information regarding specific, defined forms of medical care received during a discrete time period from healthcare entities within a discrete geographic location.  The ascertainability requirement is discussed in cases including *In re Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017).

Let me also note that plaintiffs' proposed class and subclass very likely satisfy Rule 23(b)(2).  And central to a (b)(2) class — and I'll quote here — The indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to the all of the class members or as to none of them.  The quote here is from *Wal-Mart Stores Incorporated v. Dukes,* 564 U.S. 338 (2011).

Here, I find that provisional certification under 23(b)(2) is particularly suitable because defendants' conduct applies generally to the class members and would injure the class members in the same way, and because plaintiffs seek a uniform remedy to enjoin what they have described as defendants' unlawful conduct.

In conclusion, the Court is granting plaintiffs'

application for a TRO, and their motion for provisional certification of the class and the NYU subclass.

Let me talk to the parties now about housekeeping measures going forward.

Given the 14-day timeline of the TRO, it is my intention to set Wednesday, July 8th, as the date of the preliminary injunction hearing.  But I did want the parties to speak about that.

For example, if the parties need more time because of discovery or need less time or have decided that they have given me all of their best arguments and there is no reason for an additional hearing, I want to know.  But I did want to give everyone a chance to sit with this decision and think about what options make the most sense for your clients.

So what I will ask is if I could have a letter by the end of the day on Friday, joint letter from the parties, telling me what their pleasure is with respect to additional discovery or motion practice or briefing.  And I will endorse it if it is reasonable.

I am also terminating the motion that is pending at docket entry 16 because it's been resolved by this decision.

To my friends at the plaintiffs' table, that is my decision.  Is there anything I have neglected to do, Mr. Strangio?

MR. STRANGIO:  No, your Honor.  We thank the Court for

Q6OVCOED

the thorough decision and expedited resolution of the TRO.  And we will get that letter to the Court by the end of the day on Friday.

THE COURT:  I thank you so much.

Mr. Miller, from the DOJ's perspective, is there anything I've forgotten to do?

MR. MILLER:  Nothing further, your Honor.  Thank you.

THE COURT:  I thank you so much.

All right.  And Mr. Cunha, last, but never least, sir, is there anything that you would like me to do that I have failed to do?

MR. CUNHA:  Much appreciated.  No, your Honor.

THE COURT:  All right.  With that, I know you have better things to do than listen to me read another decision, so I will let you go with my deep thanks.  And I look forward to hearing from you all on Friday.

Take care, everyone.  Thank you.

*    *    *