# Exhibit 4

# EXHIBIT 1

## DECLARATION OF R. COOPER VAUGHAN
## PURSUANT TO 28 U.S.C. § 1746

I have personal knowledge of the facts stated below and am competent to testify about them:

1.    I am a United States citizen over the age of 18. I am an attorney for the Bureau of Consumer Protection at the Federal Trade Commission.

2.    Attached as Attachment 1 is a true and correct copy of the World Professional Association for Transgender Health's Motion for a Temporary Restraining Order and Antisuit Injunction, *World Professional Association for Transgender Health v. Federal Trade Commission, et al.*, Case No. 1:26-cv-00532-JEB, ECF No. 45 (D.D.C. June 30, 2026).

3.    Attached as Attachment 2 is a true and correct copy of the World Professional Association for Transgender Health's Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order and Antisuit Injunction, *World Professional Association for Transgender Health v. Federal Trade Commission, et al.*, Case No. 1:26-cv-00532-JEB, ECF No. 45-1 (D.D.C. June 30, 2026).


I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on this 2nd day of July, 2026.

 

_____
R. Cooper Vaughan
Senior Counsel to the Director
Federal Trade Commission

# Attachment 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr>
<td>
THE WORLD PROFESSIONAL
ASSOCIATION FOR TRANSGENDER
HEALTH,

<em>Plaintiff</em>,

<em>v.</em>

FEDERAL TRADE COMMISSION;
ANDREW N. FERGUSON, in his official
capacity as Chairman of the Federal Trade
Commission; MARK R. MEADOR, in his
official capacity as Commissioner of the
Federal Trade Commission; and JOHN DOES
1–3, in their official capacities as
Commissioners of the Federal Trade
Commission,

<em>Defendants</em>.
</td>
<td>
Case No. 26-cv-00532-JEB
</td>
</tr>
</table>

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND
ANTISUIT INJUNCTION**

Pursuant to Fed. R. Civ. P. 65 and Local Civil Rule 65.1, Plaintiff the World Professional

Association for Transgender Health ("WPATH") respectfully moves for a temporary restraining

order and an antisuit injunction barring Defendant the Federal Trade Commission ("FTC"), and

others in active concert or participation therewith, from litigating the claims asserted in *FTC v.*

*WPATH*, 4:26-cv-748-O (N.D. Tex.), except as mandatory counterclaims brought before this

Court.  For the reasons set forth in the accompanying memorandum of law, the Court should grant

this motion for a temporary restraining order and, after hearing from both parties, further grant the

1

motion for an antisuit injunction.  A proposed order is attached hereto.  WPATH respectfully

requests that the Court schedule a hearing no later than July 13, 2026.

Date:   June 30, 2026                         */s/ Caleb Hayes-Deats*
        Washington, D.C.                Abbe David Lowell [Bar No. 358651]
                                      Caleb Hayes-Deats [Bar No. 1643213]
                                      Schuyler J. Standley [*admitted pro hac vice*]
                                      LOWELL & ASSOCIATES, PLLC
                                      1250 H Street, N.W., Suite 250
                                      Washington, DC 20005
                                        T: (202) 964-6110
                                        F: (202) 964-6116
                                      ALowellpublicoutreach@lowellandassociates.com
                                      CHayes-Deats@lowellandassociates.com
                                      SStandley@lowellandassociates.com

                                      *Attorneys for WPATH*

# Attachment 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH,<br><br>*Plaintiff*,<br><br>*v.*<br><br>FEDERAL TRADE COMMISSION; ANDREW N. FERGUSON, in his official capacity as Chairman of the Federal Trade Commission; MARK R. MEADOR, in his official capacity as Commissioner of the Federal Trade Commission; and JOHN DOES 1–3, in their official capacities as Commissioners of the Federal Trade Commission,<br><br>*Defendants*. | Civil Action No. 1:26-cv-00532-JEB<br><br>**Expedited Relief Requested** |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND ANTISUIT INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    I.     WPATH Engages in First Amendment-Protected Activities on Matters of Public Concern............................................................................................. 2

    II.    The Federal Government Targets WPATH Because of Its Protected Speech ................................................................................................................ 3

    III.   The FTC Targets WPATH With a Broad Civil Investigative Demand ................. 5

    IV.   WPATH Files This Lawsuit and Obtains a Preliminary Injunction ...................... 8

    V.    The DOJ Issues Grand Jury Subpoenas From the Northern District of Texas .................................................................................................................. 9

    VI.   The FTC Files Suit in the Northern District of Texas ......................................... 11

ARGUMENT..................................................................................................................... 13

    I.     WPATH Is Likely to Succeed on the Merits ......................................................... 14

        A.    An Injunction Is Necessary to Prevent Duplicative Proceedings ................... 15

        B.    An Injunction is Necessary to Prevent Evasion of This Court's Injunction .................................................................................................. 21

    II.    WPATH Has Been, and Will Continue to Be, Irreparably Harmed by the FTC's Actions.................................................................................................. 23

    III.   The Balance of the Equities and Public Interest Favor WPATH......................... 24

CONCLUSION.................................................................................................................. 25

i

## TABLE OF AUTHORITIES

**Cases**

*A.B.B. v. Morgan*,
  548 F. Supp. 3d 209 (D.D.C. 2020) ........................................................................ 14

*In re Dep't of Just. Admin. Subpoena No. 25-1431-030*,
  No. 25-mc-00063, 2026 WL 33398 (D. Colo. Jan. 5, 2026).................................... 5

*\*Am. Horse Prot. Ass'n v. Lyng*,
  690 F. Supp. 40 (D.D.C. 1988) .........................................................................*passim*

*Am. Libr. Ass'n v. Sonderling*,
  783 F. Supp. 3d 57, 59 (D.D.C. 2025) .................................................................... 14

*\*Columbia Plaza Corp. v. Sec. Nat'l Bank*,
  525 F.2d 620 (D.C. Cir. 1975) ..........................................................................*passim*

*Sterling Commer. Credit, LLC v. Phoenix Indus. I, LLC*,
  762 F. Supp. 2d 8, 12 (D.D.C. 2011) ...................................................................... 14

*In re 2025 Subpoena to Children's National Hospital*,
  No. 25-cv-03780, 2026 WL 160792 (D. Md. Jan. 21, 2026)................................... 5

*In re 2025 UPMC Subpoena*,
  No. 25-mc-01069, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) ........................... 5

*In re Admin. Subpoena, No. 25-1431-019*,
  800 F. Supp. 3d 229 (D. Mass. 2025) ..................................................................... 5

*In re Rhode Island Hosp.*,
  177 F.4th 21 (1st Cir. 2026) ............................................................................. 20, 22

*In re Subpoena Duces Tecum No. 25-1431-016*,
  No. 2:25-mc-00041, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025)...................... 5

*In re Subpoena, No. 25-1431-014*,
  810 F.Supp.3d 555 (E.D. Pa. Nov. 21, 2025).......................................................... 5

*In re Subpoena*,
  No. 1:26-mc-0007, 2026 WL 1392565 (D.R.I. May 14, 2026) ............................... 5

*In re Admin. Subpoena, 25-1431-032*,
  No. 26-mc-6, ECF No. 2 (N.D. Tex. Apr. 30, 2026) ............................................... 5

*Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*,
    342 U.S. 180 (1952) ................................................................................................ 15

*Laker Airways Ltd. v. Sabena*,
    731 F.2d 909, 927 (D.C. Cir. 1984) ................................................................ 21, 22

*League of Women Voters v. Dep't Homeland Security*,
    No. 25-cv-3501, 2026 WL 1784297 (D.D.C. June 22, 2026) .................................. 20

*Media Matters for Am. v. Fed. Trade Comm'n*,
    805 F. Supp. 3d 105 (D.D.C. 2025) ....................................................................... 14

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ............................................................................. 23

*Moore v. N.Y. Cotton Exch.*,
    270 U.S. 593 (1926) .............................................................................................. 17

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................................. 14

*Peacock v. Thomas*,
    516 U.S. 349 (1996) .............................................................................................. 21

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ............................................................................... 24

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
    2025 WL 3013568 (W.D. Wash. Oct. 27, 2025) ...................................................... 5

*\*Rich v. Butowsky*,
    No. 18-cv-681, 2020 WL 7016436 (D.D.C. Mar. 31, 2020) ............................... *passim*

*SAS Inst., Inc. v. World Programming Ltd.*,
    952 F.3d 513 (4th Cir. 2020) ...................................................................... 21, 22, 23

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977) ......................................................................................... 13, 21

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) .................................................................................................. 14

**Statutes**

28 U.S.C. § 1651 ........................................................................................................ 21

**Rules**

Fed. R. Civ. P. 65 .................................................................................................................. 14, 24

Fed. R. Civ. P. 13 .................................................................................................................... 2, 17

**Other Authorities**

Exec. Order No. 14,168, 90 Fed. Reg. 8,615 (Jan. 20, 2025) ........................................................ 3

Exec. Order No. 14,187, 90 Fed. Reg. 8,771 (Jan. 28, 2025) ........................................................ 4

**INTRODUCTION**

Since 2025, the Federal Trade Commission ("FTC") has been investigating the World Professional Association for Transgender Health ("WPATH"), supposedly for a baseless allegation that WPATH has been making deceptive statements regarding transgender healthcare for minors. WPATH filed this case to prevent that investigation from violating its First Amendment rights. After considering the parties' briefs and hearing oral argument, on May 7, 2026, this Court entered a preliminary injunction barring the FTC from enforcing or implementing a civil investigative demand ("CID") it had served on WPATH. In doing so, it found the CID had a "chilling effect" on WPATH's protected speech on transgender health, that WPATH had presented "extensive evidence of [the FTC's] animus," and that the FTC had responded with only "wafer-thin justifications lacking evidentiary support" for the CID's requests. ECF 41 at 6-9.

Rather than continue to defend its actions and motives in this District, the FTC responded to the Court's injunction by filing its own new suit in the Northern District of Texas. That suit names WPATH and two affiliated entities as defendants. It challenges the same statements by WPATH as allegedly deceptive. And it also requires consideration of the same First Amendment rights this Court has already adjudicated in its prior ruling. The FTC will inevitably seek through discovery in the Texas litigation many if not all of the documents this Court found it could not obtain through the CID.

The FTC's transition to Texas is part of a broader pattern for the federal government. The U.S. Department of Justice ("DOJ") has recently claimed to concentrate its actions relating to transgender healthcare in the Northern District of Texas after no fewer than eight other district courts declined to enforce administrative subpoenas DOJ had issued. The Southern District of New York recently found that DOJ had done so because the Northern District of Texas was the "only jurisdiction" receptive to DOJ's arguments. And DOJ's effort has resulted in issuance of at

least one grand jury subpoena seeking records from a WPATH member that would have fallen within the scope of the FTC's CID.

This Court should not permit the FTC, or others acting in concert with it, to evade the Court's jurisdiction over WPATH's remaining causes of action or attempt an end-run around this Court's preliminary injunction by initiating duplicative litigation in another district. The claims that the FTC has filed in Texas arise from the same investigation and challenge the same statements at issue in this case. The FTC has an obligation to pursue those claims here under Federal Rule of Civil Procedure 13(a).

Proceeding elsewhere wastes resources and creates a risk of conflicting rulings. That appears to be the FTC's goal. By proceeding in the only district that has granted the federal government the full discovery it sought from providers of transgender healthcare, the FTC attempts to obtain the same documents and information that this Court, after hearing the FTC's best case, previously denied it. Antisuit injunctions are made for these circumstances. The need for such relief here is pressing. Absent this Court's intervention, WPATH will need to respond to the FTC's complaint on July 14, 2026.

## BACKGROUND

### I.    WPATH Engages in First Amendment-Protected Activities on Matters of Public Concern

WPATH is a 501(c)(3) nonprofit organization dedicated to promoting science-based guidance, education, research, public policy, and respect in transgender health. *See* ECF 3-2 ¶¶ 3, 7. With more than 3,000 members in diverse fields—including medicine, mental health, research, law, and public policy—WPATH serves as a hub for professionals committed to transgender healthcare and an internationally-recognized authority on ethical, well-established, and science-based healthcare for transgender individuals. *See id.* ¶¶ 6, 8, 10.

As part of its educational and academic activities, WPATH publishes and updates standards of care on transgender healthcare, which "articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of transgender people." ECF 3-2 ¶ 9; ECF 41 at 1. Those standards reflect and express WPATH's science-based belief that people can have "gender identities or expressions that differ" from the "sex assigned to them at birth." *See* E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 International Journal of Transgender Health 51, (Sept. 15, 2022); ECF 32-1. Most recently, WPATH oversaw the compilation and publication of Standards of Care, Version 8 ("SOC8") in the *International Journal of Transgender Health* in September 2022. ECF 32-1. SOC8 is free to the public and provides detailed descriptions of sources, evidence, and methodologies used to create the publication. *See id.* at 178, 247. It is intended to be used as clinical guidance for informed, doctor-patient decision making on transgender healthcare, which may include varying interventions based on individual patient needs. *See id*. at 5.

WPATH is a non-profit, volunteer-run, charitable organization that uses its revenue (generated through membership dues, donations, and grants, not commercial transactions) to promote evidence-based healthcare for transgender individuals. *See* ECF 3-2 ¶ 15. None of its activities are undertaken for the profit of its governing body or members. *See id.* ¶ 16. And it does not provide any medical or other care directly to patients. *Id.* ¶ 17.

## II.    The Federal Government Targets WPATH Because of Its Protected Speech

The Trump Administration disagrees with the guidance provided in SOC8 and with WPATH's view that individuals can have gender identities that differ from the sex assigned to them at birth. On January 20, 2025, President Trump's first day in office, he issued Executive Order No. 14168, titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14,168, 90 Fed. Reg. 8,615 (Jan.

3

20, 2025).  That Order announced a "policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* at 8615.  Eight days later, the President issued another Executive Order, titled "Protecting Children from Chemical and Surgical Mutilation."  Exec. Order No. 14,187, 90 Fed. Reg. 8,771 (Jan. 28, 2025).  That Order specifically targeted WPATH, calling SOC8 "junk science" that "lacks scientific integrity," and directing executive agencies to rescind and amend all policies that rely on WPATH's guidance.  *Id.*  It called on executive agencies to end "gender-affirming care," and referred to well-established and medically necessary medical treatments as "chemical and surgical mutilation," "maiming and sterilizing" children, and a "stain on our Nation's history."  *Id.*; *see also* Ex. 3-12.

Following President Trump's Executive Orders, the federal government has launched a sustained assault on transgender healthcare.  ECF 1 ("Compl.") ¶¶ 82-87.  In May 2025, the Department of Health and Human Services ("HHS") issued "Treatment for Pediatric Gender Dysphoria, Review of Evidence and Best Practices" ("HHS Report"), a 400-page literature review that has been criticized for misrepresenting available research and relying on studies with flawed methodologies.  *See Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, U.S. Dep't of Health and Human Servs. (May 2025) (revised ed. November 2025), https://opa.hhs.gov/gender-dysphoria-report ("HHS Report"); *see also* ECF 3-15.  The HHS Report contains an entire chapter largely dedicated to repeating misinformation about WPATH, including its allegedly "political" ideology.  *See* HHS Report at 14, 157-87.

In April 2025, DOJ issued a memorandum directing prosecutors to "investigate and hold accountable medical providers" who offer transgender healthcare to minors.  ECF 3-16 at 4.  That memorandum again attacked WPATH and directed DOJ personnel to "identify and purge all

4

Department policies, memoranda, publications, and court filings based on WPATH's guidelines." *Id.* at 5.

In July 2025, DOJ issued more than 20 administrative subpoenas to organizations, doctors, and healthcare facilities promoting and/or providing healthcare for transgender minors. ECF 3-17. Eight courts have since quashed those subpoenas, finding they issued for the "improper purpose" of seeking "to end the very practice [DOJ] claims to be merely investigating." *QueerDoc, PLLC v. U.S. Dep't of Just.*, 2025 WL 3013568, at *5 (W.D. Wash. Oct. 27, 2025); *see also In re Subpoena*, No. 1:26-mc-0007, 2026 WL 1392565, at *8-10 (D.R.I. May 14, 2026); *In re 2025 UPMC Subpoena*, No. 25-mc-01069, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-mc-00063-SKC-CYC, 2026 WL 33398 (D. Colo. Jan. 5, 2026); *In re 2025 Subpoena to Children's National Hospital*, No. 25-cv-03780, 2026 WL 160792 (D. Md. Jan. 21, 2026); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 236-39 (D. Mass. 2025); *In re Subpoena No. 25-1431-014*, 810 F.Supp.3d 555 (E.D. Pa. Nov. 21, 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151, at *13 (W.D. Wash. Sept. 3, 2025). The only court to permit DOJ to enforce a subpoena, the Northern District of Texas, did so within only "a few hours" of receiving DOJ's motion, without any response from the targeted entity. *In re Admin. Subpoena*, 2026 WL 1392565, at *2; *In re Admin. Subpoena, 25-1431-032*, No. 26-mc-6, ECF No. 2 (N.D. Tex. Apr. 30, 2026).

### III.    The FTC Targets WPATH with a Broad Civil Investigative Demand

The FTC has also targeted WPATH for investigation because of its views on transgender healthcare. Even before his appointment as the FTC's Chairman, Andrew Ferguson expressed his commitment to "[f]ight back against the trans agenda" and "[i]nvestigate" organizations and individuals who "pushed gender confusion." ECF 3-19. In May 2025, the FTC proposed a workshop entitled "The Big Lie: The Dangers of Gender-Affirming Care for Minors" to further

build on President Trump's executive orders.  ECF 3-21.  Over 140 FTC employees sent an anonymous Statement of Concern to Congress questioning whether the FTC had jurisdiction over these issues and asserting that FTC officials' "use of charged language suggest the Commission has already taken a position opposing gender-affirming care for minors."  ECF 3-23.  It noted that the "FTC has not historically intervened in the confidential, individualized advice given across a series of professional, consent-based appointments protected by the doctor-patient relationship." *Id.*  FTC Director of Public Affairs and Senior Policy Advisor Joe Simonson responded that no "sane person" could endorse transgender healthcare for children and that "staff who oppose" the workshop are "free to resign."  *Id.*

On July 9, 2025, the FTC held the invitation-only workshop, which it retitled, "The Dangers of 'Gender-Affirming Care' for Minors."  ECF 3-29.  That workshop occurred in Washington, D.C.  *See* https://www.ftc.gov/news-events/events/2025/07/dangers-gender-affirming-care-minors.  No legitimate medical experts in transgender health, medical organizations supporting transgender healthcare, or even transgender individuals spoke at the workshop.  *See* ECF 3-29; ECF 3-6 ¶ 36.  Instead, the FTC provided a platform solely to opponents of transgender healthcare, ECF 3-29, who accused WPATH of engaging in "fraud," ECF 3-28 at 20-21.  During the workshop, then-New York State Assistant Attorney General Glenna Goldis recommended using FTC investigations as a mechanism to pressure medical associations, stating that:

> Just the act of conducting thorough investigations in the course of pursuing a prosecution and making that public will be really helpful in exposing the medical associations to the public and to themselves so that they see the road back because they're at the point where they're going to start losing members. Pediatricians are going to think, "You know what? This is not representing me well, this group. They're actually making me look bad. I don't like what they're doing. I'm not going to pay dues anymore." They could lose other revenue streams as well.

*Id.* at 81.  The FTC later hired Ms. Goldis as a senior litigator to lead FTC investigations related to pediatric transgender healthcare.  *See* ECF 3-27.  DOJ representatives attended the workshop and stated that DOJ worked "very, very closely" with the FTC on issues relating to transgender healthcare for minors.  ECF 3-28 at 50.

On January 16, 2026, the FTC served a CID on WPATH.  The CID contained fifteen interrogatories and thirteen document requests, broadly calling for WPATH to produce records relating to all aspects of its work and operations.  *See* ECF 3-8.  It described the subject of the investigation as:

> Whether the Organization or any other Person . . . have made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment . . . which, according to the Organization, purports to treat gender dysphoric or gender diverse minors, to consumers in violation of Sections 5 and 12 of the FTC Act . . . and whether FTC action to obtain monetary relief would be in the public interest.

*See* Ex. ECF 3-8 at 4.

The CID sought production of every single "Covered Statement" that WPATH has made about "Pediatric Gender Dysphoria Treatment" ("PGDT").  *See, e.g.*, Ex. ECF 3-8 at 5.  Its definition of "Covered Statement" included "any representation, whether express or implied," that: (1) "PGDTs are safe, including without limitation the representation that a treatment is safe for muscle, bone, or brain development; (2) "PGDTs are proven effective, including without limitation the representation that PGDTs are supported by *evidence-based science*;" (3) "PGDTs improve mental health;" (4) "PGDTs reduce the incidence of suicide, including without limitation the representation that PGDTs are life-saving;" (5) "PGDTs are fully or partly reversible, including without limitation the representation that a treatment is only a pause or otherwise do not cause permanent physical changes;" and (6) "PGDTs have few side effects."  *Id.* at 7 (emphasis added).  The CID also sought the names, statements, and descriptions of WPATH's associates.  *See, e.g.*,

7

*id.* at 5.  It envisioned production of not only information from the past, but also documents generated "until the date of full and complete compliance with this CID."  *Id.* at 4.

WPATH attempted in good faith to negotiate with FTC staff to narrow the CID.  ECF 3-7. The FTC refused.  *See id.*

### IV.    WPATH Files This Lawsuit and Obtains a Preliminary Injunction

On February 18, 2026, WPATH sued the FTC, Chairman Ferguson in his official capacity, and Commissioner Mark Meador in his official capacity, alleging that the investigation they had initiated (1) retaliated against WPATH for exercising its First Amendment rights; (2) discrimina-ted against WPATH based on its viewpoint on transgender healthcare; (3) violated WPATH's First Amendment right to associate with its members; and (4) exceeded the FTC's investigatory power in violation of the Fourth Amendment.  Compl. ¶¶ 131-53.  WPATH's claims arose from its protected speech on transgender healthcare, including the publication of SOC8, *id.* ¶¶ 30-57, the Trump Administration's whole-of-government effort to deny the existence of transgender individuals and target WPATH for criticism, *id.* ¶¶ 70-87, the FTC's workshop on gender-affirming care and its proposal to investigate WPATH to deprive it of members, *id.* ¶¶ 88-112, and the exceptionally broad CID the FTC issued to WPATH seeking its every communication on pediatric transgender healthcare, *id.* ¶¶ 113-130.

On February 25, WPATH moved for a preliminary injunction barring the FTC from implementing or enforcing the CID it had issued and from taking any further actions to interfere with or retaliate against WPATH's exercise of First Amendment rights.  ECF 3.  WPATH explained that the FTC's CID, and its investigation more broadly, retaliated against WPATH for expressing its protected view on transgender healthcare.  ECF 3-1 at 19-31.  The FTC's violation of WPATH's constitutional rights irreparably harmed WPATH, and no governmental or public interest outweighed those harms.  *Id.* at 36-39.  The FTC challenged the Court's authority to hear

8

pre-enforcement challenges to its CIDs, urged that WPATH had no cause of action, and contended that its investigation had no more effect on WPATH's First Amendment rights than any other investigation of potentially misleading statements.  ECF 32 at 17-40.

On May 7, 2026, the Court granted WPATH's motion "in large part and preliminarily enjoin[ed] the FTC from implementing or enforcing its issued CID."  ECF 41 at 11.  It found WPATH likely to succeed on its First Amendment retaliation claim.  It found that the FTC did not contest that WPATH had engaged in protected speech, that the CID had a "chilling effect" on that protected speech, and that the FTC's "articulated hostility towards proponents of gender-affirming care" established a causal link between WPATH's protected speech and the CID.  *Id.* at 6-7.  The Court went on to explain that the FTC's "attempted demonstration of a legitimate purpose" for the CID fell "flat."  *Id.* at 8.  The FTC "failed to offer a logical justification connecting WPATH to commercial representations and . . . supposed violators" of laws the FTC has authority to enforce. *Id.*  The Court then concluded that the "extensive evidence of animus" outweighed the FTC's "wafer-thin justifications lacking evidentiary support" and established WPATH's entitlement to a preliminary injunction.  *Id.* at 9.

## V.    The DOJ Issues Grand Jury Subpoenas from the Northern District of Texas

Following setbacks before this Court and other district courts, the federal government has moved its investigations of transgender healthcare to the Northern District of Texas.  On May 6, 2026, one day before this Court entered its injunction, DOJ caused an unknown number of grand jury subpoenas to be issued from the Northern District of Texas.  *See* Decl. of Caleb Hayes-Deats dated June 30, 2026 ("Hayes-Deats Decl.") ¶¶ 3, 7, 10 & Ex.1.[1]  At least one hospital receiving a grand jury subpoena has described it as "substantially similar" to the administrative subpoenas

---

[1] Unless otherwise noted, exhibits cited in this motion are attached to the Hayes-Deats Declaration.

DOJ issued in July 2025, Ex. 2, which at least eight district courts around the country had declined to enforce on the basis that DOJ had issued them for an "improper purpose," *see* p. 5, *supra*. The grand jury subpoenas, however, contain one notable difference. Whereas the administrative subpoenas contained no mention of WPATH, Ex. 3, the grand jury subpoenas seek all "communications" with WPATH relating to "Sex-Rejecting Procedures," SOC8, and "billing guidance," *id.* Ex. 1 at 8.

The U.S. District Court for the Southern District of New York has already entered a temporary restraining order barring DOJ from enforcing one of the grand jury subpoenas it issued insofar as it seeks information concerning minor patients. *Coe v. Blanche*, No. 26-cv-4641 (KPF), ECF 65 (S.D.N.Y. June 24, 2026); Ex. 4. It found that DOJ's conduct "shocks the conscience and rises to the level of the most egregious official conduct," because the "context surrounding this subpoena, including the various statements made by executive officers, the recent spate of similar and failed administrative subpoenas, the timeline that is before me, leaves me at pains to understand . . . how any legitimate government interest would be served by the disclosure now sought." Ex. 5 at 22:1-23:4. The District Judge, who served as a federal prosecutor for over a decade, could not "conceive of a crime that would require the breadth of disclosure sought in the subpoena." *Id.* at 22:12-14. She also found that DOJ had "strategized to concentrate legal actions related to gender-affirming medical care" in the "only jurisdiction" that was "receptive to its arguments," the "Northern District of Texas." *Id.* at 10:19-23.

On June 16, over a month after the Court issued its injunction, DOJ caused a grand jury subpoena from the Northern District of Texas to be served on a WPATH member. Hayes-Deats Decl. ¶ 10, Ex. 6. That subpoena seeks "all communications with any WPATH member," all "communications related to any WPATH publication," including SOC8, and other documents

concerning transgender healthcare from "January 1, 2020, through the present." Ex. 6 at 3. Those requests seek many of the same documents as the FTC's CID, but cover a broader time period. *Compare* ECF 3-8.

### VI.    The FTC Files Suit in the Northern District of Texas

On June 17, 2026, the FTC, together with Alaska, Iowa, Nebraska, and Texas, sued WPATH in the Northern District of Texas. *See FTC v. WPATH*, 4:26-cv-748, ECF 1 (N.D. Tex. June 17, 2026); Ex. 7. The FTC alleges that WPATH's statements in SOC8 have "deceived many consumers into believing that its treatment guidelines are based on strong evidence derived from scientific methods." *Id.* ¶¶ 8-10. According to the FTC, "[m]edical professionals have also been duped." *Id.* ¶ 11. The FTC alleges that it received hundreds of consumer complaints in response to the request for public comment it issued following its 2025 workshop. *Id.* ¶ 22; *but see* Compl. ¶ 111. It also attaches to its complaint declarations from Soren Aldaco, Claire Abernathy, Vanessa Sivadge, Beth Bourne, and Gwen Turecki, *FTC v. WPATH*, 4:26-cv-748-O, ECF 1-1, 1-2, 1-3, 1-5, 1-11 (N.D. Tex. June 17, 2026), five of the speakers at the FTC's 2025 workshop, ECF 3-28 at 8, 51, 57, 61, 63.

Ultimately, the FTC's suit challenges ten alleged "core deceptive statements." Ex. 7 ¶ 378. As shown in the table below, the FTC's "core deceptive statements" are the same "Covered Statements" about which its CID sought information:

11

| "Core Deceptive Statement," Ex. 7 ¶ 378 | "Covered Statement," ECF 3-8 |
|---|---|
| Transition "medically necessary to prevent suicide" (¶ 378(1)) | "PGDTs reduce incidence of suicide" D-3(d) |
| Transition "effective at preventing suicide" (¶ 378(2)) | "PGDTs reduce incidence of suicide" D-3(d) |
| "Puberty blockers are fully reversible" (¶ 378(3)) | "PGDTs are fully or partly reversible" D-3(e) |
| "Cross-sex hormones improve mental health" (¶ 378(4)) | "PGDTs improve mental health" D-3(c) |
| Mastectomy "safe, effective" (¶ 378(5)) | "PGDTs are safe," "proven effective" D-3(a)-(b) |
| SOC8 "result of unbiased, evidence-based expert conclusions" (¶ 378(6)) | "PGDTs are supported by evidence-based science" D-3(b) |
| Transition is "standard of care" (¶ 378(7)) | "PGDTs are supported by evidence-based science" D-3(b) |
| SOC8 does not disclose "side effects of puberty blockers" (¶ 378(8)) | "PGDTs have few side effects" D-3(f) |
| SOC8 does not disclose "side effects of cross-sex hormones" (¶ 378(9)) | "PGDTs have few side effects" D-3(f) |
| SOC8 does not disclose "side effects" of mastectomy (¶ 378(10)) | "PGDTs have few side effects" D-3(f) |

Glenna Goldis, the attorney who recommended that the FTC investigate medical associations supporting transgender healthcare, ECF 3-28 at 81, was subsequently hired by the FTC and is one of the attorneys representing the FTC in its suit against WPATH, Ex. 7 at 119. The FTC lists her as the "Assistant Director for Special Projects (Children and Adolescents)." Bureau of Consumer Protection Organization Chart, Federal Trade Commission, https://www.ftc.gov/about-ftc/bureaus-offices/bureau-consumer-protection/organization-chart (last visited June 30, 2026).

Revealing the motive behind the CID and the real purpose behind the Texas lawsuit, the

12

same day the FTC filed suit in the Northern District of Texas, it notified WPATH of its intention to withdraw the CID.  ECF 43-1.  The FTC stated that, "[d]ue to the filing of [its] complaint, the Commission no longer views compliance with the CID as necessary to its investigation."  *Id.*  The FTC simultaneously withdrew CIDs it had served on the Endocrine Society and the American Academy of Pediatrics ("AAP").  *See Endocrine Soc'y v. Federal Trade Commission*, No. 1:26-cv-00512-JEB, ECF 40 (D.D.C. June 22, 2026); *American Academy of Pediatrics v. Federal Trade Commission*, No. 1:26-cv-00508-CRC, ECF 40 (D.D.C. June 22, 2026).  On June 30, 2026, counsel for WPATH met and conferred with the FTC regarding the withdrawal of the CID.  Hayes-Deats Decl. ¶ 18.  Counsel for WPATH asked the FTC whether it intended to seek the same information requested by the CID through discovery in the Northern District of Texas.  *Id.*  The FTC declined to offer any assurances that it would not do so.  *Id.*

The FTC asserts that it served WPATH on June 23, 2026.  Hayes-Deats Decl. ¶ 16. WPATH's answer is thus due on July 14, 2026.  *Id.*

### ARGUMENT

This Court should issue a temporary restraining order ("TRO") barring the FTC and anyone in active concert with it from pursuing the Texas litigation.  It should do so for two independent reasons.  First, the Texas litigation raises the same issues as this case, involves the same parties, and implicates the same First Amendment rights that WPATH's complaint seeks to protect. Allowing the FTC to file duplicative litigation in another district will "waste" judicial resources and create a risk of "inconsistent adjudications."  *Rich v. Butowsky*, No. 18-cv-681 (RJL), 2020 WL 7016436, at *2 (D.D.C. Mar. 31, 2020).  Second, an antisuit injunction is necessary to "prevent the frustration" of the preliminary injunction the Court has already issued.  *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977).  The FTC could use discovery in the Northern District of Texas action to seek the same documents, and impose the same chilling effect, that this Court found

would likely violate WPATH's First Amendment rights.  ECF 41 at 6-11.  DOJ, acting in concert with the FTC, may already have done so.

A preliminary injunction is proper where a plaintiff (1) "is likely to succeed on the merits"; (2) "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) where "the balance of equities tips in [a plaintiff's] favor"; and (4) where the issuance of a preliminary injunction "is in the public interest."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).  The final two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "[A] plaintiff 'need only establish a likelihood of success on the merits of one claim to obtain . . . injunctive relief.'"  *Media Matters for Am. v. Fed. Trade Comm'n*, 805 F. Supp. 3d 105, 119 (D.D.C. 2025) ("*Media Matters II*") (quoting *A.B.B. v. Morgan*, 548 F. Supp. 3d 209, 218 (D.D.C. 2020)).  The "same standard applies to both temporary restraining orders and to preliminary injunctions," *Am. Libr. Ass'n v. Sonderling*, 783 F. Supp. 3d 57, 59 (D.D.C. 2025) (quoting *Sterling Commer. Credit, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 12 (D.D.C. 2011)), except that a TRO may issue "without written or oral notice to the adverse party," Fed. R. Civ. P. 65(b)(1).  Every injunction and TRO binds not just the parties named, but also anyone working in "active concert" with those parties who has notice of the order's prohibitions.  Fed. R. Civ. P. 65(d)(2).

## I.    WPATH Is Likely to Succeed on the Merits

WPATH is likely to prove its entitlement to an antisuit injunction on two separate bases. First, the Court should enjoin the FTC from initiating duplicative litigation and instead require it to present its claims in this case as mandatory counterclaims.  Second, the Court should enjoin the FTC from using the Texas litigation to frustrate the preliminary injunction entered in this case.

### A. An Injunction Is Necessary to Prevent Duplicative Proceedings

"It is clear that a federal court can enjoin the prosecution of an action where the same issues are presented in another federal court." *Am. Horse Prot. Ass'n v. Lyng*, 690 F. Supp. 40, 42 (D.D.C. 1988); *see Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 185 (1952) ("[S]ubsequent suits . . . can within the trial court's discretion be enjoined pending determination of the declaratory judgment suit."). The D.C. Circuit permits issuance of antisuit injunctions to prevent duplicative litigation in two separate districts. *Columbia Plaza Corp. v. Sec. Nat'l Bank*, 525 F.2d 620, 628 (D.C. Cir. 1975). *Columbia Plaza* involved financing to construct a commercial office building. *Id.* at 622. The property owner sued the financiers in D.D.C., alleging that they had diverted loan proceeds to other projects. *Id.* at 623. The financiers filed a separate suit in New York to recover on debt notes the property owner had issued. *Id.* Although the D.C. District Court initially denied the property owner's motion to enjoin the financier from proceeding in New York, the D.C. Circuit reversed. *Id.* at 629. Because the financier's claims were mandatory counterclaims under Federal Rule of Civil Procedure 13(a), the "two actions [we]re parts of a single controversy" and should "both" be resolved "in a single forum." *Id.* at 626. The D.C. Circuit evaluated "equitable considerations genuinely relevant to the ends of justice" and concluded that the litigation in D.D.C. should proceed, and the financier should be enjoined from further litigation in New York. *Id.* at 627-28.

Following *Columbia Plaza*, courts deciding whether to issue an antisuit injunction barring duplicative litigation consider the following factors: "the identity of the parties; the risk of inconsistent adjudications; the location of counsel familiar with the litigation; how far advanced each action is; and, 'equitable considerations genuinely relevant to the ends of justice, relating to the expeditious determination of the case without unnecessary multiplication of litigation.'"

*Butowsky*, 2020 WL 7016436, at *1 (quoting *Am. Horse*, 690 F. Supp. at 42).  Each factor weighs

in favor of an antisuit injunction barring the FTC from litigating in Texas.

1. *Identity of the Parties*.  "The parties are substantially identical when subsequent claims

are filed against the same individuals . . . involved in the initial litigation."  *Id.* at *2.  Here, the

FTC, a defendant in this case, filed suit in the Northern District of Texas against WPATH, the

plaintiff in this case.  While the FTC named three separate entities affiliated with WPATH in the

Texas litigation, it alleges that all three "have operated as a common enterprise" and refers to them

collectively as "WPATH."  Ex. 7 ¶¶ 38-49.  That four States have joined the FTC's Texas litigation

does not alter the identity of the parties in the two suits.  The FTC frequently "partner[s] with state

Attorneys General" to file lawsuits.  *See Congressional Budget Justification Fiscal Year 2027*,

Federal Trade Commission (Apr. 3, 2026),15, https://www.ftc.gov/system/files/ftc_gov/pdf/ftc-

fy-2027-congressional-budget-justification.pdf; *see also, e.g.*, *FTC v. Mallinckrodt*, 1:17-cv-120-

EGS (D.D.C. Jan. 18, 2017) (suit by FTC, Alaska, and Texas, among others).  The FTC cannot

evade restrictions on its actions simply by taking joint action with historical partners.  This factor

thus "tips in favor of enjoining the later-in-time suit."  *Butowsky*, 2020 WL 7016436, at *2.

2. *Risk of Inconsistent Adjudications*.  The Texas litigation also creates a significant risk

of inconsistent adjudications.  The "issues in this suit and the Texas Litigation are 'inextricably

intertwined' and derive from a 'common origin,' which 'weighs in favor of the comprehensive

resolution of this case in one forum.'"  *Id.* at *2 (quoting *Am. Horse*, 690 F. Supp. at 43).  This

case and Texas litigation arise from a "common origin," *i.e.*, the FTC's investigation of WPATH.

*Id.*  They also present issues that are "inextricably intertwined."  *Id.*  The Texas litigation

challenges the same statements identified in the CID the Court previously enjoined.  *Compare*

ECF 1 ¶ 121 (listing the "Covered Statements"), *with* Ex. 7 ¶ 378 (listing the "Core Deceptive

16

Statements"). The FTC's jurisdiction to investigate WPATH and its jurisdiction to bring the lawsuit in Texas both revolve around the same question of whether WPATH is a "corporation" or engages in commerce. *See* ECF 1 at 44; Ex. 7 ¶ 50. And WPATH will raise the same First Amendment rights it presented to this Court as a limitation on the FTC's investigative power as a defense to the FTC's claims in the Texas litigation. *See* ECF 1 at 44. These overlapping issues could easily result in inconsistent adjudications. As one example, the Northern District of Texas could allow the FTC to pursue in discovery the same requests that this Court previously found violated WPATH's First Amendment rights. ECF 41. That outcome appears likely. The Southern District of New York recently observed that the "Northern District of Texas" was the "only jurisdiction" that had been "receptive to [DOJ's] arguments" regarding administrative subpoenas, enforcing an administrative subpoena after eight other district courts around the country had refused. Ex. 5 at 10:19-23.

The FTC's claims in Texas are also mandatory counterclaims that it should have presented in this Court. Fed. R. Civ. P. 13(a); *Columbia Plaza*, 525 F.2d at 626. The FTC's claims arise out of the same "transaction or occurrence that is the subject matter" of WPATH's claims in this Court, and do not require adding another party over whom the Court cannot acquire jurisdiction. Fed. R. Civ. P. 13(a).[2] " 'Transaction' is a word of flexible meaning," and "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Columbia Plaza*, 525 F.2d at 625 (quoting *Moore v. N.Y. Cotton Exch.*, 270 U.S. 593, 610 (1926)). The allegations in a mandatory counterclaim need not be "precisely

---

[2] The States of Alaska, Iowa, Nebraska, and Texas could each have joined the FTC's counterclaims in this Court. Each has joined suits filed by the FTC in this District before. *See Mallinckrodt*, 1:17-cv-120-EGS (suit by FTC, Alaska, and Texas, among others); *FTC v. Sysco Corp.*, 1:15-cv-256-APM (D.D.C. Feb. 20, 2015) (suit by FTC, Iowa, and Nebraska, among others).

17

identical," and should instead be "construed generously to avoid the unnecessary expense inherent in multiplicious litigation." *Id.* Any reasonable construction of FTC's counterclaims shows their "logical relationship" to WPATH's claims. All claims arise from the same FTC investigation, concern the same statements in SOC8, and require consideration of WPATH's First Amendment rights. *See* pp. 16-17, *supra.* The Court should thus enjoin the "wasteful expenditure of energy and money incidental to separate litigation of identical issues." *Columbia Plaza*, 525 F.2d at 626.

3. *Location of Counsel Familiar with the Litigation.* The "location of counsel weighs in favor of enjoining the Texas Litigation." *Butowsky*, 2020 WL 7016436, at *2. WPATH's attorneys are located in D.C. Four of the five attorneys representing the FTC in Texas are also based in Washington, D.C., with the fifth providing an address from Atlanta, Georgia. Ex. 8. Not one attorney appearing in the Texas litigation on behalf of the FTC is located in Texas. *Id.*[3] All five FTC attorneys filed more than a thousand miles away from their offices, rather than proceed in this District with what should have been mandatory counterclaims.

4. *How Far Advanced Each Action Is.* The relative stages of the two cases also weigh in favor of an antisuit injunction. *Butowsky*, 2020 WL 7016436, at *2. This Court has already heard a motion for a preliminary injunction, determined that "WPATH is likely to demonstrate a causal link between its protected speech and the FTC's issuance of the CID," and barred the FTC from "implementing or enforcing its issued CID." ECF 41 at 9-11. Nothing happened in Texas until over a month after the Court issued its injunction. *See* Ex. 8. The D.C. Circuit has required an antisuit injunction when foreign litigation has "advanced no further than removal and

---

[3] Only one attorney appearing on behalf of plaintiffs in the Texas litigation lists an address in Texas, and that attorney, representing the State of Texas, works in the *Western* District of Texas, not the *Northern* District, where the case was filed. Ex. 8.

consideration of a motion for stay." *Columbia Plaza*, 525 F.2d at 628.  The Texas litigation has

not advanced even that far.

5. *Equitable Considerations*.  Finally, "equitable considerations, such as the conservation

of judicial resources and deterrence of forum shopping, weigh in favor of enjoining the Texas

Litigation."  *Butowsky*, 2020 WL 7016436, at *2.  It "would be a complete waste of judicial

resources to allow two cases confronting the same exact issues to proceed simultaneously." *Id.*  It

would also be "unfair to force [WPATH] to engage [Texas] counsel additional to retained local

counsel already familiar with the controversy." *Columbia Plaza*, 525 F.2d at 628.

The location of "witnesses" also weighs in favor of enjoining the Texas litigation.

*Columbia Plaza*, 525 F.2d at 628.  WPATH's principal witnesses are also located in Washington,

D.C.; Columbus, OH; and Chicago, IL.  ECF 3-4 to 3-6; Hayes-Deats Decl. ¶ 20.  The declarations

filed with the FTC's complaint are from individuals who reside or received treatment in

Massachusetts, Missouri, California, Michigan, Arizona, Minnesota, Maryland, and Forida.  *See*

*FTC v. WPATH*, No. 4:26-cv-748-O ECF 1-2 to 1-16 (N.D. Tex. June 17, 2026).  None of those

individuals will benefit significantly from proceeding in Texas.  Only two declarants in the Texas

litigation reside in Texas, *FTC v. WPATH*, No. 4:26-cv-748-O, ECF 1-1, 1-3, and both have

already traveled to Washington, D.C. to participate in the FTC's 2025 workshop, ECF 3-28 at 51,

61.

Finally, the FTC's "Texas Litigation 'has more than a faint semblance of forum shopping

aimed at evading' this Court's adjudication" of WPATH's claims.  *Butowsky*, 2020 WL 7016436,

at *2 (quoting *Am. Horse*, 690 F. Supp. at 43).  The Southern District of New York recently found

that DOJ, after repeatedly losing challenges to its administrative subpoenas, "strategized to

concentrate legal actions related to gender-affirming medical care" in the "Northern District of

Texas" because that was the "only jurisdiction" that was "receptive to its arguments."  Ex. 5 at 10:19-23.  It is surely no coincidence that the FTC, after losing WPATH's challenge to the CID, filed a duplicative lawsuit in the Northern District of Texas.  The FTC did not even purport to serve WPATH in the Northern District of Texas, but instead in Illinois and Austin, which is in the Western District of Texas.  *See FTC v. WPATH*, 4:26-cv-00748-O, ECF No. 25-26 (N.D. Tex. June 29, 2026).  The FTC's forum shopping threatens not just duplicative litigation, but also comity between federal district courts.  *See League of Women Voters v. Dep't Homeland Security*, No. 25-cv-3501 (SLS), 2026 WL 1784297, at *34 (D.D.C. June 22, 2026) (explaining "doctrine of federal comity" seeks to avoid "unnecessarily burdening the federal judiciary and delivering conflicting judgments").  If the FTC can circumvent unfavorable decisions by filing separate cases in a district it regards as favorable, different districts will repeatedly find themselves in irreconcilable conflicts.  DOJ's transfer of its investigation to the Northern District of Texas has already produced one example.  *In re Rhode Island Hosp.*, 177 F.4th 21, 23 (1st Cir. 2026) (describing competing orders from the District of Rhode Island and the Northern District of Texas).

*    *    *

Not one factor weighs in favor of allowing the FTC to prosecute duplicative claims in Texas, rather than before this Court.  The FTC's claims involve the same parties, raise the same issues, and have far less connection to Texas than Washington, D.C., where the FTC conducted its investigation and where its attorneys reside.  Permitting the FTC to proceed in Texas would waste the parties' resources and the Court's, for no purpose other than allowing the FTC to proceed before a district court that it regards as favorable to its claims.  Such cynical evasion of this Court's review threatens the "overall interests of justice."  *Columbia Plaza*, 525 F.2d at 627.

20

**B.  An Injunction Is Necessary to Prevent Evasion of This Court's Injunction**

The Court should also issue an antisuit injunction to prevent frustration of its prior orders. The All Writs Act authorizes federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  The Supreme Court has "repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued."  *N.Y. Tel. Co.*, 434 U.S. at 172; *see also Laker Airways Ltd. v. Sabena*, 731 F.2d 909, 927 (D.C. Cir. 1984) ("Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants."). "If courts lacked the ability to enforce their judgments, 'the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.'"  *SAS Inst., Inc. v. World Programming Ltd.*, 952 F.3d 513, 521 (4th Cir. 2020) (quoting *Peacock v. Thomas*, 516 U.S. 349, 356 (1996)).

The FTC and DOJ are using proceedings in the Northern District of Texas to circumvent this Court's holding that the First Amendment limits what information they can obtain from WPATH.  DOJ previously announced that it would work "very, very closely" with the FTC on issues relating to transgender healthcare for minors.  ECF 3-28 at 50.  Following the entry of this Court's injunction, DOJ issued a grand jury subpoena from the Northern District of Texas to at least one WPATH member (and potentially more) seeking "all communications with any WPATH member" and all "communications related to any WPATH publication," including SOC8, from a period of over six years.  Ex. 6.  This Court held that those same requests, in the FTC's CID, have a "chilling effect on [WPATH's] protected speech," and "predictably stifle[] future speech."  ECF 41 at 6-7.  DOJ is thus doing exactly what this Court found would likely violate the First

21

Amendment, even though neither the "extensive evidence of animus" nor the "wafer-thin justifications" for such broad requests have changed. *Id.* at 9.

The FTC's lawsuit also threatens to circumvent this Court's injunction. Every discovery request the FTC serves in the Texas litigation will likely fall within the "vast swath" of documents covered by the CID. ECF 41 at 6-7. The FTC's pursuit of those documents in the Texas litigation threatens the same "chilling effect" this Court found "readily discernible." *Id.* And there is no guarantee that the Northern District of Texas will apply the First Amendment to the FTC's requests in the same manner that this Court has. When DOJ sought to enforce an administrative subpoena in the Northern District of Texas—the same administrative subpoena that *eight* other courts had refused to enforce, *see* p. 5, *supra*—that court enforced the subpoena *ex parte*, without hearing from the hospital that had received the subpoena, and subsequently denied the hospital's request for a stay. *In re Rhode Island Hosp.*, 177 F.4th at 23. FTC has given WPATH no assurances that it will not simply reissue its CID as a set of document requests under Federal Rules of Civil Procedure 34 in the Northern District of Texas. Hayes Deats Decl. ¶ 18. Such discovery would deprive this Court's injunction of any effect. The FTC would chill the same protected speech, based on the same "wafer-thin justifications," causing the same irreparable harm to WPATH. ECF 41 at 9-11. The All Writs Act authorizes this Court to prevent that result.

This Court has a "duty to protect [its] legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants." *Laker Airways*, 731 F.2d at 927. In *SAS Institute*, the Fourth Circuit affirmed an antisuit injunction that barred a foreign defendant from initiating foreign suits to "clawback" damages awarded in the United States. 952 F.3d at 523-26. The All Writs Act authorized the district court to "protect its outstanding judgment" from a "sustained collateral attack" that was "effectively lowering" the judgment's amount. *Id.* at 524. This Court's

22

preliminary injunction faces an almost identical threat.  The FTC, through discovery in Texas, threatens to seek the exact documents from WPATH, and impose the exact chilling effect, that this Court held would likely violate the First Amendment.  ECF 41 at 9-11.  The Court should thus "protect its outstanding" injunction.  *SAS Inst.*, 952 F.3d at 524; *see also Am. Horse*, 690 F. Supp. at 44 (finding litigation in another district attempts "to divest this Court of the jurisdiction that it clearly has over the issues raised").

## II.    WPATH Has Been, and Will Continue to Be, Irreparably Harmed by the FTC's Actions

WPATH faces two forms of irreparable harm, each of which independently supports an antisuit injunction.  First, the FTC's initiation of the Texas litigation threatens to irreparably harm WPATH by violating its First Amendment rights.  This Court previously found that "WPATH has made it apparent that its constitutional rights are violated" and thus "has easily cleared the irreparable harm requirement to warrant preliminary relief."  ECF 41 at 10 (cleaned up); *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009).  WPATH has already documented "interruptions to its educational programs, mentorship programs, and the closing of an online meeting for discussion of transgender-health topics."  ECF 41 at 10 (cleaned up).  The Texas litigation threatens to cause those same interruptions and more.

Second, WPATH will be irreparably harmed because it will be "forced to devote resources" to litigating two separate cases.  *Butowsky*, 2020 WL 7016436, at *2; *see Columbia Plaza*, 525 F.2d at 628 (noting unfairness of requiring plaintiff to litigate in two districts).  WPATH is a nonprofit that "operates on a modest budget."  ECF 3-2 ¶¶ 3, 15.  Its financial disclosures from 2024 show that, even before the federal government began to target it, it operated at a loss and had only $1.2 million in net assets.  Hayes-Deats Decl. Ex. 9.  WPATH simply does not have the resources to engage multidistrict litigation with an agency of the federal government that has an

23

annual budget of more than $400 million.  ECF 34-8.  It should not have to face "an expensive, time-consuming action, as well as a vexatious attempt to relitigate issues already decided and to raise issues that more properly can be determined by this Court."  *Am. Horse*, 690 F. Supp. at 44.  That threatened harm is "immediate."  Fed. R. Civ. P. 65(b)(1).  WPATH's response to the FTC's complaint in Texas is due July 14, 2026.  Hayes-Deats Decl. ¶ 16.

### III.     The Balance of the Equities and Public Interest Favor WPATH

Finally, both the balance of the equities and the public interest support issuance of an antisuit injunction.  An injunction will not harm the FTC, or the other plaintiffs in the Texas litigation, because all claims asserted in the Texas litigation can be pursued as mandatory counterclaims that "can appropriately be heard by this Court."  *Am. Horse*, 690 F. Supp. at 44.  Requiring the FTC to litigate here "cannot be construed as injury."  *Id.*; *see also Butowsky*, 2020 WL 7016436, at *2.

The public interest also favors an antisuit injunction.  An injunction will promote the "public interest in the conservation of judicial resources and comprehensive disposition of litigation," as well as the "interests of avoiding inconsistent results and conflicting decisions."  *Am. Horse*, 690 F. Supp. at 45; *see also Butowsky*, 2020 WL 7016436, at *2.  And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation."  *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  No countervailing interest weighs against an injunction, because the FTC will remain free to litigate any legitimate claim it has before this Court.  *Am. Horse*, 690 F. Supp. at 44.

## CONCLUSION

For the foregoing reasons, WPATH respectfully requests that this Court issue a temporary restraining order barring the FTC, and anyone acting in concert with it, from litigating the claims asserted in *FTC v. WPATH*, 4:26-cv-748-O (N.D. Tex.), except as mandatory counterclaims brought before this Court.

Dated: June 30, 2026

Respectfully Submitted,

*/s/ Caleb Hayes-Deats*
Abbe David Lowell [Bar No. 358651]
Caleb Hayes-Deats [Bar No. 1643213]
Schuyler J. Standley [*admitted pro hac vice*]
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
SStandley@lowellandassociates.com
*Attorneys for WPATH*