IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE WORLD PROFESSIONAL
ASSOCIATION FOR TRANSGENDER
HEALTH,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION et al.,

*Defendants*.

Civil Action No. 1:26-CV-00532-JEB

**<u>MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND
ANTISUIT INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................4

I.       THE COURT ENJOINS THE FTC FROM ENFORCING THE CID. ..............................4

ARGUMENT .......................................................................................................................11

I.       WPATH IS NOT LIKELY TO SUCCEED ON THE MERITS. .....................................11

         A.       This Court May Not Superintend Distinct Proceedings in the Northern District of Texas. ................................................................................................. 11

         B.       The Enforcement Action in the Northern District of Texas is Distinct from the CID Action in This Court. .................................................................................. 13

II.      WPATH IS NOT IRREPARABLY HARMED BY THE FTC'S ACTIONS ...................30

III.     THE BALANCE OF EQUITIES AND PUBLIC INTEREST DISFAVOR INJUNCTIVE RELIEF ...........................................................................................32

CONCLUSION ....................................................................................................................33

**INTRODUCTION**

The Federal Trade Commission—along with Alaska, Iowa, Nebraska, and Texas—have brought suit against WPATH for violating federal and state consumer-protection laws in promoting medical-transition services to minors. That suit (the "Enforcement Action") rests on a 123-page complaint, backed by 16 sworn declarations from victims and witnesses, detailing WPATH's longstanding scheme of medical misrepresentation for profit. That suit has been filed in the Northern District of Texas—the State in which, among much else, WPATH is incorporated.

Rather than face this suit in that federal forum, WPATH has asked this Court to issue an order barring the Defendants here from "pursuing the Texas litigation." This Court should deny that remarkable request. One federal district court lacks the power to superintend proceedings in another. Where a litigant takes issue with some aspect of a district court case, the proper course is up, not out: The federal judiciary has a vertical structure; if WPATH thinks there is some legal defect with the Enforcement Action in the Northern District of Texas, its first stop is that court, and should it lose, its next is the Fifth Circuit or Supreme Court. Basic principles of comity and equity make clear the United States District Court for the District of Columbia has no role to play here, and it cannot commandeer foreign proceedings by ordering their litigants to stand down.

WPATH asserts that this Court should effectively seize control of the Enforcement Action by arguing that the Enforcement Action substantially overlaps with the preliminary injunction that this Court issued in May, which enjoined a prior administrative subpoena issued by the FTC to WPATH (the "CID Action"). That is baseless. This Court's order made express that it was barring the FTC from "implementing or enforcing its issued [CID]," and no further. ECF 40, at ¶¶1–2. And the FTC has done even more than what this Court ordered, choosing to *withdraw* the CID and disclaim enforcement. Otherwise, this Court made express—including by rejecting WPATH's request for a "broader" injunction—that the FTC is "free to deploy other investigative tools" to

pursue WPATH as appropriate. ECF 41, at 10. And the FTC took this Court at its word: it used those tools to assemble the 123-pages of allegations against WPATH that make up the Enforcement Action, and it brought suit in the Northern District of Texas to litigate WPATH's violations of the FTC Act.

This Court has no control over that litigation. And WPATH's main argument otherwise proves the point. WPATH contends this Court somehow has a claim over the Enforcement Action because it is *duplicative* with the CID Action, such that the former should have been brought as a mandatory counterclaim to the latter. But every court to address that argument has rightly rejected it. Counterclaims are, among other things, claims that could have been brought at the time the other party's complaint is filed; but the entire purpose of an investigative tool like a CID is to investigate *whether* to bring an enforcement action. On WPATH's logic, every time a regulated party brings a pre-enforcement suit against a subpoena, the regulator must file the enforcement action as a counterclaim (or lose it). Worse, so too does every *State* in the Nation that wants to file an enforcement action challenging similar conduct (even if under their own laws). That cart-before-the-horse system is not the law. A challenge to a subpoena is a challenge to the government's mode of conducting an investigation; an enforcement action is a challenge to a party's conduct as measured against federal or state law. Those are fundamentally different actions. And in turn, it is wholly appropriate (and exceedingly common) that they occur in different federal forums. This Court thus cannot reach into the Northern District of Texas to strip it of jurisdiction over a filed action properly before it.

Confronted with these obvious problems, WPATH resorts to the argument that the FTC's and State's enforcement action in the Northern District of Texas evades or circumvented the preliminary injunction. That argument is absurd. The preliminary injunction forbade the FTC from

enforcing or implementing a specific CID, which the Commission withdrew weeks ago. This Court expressly *refused* WPATH's request to enjoin the FTC from doing anything else. It held instead that the FTC was free to use other methods to investigate WPATH's conduct. That is what the Commission did, and this enforcement action is the fruit of those efforts. An action to enforce federal consumer-protection law is not the enforcement or implementation of a CID. It is instead precisely what this Court left the Commission free to do.

It is uncertain how much WPATH actually believes its own (oft-rejected) legal arguments. Indeed, scattered throughout its motion, it seems WPATH's real point is that this Court *must* do something because the Northern District of Texas cannot be trusted to faithfully apply the law. Time and again, WPATH has claimed an extraordinary order—again, one telling litigants in a different district court to stop "pursuing" that litigation in that forum—is necessary, because that court is—according to WPATH—little more than a rubber stamp for the Government, willing to accept what other more enlightened forums have rejected. *See, e.g.*, See Mem. 1–2, 5, 17. WPATH cites no authority considering such an indecorous argument to be a valid reason to enjoin a sister court's proceedings, and this Court should not countenance a motion premised on it. The Enforcement Action is its own governmental action, and a separate lawsuit filed in a separate forum involving distinct parties and different sets of law. Under our system of government, if WPATH has any defense to the complaint's allegations, the audience for that defense is the Northern District of Texas. It must answer for its actions there, with the full right to appeal to the Fifth Circuit or Supreme Court should it disagree on any score. This Court should hew to the ordinary course of litigation in this country and reject WPATH's naked attempt to enlist this Court in circumventing it.

## BACKGROUND

### I.    THE COURT ENJOINS THE FTC FROM ENFORCING THE CID.

WPATH is an organization founded and incorporated in Texas whose membership consists primarily of clinicians and others that sell pediatric medical transition services or benefit from their purchase, including surgeons, endocrinologists, psychiatrists, and pediatricians. *See* ECF No. 1 ¶ 6, *FTC v. World Prof'l Ass'n for Transgender Health, Inc.*, No. 4:26-cv-748 (N.D. Tex. June 17, 2026) ("Enforcement Action Compl."). WPATH is an active Texas domestic corporation, and has a registered office and a corporate registered agent in Texas. *Id.* ¶ 34.

In January 2026, the FTC issued a Civil Investigative Demand ("CID") to WPATH to investigate whether it "ha[s] made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment." ECF No. 40 at 2. Prior to issuing the CID to WPATH, the FTC had been investigating potential violations of the FTC Act by WPATH and others, including through holding a public workshop and public comment period. The FTC has a long history of investigating deceptive claims that take advantage of parents looking for products and services to help their children.[1]

On February 18, WPATH filed suit in this Court, claiming that the FTC's investigation constituted retaliation in violation of its First Amendment rights. ECF No. 1. The focus of the complaint was the CID. *E.g., id.* ¶¶ 3–4, 113–26, 132, 139, 147, 152. WPATH then moved for a

---

[1] *See, e.g.*, FTC, FTC Sues to Stop Amare Global Holding from Misrepresenting the Health Benefits of Its Dietary Supplements for Children and Adults (June 2, 2026), https://www.ftc.gov/news-events/news/press-releases/2026/06/ftc-sues-stop-amare-global-holdings-misrepresenting-health-benefits-its-dietary-supplements-children (alleging that Amare misrepresented to parents and other consumers that its dietary supplements marketed for children and adults could treat or cure health conditions such as depression, anxiety and ADHD).

preliminary injunction, again focusing on the CID. ECF No. 3 at 7–8, 20–23. Its primary ask to this Court was to "issue a preliminary injunction barring Defendants from implementing or enforcing the Civil Investigative Demand." *Id.* at 39. WPATH also added, though, a broader request for a general order barring the FTC from "taking further actions" against WPATH. *Id.*

This Court granted WPATH's motion, but only in part. *See* ECF No. 41. The Court found that WPATH was likely to succeed on the merits of its First Amendment claim with respect to the CID that had been issued.   *Id.* at 8–9. Accordingly, the Court enjoined the FTC from "implementing or enforcing its issued CID." *Id.* at 11.

But the Court "den[ied] the Motion to the extent it seeks further relief." *Id.* In particular, the court did not otherwise enjoin the Commission from investigating WPATH—despite that organization requesting "a broader injunction." *Id.* Indeed, the court explicitly noted that the FTC "remains free to deploy other investigative tools" pursuant to its "interest in enforcing the law." *Id.* The Court reiterated that it "only enjoin[ed] the FTC from further action regarding the CID." *Id.*; *see also* ECF No. 45-1 (WPATH describing the preliminary injunction as "barring the FTC from enforcing or implementing a civil investigative demand [] it had served on WPATH"). Accordingly, at multiple turns, this Court made express that, notwithstanding WPATH's contrary request, the Commission remained free to continue investigating WPATH—and to pursue relief against WPATH under the FTC Act if appropriate. Its injunction reached the challenged CID, and no further.

## II.    THE FTC USES ITS OTHER INVESTIGATORY TOOLS AND UNCOVERS PROLIFIC VIOLATIONS OF LAW BY WPATH.

After the Court preliminarily enjoined enforcement of the CID, the FTC followed this Court's order: It used its "other investigative tools" to investigate WPATH. The FTC contacted victims who provided sworn declarations to the FTC documenting their experiences with the

5

purchase of medical transition services. The FTC also reviewed publicly available information, including medical and academic publications, information and documents available on WPATH's website, and information from other enforcement actions and private lawsuits involving WPATH. The publicly available documents from these other lawsuits included internal WPATH communications and other materials.[2]

Through these other methods, the FTC uncovered substantial evidence that WPATH has made false, misleading, or unsubstantiated statements and thereby provided the means and instrumentalities for medical providers to deceive consumers into purchasing pediatric medical transition services—drugs, surgeries, and other interventions sold to consumers whose children express dissatisfaction with, or report distress about, their sex-linked biological and anatomical characteristics. Though a complete recitation of the evidence is beyond the scope of this filing, we very briefly summarize below WPATH's misrepresentations, how those misrepresentations were made to profit WPATH's members by inducing the purchase of pediatric medical transition services, and the resulting physical and financial injury to consumers.

---

[2] WPATH speculates that the FTC "may" have "intentionally coordinated" with the United States Department of Justice ("DOJ") to "obtain information from WPATH that this Court's injunction barred the FTC from requesting under the CID" because, "[f]ollowing the entry of this Court's injunction, DOJ issued a grand jury subpoena from the Northern District of Texas to at least one WPATH member (and potentially more)." ECF No. 45-1 at 13-14, 21-22. As the declarations attached hereto demonstrate, members of the FTC case team that was responsible for investigating WPATH and preparing the complaint have no knowledge of any coordination between the FTC and DOJ to obtain information from WPATH that this Court's injunction barred the FTC from requesting under the CID, have no reason to believe any such coordination occurred, are not aware of any documents the FTC received through the grand jury proceedings, and did not even learn that the DOJ directed subpoenas to a WPATH member or members until after the issuance of those subpoenas became public—after the FTC and the State plaintiffs had already filed their lawsuit. *See* Declarations, Defendants' Exs. 1–2, 4–5. In addition, the Deputy Director for Litigation and Chief Litigation Counsel have also provided similar declarations for the Court's review. *See* Declarations, Defendants' Exs. 3, 6.

WPATH operates for the profit of its membership, which primarily consists of clinicians that perform or otherwise profit directly from these commercial services, including surgeons, endocrinologists, psychiatrists, and pediatricians. Enforcement Action Compl. ¶ 6. Through the self-publication, distribution, and promotion of what it calls its "Standards of Care" ("SOC"), WPATH provides the principal mechanism by which its members market, justify, and sell pediatric transition services. *Id.* ¶ 7. WPATH represents in the SOC that such interventions are "medically necessary" and effective at preventing suicide in children; that puberty blockers are fully reversible; that cross-sex hormones improve mental health; and that breast amputations are safe, effective, and "consistently and directly" increase children's health-related quality of life. *Id.* ¶ 378.

The sworn declarations from consumers obtained by the FTC confirm that these misrepresentations directly shape clinical encounters, thereby connecting WPATH's false, misleading, or unsubstantiated statements to commercial representations to consumers. *Id.* ¶ 317; *id*. Exs. 1–16. Clinicians rely on WPATH's representations when diagnosing children, and clinicians repeat WPATH's assertions in the SOC and elsewhere about the necessity, safety, and purported benefits of medical transition when persuading children and their parents to purchase their services. *Id.* ¶¶ 330–37, 342–53. Clinicians also direct parents to WPATH's publications, website, and the SOC as authoritative sources of medical information. *Id.* ¶¶ 325–29. WPATH's claims thus give WPATH members and other clinicians the means to assure parents that invasive, life-altering interventions are required for their child's well-being. *Id.* ¶ 19.

But WPATH's internal documents, and the other evidence compiled by the FTC to date, show these assertions to be unsubstantiated. WPATH leaders privately admitted they "struggled to find any sound evidence-based argument(s) underpinning" the removal of age limitations for

these services in the most recent SOC, that claims regarding the reversibility of puberty-blockers required an "asterisk," and that there is a lack of "research basis" to support the strong claims in the SOC about hormone therapy and breast amputations for children. *Id.* ¶¶ 18, 91–92, 113, 195. And despite asserting that the SOC are the result of scientific procedures and expert consensus, WPATH ignored the results of its own evidence reviews, and its drafters have privately acknowledged that it disregarded established guideline-development standards, including those it claimed to have followed. *Id.* ¶¶ 18, 83, 115.

WPATH declared virtually every transition service its members provide as "medically necessary" for children because, as SOC-8 itself explains, that designation "is central to payment, subsidy, and/or reimbursement." *Id.* ¶ 265. In the words of one drafter, who argued that WPATH "needed to be advocating for insurance coverage" more aggressively, the declaration of medical necessity was made because it was "necessary to move forward on the insurance front." *Id.* ¶ 260. To make its objective even more transparent, SOC-8 explicitly urged "health care systems to provide these medically necessary treatments and eliminate any exclusions from their policy documents and medical guidelines that preclude coverage for any medically necessary procedures or treatments." *Id.* ¶ 261. Not content to let SOC-8 speak for itself, shortly after disseminating SOC-8 to its members, WPATH created, published, and disseminated a presentation titled "Insurance Coverage of Gender Affirming Healthcare: WPATH SOC-8 Updates" explaining that "Insurers Must Update Adolescent Surgery Eligibility Criteria to be in Alignment with SOC-8" to include no lower age limit for surgery so long as the child has sufficient "emotional and cognitive maturity" to consent. *Id.* ¶ 270. WPATH's plan worked. Today, many of the largest health insurance providers, both public and private, defer to WPATH's and SOC-8's declaration that medical transition drugs, surgeries, and other services are medically necessary. *Id.* ¶ 273. The net

8

result of WPATH's efforts has been that, in the words of WPATH's former president Marci Bowers, "insurers look to the" SOC "to set criteria for their members to be covered." *Id.* ¶ 274. Accordingly, WPATH's successful efforts to obtain insurance coverage for pediatric medical transition services have unlocked enormous profits for WPATH's members. *Id.* ¶ 275.

But these profits have come at the expense of children and their parents. As reflected in the sworn statements obtained by the FTC, WPATH's misrepresentations have caused unspeakable physical and psychological harm to countless children, including incontinence, genital pain, sexual dysfunction, inability to orgasm, genital atrophy, nipple necrosis, hot flashes, brain fog, internal bleeding, and psychotic episodes. *See, e.g.*, *id.* ¶¶ 20, 234. To take just one example, a Texas girl was admitted to a psychiatric facility in Fort Worth after a stressful family-related incident. *Id.* ¶ 21; *id*. Ex. 1. There, the psychiatrist determined that the girl was suffering from gender dysphoria and was really a male. Through attending a support group in the Dallas-Fort Worth area, she learned that the treatment for her "cross-sex identity was medical transition" in accordance with the "standards of care" which "came from an organization called 'WPATH.'" *Id.* Acting on that advice, this girl underwent pediatric medical transition by injecting testosterone, blocking her estrogen, and undergoing breast amputation. *Id.* She has since disclaimed her psychiatrist's determination that she is male and stopped taking testosterone, but she "continue[s] to experience ongoing health problems including fatigue, joint pain, clitoral cysts, and a lot of pain and physical discomfort in [her] upper chest and shoulders" from her medical transition treatments—side effects that the SOC never disclosed. *Id.*

## III.    THE FTC AND FOUR STATES SUE WPATH IN THE NORTHERN DISTRICT OF TEXAS TO ENFORCE THE LAW.

On July 17, the FTC—along with the states of Alaska, Iowa, Nebraska, and Texas—sued WPATH and two of its affiliates in the United States District Court for the Northern District of

9

Texas to stop the unconscionable harm inflicted by WPATH's deceptive claims about the necessity, safety, and efficacy of pediatric medical transition services. *FTC v. World Prof'l Ass'n for Transgender Health, Inc.*, No. 4:26-cv-748 (N.D. Tex. June 17, 2026) ("Enforcement Action"). In their 123-page complaint—supported by 16 attached sworn declarations from victims and witnesses—the FTC and State plaintiffs detail WPATH's serial violations of the FTC Act and of several state consumer protection statutes. The FTC seeks a permanent injunction to prevent future violations of the FTC Act, and the State plaintiffs seek an injunction, civil penalties, and other forms of monetary relief.

The Northern District of Texas was the natural forum in which to bring the Enforcement Action. WPATH was incorporated in Texas in 1980 and remains an active Texas domestic corporation. Enforcement Action Compl. ¶ 34. WPATH has a registered office and a corporate registered agent in Texas. *Id.* Two of the witnesses on whom the FTC and States rely are residents of Texas. *Id.* Exs. 1 & 3. Many of WPATH's actions took place in Texas—*e.g.*, a nurse at Texas Children's Hospital witnessed the use of SOC-8 to sell pediatric transition services, *see id.*, Ex. 3. In turn, the State of Texas is also a plaintiff in the Enforcement Action, seeking to enforce laws against injuries inflicted by a Texas corporation against Texas citizens.. The FTC maintains a major regional office in Texas. Accordingly, the FTC therefore exercised its statutory authority to choose among multiple proper venues for its Enforcement Action, 15 U.S.C. § 53(b), and appropriately filed suit in the Northern District of Texas.[3]  And on June 23, the FTC served WPATH in Texas. *See* Enforcement Action, ECF No. 25.

---

[3] *See* 15 U.S.C. § 53(b)(2) ("[T]he Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice . . . Any suit may be brought where such person, partnership, or corporation resides or transacts business, or wherever venue is proper under section 1391 of title 28.").

Shortly thereafter, the FTC withdrew the CID it had issued to WPATH and that had been the focus of this case. The FTC explained that, in light of the filing of its lawsuit, "the Commission no longer regards compliance with the CID issued to WPATH as necessary to its investigation." *See* ECF No. 43 at 1 (notice of withdrawal of CID); ECF No. 43-1 (letter formally withdrawing CID). As a result, the object of this Court's preliminary injunction—the CID—no longer exists.

## IV.    WPATH SEEKS A TRO AND ANTISUIT INJUNCTION FROM THIS COURT.

On June 30, WPATH filed this Motion, mere minutes after notifying the FTC of its intentions. The Motion seeks a TRO and a preliminary antisuit injunction "barring the FTC and anyone in active concert with it from pursuing the Texas litigation." ECF No. 45-1 at 13.

On July 2, WPATH filed an "emergency motion" asking the Court "to immediately enter its requested TRO," after the FTC, Texas, and Iowa filed a motion for temporary restraining order and preliminary injunction in the Enforcement Action. ECF No. 50. On July 3, the Court, "[a]fter consultation with Chief Judge O'Connor (N.D. Tex.)," entered a minute order denying WPATH's emergency motion, ordering that "[t]he parties shall comply with the previously ordered briefing schedule and hearing date set in this case."

## ARGUMENT

## I.    WPATH IS NOT LIKELY TO SUCCEED ON THE MERITS.

### A.  This Court May Not Superintend Distinct Proceedings in the Northern District of Texas.

The federal judiciary exists in a "vertical hierarchy," *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994) (Easterbrook, J.), and only courts of appeals exercise "general supervisory authority" over their federal district courts. *Air Line Pilots*, 880 F.2d 491, 503 (D.C. Cir. 1989). Thus, "the structure of the federal courts does not allow one judge of a district court to rule directly on the legality of another district judge's judicial acts or to deny another district judge his or her

lawful jurisdiction." *In re McBryde*, 117 F.3d 208, 225 (5th Cir. 1997); *see, e.g.*, *Verogna v. Johnstone*, 583 F. Supp. 3d 331, 336–37 (D.N.H. 2022) (collecting cases).

In asking this Court to issue an order prohibiting the Defendants here from "pursuing the Texas litigation," Mem. at 13, WPATH is asking for precisely that—*i.e.*, an effective command from this Court either for the FTC and its co-Plaintiffs to dismiss their suit that is pending before another federal court, or to muzzle themselves in that forum. By commanding the litigants to stand down, WPATH would have this Court essentially "deny" the "lawful jurisdiction" of the Northern District of Texas. *McBryde*, 117 F.3d at 225.

That remarkable request is anathema to the structure of our judicial system. And unsurprisingly, it runs headlong into basic doctrines of comity and equity, all of which have developed around the common-sense principle that when a defendant is discontent with proceedings in a federal district court, the proper course is going up on appeal—not going across the country to a different trial court leagues away.

To start, routine principles of comity prevent one district court from interfering in the ongoing proceedings of another district court. The federal district courts are of "coordinate jurisdiction and equal rank." *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*, 751 F.2d 721, 728 (5th Cir. 1985). Accordingly, one district court cannot sit in judgment of another—or superintend their proceedings as if it were some magistrate. *See, e.g.*, Wright & Miller, *Federal Practice & Procedure*, § 2942 n.44 (3d ed.). "As a 'trial level court in the federal judicial system,' this Court 'lacks appellate jurisdiction over other judicial bodies' and cannot review, revise, or enjoin decisions by other Article III judges in separate cases." *Sun v. Swain*, 2025 WL 3165666 at *5 (D.D.C. Nov. 13, 2025). Once a case has been filed with a federal district court, it falls to that court to police its defects. If it fails, that is a matter for appeal. It is not the province of a district court in another circuit.

12

By these lights, when a case is filed in one district court, equity forbids another district court from attempting to enjoin or adjudicate the same matter. *See Utah American Energy, Inc. v. Dep't of Labor*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) (per curiam); *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 606 (5th Cir. 1999). Moreover, "[g]enerally, if a party will have opportunity to raise its claims in the concurrent federal proceeding sought to be enjoined, that concurrent proceeding is deemed to provide an adequate remedy at law" and injunctive relief is improper. *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1132 (11th Cir. 2005) (citing *Porto Rico Tel. Co. v. Puerto Rico Commc'n Auth.*, 189 F.2d 39, 41 (1st Cir. 1951) and 11A Wright, Miller & Kane, *Federal Practice & Procedure*: Civil 2d § 2942). And as discussed further below, the Enforcement Action is a distinct filing brought by both the FTC and a series of States. It is distinct from the CID Action—*i.e.*, it is the first filing in that case.  That case is the province of the Northern District of Texas; this Court cannot use its inherent equitable authority to effectively commandeer those proceedings, by commanding its litigants to stand down. *See Nat'l Indus. for the Blind v. Dep't of Veterans Affairs*, 296 F. Supp. 3d 131, 138 (D.D.C. 2017) (Jackson, J.).

Put together, WPATH's extraordinary request that this Court order the litigants in a separate federal district court to stop "pursuing the Texas litigation" defies comity, equity, and the basic structure of the federal courts. This Court should be loath to indulge that sort of ask.

### B. The Enforcement Action in the Northern District of Texas is Distinct from the CID Action in This Court.

WPATH minimizes the nature of its remarkable request. But it does not deny that to the extent the Enforcement Action is a distinct suit, this Court is powerless to reach into the Northern District of Texas to superintend proceedings. Accordingly, WPATH is forced to make the claim that the Enforcement Action in Texas is in substance derivative of the CID Action that is currently

13

pending before this Court—or even bolder, that the Enforcement Action has *already* been enjoined by this Court (notwithstanding the letter of its order). Both of those claims are meritless.

### 1.      *The Enforcement Action and CID Action Are Not Duplicative.*

Proceedings are "duplicative" only when they comprise the same claims or involve compulsory counterclaims under Federal Rule of Civil Procedure 13(a). *See Columbia Plaza*, 525 F.2d at 624–26 (applying Rule 13(a)); *see also Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 350 (D.C. Cir. 2003). Accordingly, "a court abuses its discretion when it enjoins a party from proceeding in another suit that is not truly duplicative of the suit before it." *Smith v. SEC*, 129 F.3d 356, 361 (6th Cir. 1997) (en banc); *see Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 893 F.2d 26, 28–29 (2d Cir. 1990) (an injunction is permissible only "if the claims presented in the second action should have been interposed as compulsory counterclaims to the claims in the [prior] suit").

There is no colorable argument that the Enforcement Action is the "same" as the CID Action. The CID Action concerned a single CID issued by the FTC that the Commission has since withdrawn. The Enforcement Action is an entirely distinct governmental enforcement action, brought by not only the FTC but also a number of separate sovereigns pursuing claims under their own laws. The dispute in the CID Action was whether the FTC's investigation into WPATH (primarily the CID directed to WPATH) was proper. Meanwhile, the dispute in the Enforcement Action is whether WPATH violated the FTC Act and several State consumer protection statutes by making false, misleading, or unsubstantiated representations that it knew would provide medical practitioners with the means to mislead consumers. Enforcement Action, ECF No. 1 ¶¶ 378–79. Those issues are fundamentally different. The Sixth Circuit's decision in *Smith v. SEC* confirms that conclusion. 129 F.3d 356 (6th Cir. 1997) (en banc). A district court in Tennessee

14

enjoined the SEC from using evidence it had obtained about a business executive in an investigation into insider trading. *Id.* at 359. The SEC subsequently filed an enforcement action in a district court in California, alleging that the executive violated laws against insider trading. In response, the Tennessee court enjoined the California action. *Id.* at 360. Sitting en banc, the Sixth Circuit reversed. It held that the two cases were "not identical" because the California action "would focus on an issue not presented in the Tennessee action, to wit, whether [the executive] is liable for insider trading." *Id.* at 361. By enjoining "a party from proceeding in another suit that [was] not truly duplicative of the suit before it," the Sixth Circuit explained, the Tennessee court "abuse[d] its discretion." *Id.* Just as the evidentiary and investigatory matters at issue in *Smith* were not grounds to enjoin litigation concerning "the ultimate issue of liability" under insider trading laws, *id.*, WPATH's challenge to the CID provides no basis to halt the FTC's action to adjudicate violations of the FTC Act.

WPATH does not meaningfully contest the above. Instead, it contends that the FTC was required to bring the Enforcement Action as a *mandatory counterclaim* to WPATH's suit challenging the CID. But the notion the FTC must "file [an] enforcement proceeding as a counterclaim" to a "preenforcement injunctive action" is "totally without merit." *FTC v. Carter*, 464 F. Supp. 633, 639 (D.D.C. 1979), *aff'd*, 636 F.2d 781 (D.C. Cir. 1980). That common-sense conclusion holds true for at least three independent reasons.

     i.     WPATH's argument first flunks Rule 13(a)'s maturity rule. Rule 13(a) provides that a counterclaim is compulsory if it existed "at the time of [the Complaint's] service." *See In re Kaiser Grp. Int'l Inc.*, 399 F.3d 558, 568 (3d Cir. 2005). But the entire point of an *investigative* tool (*e.g.*, a CID) is to *investigate* in anticipation of an enforcement claim. It makes no sense to require the FTC (or any regulatory agency) to assert an enforcement claim as essentially a

condition to defending the propriety of one of its investigative tools. Not only does the agency not yet have the evidence that it needs to make that decision (hence the CID)—but it also may choose to *decline* to take further action, once given fuller information.

Indeed, the FTC has authority to issue a CID when it has "reason to believe" that the recipient "may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to" a violation of the laws that the FTC enforces. 15 U.S.C. § 57b-1(c). By contrast, the FTC cannot bring an Enforcement Action unless it has "reason to believe that" a defendant has in fact *violated a law* that the FTC enforces. 15 U.S.C. § 45(a). Those are fundamentally different questions. And for that reason, the FTC typically investigates potential misconduct *well before* filing a claim—as this Court implicitly recognized in its opinion enjoining enforcement of the CID. ECF No. 41 at 10 (explaining that the FTC "remains free to deploy other investigative tools" notwithstanding the injunction). WPATH's claims in this case could not have triggered an obligation to file an Enforcement Action because the FTC would not necessarily have had the required "reason to believe" that the law had been violated during a challenge to the CID. *Cf. Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 360–61 (7th Cir. 1990) (internal citations omitted) ("A compulsory counterclaim is compulsory; unless set forth in the answer to the complaint it is waived. It would be bizarre to attach this sanction to a counterclaim that could not have been filed with the answer because it did not exist when the answer was due.").

Moreover, WPATH's argument would lead to utterly perverse incentives. If WPATH were correct, then federal law-enforcement agencies would have a mandatory obligation to file enforcement actions every time a party challenged a subpoena. And if the agencies lacked the

16

necessary evidence to do so, then those agencies would waive those claims forever. *McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298, 304 (5th Cir. 1993). That has never been the law.

WPATH's argument is also at loggerheads with the system Congress designed for FTC enforcement actions. Congress has given the FTC considerable discretion regarding where to file such enforcement actions. *See* 28 U.S.C. § 1391(c)(2) (providing that entities are deemed to "reside" in any judicial district in which they are subject to personal jurisdiction); 15 U.S.C. § 53(b)(2) (providing that the FTC can sue entities anywhere that they "reside"). Under WPATH's theory, that discretion would be illusory; any FTC defendant could simply file an independent action to contest some aspect of the FTC's investigation in the venue of its choice, and then demand that the FTC bring any subsequent enforcement action in that defendant-chosen forum as a purported compulsory counterclaim.. This is not the law. *See In re FTC Corporate Patterns Report Litigation*, 432 F. Supp. 274, 284 (D.D.C. 1977), , *aff'd*, 595 F.2d 685 (D.C. Cir. 1978) (accepting this argument "would mean that companies seeking to resist FTC orders might well be able to choose the forum and pace of the litigation simply by bringing preenforcement actions"); *A. O. Smith v. FTC*, 417 F. Supp. 1068, 1088 (D. Del. 1976) (rejecting the argument "that [a CID] enforcement proceeding must be asserted as a compulsory counterclaim under Fed. R. Civ. P. 13(a)" in part because it "would invariable guarantee . . . the complainant's choice of forum").

ii.      Another defect with WPATH's argument is that the Enforcement Action does not arise out of the "same transaction or occurrence" as the CID Action.  FRCP 13(a)(1); *see also Moore v. New York Cotton Exch.*, 270 U.S. 593, 610 (1926).

Courts have uniformly rejected the notion that an action to enforce a CID arises out of the same transaction or occurrence as a pre-enforcement challenge to that CID. *See, e.g.*, *Carter*, 464 F. Supp. at 639 (rejecting as "totally without merit" the position that an action to enforce a CID is

17

a compulsory counterclaim to a pre-enforcement challenge to that CID); *A. O. Smith*, 417 F. Supp. at 1088 (same); *In re FTC Corp. Patterns Rep. Litig.*, 432 F. Supp. at 284 (noting that movant cited "no cases in which a court has treated an Enforcement Action as a compulsory counterclaim"); *see also EEOC v. Univ. of Pennsylvania*, 850 F.2d 969, 972–73 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990) (affirming refusal to dismiss as duplicative an action to enforce an EEOC subpoena despite a "previously filed" "constitutional challenge" in D.D.C. to "the policy authorizing the EEOC subpoena"). The same follows *a fortiori* here, as the FTC's Enforcement Action alleging violations of the FTC Act is obviously far *less* closely related to this CID pre-enforcement challenge than an action to enforce the CID would have been.

In short, a suit challenging a subpoena or similar tool focuses on the propriety of a governmental investigation; but an enforcement action focuses instead on the defendant's prior conduct, and how it measures against some source of federal law. On this score, the Sixth Circuit's decision in *Smith v. SEC* is instructive. 129 F.3d 356 (6th Cir. 1997) (en banc). WPATH's cited authorities are not to the contrary. In each case they cite, the proceedings at issue were genuinely duplicative. *American Horse Protection Association v. Lyng* involved parallel suits that were "inextricably intertwined" and sought "identical results," namely, both suits sought to suspend or delay the same regulation. 690 F. Supp. 40, 41, 43, 45 (D.D.C. 1988). In *Rich v. Butowsky*, a defendant in an existing defamation case filed a complaint in another court against the plaintiff's lawyers, claiming the allegations in the first complaint were themselves defamatory; as the central issue in both cases was whether the allegations in the first complaint were true, the cases were duplicative. 2020 WL 7016436, at *1 (D.D.C. Mar. 31, 2020). *Columbia Plaza* fits the same mold: The court there considered issuing an injunction only after concluding that the proceedings involved compulsory counterclaims under Rule 13(a), as one party "was seeking in New York to

18

recover on [a debt] while at the same time [the other party] was seeking in the District of Columbia to prevent recovery." 525 F.2d at 624–26.

iii.    Finally, Federal Rule of Civil Procedure 13(a)(1)(B) provides that counterclaims are never compulsory if they would require "adding another party over whom the court cannot acquire jurisdiction." That is the case here. In its motion, WPATH essentially ignores that the Enforcement Action *also* involves four separate sovereigns enforcing their own consumer-protection laws. It is absurd to suggest that *nonparties* to the CID Action—to say nothing of *States* looking to enforce *state law*—were required to file their Enforcement Actions as *counterclaims* in a case challenging one of the FTC's CIDs, issued to investigate potential violations of the FTC Act. More fundamental, this Court cannot *compel* States to file affirmative litigation based on their own laws (or otherwise lose their claims) just because the *Federal Government* has chosen to take action with respect to *federal law*. This Court thus cannot "acquire jurisdiction" over those States—*i.e.*, force them into federal court, upon punishment of otherwise losing their state law actions—based on a distinct action brought by a *federal* regulatory agency enforcing *federal* law. *See Gensetix, Inc. v. Bd. of Regents of Univ. of Texas Sys.*, 966 F.3d 1316, 1323 (Fed. Cir. 2020) (holding that the Eleventh Amendment prohibits a federal court from "forcing [a state] to litigate" in federal court "against its will" by requiring it to join a federal action as a plaintiff). Indeed, on WPATH's theory, every *State* in the Union that could bring an Enforcement Action related to information that could have been obtained through a challenged *federal* CID would be required to file those actions as counterclaims to a private party's challenge to a federal administrative subpoena. That is wrong.

In all events, under D.C. Circuit precedent, even if the CID and Enforcement Actions are somehow duplicative, the equities would need to favor this forum over the Northern District of

Texas in order for an antisuit injunction to issue. *See Columbia Plaza Corp. v. Sec. Nat. Bank*, 525 F.2d 620, 624–27 (D.C. Cir. 1975); *see Air Line Pilots*, 880 F.2d at 502 (antisuit injunctions—"with all of [their] troubling implications—should be confined to [narrow] circumstances"); *In re Jimmy John's Overtime Litig.*, 877 F.3d 756, 762 (7th Cir. 2017) ("It is particularly rare for a federal court to enjoin litigation in another federal court."). WPATH does not come close to making this showing.

**Identity of Parties.**

WPATH (at 16) says that the CID Action and the Enforcement Action involve "substantially identical" parties. But that defies basic English. This CID Action involves two parties: WPATH and the FTC. The Enforcement Action in Texas involves (many) additional parties: The States of Alaska, Iowa, Nebraska, and Texas, as well as two parties affiliated with WPATH, which it brands as "separate entities." Mem. at 16. That should be enough to tip this factor heavily against WPATH. *See Trilogy Fed., LLC v. CivitasDX, LLC*, 2025 WL 405409, at *3 (D.D.C. Feb. 5, 2025) (asking "whether all parties are present in both cases"); *see also Jimmy John's*, 877 F.3d at 765 ("In cases where a district court enjoined duplicative litigation in another district court . . . the court enjoined identical litigation *between the same parties*.").

WPATH has no answer to this. As for the four States that are part of the action in Texas, WPATH just asserts (at 16) that the FTC "frequently" partners with States in its lawsuits. True, but that does not make the litigants any more identical. Especially so here, where again, the States are enforcing *their own laws*. The Enforcement Action involves five sovereigns enforcing five

distinct sets of laws; in no sense is that "substantially identical" to the parties in the CID Action.

**Risk of Inconsistent Adjudications.**

WPATH (at 16-17) raises the specter of "inconsistent adjudications." But that is obviously wrong, because the CID Action involves a dispute over a CID that has *since been withdrawn*. It is impossible to say that there will be "inconsistent adjudications" in the future, because the action before this Court—concerning a single CID—is over (and indeed, as the FTC will argue in an upcoming motion, moot). Even putting that aside, to the extent WPATH plans to raise a "First Amendment" objection, *see* Mem. at 17, to any aspect of the Enforcement Action, it will be challenging a *different* governmental action, the propriety of which will be measured against a different record and under different standards (be it for the dismissal of a complaint or a discovery dispute). *Compare Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (describing the legal standard for evaluating a motion to dismiss) *with Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (describing the legal standard for evaluating a motion for a preliminary injunction); *see* ECF No. 41 at 4 (applying the *Winter* factors); *id.* at 10 (granting a preliminary injunction as to "the CID" that the FTC issued, denying "WPATH's request to issue a broader injunction," noting that "this relief is not permanent," and explaining that the FTC "remains free to deploy other investigative tools").

**Location of Witnesses.**

The location of witnesses likely to be at issue in the Enforcement Action do not favor this forum either. Normally, this factor favors a forum when a majority of the witnesses are located in the area. *Columbia Plaza*, 525 F.2d at 628 (enjoining parallel litigation in favor of litigation in D.D.C. in part because the majority of witnesses were located "in or near the District of Columbia"); *cf. Blackhawk Consulting, LLC v. Federal Nat'l Mortgage Ass'n*, 975 F. Supp. 2d 57,

21

61 (D.D.C. 2013). WPATH has not made that showing here. It asserts that its "principal witnesses" are divided between D.C., Ohio, and Chicago. Mem. at 19. Notably, although WPATH claims to have an unidentified witness in Washington, D.C., the material it cites does not support that. ECF45-1 (WPATH erroneously citing "ECF3-4 to 3-6; Hayes-Deats Decl. ¶ 20").[4] In any event, that D.C. is one of *three* cities where WPATH's principal witnesses reside is weak support for an injunction favoring this forum. As for the witnesses the FTC and States rely on, two of them are Texas residents. And as WPATH itself acknowledges, *see* Mem. at 19, the other individuals who submitted declarations in support of the FTC's complaint reside or received treatment in States spanning the Country, from California to Florida, and not one of them is in this jurisdiction.

Meanwhile, the Northern District of Texas is a convenient and appropriate forum. *Contra* Mem. at 19–20. WPATH was founded and incorporated in Texas nearly five decades ago. The State of Texas is a plaintiff to the Enforcement Action, enforcing its laws against injuries inflicted by a Texas corporation against Texas citizens. The FTC maintains a major regional office in the Dallas/Fort Worth, Texas region. As noted above, two of the witnesses on which the FTC and States rely are residents of Texas. Further, Texas is a convenient central location for witnesses

---

[4] ECF Nos. 3-4 through 3-6 are declarations WPATH submitted in support of its initial preliminary injunction motion in this matter. The first (ECF No. 3-4) is from Asa Radix, whom the FTC served with the Enforcement Action in New York. ECF No. 26, Proof of Service, *FTC v. WPATH*, No. 4:26-cv-00748-O (June 29, 2026) (Asa Radix). The second (ECF No. 3-5) is from Loren Schecter, who does not identify a residence in the declaration, but states current employment in Illinois. *See* ECF No. 3-5 at 2 (claiming to be a "Professor of Surgery and Urology at Rush University Medical Center," which is located in Chicago Illinois, and "maintain a clinical practice in plastic surgery in Illinois"). The third (ECF No. 3-6) is from Scott Leibowitz, whose declaration does not identify a residence or current employment, but identifies recent employment in Ohio. *See* ECF No. 3-6 at 1-2. Finally, the Hayes-Deats declaration simply repeats the unsupported allegation in the WPATH's brief; it does not identify any witness in Washington, D.C. *See* ECF No. 47 at 5. Accordingly, despite its implication, WPATH has not identified a single witness in Washington, D.C.

scattered across the country, and Fort Worth is close to two major airports, including an international airport.

Given WPATH's own decision to incorporate and remain incorporated in Texas, it is risible for WPATH to argue that defending a lawsuit in Texas is somehow "unfair." Mem. at 19; *see, e.g.*, *NETGEAR, Inc. v. Ruckus Wireless, Inc.*, 2011 WL 3236043, at *3 (D. Del. July 28, 2011) ("[B]ecause defendant is a Delaware corporation, it has no reason to complain about being sued in Delaware."); *Intell. Ventures I LLC v. Altera Corp.*, 842 F. Supp. 2d 744, 756 (D. Del. 2012) ("[A]bsent some showing of a unique or unexpected burden, a company should not be successful in arguing that litigation in its state of incorporation is inconvenient."); *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1332 (Fed. Cir. 2011) (similar). And the location of the FTC's counsel is certainly no reason to override the *FTC's* choice of forum—let alone that of its State partners, including Texas. *See In re Chamber of Com. of U.S. of Am.*, 105 F.4th 297, 305 (5th Cir. 2024) (rejecting "counsel's location" as a factor under the § 1404 transfer analysis). Especially so here, where the FTC's statutory authority to choose among multiple proper venues for an Enforcement Action reinforces the well-established principle that "the plaintiff's choice of forum should rarely be disturbed," *Schexnider v. McDermott Int'l, Inc.*, 817 F.2d 1159, 1163 (5th Cir. 1987); *see Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62 n.6 (2013) ("The Court must . . . give some weight to the plaintiffs' choice of forum.").

**Relative progress of the proceedings.**

The comparative status of the two proceedings does not favor an injunction either. This is not a case like *Columbia Plaza*, where "extensive proceedings in the District of Columbia action" made it likely that the proceedings could "be more expeditiously determined" in D.C. 525 F.2d at

23

628. Instead, both proceedings are essentially at the same stage. The next step in both cases is for the respective defendants to file a responsive pleading under Federal Rule of Civil Procedure 12(a).

WPATH (at 18) points to this Court's preliminary injunction as the advanced proceedings that should bar the Enforcement Action. But—as already discussed—those proceedings concerned the propriety of a discrete CID, and this Court's ruling did not address (and could not have addressed) "the ultimate issue of liability" under the FTC Act or under the applicable state laws, because none of those issues were before this Court. *Smith*, 129 F.3d at 361. Indeed, this Court disclaimed deciding even other *investigative* actions, let alone an even more attenuated ultimate action to enforce the FTC's or states' laws. There is no reason to think that the claims in the Texas case could be "adjudicated earlier or more easily" in this Court, *Columbia Plaza*, 525 F.2d at 628.

**Location of Counsel.**

Tellingly, WPATH's argument concerning this factor ignores the States. None of the six lawyers who represent the States are D.C.-based, and two are based in Texas. *See* Docket, *FTC v. World Prof'l Ass'n for Transgender Health, Inc.*, No. 4:26-cv-748 (N.D. Tex.) (listing counsel). Contrary to WPATH's claim, only two of the five attorneys representing the FTC in the Enforcement Action are D.C.-based.[5] Regardless, when considering analogous transfer motions, courts either consider counsel's location to be the least significant factor, or they do not consider it at all. *See*, *e.g.*, *In re Chamber of Com.*, 105 F.4th at 305 (rejecting "counsel's location" as a factor under the § 1404 transfer analysis); Wright & Miller, *15 Federal Practice & Procedure*, § 3850 (explaining that "the great majority of the cases" have concluded that convenience and location of counsel "is not to be considered at all, that it is 'irrelevant' or 'improper' to consider,

---

[5] Two attorneys use the agency's D.C. address, but are remote employees residing outside of commuting distance from Washington, D.C. The FTC has not assigned them physical offices here.

or that it is to be given very little weight by the district court" in considering whether to transfer a case); *see also Butowsky*, 202 WL 7016436, at *2 (location of counsel factor was supplemented because "additional long-distance travel *under the current health crisis* is not in anyone's interest" (emphasis added)).

### Other Equitable Factors.

More generally, *Columbia Plaza* also calls for analysis of other "equitable considerations genuinely relevant to the ends of justice." 525 F.2d at 628. These considerations include "[w]ise judicial administration," *id.* at 627, which encompasses the comity and respect due to a sister court: "It is extraordinary for a court to enjoin a proceeding in another forum . . . because of the respect that must properly be given to that forum." *U.S. CFTC*, 523 F. Supp. 2d at 334. As this Court has explained, "a 'trial level court in the federal judicial system,' . . . 'lacks appellate jurisdiction over other judicial bodies' and cannot review, revise, or enjoin decisions by other Article III judges in separate cases." *Sun v. Swain*, 2025 WL 3165666, at *5 (D.D.C. Nov. 13, 2025). Yet that is the comity-breaching relief WPATH requests. *See Air Line Pilots*, 880 F.2d at 503 & n.8 ("[A]n injunction issued by one court against the parties to litigation in another forum 'in effect . . . acts to restrain the other court and therefore represents an interference with the jurisdiction of another tribunal.'"); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1098 (9th Cir. 2008) (same).

In addition to wise judicial administration, the "conservation of judicial resources and comprehensive disposition of litigation" also weigh against issuing an injunction. *Columbia Plaza*, 525 F.2d at 627. While it may be a "waste of judicial resources to allow two cases confronting the same exact issues to proceed simultaneously," Mem. at 19 (quoting *Rich*, 2020 WL 7016536, at *2), that is not remotely the situation here. This case and the Texas case will address entirely distinct issues, particularly as this case has become moot due to the withdrawal of the CID. Thus,

25

there would be no meaningful efficiency gains from consolidating the cases in either forum. And even if it were otherwise, other remedies for duplicative litigation, such as transfer, would be far "more consonant with the overall interests of justice" than an injunction in a different court. *Columbia Plaza*, 525 F.2d at 627.[6]

In a last-ditch attempt to score equitable points, WPATH mischaracterizes the Texas case as "'forum shopping aimed at evading' this Court's [jurisdiction]." Mem. at 19. As explained above, neither the FTC's claims nor the States' claims are compulsory counterclaims. The FTC and States were well within their rights to file in Texas, particularly given that State of Texas is a plaintiff and WPATH is incorporated in Texas. And as explained below, filing the Texas complaint neither violates this Court's preliminary injunction order nor threatens its jurisdiction over the CID claims. Besides, as with any other plaintiffs, the FTC and the States are "master[s] of the complaint" and are entitled to their "choice of forum." *Chamber of Com.*, 105 F.4th at 302. If WPATH thinks that forum somehow inappropriate, it can move to transfer. *Id.* at 302–03.

### 2.    *The Enforcement Action Does Not Circumvent this Court's Order.*

As a fallback argument, WPATH asserts (at Mem. 21–23) that this Court must enjoin the Enforcement Action to prevent circumvention of its preliminary injunction in the CID Action. That is not a good argument at all.

---

[6] Most cases involving arguably duplicative litigation do not even *mention* the possibility of issuing an injunction against another federal court. *E.g.*, *D.C. by Chaplick v. Fairfax Cnty. Sch. Bd.*, 171 F.4th 255, 265 (4th Cir. 2026) ("[A] 'district court may stay or dismiss a suit that is duplicative of another federal court suit as part of its general power to administer its docket.'"); *Handy, Shaw, Bransford, Villeux & Roth*, 325 F.3d at 349–51 (addressing a district's court's dismissal of a duplicative suit). Instead, the ordinary remedy for duplicative litigation is to transfer, stay, or dismiss one of the cases. *E.g.*, *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*, 342 U.S. 180, 183–84 (1952) (affirming stay to allow litigation in another court to proceed); *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982) (affirming dismissal of a duplicative suit); *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 789 (6th Cir. 2016) (same).

For starters, WPATH's circumvention argument does not and cannot apply to the State plaintiffs who are bringing their own litigation under their own laws. WPATH does not meaningfully argue otherwise.

As fundamental, WPATH's circumvention argument has zero basis in this Court's actual order. An injunction is not an amorphous concept. "Every order granting an injunction . . . must" both "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained." Fed. R. Civ. P. 65(d)(1). And as touched on above, this Court's preliminary injunction was expressly limited to barring the FTC from "implementing or enforcing its issued CID." ECF No. 41 at 11. And on *that* score, the FTC followed this Court's order and more. Beyond just stalling its CID over the course of litigation, per the preliminary injunction, it has since *withdrawn* the CID, and has represented that it has no plans to try to enforce it, now that the complaint in the Enforcement Action has been filed.

WPATH seems to contend that the Enforcement Action nonetheless conflicts with this Court's order, because it is possible the same information sought in the CID may come up through discovery in that case. *See* Mem. at 22. But if any argument conflicts with this Court's directives, it is that one. This Court *rejected* WPATH's request for a "broader injunction." ECF No. 41 at 10. And it *affirmed* that the FTC "remains free to deploy other investigative tools" as part of carrying on with its investigation. *Id.* Nowhere did this Court indicate that WPATH (or certain of its materials) was off-limits; in fact, this Court said the opposite.

Moreover, the fact that discovery may involve material similar to that sought in the CID does not give this Court license to now broaden its injunction, and start effectively adjudicating discovery disputes in the Northern District of Texas. Again, far from conflicting with this Court's order, the Enforcement Action took it at its word: The FTC tabled (and has now scrapped) its CID,

27

but continued to use its "other investigative tools." Those tools have independently revealed an extensive set of violations of the FTC Act on the part of WPATH and its affiliates. And given those violations, the FTC has exercised its existing authority to bring suit against WPATH in the state of its incorporation. Nothing in that course of events conflicts with a letter of this Court's order. And for all of the reasons supplied above, *see* Argument §§ 1.A.–B., *supra*, this Court cannot *now* augment its preliminary injunction to interfere with those proceedings. To the extent WPATH still seeks to press its First Amendment arguments to combat discovery—notwithstanding the 123-pages of substantive allegations supporting the Enforcement Action, *contra* Memorandum Opinion, ECF No. 41 at 9 (explaining that the Court's ruling on the Preliminary Injunction was based on a "preliminary record . . . lacking evidentiary support.")—the proper forum for that dispute is the Northern District of Texas.

Moreover, unable to support its assertion that the FTC has evaded the Preliminary Injunction, WPATH spends much of its time airing various grievances it has with the Department of Justice and its criminal investigations. *E.g.*, Mem. at 1–2, 4–5, 9–10, 14, 21, 22. Indeed, WPATH mentions the Department of Justice *over thirty times* in its brief before this Court. *Id.* at 1–2, 4–5, 7, 9–11, 14, 17, 19, 10, 15, 19, 20–22. But the Department of Justice is not a party to this suit, and the FTC does not conduct criminal investigations. Whatever WPATH's dispute with the Department of Justice or its criminal grand jury proceedings may be, it is irrelevant here. Again, this Court's Preliminary Injunction did nothing more than enjoin the FTC from enforcing its previously issued CID. It did not enjoin the Department of Justice from conducting criminal investigations. WPATH does not request such relief even now. *See* Mem. at 30.

WPATH instead uses those irrelevant assertions about the Department of Justice in an attempt to malign the FTC attorneys assigned to this matter. WPATH repeatedly implies, but does

28

not directly allege, that the FTC is somehow orchestrating these criminal investigations and that the FTC has violated the secrecy of the grand jury process by obtaining information from criminal grand jury subpoenas.[7] *See* Mem. at 1–2, 4–5, 9–10, 14, 21–22; Mem. of Law in Support of Plaintiff's Mot. For Discovery Regarding Potential Violations of the Preliminary Injunction, ECF No. 46-1 at 1, 3, 5–9. As explained above, WPATH's assertions are baseless. WPATH's attempt to smear FTC counsel through irrelevant and spurious accusations only underscores the lack of merit in each of its motions.[8]

Finally, WPATH's casual accusations regarding the FTC and DOJ are only outdone by its outward contempt for the Northern District of Texas. Indeed, WPATH's motion is remarkable in its willingness to impugn before this Court the ability of another district judge to do his job.  *See, e.g.*, Mem. at 1–2 (characterizing the Northern District of Texas as a rogue jurisdiction given it ruled differently than other district courts on a particular issue); *id* at 5 (similar); *id.* at 22 (similar); *id.* at 27 (insinuating that the Northern District of Texas is unable to correctly resolve First

---

[7] WPATH goes even further in the filing it paired with the motion at issue here. In its motion for discovery, it alleges that "the available evidence raises significant questions about whether" FTC staff have violated this Court's Preliminary Injunction. Mem. of Law in Support of Plaintiff's Mot. For Discovery Regarding Potential Violations of the Preliminary Injunction, ECF No. 46-1 at 1–2. The FTC has not. *See* Declarations, Defendants' Exs. 1–6.

[8] WPATH's willingness to distort reality is not limited to discovery disputes. In WPATH's most recent filing to this Court, WPATH selectively quotes the FTC's Director of Public Affairs— asserting that "FTC Director of Public Affairs and Senior Policy Advisor Joe Simonson responded that no 'sane person' could endorse transgender healthcare for children and that "staff who oppose" the workshop are 'free to resign'"—in an effort to bolster its position that the FTC targeted WPATH. Mem. at 6. In reality, WPATH knows full well that Mr. Simonson stated "No sane person could endorse the *needless* mutilation of children. Every American should be troubled by *the possibility that parents and their children were misled* about the use of medical 'therapies' that may have caused serious harm" and that "staff who oppose *a workshop designed to better understand the concerns of tens of millions of parents, children, and medical professionals* are free to resign," as was quoted in an exhibit WPATH filed as part of its first motion for a preliminary injunction before this Court. ECF No. 3-23 at 3 (emphasis added).

29

Amendment questions because "there is no guarantee that the Northern District of Texas will apply the First Amendment to the FTC's requests in the same manner that this Court has"). This Court should not countenance an effort that is expressly premised on one of its colleagues being unable to follow his oath.

## II.    WPATH IS NOT IRREPARABLY HARMED BY THE FTC'S ACTIONS

WPATH has not shown that it has, or will, suffer irreparable harm. WPATH claims that the Enforcement Action harms it in two ways. First, WPATH asserts that its First Amendment rights will be violated if the Enforcement Action continues. This supposed harm is based on WPATH's claim that the Northern District of Texas may not faithfully comply with the Constitution. *See* Mem. at 22 ("And there is no guarantee that the Northern District of Texas will apply the First Amendment to the FTC's requests in the same manner that [D.D.C.] has."). In essence, WPATH asks this Court to declare that another federal judge is incapable of resolving the claims and defenses before him. The Court should decline this invidious invitation. *See Kerotest Mfg. Co.*, 342 U.S. at 185 ("If in a rare instance a district judge abuses [his or her] authority . . . there is always the opportunity for corrective review by a Court of Appeals and ultimately by [the Supreme Court.]").

Second, WPATH laments that the continuation of the Enforcement Action will cause it irreparable harm because it lacks the resources to devote to two separate litigations. As previously described, the FTC agrees that the parties need not continue to expend resources to litigate in two separate forums. As the FTC intends to argue in a motion to dismiss, now that the FTC has withdrawn its CID and has no intention of attempting to obtain information pursuant to the CID, the CID litigation is moot.

30

While WPATH has failed to meet its burden, there is no question that the FTC and State plaintiffs will be irreparably harmed if an antisuit injunction is issued. A party suffers "irreparable harm" when "deprived of its bargained-for choice of forum." *Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*, 25 F.4th 998, 1008 (Fed. Cir. 2022). FTC and the State plaintiffs, including Texas, properly chose Texas as the forum in which to litigate multiple serious claims that WPATH violated the FTC Act and state consumer protection laws resulting in severe harms to children, including children residing in Texas. An antisuit injunction would deprive the FTC and State plaintiffs of their properly chosen forum.

Significantly, an injunction here would prohibit States who are not parties and whose claims are not at issue in the CID Action from enforcing their own consumer protection laws. This is a quintessential form of irreparable harm. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *cf. Trainor v. Hernandez*, 431 U.S. 434, 442 (1977) (explaining that "only extraordinary circumstances would suffice . . . to warrant interference by the federal courts with legitimate state efforts to enforce state laws"). The FTC would be similarly impaired in enforcing its own law, another classic irreparable harm. *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025) ("[T]he Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the [courts'] authority."); *Trump v. Slaughter*, 609 U.S. ___, slip op. at 26–27 (2026) (explaining that the FTC's "'discretionary power to seek judicial relief' lies at the very core of executive authority" (quoting *Buckley v. Valeo*, 424 U.S. 1, 138 (1976)).

31

**III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST DISFAVOR INJUNCTIVE RELIEF.**

The balance of equities and public interest weigh against injunctive relief. *See Medinatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021) (noting that these factors merge when the government is the party sought to be enjoined). As extensively catalogued above, the FTC and the State plaintiffs would be harmed by an antisuit injunction. Contrary to WPATH's assertions, the claims in the Enforcement Action, which include violations of the FTC Act and four States' consumer protection law, are not proper mandatory counterclaims to litigation over a never-enforced and now-withdrawn CID.

The public interest also disfavors an antisuit injunction. The FTC and State plaintiffs are tasked with protecting consumers through the vigorous enforcement of federal and state consumer protection statutes. *Slaughter*, 609 U. S. ___, slip op. at 26–27; *United States v. Texas*, 599 U.S. 670, 684 (2023) (explaining that "the Executive's Article II authority to enforce federal law [is] deeply rooted history of enforcement discretion in American law."). They have filed suit to redress WPATH's prolific violations of those laws. And they have properly selected Texas as the forum within which to do so. The equities compel the Texas Enforcement Action to proceed in the ordinary course, consistent with the constitutional structure of our judicial system. Denying WPATH's motion will accomplish that, protecting the rule of law and the reliance interests of all parties by reinforcing "the principle of comity" between "courts of coordinate jurisdiction and equal rank." *W. Gulf Mar. Ass'n*, 751 F.2d at 728.

On the other side of the ledger, WPATH's claim to harm is that it prefers how (it assumes) this Court will review this case, as opposed to how the Northern District of Texas (it assumes) will approach these issues. As we explain above, that is an illegitimate consideration. Federal fora exist on equal footing; each district judge is equally capable of resolving the case before him. WPATH's

claim that it will suffer harm by having to litigate in Texas—the State of its incorporation for nearly fifty years—is based purely on its prediction about how the Northern District of Texas will resolve the merits of the Plaintiffs' claims and WPATH's defenses. That is obviously deficient; were it legitimate, Congress's design of 93 equal judicial districts would collapse overnight.

The public interest lies in denying WPATH's motion so that the Enforcement Action can properly proceed. The FTC Act and the State plaintiffs' consumer protection laws require that entities like WPATH do not mislead consumers, including by making statements which lack adequate substantiation. "Facilitating the proper enforcement of" such laws by allowing the Plaintiffs to litigate their claims on the merits, rather than permitting WPATH to block those claims in unrelated proceedings, "is all to the good." SEC v Chappell, 107 F.4th 114, 139 (3d Cir. 2024).

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to issue a temporary restraining order or a preliminary injunction.

33

Dated: July 6, 2026

Respectfully submitted,

OF COUNSEL:

LUCAS CROSLOW
  *General Counsel*
ALEX POTAPOV
  *Deputy General Counsel*
ETHAN D. BECK
  *Counsel to the General Counsel*

CHRISTOPHER MUFARRIGE
  *Director*, Bureau of Consumer Protection
KATHERINE WHITE
  *Principal Deputy Director*, Bureau of
Consumer Protection

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2110
ebeck@ftc.gov

Jonathan Cohen
  *Chief Litigation Counsel*  District
of Columbia Bar No.  48344

*/s/ R. Cooper Vaughan*
R. Cooper Vaughan
  *Senior Counsel to the Director*
Virginia State Bar No. 92580

FEDERAL TRADE COMMISSION
Bureau of Consumer Protection
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 468-9914
Fax: (214) 953-3079
E-mail: RVaughan@FTC.gov

*Attorneys for Defendants*

34